**Lewis R. Landau** (CA Bar No. 143391)
**Attorney-at-Law**
22287 Mulholland Hwy., #318
Calabasas, California 91302
Voice and Fax: (888) 822-4340
*Email:  Lew@Landaunet.com*

[Proposed] Attorney for Debtor and
Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| In re | Case No.: 2:17-bk-22432 WB |
|---|---|
| Point.360, a California corporation, dba DVDs on the Run, Inc.; dba Digital Film Labs; dba International Video Conversions, Inc.; dba Modern VideoFilm; dba Movie Q; dba Visual Sound Closed Captioning Services; dba Eden FX, | Chapter 11 **EXPEDITED FIRST DAY MOTION FOR** 1. **INTERIM AND FINAL ORDERS APPROVING USE CASH COLLATERAL AND SETTING FINAL HEARING; AND/OR** 2. **INTERIM AND FINAL ORDERS APPROVING DEBTOR IN POSSESSION FINANCING AND SETTING FINAL HEARING; AND** 3. **AUTHORIZING PAYMENT OF PREPETITION NON-INSIDER PAYROLL AND HONOR EMPLOYMENT PROCEDURES AND TAXES; AND** 4. **LIMITING NOTICE** |
| Debtor. | *Hearing Date and Time to be Set Pursuant to Court Order* |
| Debtor's EIN: 01-0893376 Address:  2701 Media Center Drive          Los Angeles, CA 90065 | Date:     October ____, 2017 (*to be set*) Time:     (*to be set*) Place:    Courtroom 1375; Judge Brand          United States Bankruptcy Court          255 E. Temple Street, 13th Floor          Los Angeles, CA 90012 |

## CONCISE SUMMARY OF RELIEF REQUESTED

Point.360, a California corporation ("Debtor" or "Point.360"), filed a voluntary chapter 11 petition on October 10, 2017. Debtor filed for chapter 11 relief to preserve the going concern value of its video post-production business and reorganize its financial affairs. To maintain Debtor's continuing operations and timely pay Debtor's approximately 245 non-insider employees, Debtor moves the court, on an emergency basis, for interim and final orders authorizing use of cash collateral, that may include approval of Debtor in Possession ("DIP") financing. The use of cash collateral is sought in accordance with the budget attached hereto as Exhibit 1, subject to a 5% cumulative deviation ("Budget"). The only party having an interest in cash collateral is Austin Financial Services, Inc. ("Austin") pursuant to a July 13, 2016 Amended and Restated Loan and Security Agreement as amended ("LSA") attached hereto as Exhibit 2. Debtor contends that Austin is substantially adequately protected based on its first-priority lien on all the Debtor's assets and continued business operations pursuant to the Budget will maintain collateral values and result in increased cash accrual over the Budget period.

Debtor further requests authority to pay prepetition non-insider payroll to the approximately 245 employees in Exhibit 3 hereto. Debtor also requests an order limiting notice.

The motion is based on this motion and concise statement, the attached Memorandum of Points and Authorities and exhibits hereto, the attached Declaration of Haig S. Bagerdjian ("Bagerdjian Declaration") and concurrently filed declaration of Lewis R. Landau ("Landau Declaration"), all pleadings, papers and records on file with this Court, and upon such other evidence, oral or documentary, as may be presented to this Court at or prior to the hearing on this Motion. The following concise statements of the relief requested is presented pursuant to the requirements of Federal Rule of Bankruptcy Procedure ("FRBP") 4001(b)(1) and to the extent applicable, FRBP 4001(c):

1.      *The name of each entity with an interest in cash collateral*. The Debtor believes that the only entity having an interest in cash collateral is Austin. A complete Uniform Commercial Code ("UCC") search report reflecting all financing statements is attached to the

1  concurrently filed Landau Declaration as Exhibit 1 thereto.  Austin is the only creditor with an

2  interest in accounts and proceeds constituting cash collateral.

3      2.  *The purposes for the use of cash collateral*.  The Debtor requires the use of cash

4  collateral to continue going concern operations in accordance with the Budget, as attached as

5  Exhibit 1 hereto.

6      3.  *The material terms, including duration, of the use of cash collateral*.  The Debtor

7  request interim authorization to use cash collateral in accordance with the Budget attached hereto

8  as Exhibit 1 on the same terms as Austin's prepetition financing pursuant to the LSA attached

9  hereto as Exhibit 2 until the date of a final hearing on the motion and then subsequent use of cash

10  collateral through January 5, 2018.  The fundamental terms of Austin's revolving loan agreement

11  is an 85% advance rate against eligible receivables at a 6% annual interest rate and 6.5% annual

12  management fee.  This 12.5% annualized cost of financing is paid monthly.  The last payment of

13  $28,048.15 was paid to Austin on September 29, 2017.  Austin's current balance is $2,433,184.73

14  pursuant to the account statement included with Exhibit 2.  To the extent Austin consents to

15  provide such DIP financing, the approval requested herein seeks approval of such financing.

16      If Austin opts to terminate Debtor's prepetition financing, then Debtor will demand

17  turnover of post-petition receivable collections and use such proceeds in operations without further

18  advances from Austin during the interim approval period.  The magnitude of Austin's adequate

19  protection supports the use of cash collateral under either scenario.

20      4.  *Any liens, cash payments, or other adequate protection that will be provided to*

21  *each entity with an interest in the cash collateral or, if no additional adequate protection is*

22  *proposed, an explanation of why each entity's interest is adequately protected*.  Austin shall be

23  granted a replacement lien of the same validity, priority and extent as its prepetition lien.  *See* 11

24  U.S.C. § 361(2).  The only payments proposed to be made to Austin are those same fees and

25  charges Austin is entitled to under the LSA, provided Austin continues to finance post-petition

26  receivables.  If Austin opts to terminate Debtor's financing arrangement, then Debtor will demand

27  turnover of post-petition receivable collections and use such proceeds in operations without further

28

1  advances from Austin.  Nonetheless, Austin shall be granted a replacement lien of the same

2  validity, priority and extent as their prepetition lien.  *See* 11 U.S.C. § 361(2).

3      5.    *Compliance with FRBP 4001(c)*: Debtor does not yet have a DIP financing credit

4  agreement or proposed order with Austin for consensual post-petition financing.  To the extent

5  Austin consents to such DIP financing, Debtor will separately file Local Bankruptcy Form 4001-2

6  to disclose any terms required by this rule.

7      6.    *Proposed Order*.  Local Bankruptcy Form 4001-2 and a form of order are attached

8  hereto as Exhibit 5.

9      *Wherefore*, Debtor requests approval of these first day motions.

10                **MEMORANDUM OF POINTS AND AUTHORITIES**

11                                **I.**

12                        <u>**STATEMENT OF FACTS**</u>

13  **A.    The Chapter 11 Bankruptcy Case and Jurisdiction.**

14      On October 10, 2017 (the "Petition Date"), the Debtor commenced its bankruptcy case by

15  filing in this Court a voluntary petition for relief under chapter 11 of title 11 of the United States

16  Code (the "Bankruptcy Code").  The Debtor continues to operate its business and manage its

17  property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

18  A committee of creditors holding unsecured claims has not been appointed.  The Court has core

19  jurisdiction over this matter under 28 U.S.C. §§ 1334(b) and 157(b)(2)(A), (D), (K), (M) and (O).

20  **B.    The Debtor's Business, Need for Chapter 11 Relief and Reorganization Strategy**

21      1. <u>Nature of Debtor's Business</u>.

22      Point.360 provides high definition and standard definition digital mastering, data

23  conversion, video and film asset management, distribution and other services to owners, producers

24  and distributors of entertainment and advertising content. Point.360 provides the services

25  necessary to edit, master, reformat, convert, archive and ultimately distribute its clients' film and

26  video content, including television programming feature films and movie trailers. The Debtor's

27  interconnected facilities provide service coverage to all major U.S. media centers. Clients include

28  major motion picture studios and independent producers.

The Debtor presently operates from three post production and administrative office locations: (1) 2701 Media Center Drive, Los Angeles, California ("Media Center"); (2) 1122 and 1133 North Hollywood Way, Burbank, California ("HWay"); and (3) 2300 Empire Avenue, Suite 100, Burbank, California ("Empire"). Each post production location is electronically tied to the others and serves the same customer base. Depending on the location size, the production equipment consists of tape duplication, editing, encoding, standards conversion, and other machinery. Each location employs personnel with the skills required to efficiently run the equipment and handle customer requirements.

Typically, a feature film or television show or related material will be submitted to a facility by a motion picture studio, independent producer, advertising agency, or corporation for processing and distribution. A common sales force markets Point.360's capabilities for all facilities.

Debtor is a public company with securities registered under the Securities Exchange Act of 1934. Debtor has 12,704,506 shares of its common stock outstanding. Debtor's market symbol is "PTSX." Additional information concerning the Debtor's operations and management is available on its website at **https://www.point.360.com.**

2. Need for Chapter 11 Relief and Reorganization Strategy.

On July 8, 2015, Point.360 acquired certain assets of Modern VideoFilm, Inc. ("MVF") including, but not limited to, MVF's equipment, inventory, and accounts receivable, in a private Article 9 foreclosure sale, and assumed no debts, obligations or liabilities except for agreeing to pay a portion of the rent for each facility of MVF to its landlord on a per diem basis based and certain employee liabilities. The MVF acquisition was intended to add two unique lines of business to augment Debtor's existing businesses and strengthen and synergize the existing business lines by combining operations and optimizing cost efficiencies.

Regarding the purchase of the assets of MVF, on July 8, 2015, the Debtor entered into a Term Loan Agreement Medley Opportunity Fund II, LP ("Medley"). The Medley Loan Agreement is comprised of a five-year term loan facility in the amount of $6,000,000, $1,000,000 of which was funded on the July 8, 2015 closing date. As of March 31, 2017, the Company had

1  borrowed the $6,000,000 under the Medley Loan Agreement.  Debtor has elected to pay interest as

2  payment in kind ("PIK") as permitted by the Loan Agreement. The outstanding principal balance

3  and all accrued and unpaid interest on the Term Loan are due and payable on July 8, 2020.[1]

4       The MVF transaction resulted in substantial and unanticipated operating losses requiring

5  that Debtor reorganize its financial affairs.  Point.360 entered into the MVF acquisition in reliance

6  on misleading information concerning MVF's profitability.  For example, Point.360 was given *pro*

7  *forma* projections showing $29 million in sales and $4.1 million in EBITDA for the 2015 - 2016

8  period.  Actual results after the MVF acquisition resulted in $15.6 million in sales and EBITDA of

9  *negative* $6.3 million.  This $10.4 million difference between projected and actual EBITDA for

10 2105 - 2016, which continued into the fiscal 2017 period, has resulted in Debtor's need for

11 financial reorganization.

12      After the initial disappointing results of the MVF acquisition, Debtor initiated a business

13 plan to reduce expenses and reestablish profitability.   The significant changes to Debtor's

14 operations are as follows:

15      1.  Debtor has eliminated approximately 100,000 square feet of rental space by vacating

16          its Santa Monica, Glendale and Empire (second floor) facilities in 2015.

17      2.  Debtor has reduced rent and associated expenses by initiating the pending closure of its

18          37,930-foot Empire facility (first floor).   Rent and CAM charges at this facility

19          exceeded $150,000 monthly.  Debtor has entered into a prepetition stipulation with

20          lessor REEP OFC 2300 Empire CA LLC ("REEP") to vacate the facility by December

21          4, 2017 and will not incur post-petition rent during the period prior to December 4,

22          2017 as long as Debtor vacates by that date.

---

[1] As further consideration for the MVF foreclosure sale purchase transaction, the Debtor issued 2,000,000 shares of common stock, and five-year warrants to purchase an aggregate of 800,000 shares of common stock at an exercise price of $0.75 per share. As consideration for the Medley Loan Agreement, the Debtor also issued warrants to Medley and Medley Capital Corporation to purchase an aggregate of 500,000 shares of common stock.

While Debtor was working toward profitability, Debtor received a 3-day notice to pay rent or quit for its Media Center facility on October 6, 2017. The Debtor must retain the Media Center facility as a critical component of the reorganized business. Consequently, Debtor was required to file its chapter 11 petition on October 10, 2017 to maintain its core operating facilities and implement its reorganization plan through the chapter 11 process.

Based on the foregoing, Debtor is poised to reorganize its capital structure and gain access to liquidity, reduce costs and liabilities, optimize operations to meet customer needs and create value for employees, customers and creditors.

3.    The Proposed Use of Cash Collateral and Adequate Protection.

The Debtor's revenues are cash collateral in which Austin has an interest. The Debtor proposes to use cash collateral generally in the ordinary course of business during the authorization period. Debtor's accounts receivable presently stand at approximately $3,800,000 including accrued sales. The use of proceeds of accounts will generate additional accounts to which Austin's replacement lien will attach thus providing adequate protection.

All expenses set forth in the Budget are necessary to avoid immediate and irreparable harm to the Debtor which would be occasioned by the interruption of critical operational payments. Over the next two weeks, the following expenses must be paid to avoid immediate and irreparable harm as set forth in the Budget:

1.    $472,605 in wages and benefits and $23,000 in 401k payments per Exhibit 3, excluding insider payments subject to insider compensation procedures.

2.    $50,335 in miscellaneous vendor payments.

3.    $93,000 in freelance contractor payments primarily consisting of translators for work in process.

4.    $50,000 in moving, relocation and reduction in force expenses.

As and for adequate protection of the interests of secured creditors, the Debtor contends that Austin is adequately protected by an equity cushion in the value of its collateral as detailed below and continued cash positive business operations will enhance such adequate protection.

1    For all the foregoing reasons, the Court should approve the Debtor's motion to use cash

2    collateral on an interim basis pending a final hearing thereon.

3    **C.    Summary of Assets and Liabilities.**

4    The Debtor's assets consist primarily of accounts receivable and property, plant and

5    equipment ("PPE") used in operations.  Debtor's accounts receivable maintains a balance of

6    approximately $4,000,000 monthly based on month end balances over the last six (6) months as

7    follows:

8    3/2017:        4,373,310
      4/2017:        4,405,614
9    5/2017:        4,475,723
      6/2017:        4,391,976
10   7/2017:        3,936,697
11   8/2017:        4,507,773

12   Debtor's accounts receivable balance is presently approximately $3,800,000 including

13   accrued sales and Debtor expects the account receivable balance to remain consisting with past

14   balances through the Budget period.  Debtor's work in process remains constant with 2017 levels

15   to date.  All such receivables are collectable subject to a historical 0.1% reserve for bad debt.  *See*

16   Bagerdjian Declaration.

17   Debtor's PPE was valued regarding the MVF transaction as of July 9, 2015 at $5,074,917.

18   *See* Exhibit 4 hereto.  While there have been minor changes in the PPE inventory since July 2015,

19   Mr. Bagerdjian's declaration confirms that the PPE as set forth in the appraisal remains materially

20   intact and the value has not significantly declined.

21   Based on the foregoing, Austin's $2,433,184.73 debt is secured by $9 million in collateral.

22   Moreover, continuing operations during the Budget period will accrue additional cash while asset

23   values remain constant.  Debtor's starting cash is presently $125,000 and increases to $491,232 by

24   January 2018.  Thus, continuing operations enhance Austin's adequate protection.

25   The Debtor's material liabilities are as follows:

26   1.  Austin: $2,433,184.73

27   2.  Medley: $6,477,565.

28   3.  REEP (Empire lessor per stipulation): $927,522.30.

4. Other 20 largest unsecured creditors [*See* ECF # 1]: approximately $1.5 million.

5. Various other insider, relatively small trade and contingent liabilities, including personal property equipment leases.

For all these reasons, the motion should be granted.

## II.

### THE COURT SHOULD APPROVE THE USE OF CASH COLLATERAL PURSUANT TO THE BUDGET AND POST-PETITION FINANCING TO THE EXTENT OF AUSTIN'S CONSENT

Austin has an interest in all Debtor's assets, including cash collateral.  To facilitate the Debtor's continued operations pending reorganization, Debtor must use the cash proceeds of accounts receivable pursuant to the Budget.  The Debtor has independently formulated the Budget attached hereto as Exhibit 1.  The Budget addresses the period from October 10, 2017 to January 5, 2018.  Debtor does not believe that the use of cash collateral pursuant to the Budget and Austin's LSA will prejudice the rights of creditors as doing so merely continues the prepetition financing relationship.  If Austin opts to terminate its prepetition financing agreement, Debtor may still use the proceeds of its accounts, and provide the same adequate protection package to Austin, simply without the benefit of Austin financing Debtor's receivables.

This Motion seeks authority to use cash collateral generally in the ordinary course of business.  This Motion is brought pursuant to 11 U.S.C. § 363(c)(2), (3) and 363(e) and 364(d).  Section 363 states in relevant part:

> (c)(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
>       (A) each entity that has an interest in such cash collateral consents; or
>       (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.
> (3) Any hearing under paragraph (2)(B) of this subsection may be a preliminary hearing or may be consolidated with a hearing under subsection (e) of this section, but shall be scheduled in accordance with the needs of the debtor. If the hearing under paragraph (2)(B) of this subsection is a preliminary hearing, the court may authorize such use, sale, or lease only if there is a reasonable likelihood that the trustee will prevail at the final hearing under subsection (e) of this section. The court shall act promptly on any request for authorization under paragraph (2)(B) of this subsection.

1

2

3

4

(e)  Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease **as is necessary to provide adequate protection of such interest.** This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362).

5

11 U.S.C. § 363(c)(2), (3), (e) (emphasis added).

6

Section 364 states in relevant part:

7

8

9

10

(d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
(A) the trustee is unable to obtain such credit otherwise; and
(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11

11 U.S.C. § 364(d).

12

13

14

15

16

17

Thus, cash collateral may be used under section 363, if the Court finds that that secured creditors' claims are adequately protected.  In addition, DIP financing secured by an equal or senior priority lien may be approved when the Debtor is unable to secure such credit otherwise and other senior or equal lienholder are adequately protected.  Based on Debtor's preexisting relationship with Austin, Debtor does not believe that replacement financing is available from any party other than Austin on more favorable terms.

18

19

20

The Debtor's use of cash collateral and/or approval of post-petition financing requires that the Court find adequate protection of existing secured creditors' lien interests.  Adequate protection is defined in section 361 as follows:

21

22

23

24

25

26

27

28

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by -
(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
(3) **granting such other relief**, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, **as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.**

11 U.S.C. § 361 (emphasis added).

Thus, according to the statute, the key question is whether the value of the secured creditor's collateral is decreasing and whether the proposed form of adequate protection provides the creditor with the indubitable equivalent of such entities' interest in the used property. The Debtor's continued profitable business operations in conjunction with a replacement lien having the same validity, priority and extent of Austin's prepetition lien provides Austin with adequate protection of its interest. *See* Farmers Home Administration v. Arnold and Baker Farms (In re Arnold and Baker Farms), 177 B.R. 648 (9th Cir. B.A.P. 1994) (discussing history of indubitable equivalent standard), *affirmed*, 85 F. 3d 1415 (9th Cir. 1996). Moreover, to the extent Austin consents to maintaining its financing relationship with the Debtor, the Debtor will make the periodic cash payments to Austin as called for in Austin's Loan Agreement. *See* Exhibit 2. As its post-petition financing lien will replace its prepetition lien, Austin is adequately protected.

In operating cases, profitable operations and the maintenance of soft "cycling asset" values provides a floating lien creditor with adequate protection of its interests:

> With regard to a lien of this nature, i.e., a "floating lien" of a blanket nature on changing and cycling soft collateral, the appropriate adequate protection, and the concomitant valuation of collateral appropriate for a determination of adequate protection, is a showing that the level of such a fluctuating base of items of collateral that are constantly cycling through different shapes and forms, as the business operation continues, will in fact remain at the same magnitude (in terms of ongoing operational values) during the relevant period of debtor-in-possession business operation in the chapter 11 reorganization proceedings.

In re Dynaco Corp., 162 B.R. 389, 394-395 (Bankr. D. N.H. 1993), *see also*, Pacific First Bank v. Boulders on the River, Inc. (In re Boulders on the River, Inc.), 164 B.R. 99, 104 (9th Cir. B.A.P. 1994) (use of cash collateral to pay legal fees is prudent and appropriate provided creditor is otherwise adequately protected). Here, Austin's collateral value plus the Debtor's operating cash accrual plus the maintenance of accounts receivable levels provides Austin with adequate protection. As such, the Debtor should be permitted to operate in accordance with the Budget, subject to a 5% cumulative variance.

For all these reasons, the motion should be granted.

**III.**

**THE DEBTOR'S REQUESTS ARE CONSISTENT WITH THE**

**OBJECTIVES OF CHAPTER 11 RELIEF**

This case and the requests set forth herein are consistent with the goals of chapter 11 relief. The principal purposes of chapter 11 reorganization have been summarized by the Ninth Circuit Court of Appeals as follows:

> Chapter 11 has two major objectives 1) to permit successful rehabilitation of debtors (NLRB v. Bildisco and Bildisco, 465 U.S. 513, 527, 79 L. Ed. 2d 482, 104 S. Ct. 1188 (1984)); and 2) to maximize the value of the estate (Toibb v. Radloff, 115 L. Ed. 2d 145, 111 S. Ct. 2197, 2201 (1991)).
>
> ……
>
> [W]hile the protection of creditors' interests is an important purpose under Chapter 11, the Supreme Court has made clear that successful debtor reorganization and maximization of the value of the estate are the primary purposes.  See Bildisco, 465 U.S. at 527; Toibb v. Radloff, 111 S. Ct. at 2201. Chapter 11 is designed to avoid liquidations under Chapter 7, since liquidations may have a negative impact on jobs, suppliers of the business, and the economy as a whole.  See United States v. Whiting Pools, Inc., 462 U.S. 198, 203, 76 L. Ed. 2d 515, 103 S. Ct. 2309 (1983).

Bonner Mall Partnership v. U.S. Bancorp Mortgage Co. (In re Bonner Mall Partnership), 2 F.3d 899, 915-916 (9th Cir. 1993), *cert. granted*, 510 U.S. 1039, *vacatur denied and appeal dism'd as moot*, 513 U.S. 18 (1994).

Debtor's case and this Motion raise the issues that are at the center of fulfilling the principal purposes of chapter 11 reorganization.  Without use of cash collateral, the Debtor must necessarily terminate operations and liquidate.  The closing of Point.360's business will result in the loss of approximately 275 full and part time entertainment industry jobs.  The ripple effect of the losses occasioned by closing the business will be felt among the Debtor's creditors and vendors.  Importantly, the Debtor is in the middle of producing many important projects that will be severely disrupted by a cessation of the Debtor's business.  These impacts are mitigated by allowing the continuation of the Debtor's business through approval of this Motion.

For all these reasons, the motion should be granted.

**IV.**

**THE DEBTOR SHOULD BE AUTHORIZED TO PAY PREPETITION PAYROLL,**

**HONOR EMPLOYEE PROCEDURES AND PAY RELATED TAXES TO AVOID**

**IMMEDIATE AND IRREPARABLE HARM TO THE ESTATE**

The Debtor has approximately 275 employees. Of these employees, approximately 245 are owed prepetition payroll and benefits accrued during the most current payroll period. The Debtor has a bi-weekly (every two weeks) pay period that runs one (1) to two (2) weeks in arrears. Debtor's last payroll was paid on September 29, 2017 and paid payroll for the period of September 10 through September 23, 2017. Payroll for the period September 24, 2017 to October 7, 2017 will be due for payment on October 13, 2017. An additional approximately 10% of prepetition payroll accrued from October 8, 2017 to October 9, 2017. Based on the Debtor having filed its chapter 11 petition on October 10, 2017, payroll for the pre-October 10 pay period is earned and constitutes a pre-petition claim for employees. A schedule reflecting payroll for the October 13, 2017 pay period for the approximately 245 employees is attached hereto as Exhibit 3. Exhibit 3 contains insider payroll that will not be paid absent compliance with United States Trustee procedures.

The Debtor must pay its employees in full to maintain the going concern value of its business. The Debtor believes that the failure to pay any prepetition payroll will result in a loss of employee morale and employee resignations at this critical juncture early in the chapter 11 case. The Debtor must maintain its employee relationships to maintain a going concern.

Local Bankruptcy Rule 2081-1(a)(6) states that a motion to pay prepetition payroll and honor prepetition employment procedures must be supported by evidence that establishes the following:

(A) *The employees are still employed*;

The employees listed on redacted Exhibit 3 are still employed by the Debtor. The Debtor will make an unredacted version of Exhibit 3 available upon request with appropriate confidentiality arrangements.

(B) *The necessity for payment*;

Numerous courts have recognized that a chapter 11 debtor must be able to maintain a stable employee base and harmonious employee relations if it is to successfully reorganize:

> [E]mployee good will and contentment is an asset which is vital to the continuation of a debtor's business operation and its ability to effectively reorganize during the Chapter 11 process. . . . In granting Debtors' applications for permission to provide hardship payments to injured workers, this Court determined that the uninterrupted payment of LTV Steel workers' compensation obligations is essential to employee morale and industrial tranquility which, in turn, are critical to a successful reorganization.

LTV Corp. v. Aetna Cas. & Sur. Co. (In re Chateaugay Corp.), 116 B.R. 887, 898 (Bankr. S.D.N.Y. 1990) (citation omitted)

Per the Bagerdjian Declaration, The Debtor believes that the failure to pay any prepetition payroll will result in a loss of employee morale and employee resignations at this critical juncture early in the chapter 11 case.

(C) *The benefit of the procedures*;

The procedures will authorize the uninterrupted maintenance of employee relationships with the Debtor.

(D) *The prospect of reorganization*;

Debtor's prospect of reorganization is excellent.  Per the Budget, Debtor has positive cash flow from operations and is implementing a cost reduction program to maintain profitability.

(E) *Whether the employees are insiders*;

No insiders will be paid absent compliance with United States Trustee insider compensation procedures.

(F) *Whether the employees' claims are within the limits established by 11 U.S.C. § 507*;

Yes.

(G) *The payment will not render the estate administratively insolvent*.

The payments will not render the estate administratively insolvent.

1    All employees listed on Exhibit 3 continue to be employed by the Debtor.  To the extent

2    employees are terminated, no prepetition claim will be paid to such employee.  The proposed

3    payment of prepetition payroll will not render the Debtor administratively insolvent based on the

4    projections of future operations.  *See* LBR 2081-1(a)(6).  Pursuant to 11 U.S.C. §§ 105(a), 363(b)

5    and (c), 507(a)(4), (a)(5) and (a)(8), 541(b)(7), 1122(b) and 1129(a)(9), the Debtor requests

6    authority: (a) to pay outstanding balances of prepetition payroll and related benefits as set forth in

7    specific detail in the list of employees, prepetition wages and insider designation, attached as

8    Exhibit 3, and to continue prepetition payroll procedures; (b) to pay benefits that accrued

9    prepetition but that mature postpetition in the ordinary course of business to the extent of the

10    statutory priority and providing such employees continue their employment with the Debtor; and

11    (c) to pay any prepetition non-default taxes that the Debtor must collect or withhold.

12    All Exhibit 3 amounts will be limited to priority claim status under 11 U.S.C. § 507(a)(4).

13    The Debtor would be required to pay such claims in full under any plan.  The Debtor thus requests

14    authority to pay the prepetition payroll amounts set forth on Exhibit 3 and all payroll related taxes

15    on such payroll under the doctrine of necessity and 11 U.S.C. § 105(a), as necessary to support the

16    reorganization of the Debtor.  *See*, Burchinal v. Central Washington Bank (In re Adams Apple,

17    Inc.), 829 F.2d 1484, 1490 (9th Cir. 1987); In re Ionosphere Clubs, Inc., 98 B.R. 174 (Bankr. S.D.

18    N.Y. 1989); In re Lehigh & New England Railway Co., 657 F.2d 570, 581 (3d Cir. 1981).

19    Alternatively, such payments constitute ordinary course of business payments and if authorized,

20    such payments can be paid under 11 U.S.C. § 549.

21    No insider pre-petition payroll approval is sought in this motion.

22    Based on all the foregoing, the Court should approve payment of prepetition non-insider

23    payroll and benefits as set forth in Exhibit 3.

24    **V.**

25    **DEBTOR REQUESTS AN ORDER LIMITING NOTICE**

26    Finally, Debtor requests an order limiting notice to alleviate the administrative burden

27    created by having to mail all notices to all creditors.  The Debtor has over 125 parties in interest

28    listed on its master mailing list.  *See* ECF # 1.  The Debtor is requesting that the Court enter an

order limiting notice such that, with the exceptions set forth below, service of notice of matters in this case shall be limited to the following parties: (a) the Office of the United States Trustee; (b) the parties listed on the "List of Creditors Holding 20 Largest Unsecured Claims" or, if appointed under Bankruptcy Code section 1102, to the official committee of unsecured creditors ("Committee"), in lieu of the Debtor's twenty largest unsecured creditors or its counsel; (c) any party holding a security interest in the Debtor's assets (herein "Secured Creditors"); (d) any party against whom direct relief is sought by a motion, application or otherwise; and (e) all parties receiving Notices of Electronic Filing ("NEF") through the Court's Electronic Case Filing system.

Notwithstanding the foregoing limitation, notice of the matters set forth below shall be served upon all creditors and equity interest holders:

A. The notice of commencement of the case;
B. Any first meeting of creditors;
C. The hearing on any motion for the sale of substantially all of the assets of the Debtor's estate;
D. Any bar date for the filing of proofs of claim;
E. The time fixed for filing objections to, and the hearing to consider confirmation of, any chapter 11 plan in this case;
F. The hearing on any motion for the dismissal of the case or for the conversion of the case to chapter 7 of the Bankruptcy Code; and
G. The time fixed to accept or reject any proposed modification of a chapter 11 plan in this case (to the extent that the proposed modification requires notice to parties in interest affected thereby).

FRBP rules 2002 and 9007 provide authority for the relief requested herein. Similarly, FRBP 9007 affords the Court general authority to regulate notices. Pursuant to FRBP 2002 and 9007, this Court has the authority to limit the manner of service of notice in the Debtor's case.

No party will be prejudiced by the proposed limitation on notice procedures since any parting in interest that desires to receive notice of all matters in this case may, by submitting a request for courtesy NEF delivery, receive such notices. Debtor will serve notice of entry of the order limiting notice on the master mailing list maintained by the clerk. Based on all the foregoing, the Court should grant the requested relief.

**VI.**

**CONCLUSION**

    **WHEREFORE**, based on all the foregoing, Point.360 respectfully requests that the Court enter its order approving the use of cash collateral pursuant to the Budget, authorize debtor in possession financing subject to Austin consent, allow payment of prepetition payroll and limit notice, setting a final hearing as necessary, and granting such other and further relief as the Court deems just and proper under the circumstances.

Dated:  October 11, 2017

**Lewis R. Landau**
**Attorney at Law**


By:*/s/ Lewis R. Landau*
Lewis R. Landau
[Proposed] Attorney for the Debtor

### DECLARATION OF HAIG S. BAGERDJIAN

I, Haig S. Bagerdjian, do hereby declare:

       1.      I am the president of Point.360, a California corporation ("Point.360" or "Debtor") and I have personal knowledge of the facts set forth herein.  On October 10, 2017 (the "Petition Date"), the Debtor commenced its bankruptcy case by filing in this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtor continues to operate its business and manage its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  A committee of creditors holding unsecured claims has not yet been appointed.

       2.      Debtor filed for chapter 11 relief to preserve the going concern value of its video post-production business and reorganize its financial affairs.  To maintain Debtor's continuing operations and timely pay Debtor's approximately 245 non-insider employees, Debtor must receive an order authorizing use of cash collateral.  The use of cash collateral is sought in accordance with the budget attached hereto as Exhibit 1, subject to a 5% cumulative deviation ("Budget").  The Budget was prepared at my direction and I have personal knowledge of its contents.  The Budget reflects the reasonably anticipated income and expenses based on historical operations expected to be received and incurred over the Budget period.  The income and expenses in the Budget reflect ordinary course of business income and expenditures.

       3.      The only party having an interest in cash collateral is Austin Financial Services, Inc. ("Austin") pursuant to a July 13, 2016 Amended and Restated Loan and Security Agreement as amended ("LSA") attached hereto as Exhibit 2.  Debtor proposes to either continue the Austin financing relationship or otherwise use cash proceeds from receivables collections as authorized by the Court.  To the extent Austin consents to continue its financing relationship with the Debtor, then such DIP financing should be approved.  Based on the Debtor's preexisting relationship with Austin, I do not believe that replacement financing is available from any party other than Austin on more favorable terms.

       4.      Point.360 provides high definition and standard definition digital mastering, data conversion, video and film asset management, distribution and other services to owners, producers

1  and distributors of entertainment and advertising content. Point.360 provides the services

2  necessary to edit, master, reformat, convert, archive and ultimately distribute its clients' film and

3  video content, including television programming feature films and movie trailers. The Debtor's

4  interconnected facilities provide service coverage to all major U.S. media centers. Clients include

5  major motion picture studios and independent producers.

6       5.      The Debtor presently operates from three post production and administrative office

7  locations: (1) 2701 Media Center Drive, Los Angeles, California ("Media Center"); (2) 1122 and

8  1133 North Hollywood Way, Burbank, California ("HWay"); and (3) 2300 Empire Avenue, Suite

9  100, Burbank, California ("Empire"). Each post production location is electronically tied to the

10  others and serves the same customer base. Depending on the location size, the production

11  equipment consists of tape duplication, editing, encoding, standards conversion, and other

12  machinery. Each location employs personnel with the skills required to efficiently run the

13  equipment and handle customer requirements.

14       6.      Typically, a feature film or television show or related material will be submitted to

15  a facility by a motion picture studio, independent producer, advertising agency, or corporation for

16  processing and distribution. A common sales force markets Point.360's capabilities for all

17  facilities.

18       7.      Debtor is a public company with securities registered under the Securities

19  Exchange Act of 1934.  Debtor has 12,704,506 shares of its common stock outstanding.  Debtor's

20  market symbol is "PTSX."  Additional information concerning the Debtor's operations and

21  management is available on its website at **https://www.point.360.com.**

22       8.      On July 8, 2015, Point.360 acquired certain assets of Modern VideoFilm, Inc.

23  ("MVF") including, but not limited to, MVF's equipment, inventory, and accounts receivable, in a

24  private Article 9 foreclosure sale, and assumed no debts, obligations or liabilities except for

25  agreeing to pay a portion of the rent for each facility of MVF to its landlord on a per diem basis

26  based and certain employee liabilities.  The MVF acquisition was intended to add two unique lines

27  of business to augment Debtor's existing businesses and strengthen and synergize the existing

28  business lines by combining operations and optimizing cost efficiencies.

9.      Regarding the purchase of the assets of MVF, on July 8, 2015, the Debtor entered into a Term Loan Agreement Medley Opportunity Fund II, LP ("Medley"). The Medley Loan Agreement is comprised of a five-year term loan facility in the amount of $6,000,000, $1,000,000 of which was funded on the July 8, 2015 closing date. As of March 31, 2017, the Company had borrowed the $6,000,000 under the Medley Loan Agreement.  Debtor has elected to pay interest as payment in kind ("PIK") as permitted by the Loan Agreement. The outstanding principal balance and all accrued and unpaid interest on the Term Loan are due and payable on July 8, 2020.[2]

10.      The MVF transaction resulted in substantial and unanticipated operating losses requiring that Debtor reorganize its financial affairs.  Point.360 entered into the MVF acquisition in reliance on misleading information concerning MVF's profitability.  For example, Point.360 was given *pro forma* projections showing $29 million in sales and $4.1 million in EBITDA for the 2015 - 2016 period.  Actual results after the MVF acquisition resulted in $15.6 million in sales and EBITDA of *negative* $6.3 million.  This $10.4 million difference between projected and actual EBITDA for 2105 - 2016, which continued into the fiscal 2017 period, has resulted in Debtor's need for financial reorganization.

11.      After the initial disappointing results of the MVF acquisition, Debtor initiated a business plan to reduce expenses and reestablish profitability.  The significant changes to Debtor's operations are as follows:

a.   Debtor has eliminated approximately 100,000 square feet of rental space by vacating its Santa Monica, Glendale and Empire (second floor) facilities in 2015.

b.   Debtor has reduced rent and associated expenses by initiating the pending closure of its 37,930-foot Empire facility (first floor).  Rent and CAM charges at this facility exceeded $150,000 monthly.   Debtor has entered into a prepetition stipulation with lessor REEP OFC 2300 Empire CA LLC ("REEP")

---

[2] As further consideration for the MVF foreclosure sale purchase transaction, the Debtor issued 2,000,000 shares of common stock, and five-year warrants to purchase an aggregate of 800,000 shares of common stock at an exercise

1   to vacate the facility by December 4, 2017 and will not incur post-petition rent
2   during the period prior to December 4, 2017 as long as Debtor vacates by that
3   date.

4      12.    While Debtor was working toward profitability, Debtor received a 3-day notice to
5   pay rent or quit for its Media Center facility on October 6, 2017.  The Debtor must retain the
6   Media Center facility as a critical component of the reorganized business.  Consequently, Debtor
7   was required to file its chapter 11 petition on October 10, 2017 to maintain its core operating
8   facilities and implement its reorganization plan through the chapter 11 process.

9      13.    Based on the foregoing, Debtor is poised to reorganize its capital structure and gain
10  access to liquidity, reduce costs and liabilities, optimize operations to meet customer needs and
11  create value for employees, customers and creditors.

12     14.    The Debtor's revenues are cash collateral in which Austin has an interest.  The
13  Debtor proposes to use cash collateral generally in the ordinary course of business during the
14  authorization period.  Debtor's accounts receivable presently stand at $3,800,000 including
15  accrued sales.  The use of proceeds of accounts will generate additional accounts to which
16  Austin's replacement lien will attach thus providing adequate protection.

17     15.    All expenses set forth in the Budget attached hereto are necessary to avoid
18  immediate and irreparable harm to the Debtor which would be occasioned by the interruption of
19  critical operational payments.  Over the next two weeks, the following expenses must be paid to
20  avoid immediate and irreparable harm as set forth in the Budget:

21         a.   $472,605 in wages and benefits and $23,000 in 401k payments per Exhibit 3,
22              excluding insider payments subject to insider compensation procedures.
23         b.   $50,335 in miscellaneous vendor payments.
24         c.   $93,000 in freelance contractor payments primarily consisting of translators for
25              work in process.
26         d.   $50,000 in moving, relocation and reduction in force expenses.

27
28  price of $0.75 per share. As consideration for the Medley Loan Agreement, the Debtor also issued warrants to Medley

-21-

16.    As and for adequate protection of the interests of secured creditors, the Debtor contends that Austin is adequately protected by an equity cushion in the value of its collateral as detailed below and continued cash positive business operations will enhance such adequate protection.

17.    The Debtor's assets consist primarily of accounts receivable and property, plant and equipment ("PPE") used in operations.  Debtor's accounts receivable maintains a balance of approximately $4,000,000 monthly based on month end balances over the last six (6) months as follows:

```
3/2017:          4,373,310
4/2017:          4,405,614
5/2017:          4,475,723
6/2017:          4,391,976
7/2017:          3,936,697
8/2017:          4,507,773
```

18.    Debtor's accounts receivable balance is presently approximately $3,800,000 including accrued sales and Debtor expects the account receivable balance to remain consisting with past balances through the Budget period.  Debtor's work in process remains constant with 2017 levels to date.  All such receivables are collectable subject to a historical 0.1% write off for bad debt.

19.    Debtor's PPE was valued in connection with the MVF transaction as of July 9, 2015 at $5,074,917.  Attached hereto as Exhibit 4 is a true and correct copy of the July 9, 2015 appraisal report.  While there have been minor changes in the PPE inventory since July, 2015, the PPE as set forth in the appraisal remains materially intact and the value has not significantly declined.

20.    Based on the foregoing, Austin's $2,433,184.73 debt is secured by $9 million in collateral.  Moreover, continuing operations during the Budget period will accrue additional cash while asset values remain constant.  Debtor's starting cash is presently $125,000 and increases to $491,232 by January, 2018.  Thus, continuing operations enhance Austin's adequate protection.

and Medley Capital Corporation to purchase an aggregate of 500,000 shares of common stock.

21.    The Debtor's material liabilities are as follows:

    a.    Austin: $2,433,184.73.

    b.    Medley: $6,477,565.

    c.    REEP (Empire lessor per stipulation): $927,522.30.

    d.    Other 20 largest unsecured creditors [*See* ECF # 1]: approximately $1.5 million.

    e.    Various other insider, relatively small trade and contingent liabilities, including personal property equipment leases.

22.    Without use of cash collateral, the Debtor must necessarily terminate operations and liquidate. The closing of Point.360's business will result in the loss of approximately 275 full and part time entertainment industry jobs. The ripple effect of the losses occasioned by closing the business will be felt among the Debtor's creditors and vendors. Importantly, the Debtor is in the middle of producing many important projects that will be severely disrupted by a cessation of the Debtor's business. These impacts are mitigated by allowing the continuation of the Debtor's business through approval of this Motion.

23.    The Debtor has approximately 275 employees. Of these employees, approximately 245 are owed prepetition payroll and benefits accrued during the most current payroll period. The Debtor has a bi-weekly (every two weeks) pay period that runs one (1) to two (2) weeks in arrears. Debtor's last payroll was paid on September 29, 2017 and paid payroll for the period of September 10 through September 23, 2017. Payroll for the period September 24, 2017 to October 7, 2017 will be due for payment on October 13, 2017. An additional approximately 10% of prepetition payroll accrued from October 8, 2017 to October 9, 2017. Based on the Debtor having filed its chapter 11 petition on October 10, 2017, payroll for the pre-October 10 pay period is earned and constitutes a pre-petition claim for employees. A schedule reflecting payroll for the October 13, 2017 pay period for the approximately 245 employees is attached hereto as Exhibit 3. Exhibit 3 contains insider payroll that will not be paid absent compliance with United States Trustee procedures.

24.    The Debtor must pay its employees in full to maintain the going concern value of its business. On behalf of the Debtor, I believe that the failure to pay any prepetition payroll will

-23-

result in a loss of employee morale and employee resignations at this critical juncture early in the chapter 11 case.  The Debtor must maintain its employee relationships to maintain a going concern.

25.    The employees listed on redacted Exhibit 3 are still employed by the Debtor.  The Debtor will make an unredacted version of Exhibit 3 available upon request with appropriate confidentiality arrangements.  The procedures will authorize the uninterrupted maintenance of employee relationships with the Debtor.

26.    Debtor's prospect of reorganization is excellent.  Per the Budget, Debtor has positive cash flow from operations and is implementing a cost reduction program to maintain profitability.  No insiders will be paid absent compliance with United States Trustee insider compensation procedures.  The payments will not render the estate administratively insolvent.

27.    All employees listed on Exhibit 3 continue to be employed by the Debtor.  To the extent employment relationships are terminated, payment will be subject to payment under a chapter 11 plan.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 11th day of October, 2017 at Los Angeles, California.

*/s/ Haig S. Bagerdjian*
Haig S. Bagerdjian

# EXHIBIT 1

| Week | 0 | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| Week ending | 10/13/2017 | 10/20/2017 | 10/27/2017 | 11/3/2017 | 11/10/2017 | 11/17/2017 |
| **Operating Cash-In** | 3 days only | | | | | |
| Revenues-Cash collections From Accounts Receivable | $ 285,000 | $ 398,599 | $ 398,599 | $ 398,599 | $ 401,786 | $ 401,786 |
| Non-AR Collections (sublease-rents and services provided to 3rd pty) | $ 102,140 | $ 37,595 | $ 102,140 | $ - | $ 102,140 | $ 37,595 |
| Total Collections | $ 387,140 | $ 436,195 | $ 500,739 | $ 398,599 | $ 503,925 | $ 439,381 |
| Total cash-in | $ 387,140 | $ 436,195 | $ 500,739 | $ 398,599 | $ 503,925 | $ 439,381 |
| **Operating Cash-out** | | | | | | |
| Vendor Payments | $ - | $ (50,335) | $ (77,128) | $ (172,128) | $ (68,197) | $ (68,197) |
| Freelance Contractor payments | $ - | $ (93,000) | $ (40,127) | $ (3,000) | $ (40,127) | $ (93,000) |
| Non-Insider Payroll Payments | $ (472,605) | $ - | $ (453,563) | $ - | $ (434,520) | $ - |
| Insider Payroll Payments | $ (13,415) | $ - | $ (13,415) | $ - | $ (13,415) | $ - |
| 401k payments | $ (23,000) | $ - | $ (23,000) | $ (182,000) | $ (23,000) | $ - |
| Rent Payments | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Cash out | $ (509,021) | $ (143,335) | $ (607,233) | $ (357,128) | $ (579,260) | $ (161,197) |
| Net Operating Cashflow | $ (121,881) | $ 292,859 | $ (106,494) | $ 41,471 | $ (75,334) | $ 278,184 |
| **Non-Operating cash in (out)** | | | | | | |
| Line of Credit Drawdowns | $ - | $ - | $ - | $ - | $ - | $ - |
| RIF Expense: | $ - | $ (4,444) | $ (4,444) | $ (4,444) | $ (4,444) | $ (4,444) |
| Capital Expenditures | $ - | $ (12,500) | $ (54,500) | $ (12,500) | $ (12,500) | $ (12,500) |
| Tenant Improvements | $ - | $ (12,500) | $ (12,500) | $ (17,500) | $ (12,500) | $ (17,500) |
| Debt Repayments | $ - | $ - | $ - | $ - | $ - | $ - |
| C11 Administration expenses | | | | | | |
| Toal Non-Operating cash out | $ - | $ (29,444) | $ (71,444) | $ (34,444) | $ (29,444) | $ (34,444) |
| Net Cashflow (outflow) for the Period | $ (121,881) | $ 263,415 | $ (177,939) | $ 7,027 | $ (104,779) | $ 243,739 |
| Beginning Cash | $ 125,000 | $ 3,119 | $ 266,534 | $ 88,595 | $ 95,622 | $ (9,157) |
| **Ending Cash** | $ 3,119 | $ 266,534 | $ 88,595 | $ 95,622 | $ (9,157) | $ 234,582 |

*026*

| | 6 11/24/2017 | 7 12/1/2017 | 8 12/8/2017 | 9 12/15/2017 | 10 12/22/2017 | 11 12/29/2017 | 12 1/5/2018 | 13 1/12/2018 | Total Weeks 1 to 13 |
|---|---|---|---|---|---|---|---|---|---|
| $ | 401,786 | 401,786 | 409,856 | 409,856 | 409,856 | 409,856 | 409,856 | 409,856 | 5,547,076 |
| $ | 102,140 | - | 102,140 | 37,595 | 102,140 | - | 102,140 | 37,595 | 865,358 |
| $ | 503,925 | 401,786 | 511,995 | 447,451 | 511,995 | 409,856 | 511,995 | 447,451 | 6,412,434 |
| $ | 503,925 | 401,786 | 511,995 | 447,451 | 511,995 | 409,856 | 511,995 | 447,451 | 5,964,982 |
| $ | (68,197) | (163,197) | (68,197) | (68,197) | (68,197) | (163,197) | (68,197) | (68,197) | (1,171,563) |
| $ | (40,127) | (3,000) | (40,127) | (93,000) | (40,127) | (3,000) | (40,127) | (40,127) | (568,889) |
| $ | (415,478) | - | (438,047) | - | (438,047) | - | (438,047) | - | (3,090,306) |
| $ | (13,415) | - | (13,415) | - | (13,415) | - | (13,415) | - | (93,908) |
| $ | (23,000) | - | (23,000) | - | (23,000) | - | (23,000) | (23,000) | (184,000) |
| $ | - | (182,000) | - | - | - | - | (226,203) | - | (590,203) |
| $ | (560,217) | (348,197) | (582,786) | (161,197) | (582,786) | (166,197) | (808,989) | (131,324) | (5,567,544) |
| $ | (56,292) | 53,588 | (70,791) | 286,254 | (70,791) | 243,659 | (296,994) | 316,127 | 397,438 |
| $ | (4,444) | (4,444) | (4,444) | (4,444) | (4,444) | (4,444) | (4,444) | - | (53,333) |
| $ | (54,500) | (12,500) | (12,500) | - | - | - | - | - | (184,000) |
| $ | (12,500) | (12,500) | (12,500) | - | - | - | - | - | (110,000) |
| $ | - | - | - | - | - | - | - | - | - |
| $ | (71,444) | (29,444) | (29,444) | (4,444) | (4,444) | (4,444) | (4,444) | - | (338,444) |
| $ | (127,736) | 24,144 | (100,235) | 281,810 | (75,235) | 239,214 | (301,438) | 316,127 | 366,232 |
| $ | 234,582 | 106,846 | 130,990 | 30,755 | 312,564 | 237,329 | 476,543 | 175,105 | 125,000 |
| $ | 106,846 | 130,990 | 30,755 | 312,564 | 237,329 | 476,543 | 175,105 | 491,232 | 491,232 |

**Key assumptions and Ending cash position**

Point 360 has proposed an aggressive cost reduction and site consolidation plan to generate $366k in new cashflow during this initial 13 week restructuring period. This 13 week cashflow is prepared on a cash basis from management's projections. The cash basis closely approximates accrual based revenue and expenses.

**Cash-In: Primarily** collections on Invoiced Sales from services. Average days sales outstanding is historically consistent at 58 days with a beginning and ending Accounts receivable balance of $3.7Million. As sales are generated, they are  advanced by Austin at 85% of invoice value, less certain adjustments for ineligible receivables.  Additional opportunity exists with the sale of the Vault business lactated at Media center (Est. net cash approx. $1.5 million)

**Cash-out:** Primarily of l)vendor payments for current purchases and services, generally COD or 5 to 30 day terms; and ii) Payroll, paid 1 week in arrears bi-weekly. During the 13 week period the accounts payable balance is projected to remain flat.

Ending cash position:  Improves to $491k from an initial position of $125k.

Air Conditioning Repair - $84k for HWAY, $10k for Media Center.

*028*

# EXHIBIT 2

1.4    **Exhibits and Schedules.** All of the exhibits and schedules attached hereto shall be deemed incorporated herein by reference.

## ARTICLE 2

### LOAN FACILITIES

2.1    **Revolving Advances.**

(a)    Provided that no Default or Event of Default has occurred and is continuing and subject to the terms and conditions of this Agreement, Lender hereby agrees to make revolving Advances to Borrower from time to time up to but not including the Final Maturity Date. The aggregate amount of Advances outstanding after giving effect to any proposed new Advance shall not exceed the lesser of (i) the Line of Credit Commitment, or (ii) the Borrowing Base. Borrower may repay outstanding Advances and, subject to the terms and conditions of this Agreement, any amounts so repaid may be reborrowed. On the Final Maturity Date, Borrower shall pay to Lender the entire unpaid principal balance of the Advances together with all accrued but unpaid interest thereon. The Advances, and Borrower's obligation to repay the same, shall be evidenced by this Agreement and the books and records of Lender.

(b)    Borrower may request one or more Advances on any Business Day. Concurrent with such request, Borrower shall provide to Lender a duly completed and signed Daily Availability Report that supports the requested Advance amount. Provided that the terms and conditions for the requested Advance have been met, Lender will make the requested Advance available to Borrower on the Business Day of request; provided that the request is received by 9:30 a.m., Pacific time, and Borrower has provided to Lender a Daily Availability Report on a daily basis for the prior 30 days. In all other cases, Lender will make the requested Advance available to Borrower on the Business Day following the Business Day of request; provided that the request is received by 12:00 p.m., Pacific time.

2.2    **Overadvances.** If, at any time or for any reason, the amount of Advances outstanding exceeds the lesser of the Line of Credit Commitment or the Borrowing Base (an "**Overadvance**"), Borrower shall immediately pay to Lender, upon Lender's election and demand, in cash, the amount of such Overadvance to be used by Lender to repay outstanding Advances.

2.3    Reserved.

2.4    Reserved.

2.5    Reserved.

2.6    **Fees.** Borrower shall pay to Lender:

(a)    **Facility Fee.** An annual facility fee in the amount set forth in Section 2.6(a) of **Schedule B.** Such annual facility fee shall be due and payable in advance and fully earned by Lender on the date of the initial Advance and each anniversary of the date of this Agreement.

(b)    **Unused Line Fee.** An unused line fee in an amount equal to the Unused Line Fee Percentage times the difference between the (i) Line of Credit Commitment and (ii) the sum of average outstanding Advances during the period from the first day of the prior month to the date payment is due (the "**Unused Line Fee**"). The Unused Line Fee shall be payable monthly in arrears on the first day of each month and on the Final Maturity Date. The Unused Line Fee shall be calculated on the basis of a year of 360 days for the actual days elapsed.

(c)    **Collateral Exam Fees.** In connection with any collateral exams, audits or inspections conducted by or on behalf of Lender at the current rates established from time to time by Lender as its collateral exam fees (which fees are currently $850.00 per day per collateral examiner),

BN 20996225v7

2

---

AUSTIN

| AMENDED AND RESTATED<br>LOAN AND SECURITY<br>AGREEMENT | POINT 360,<br>a California corporation,<br>as "Borrower" |
|---|---|

This AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT (this "**Agreement**"), dated as of July 13, 2016, is entered into between AUSTIN FINANCIAL SERVICES, INC., a Delaware corporation ("**Lender**"), and POINT 360, a California Corporation ("**Borrower**").

Summit Financial Resources, L.P., a Hawaii limited partnership ("**Assignor**") and Borrower entered into that certain Agreement dated February 13, 2015, as amended by that certain First Amendment to Agreement dated September 16, 2015, that certain Second Amendment to Agreement dated March 2, 2016, and that certain Third Amendment to Agreement dated April 13, 2016 (as amended, the "**Summit Loan and Security Agreement**"), pursuant to which Assignor provided loans and other financial accommodations to Borrower (the "**Financing**").

Pursuant to that certain Assignment and Assumption of Financing and Financing Documents dated July 13, 2016, among Assignor, Borrower and Lender (the "**Assignment Agreement**"), Assignor assigned, transferred, and conveyed the Financing, the Financing Documents (as defined in the Assignment Agreement), and all of Assignor's right, title, and interest therein, along with any and all of Assignor's claims, demands, actions, causes of action, damages, costs, expenses, and other rights and interests of any nature whatsoever, whether known or unknown, arising thereunder or related thereto, to Lender.

Borrower has requested that Lender continue to make available the Financing, and Lender has agreed to do so as provided in this Agreement. This Agreement amends and restates the Summit Loan and Security Agreement. All indebtedness outstanding under the Summit Agreement is deemed outstanding under this Agreement and no cancellation of the Summit Agreement shall be deemed to evidence the discharge of the indebtedness thereunder.

Borrower and Lender desire for Lender to provide secured financing to Borrower in an amount up to the Total Commitment. In consideration of the mutual promises set forth in this Agreement, Borrower and Lender hereby agree as follows:

## ARTICLE 1

### DEFINED TERMS AND CONSTRUCTION

1.1    **Defined Terms.** All initially capitalized terms used in this Agreement have the meanings given to such terms in **Schedule A** attached to this Agreement and incorporated herein by reference.

1.2    **UCC Terms.** All non-initially capitalized terms used herein that are defined in the UCC have the meanings given to such terms in the UCC.

1.3    **Construction.** Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular and to the singular include the plural, references to any gender include any other gender, the part includes the whole, the term including is not limiting, and the term or has, except where otherwise indicated, the inclusive meaning represented by the phrase and/or. The words hereof, herein, hereunder, and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. Article, section, subsection, clause, exhibit and schedule references are to this Agreement, unless otherwise specified. Any reference in this Agreement or any of the Loan Documents to this Agreement or any of the Loan Documents includes any and all permitted alterations, amendments, changes, extensions, modifications, renewals, or supplements thereto or thereof, as applicable.

BN 20996225v7

030

together with all actual out-of-pocket costs and expenses incurred in conducting any collateral examination or inspection.

(d)   **Collateral Management Fees.**  A collateral management fee in an amount equal to the percentage indicated Section 2.6(d) of **Schedule B** times the average outstanding Loans during the prior month, due and payable monthly in arrears on the first day of the month and on the Final Maturity Date.

(e)   **Line of Credit Early Termination and/or Reduction Fees.**  If (i) Lender terminates the Line of Credit Commitment after the occurrence and during the continuation of an Event of Default, or if (ii) Borrower terminates the Line of Credit Commitment pursuant to Section 2.6 of (iii) Borrower shall fails to pay the Obligations in full on the Final Maturity Date, or if (iv) Borrower and Lender agree to reduce the Line of Credit Commitment and while terminating this Agreement, then Borrower shall pay Lender an early termination or reduction fee in an amount equal to a percentage of the Line of Credit Commitment (or the reduction of the Line of Credit Commitment, as the case may be) calculated as set forth in Section 2.6(e) of **Schedule B**.

(f)   **Overadvance Fees.**  An Overadvance fee in an amount of of not less than two percent (2%) of the average balance of any Overadvances that may exist during any month, payable monthly in arrears; _provided_ that Lender's acceptance of the payment of such fees shall not constitute either consent to the Overadvance or waiver of the resulting Event of Default.

2.7   **Interest; Interest Payments.**

(a)   **Interest Rate.**  Subject to the terms and conditions hereof, all Loans shall bear interest at the Interest Rate.

(b)   **Default Rate.**  Upon the occurrence and during the continuation of an Event of Default, including Borrower's breach of Section 9.3, Lender, at its option, may, as permitted under applicable law, add any unpaid accrued interest, Fees and Expenses to the principal balance of the Loans. Also, upon the occurrence and during the continuation of an Event of Default, including Borrower's breach of Section 9.3, Lender, at its option, may, as permitted under applicable law, increase the interest rate on the Loans to the Default Rate.

(c)   **Minimum Interest.**  Notwithstanding the other terms of Section 2.7(a) to the contrary, and except as limited by the usury savings provision of Section 2.7(f), Borrower shall pay Lender at least the Minimum Interest of interest each calendar month during the term of this Agreement, and Borrower shall pay any deficiency between the Minimum Interest and the amount of interest otherwise payable on the first day of each month and on the Final Maturity Date. When calculating this deficiency, the Default Rate shall be disregarded.

(d)   **Clearance Days.**  Payments received by Lender shall be applied to the Advances as provided in Section 2.8, but the principal amount paid down shall continue to accrue interest through the end of the number of Business Day indicated in Section 2.7(d) of **Schedule B** following the Business Day that the payment was applied to the Advances.

(e)   **Computation of Interest.**  All computations of interest shall be calculated on the basis of a year of three hundred sixty (360) days for the actual days elapsed. Interest on each Loan shall accrue from the date such Loan is made to the date of repayment of such Loan in accordance with the provisions of this Agreement, subject to Section 2.7(c); _provided, however,_ if a Loan is repaid on the same day on which it is made, then one (1) day's interest shall be paid on that Loan. Any and all interest not paid when due shall thereafter be deemed to be an Advance made under Section 2.1 and shall bear interest thereafter as provided for in Section 2.7(b).

BN 20990225v7

(f)   **Interest Rate Floor; Maximum Interest Rate.**

(i)   Under no circumstances shall the Interest Rate on the Advances ever be less than the Minimum Interest Rate indicated in Section 2.7(f)(i) of **Schedule B** and

(ii)   Under no circumstances shall the interest rate and other charges hereunder exceed the highest rate permissible under any law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto. In the event that such a court determines that Lender has received interest and other charges hereunder in excess of the highest rate applicable hereto, such excess shall be deemed received on account of, and shall automatically be applied to reduce the Obligations, other than interest, in the inverse order of maturity, and the provisions hereof shall be deemed amended to provide for the highest permissible rate. If there are no Obligations, Lender shall refund to Borrower such excess.

(g)   **Payments of Interest.**  All accrued but unpaid interest on the Advances, calculated in accordance with this Section 2.7, shall be due and payable, in arrears, on the first day of each month and on the Final Maturity Date.

2.8   **Collection Account and Application to Advances.**  On a daily basis, Borrower shall deposit all payments received on the Accounts, and all other proceeds of Collateral, into the Collection Account. Until deposited, Borrower shall hold all such payments and proceeds in trust for Lender without commingling with other funds or property. Lender will withdraw all monies deposited to the Collection Account and pay down outstanding Advances on the first Business Day following the Business Day of deposit to the Collection Account, subject to Section 2.7(d).

2.9   **Payments Due on Non Business Days.**  If any payment due hereunder falls on a day that is not a Business Day, such payment shall be made on the next Business Day, and interest shall continue to accrue during that time period.

2.10   **Monthly Statements.**  Lender shall render monthly statements to Borrower, including statements of all principal and interest owing on the Loans, and all Fees and Expenses owing, and such statements shall be presumed to be correct and accurate and constitute an account stated between Borrower and Lender, absent manifest error, unless, within thirty (30) days after receipt thereof by Borrower, Borrower delivers to Lender written objection thereof specifying the error or errors, if any, contained in any such statement.

2.11   **Taxes on Payments.**  All payments in respect of the Obligations shall be made free and clear of and without any deduction or withholding for or on account of any present and future taxes, levies, imposts, deductions, charges, withholdings, assessments or governmental charges, and all liabilities with respect thereto, imposed by the United States of America, any foreign government, or any political subdivision or taxing authority thereof or therein, excluding any taxes imposed on Lender under the Internal Revenue Code or similar state and local laws and determined by Lender's net income, and any franchise taxes imposed on Lender by any state (or any political subdivision thereof) (all such taxes referred to herein referred to as "**Taxes**"). If any Taxes are imposed and required by law to be deducted or withheld from any amount payable to Lender, then Borrower shall (i) increase the amount of such payment so that Lender will receive a net amount (after deduction of all Taxes) equal to the amount due hereunder, and (ii) pay such Taxes to the appropriate taxing authority for the account of Lender prior to the date on which penalties attach thereto or interest accrues thereon; provided, however, if any such penalties or interest shall become due, Borrower shall make prompt payment thereof to the appropriate taxing authority.

BN 20990225v7

Case 2:17-bk-22432-WB    Doc 2    Filed 10/11/17    Entered 10/11/17 09:55:05    Desc
Main Document    Page 32 of 93

## ARTICLE 3
### GRANT OF SECURITY INTEREST

**3.1    Grant of Security Interest.**    Borrower hereby grants to Lender a continuing security interest in all presently existing and hereafter acquired or arising Collateral in order to secure the prompt payment and performance of all of the Obligations. Borrower acknowledges and affirms that such security interest in the Collateral has attached to all Collateral without further act on the part of Lender or Borrower. Promptly following Lender's request, Borrower shall grant Lender a security interest in all commercial tort claims that it may have against any Person.

**3.2    Notifying Account Debtors; Collection of Collateral.**    Lender may at any time (after the occurrence and during the continuance of an Event of Default) give notice to Account Debtors or other Persons obligated to pay an Account, a general intangible, or other amount due, that the Account, general intangible, or other amount due has been assigned to Lender for security and must be paid directly to Lender. Borrower shall join in giving such notice upon Lender's request. After Borrower or Lender gives such notice, Lender may, but need not, in Lender's or in Borrower's name, demand, sue for, collect or receive any money or property at any time payable or receivable on account of, or securing, such Account, general intangible, or other amount due, or grant any extension to, make any compromise or settlement with or otherwise agree to waive, modify, amend or change the obligations (including collateral obligations) of any Account Debtor or other obligor. Lender may at any time (after the occurrence and during the continuance of an Event of Default), in Lender's name or in Borrower's name, as Borrower's agent and attorney-in-fact, notify the United States Postal Service to change the address for delivery of Borrower's mail to any address designated by Lender, otherwise intercept Borrower's mail, and receive, open and dispose of Borrower's mail, applying all Collateral as permitted under this Agreement and holding all other mail for Borrower's account or forwarding such mail to Borrower's last known address.

**3.3    Further Assurances; Power of Attorney.**

(a)    Borrower shall execute and deliver to Lender from time to time at the reasonable request of Lender, all security agreements, mortgages, assignments, and all other documents that Lender may reasonably require, in form reasonably satisfactory to Lender, to perfect and maintain perfected Lender's security interests in the Collateral. Borrower hereby irrevocably makes, constitutes, and appoints Lender (and Lender's officers, employees, or agents) as Borrower's true and lawful attorney with power to sign the name of Borrower on any of the above described documents or on any other similar documents which need to be executed, recorded, or filed, and to do any and all things necessary in the name and on behalf of Borrower in order to perfect, or continue the perfection of, Lender's security interests in the Collateral. Borrower agrees that neither Lender, nor any of its designees or attorneys-in-fact, will be liable for any act of commission or omission, or for any error of judgment or mistake of fact or law with respect to the exercise of the power of attorney granted under this Section 3.3, other than as a result of its or their gross negligence or willful misconduct. THE POWER OF ATTORNEY GRANTED UNDER THIS SECTION 3.3 IS COUPLED WITH AN INTEREST AND SHALL BE IRREVOCABLE UNTIL THE TERMINATION DATE.

(b)    Without limiting the generality of the foregoing, Section 3.3(a) or any of the provisions of this Agreement, Borrower shall appear in and defend any action or proceeding which may affect Borrower's title to, or the security interest of Lender in, any of the Collateral.

(c)    With respect to the negotiable instruments among the Collateral (other than drafts received in the ordinary course of business), Borrower shall immediately upon reasonable request by Lender, endorse (where appropriate) and assign the negotiable instrument over to Lender, and deliver to Lender actual physical possession of the negotiable instrument to Lender.

5

(d)    Borrower shall deliver to Lender a duly executed control agreement in form and substance reasonably satisfactory to Lender with respect to all of its deposit accounts, electronic chattel paper, investment property, and letter of credit rights.

(e)    Borrower shall promptly notify Lender of any commercial tort claims in may bring against any Person, including the name and address of each defendant, a summary of the facts, an estimate of damages, copies of any complaint or demand letter submitted by Borrower, and in connection therewith, Borrower and Lender shall enter into an amendment to this Agreement granting a security interest to Lender in each such commercial tort claim to secure the Obligations.

**3.4    Insurance.**    Borrower shall maintain general liability and product liability insurance with financially sound and reputable insurance companies or associations in such amounts and covering such risks as are usually carried by companies engaged in the same or a similar business and similarly situated. Such policies shall provide for a minimum thirty (30) days' written cancellation notice to Lender. Upon request, policies or certificates attesting to such coverage shall be delivered to Lender.

**3.5    Borrower's Premises.**

(a)    [Reserved]

(b)    **Lender's Use of Borrower's Premises.**    Lender may use all locations where Borrower conducts its business, including all locations listed in Section 5.2 of **Schedule C**, or has any rights of possession (the "**Premises**") to store, process, manufacture, sell, use, and liquidate or otherwise dispose of items that are Collateral, and for any other incidental purposes deemed appropriate by Lender in good faith.

(c)    **Borrower's Obligation to Reimburse Lender.**    Lender shall not be obligated to pay rent or other compensation for the possession or use of any Premises, but if Lender elects to pay rent or other compensation to the owner of any Premises in order to have access to the Premises, then Borrower shall promptly reimburse Lender all such amounts, as well as all taxes, fees, charges and other expenses at any time payable by Lender with respect to the Premises by reason of the execution, delivery, recordation, performance or enforcement of any terms of this Agreement.

(c)    **Collateral Access Agreements.**    Upon Lender's request, Borrower shall promptly deliver to Lender a Collateral Access Agreement with respect to each of its Premises, or any other locations where any Collateral is in the possession of a third Person, duly executed by the owner or operator of such Premises or other location, and otherwise in form and substance satisfactory to Lender.

**3.6    License.**    Borrower hereby grants to Lender a non-exclusive, worldwide and royalty-free license to use or otherwise exploit all intellectual property of Borrower for the purpose of: (a) completing the manufacture of any in-process materials so that such materials become saleable Inventory, all in accordance with the same quality standards previously adopted by Borrower for its own manufacturing and subject to Borrower's reasonable exercise of quality control; and (b) selling, leasing or otherwise disposing of any or all Collateral.

**3.7    Financing Statements.**

(a)    **Authorization to File.**    Borrower authorizes Lender to file financing statements describing Collateral to perfect Lender's security interest in the Collateral, and Lender may describe the Collateral as "all personal property" or "all assets" or describe specific items of Collateral including without limitation any commercial tort claims.

(b)    **Termination.**    On the Termination Date Lender shall, at Borrower's expense, release or terminate any filings or other agreements that perfect Lender's security interest, upon Lender's receipt of the following, in form and content satisfactory to Lender: (i) a release of all claims against

6

BN 20996225v7

BN 20996225v7

032

Lender by Borrower relating to Lender's performance and obligations under the Loan Documents, and (ii) an agreement by Borrower, and any new lender to Borrower to indemnify Lender for any payments received by Lender that are applied to the Obligations as a final payoff that may subsequently be returned or otherwise not paid for any reason.

### ARTICLE 4
### EFFECTIVENESS OF AGREEMENT; CONDITIONS TO LOANS

4.1    **Effectiveness of Agreement.** This Agreement shall be effective when it has been duly executed by Borrower and Lender, and accepted by Lender.

4.2    **Conditions Precedent to All Loans.** Lender's obligation to make any Loan (including the initial Loan) is subject to and contingent upon the fulfillment of each of the following conditions to the satisfaction of Lender: (a) the fact that, both immediately before and immediately after the making of such Loan, no Default or Event of Default shall have occurred or be continuing, and (b) the fact that the representations and warranties of Borrower contained in this Agreement and the Loan Documents shall be true and correct on and as of the date of making of such Loan, except to the extent that any such representation or warranty expressly relates to an earlier date.

### ARTICLE 5
### REPRESENTATIONS AND WARRANTIES

In order to induce Lender to enter into this Agreement and to make Loans, Borrower represents and warrants to Lender that on the Closing Date and on the date of making of each Loan:

5.1    **Legal Status.** Borrower is the type of legal entity indicated in the preamble to this Agreement, and is duly organized and existing under the laws of the state indicated in Section 5.1 of **Schedule C**. Borrower has the power and authority to own its own assets and to transact the business in which it is engaged, and is properly licensed, qualified to do business and in good standing in every jurisdiction in which it is doing business where failure to so qualify could have a Material Adverse Effect. Borrower's exact legal name, state of incorporation, FEIN and charter or organizational identification number is as indicated in Section 5.1 of **Schedule C**.

5.2    **Locations of Borrower's Books and Records, Collateral.** The location of Borrower's chief executive office, books and records, and all other locations where Borrower conducts business or Collateral is kept are set forth in Section 5.2 of **Schedule C**.

5.3    **Trade Names and Trade Styles.** All trade names and trade styles under which Borrower presently conduct their business operations are set forth below, and, except as set forth in Section 5.3 of **Schedule C**, Borrower has not, at any time prior to the twenty years preceding the date of this Agreement: (i) been known as or used any other corporate, trade or fictitious name; (ii) changed its name, (iii) been the surviving or resulting corporation in a merger or consolidation; or (iv) acquired through asset purchase or otherwise any business of any Person.

5.4    **No Violation; Compliance.** The execution, delivery and performance of this Agreement and the Loan Documents to which Borrower is a party are within Borrower's powers, are not in conflict with the terms of the Governing Documents of Borrower, and do not result in a breach of or constitute a default under any contract, obligation, indenture or other instrument to which Borrower is a party or by which Borrower is bound or affected, which breach or default could reasonably be expected to have a Material Adverse Effect. There is no law, rule or regulation (including Regulations T, U and X of the Federal Reserve Board), nor is there any judgment, decree or order of any court or Governmental Authority binding on Borrower which would be contravened by the execution, delivery, performance or enforcement of this Agreement and the Loan Documents to which Borrower is a party.

5.5    **Authorization; Enforceability.** Borrower has taken all corporate, partnership or limited liability company, as applicable, action necessary to authorize the execution and delivery of this Agreement and the Loan Documents to which Borrower is a party, and the consummation of the transactions contemplated hereby and thereby. Upon their execution and delivery in accordance with the terms hereof, this Agreement and the Loan Documents to which Borrower is a party will constitute legal, valid and binding agreements and obligations of Borrower enforceable against Borrower in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, and similar laws and equitable principles affecting the enforcement of creditors' rights generally.

5.6    **Approvals; Consents.** No approval, consent, exemption or other action by, or notice to or filing with, any Governmental Authority is necessary in connection with the execution, delivery, performance or enforcement of this Agreement or the Loan Documents. All requisite Governmental Authorities and third parties have approved or consented to the transactions contemplated by this Agreement and the Loan Documents to the extent the failure to obtain such approval or consent would reasonably be likely to have a Material Adverse Effect, and all applicable waiting periods have expired and there is no governmental or judicial action, actual or threatened, that has or could have a reasonable likelihood of restraining, preventing or imposing burdensome conditions on the transactions contemplated by this Agreement and/or the Loan Documents.

5.7    **Liens.** Borrower has good and marketable title to, or valid leasehold interests in, all of the Collateral, free and clear of all Liens or rights of others, except for Permitted Liens. Borrower has rights in and the power to transfer the Collateral.

5.8    **Indebtedness.** Borrower has no indebtedness other than the Obligations and the indebtedness listed in Section 5.8 of **Schedule C**.

5.9    **Financial Condition; No Adverse Change.** Borrower has furnished to Lender its financial statements indicated in Section 5.9 of **Schedule B**, and those statements fairly present Borrower's financial condition as of those dates and the results of Borrower's operations and cash flows for the periods then ended and were prepared in accordance with GAAP. Since the date of the most recent financial statements, there has been no Material Adverse Effect.

5.10    **Litigation.** Except as set forth in Section 5.10 of **Schedule C**, there are no material suits, proceedings, claims or disputes pending or, to the knowledge of Borrower, threatened, against or affecting Borrower or any of Borrower's assets which are not fully covered by applicable insurance and as to which no reservation of rights has been taken by the insurer thereunder.

5.11    **No Default.** No Default or Event of Default has occurred and is continuing or would result from the incurring of Obligations by Borrower under this Agreement or the Loan Documents.

5.12    **Taxes.** All tax returns required to be filed by Borrower in any jurisdiction have in fact been filed, except for such tax returns where the failure to file would not reasonably be expected to have a Material Adverse Effect. All material taxes, assessments, fees and other governmental charges upon Borrower or upon any of its assets, income or franchises, which are due and payable have been paid, other than such taxes, assessments, fees and other governmental charges being contested in good faith by appropriate proceedings, and for which adequate reserves have been set aside with respect thereto as required by GAAP and, by reason of such contest or nonpayment, no property is subject to a material risk of loss or forfeiture. The provisions for taxes on the books of Borrower are adequate for all open years, and for Borrower's current fiscal period.

5.13    **Projections.** Any forecasts of future financial performance delivered by Borrower to Lender have been made in good faith and are based on reasonable assumptions and investigations by Borrower.

BN 20999225v7

BN 20999225v7

**033**

5.14 **Other Obligations.** Borrower is not in default on any (i) material indebtedness or (ii) any other lease, commitment, contract, instrument or obligation which is material to the operation of its business.

5.15 **Patents, Trademarks, Copyrights, and Intellectual Property, etc.** Borrower has all necessary patents, patent rights, licenses, trademarks, trademark rights, trade name rights, copyrights, permits, and franchises in order for it to conduct its business and to operate its assets, without known conflict with the rights of third Persons, and all of same are valid and subsisting. The consummation of the transactions contemplated by this Agreement will not alter or impair any of such rights of Borrower. Borrower has not been charged or, to Borrower's knowledge, threatened to be charged with any infringement or, after due inquiry, infringed on any, unexpired trademark, trademark registration, trade name, patent, copyright, copyright registration, or other proprietary right of any Person.

5.16 **Environmental Condition.** Except as set forth in Section 5.16 of **Schedule C**, to Borrower's knowledge, (i) none of Borrower's assets has ever been used by Borrower by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Materials, except in compliance, in all material respects, with applicable laws, (ii) none of Borrower's assets has ever been designated or identified in any manner pursuant to any environmental protection statute as a Hazardous Materials disposal site, or a candidate for closure pursuant to any environmental protection statute, (iii) no Lien arising under any environmental protection statute has attached to any revenues or to any real or personal property owned or operated by Borrower, and (iv) Borrower has not received a summons, citation, notice, or directive from the Environmental Protection Agency or any other federal or state governmental agency concerning any action or omission by Borrower resulting in the releasing or disposing of Hazardous Materials into the environment.

5.17 **Solvency.** Borrower is solvent. No transfer of property is being made by Borrower and no obligation is being incurred by Borrower in connection with the transactions contemplated by this Agreement or the Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of Borrower.

5.18 **Eligible Accounts.** Each Account included in the Borrowing Base is an "Eligible Account" as defined herein, and conforms to the definition thereof. Without limiting the generality of the foregoing, (a) each Eligible Account represents valid, binding and enforceable obligations of the Account Debtor obligated thereon, except as enforceability may be limited by bankruptcy, insolvency, and similar laws and equitable principles affecting the enforcement of creditors' rights generally, representing undisputed, bona fide transactions completed in accordance with the terms and provisions contained in any documents related thereto, and is and will be genuine, free from Liens (other than Permitted Liens), adverse claims, counterclaims, setoffs, defaults, disputes, defenses, retainages, holdbacks and conditions precedent of any kind of character, (b) to Borrower's knowledge, the Account Debtor is solvent and generally paying its debts as they come due, (c) each Eligible Account complies with all applicable laws concerning form, content and manner of preparation and execution, including where applicable any federal and state consumer credit laws, (d) Borrower has not assigned any of its rights to collect the Accounts other than to Lender pursuant to this Agreement, (e) all statements made, all unpaid balances and all other information in Borrower's books and records and other documentation relating to the Accounts are true and correct and what they purport to be, (f) and Borrower has no knowledge of any fact or circumstance which would materially impair the validity or collectability of any Eligible Account.

5.19 **[Reserved]**

5.20 **[Reserved]**

5.21 **Deposit Accounts.** The names and addresses of all financial institutions at which Borrower maintains its deposit accounts, and the account numbers and account names of such deposit accounts, are set forth Section 5.21 of **Schedule C.**

9

BN 20990225v7

at which Borrower maintains its securities and commodities accounts, and the account numbers and account names of such accounts, are set forth in Section 5.22 of **Schedule C.**

5.22 **Securities and Commodities Accounts.** The names and addresses of all brokerages at which Borrower maintains its securities and commodities accounts, and the account numbers and account names of such accounts, are set forth in Section 5.22 of **Schedule C.**

5.23 **Security Interest.** This Agreement creates a security interest which is enforceable against the Collateral in which Borrower now has rights and will create a security interest which is enforceable against the Collateral in which Borrower hereafter acquires rights at the time Borrower acquires any such rights, and (ii) Lender has a perfected security interest (to the fullest extent perfection can be obtained by filing, possession or control) and a first priority security interest in the Collateral in which Borrower now has rights (subject only to Permitted Liens), and will have a perfected and first priority security interest (to the fullest extent perfection can be obtained by filing, possession or control) in the Collateral in which Borrower hereafter acquires rights at the time Borrower acquires any such rights (subject only to Permitted Liens), in each case securing the payment and performance of the Obligations.

5.24 **Other Financing Statements.** Other than financing statements in favor of Lender and financing statements filed in connection with Permitted Liens, to the knowledge of Borrower, no effective financing statement naming Borrower as debtor, assignor, lessee, mortgagor, pledgor or the like and covering all or any part of the Collateral is on file in any filing or recording office in any jurisdiction.

ARTICLE 6

**AFFIRMATIVE COVENANTS**

Borrower covenants and agrees that from the Closing Date and thereafter until the Termination Date, Borrower shall:

6.1 **Punctual Payments.** Punctually pay the interest and principal on the Loans, the Fees and all Expenses and any other fees and liabilities due under this Agreement and the Loan Documents at the times and place and in the manner specified in this Agreement or the Loan Documents.

6.2 **Books and Records.** Keep complete and accurate books and records with respect to the Collateral and Borrower's business and financial condition such concurrent and any other matters that Lender may request, in accordance with GAAP, including ledger and account cards and/or computer tapes and computer discs, computer printouts and computer records pertaining to the Accounts which contain such information as may from time to time be requested by Lender. Borrower shall keep its books and records, at all times, at the premises location set forth in Section 5.2 of **Schedule C**. Borrower shall permit any employee, attorney, accountant or other agent of Lender to audit, review, make extracts from and copy any of its books and records at any time during normal business hours, and to discuss Borrower's affairs with any of its directors, officers, employees, owners or agents. If now or at any time hereafter during the term of this Agreement, Borrower's records are prepared or retained by a computer service company or any accountant or accounting service, Borrower authorizes such company or individual to deliver to Lender, and grants Lender the absolute and irrevocable right to inspect, said records, receive duplicate copies of all information furnished to Borrower and prepared by such company or individual, and Borrower agrees to furnish such further consents as may be necessary to effectuate same. Borrower further agrees to promptly notify Lender of the name and address of any such company or individual and of any change of such company or individual.

6.3 **Financial Reports; Collateral Reporting.** Furnish to Lender the following in form and detail satisfactory to Lender:

(a) as soon as available but in any event no later than Friday of each week, and concurrent with each request for an Advance pursuant to Section 2.1, a Daily Availability Report covering the period since the date of the last Daily Availability Report delivered to Lender;

10

BN 20990225v7

**034**

(b)     as soon as available but in any event no later than Friday of each week for the prior seven days, daily schedules of sales made, credits issued, and cash received and deposited with Lender;

(c)     as soon as available but in any event no later than 20 days after the end of each month, or more frequently if required by Lender, (i) an accounts receivable aging and accounts payable aging as of the end of such month and (ii) a balance sheet for such month and a year to date income statement;

(d)     upon Lender's request, copies of customer statements, purchase orders, sales invoices, credit memos, remittance advices and reports, and copies of deposit slips and bank statements, copies of shipping and delivery documents, and copies of purchase orders, invoices and delivery documents for inventory;

(e)     as soon as available but in any event no later than 30 days after the end of each month, all financial and operating statements as may be requested from time to time by Lender for such month;

(f)     as soon as available but in any event no later than 120 days after the end of each fiscal year of Borrower, if requested by Lender, financial and operating statements for such fiscal year, audited by a Certified Public Accountant selected by Borrower but acceptable to Lender, and of the type indicated in Section 6.3(f) of **Schedule B**;

(g)     at such times as Lender may request, all information and documentation relating to the Collateral certified by an authorized employee of Borrower as to its accuracy, as Lender may request;

(h)     upon Lender's request, no later than 30 days prior to each fiscal year end, Borrower's projected balance sheet and income statement, and statement of retained earnings and cash flows, for each month of the next fiscal year, certified as accurate by Borrower's chief financial officer or like officer, and accompanied by a statement of assumptions and supporting schedules and information; and

(i)     as soon as available but in any event no later than 30 days after filing, copies of Borrower's federal income tax returns (including any Schedule K-1s) or evidence of any extensions.

6.4     **Location of Borrower's Books and Other Collateral.** Keep all of Borrower's books and records and other Collateral only at the locations set forth in Section 5.2 of **Schedule C**.

6.5     **Existence; Preservation of Licenses; Compliance With Laws.** Preserve and maintain its corporate existence and good standing in the state of its organization, qualify and remain qualified as a foreign corporation in every jurisdiction where the failure to be so qualified would reasonably be expected to have a Material Adverse Effect; and preserve all of its licenses, permits, governmental approvals, rights, privileges and franchises required for its operations except where the failure to so preserve would not reasonably be expected to have a Material Adverse Effect, and comply with the provisions of its Governing Documents and comply with the requirements of all applicable laws, rules, regulations, orders of any Governmental Authority having authority or jurisdiction over it except where the failure to so comply would not reasonably be expected to have a Material Adverse Effect; and comply with all requirements for the maintenance of its business, insurance, licenses, permits, governmental approvals, rights, privileges and franchises except where the failure to so comply would not reasonably be expected to have a Material Adverse Effect.

6.6     **Collateral Examinations; Inspections.** Permit Lender's employees, accountants, attorneys or other Persons acting as its agent, to examine and inspect any Collateral or any other property of Borrower at any time during ordinary business hours.

6.7     **Account Verification; Payment of Permitted Liens.** Permit Lender or its agents to (a) contact Account Debtors and other obligors at any time to verify Borrower's Accounts; and (b) require Borrower to send requests for verification of Accounts or send notices of assignment of Accounts to Account Debtors and other obligors. Borrower shall pay when due each account payable due to any Person holding a Permitted Lien (as a result of such payable) on any Collateral.

6.8     **Payment of Taxes and Other Claims.** Pay or discharge, when due, (a) all taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties belonging to it (including without limitation the Collateral) or upon or against the creation, perfection or continuance of Lender's security interest in the Collateral, prior to the date on which penalties attach, (b) all federal, state and local taxes required to be withheld by it, and (c) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a Lien upon any properties of Borrower, although Borrower shall not be required to pay any such tax, assessment, charge or claim whose amount, applicability or validity is being contested in good faith by appropriate proceedings and for which proper reserves have been made.

6.9     **Maintenance of Collateral and Properties.** Keep and maintain the Collateral and all of its other properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted). Borrower shall defend the Collateral against all Liens, claims and demands of all third Persons claiming any interest in the Collateral. Borrower shall keep all Collateral free and clear of all Liens except Permitted Liens.

6.10     **Insurance.** At all times maintain insurance with insurers acceptable to Lender in such amounts and on such terms (including deductibles) as Lender in its sole discretion may require and including, as applicable and without limitation, business interruption insurance (including force majeure coverage), hazard coverage on an 'all risks' basis for all tangible Collateral. Each policy of insurance shall contain a clause requiring the insurer to give not less than ten days' written notice to Lender in the event of cancellation of the policy for any reason whatsoever and a clause that the interest of the Lender shall not be impaired or invalidated by any act or omission of Borrower or the owner of the property nor by the occupation of the premises wherein such property is located for purposes more hazardous than are permitted by said policy. If Borrower fails to provide and pay for such insurance, Lender may procure the same at Borrower's expense, but shall not be required to do so. Borrower agrees to deliver to Lender, promptly as rendered, true copies of all monthly reports made to insurance companies.

6.11     **Notice to Lender.** Promptly, upon Borrower acquiring knowledge thereof, give written notice to Lender of:

(a)     all litigation affecting Borrower where the amount in controversy is in excess of $100,000, and thereafter an update on such litigation on a quarterly basis;

(b)     any dispute which may exist between Borrower and any Governmental Authority;

(c)     any labor controversy resulting in or threatening to result in a strike against Borrower;

(d)     any proposal by any Governmental Authority to acquire the assets or business of Borrower, or to compete with Borrower;

(e)     any Default or Event of Default; and

(f)     any other matter which has resulted or could reasonably be expected to result in a Material Adverse Effect.

035

6.12  **Delivery of Instruments, etc.**  Upon request by Lender, promptly deliver to Lender in pledge all instruments, documents and chattel paper constituting Collateral, endorsed or assigned by Borrower.

6.13  **Environment.**  Be and remain, and cause each operator of any of Borrower's assets to be and remain, in compliance in all material respects with the provisions of all federal, state and local environmental, health and safety laws, codes and ordinances, and all rules and regulations issued thereunder; notify Lender promptly of any notice of a hazardous discharge or environmental complaint received from any Governmental Authority or any other Person; notify Lender promptly of any material hazardous discharge from or affecting its premises not in compliance in all material respects with applicable laws; promptly contain and remove the same, in compliance in all material respects with all applicable laws; promptly pay any fine or penalty assessed in connection therewith other than such fines or penalties being contested in good faith by appropriate proceedings, and for which adequate reserves have been set aside with respect thereto as required by GAAP and, by reason of such contest, or nonpayment, no property is subject to a material risk of loss or forfeiture; permit Lender to inspect the premises and to inspect all books, correspondence, and records pertaining thereto; and at Lender's reasonable request, and at Borrower's expense, provide a report of a qualified environmental engineer, reasonably satisfactory in scope, form and content to Lender, and such other and further assurances reasonably satisfactory to Lender that the condition has been corrected.

6.14  **Returns.**  Cause returns and allowances, as between Borrower and its Account Debtors, to be on the same basis and in accordance with the usual customary practices of Borrower, as they exist at the time of the execution and delivery of this Agreement.

6.15  **Bank Accounts.**  Maintain its cash on hand and cash equivalent investments solely in deposit accounts held at the financial institutions listed in Section 5.21 of **Schedule C**.

6.16  **Attorney in Fact.**  To facilitate Lender's performance or observance of Borrower's obligations under this Agreement, Borrower hereby irrevocably appoints Lender and Lender's agents, as Borrower's attorney in fact (which appointment is coupled with an interest) with the right (but not the duty) to create, prepare, complete, execute, deliver, endorse or file on behalf of Borrower any instruments, documents, assignments, security agreements, financing statements, applications for insurance and any other agreements, instruments or documents required to be obtained, executed, delivered or endorsed by Borrower in accordance with the terms of this Agreement.

## ARTICLE 7

## NEGATIVE COVENANTS

Borrower covenants and agrees that from the Closing Date and thereafter until the Termination Date, Borrower shall not:

7.1  **Use of Proceeds of Loans; Margin Regulation.**

(a)  Use any proceeds of the Loans for any purpose other than for working capital and general corporate purposes; or

(b)  Use any portion of the proceeds of the Loans in any manner which might cause the Loans, the application of the proceeds thereof, or the transactions contemplated by this Agreement to violate Regulation T, U, or X of the Board of Governors of the Federal Reserve System, or any other regulation of such board, or to violate the Securities and Exchange Act of 1934, as amended or supplemented.

7.2  **Indebtedness.**  Create, incur, assume or suffer to exist any indebtedness except the Obligations, and the indebtedness listed in Section 5.8 of **Schedule C**.

7.3  **Liens.**  Create, incur, assume or suffer to exist any Lien (including the lien of an attachment, judgment or execution) on any of its assets, whether now owned or hereafter acquired, except Permitted Liens; or authorize to file under the UCC as adopted in any jurisdiction a financing statement which names Borrower as a debtor, except with respect to Permitted Liens.

7.4  **Merger, Consolidation, Transfer of Assets.**  Wind up, liquidate or dissolve, reorganize, reincorporate, merge or consolidate with or into any other Person, or acquire all or substantially all of the assets or the business of any other Person unless approved by Lender.

7.5  **Sales and Leasebacks.**  Sell, transfer, or otherwise dispose of any real or personal property to any Person, and thereafter directly or indirectly leaseback the same or similar property unless approved by Lender.

7.6  **Asset Sales.**  Conduct any asset sale other than (a) sales or other dispositions in the ordinary course of business of equipment that is substantially worn, damaged, or obsolete or no longer useful, and (b) sales of inventory to buyers in the ordinary course of business.

7.7  **Investments and Subsidiaries.**  Make or permit to exist any loans or advances to, or make any investment or acquire any interest whatsoever in, any Person, including without limitation any partnership or joint venture, nor purchase or hold beneficially any stock or other securities or evidence of indebtedness of any Person, except:

(a)  Investments in direct obligations of the United States of America or any of its political subdivisions whose obligations constitute the full faith and credit obligations of the United States of America and have a maturity of one year or less, commercial paper issued by U.S. corporations rated "A 1" or "A 2" by Standard & Poor's Ratings Services or "P 1" or "P 2" by Moody's Investors Service or certificates of deposit or bankers' acceptances having a maturity of one year or less issued by members of the Federal Reserve System having deposits in excess of $100,000,000 (which certificates of deposit or bankers' acceptances are fully insured by the Federal Deposit Insurance Corporation);

(b)  Loans to Borrower's officers and employees not exceeding at any one time an aggregate of $50,000, or $10,000 for any single advance or loan;

(c)  Prepaid rent or security deposits; and

(d)  Current investments in Borrower's subsidiaries in existence on the date of this Agreement.

(e)  As permitted in Section 7.4 of this Agreement.

7.8  **Character of Business.**  Engage in any business activities or operations substantially different from or unrelated to its present business activities and operations.

7.9  **Dividends and Distributions.**

(a)  Except as otherwise permitted in Sections 7.9(b), (c) and (d), declare or pay any dividends (other than dividends payable solely in stock of Borrower) on any class of its stock, or make any payment on account of the purchase, redemption or retirement of any shares of its stock, or other securities or evidence of its indebtedness or make any distribution regarding its stock, either directly or indirectly.

(b)  If, and only if, Borrower is a "pass-through" tax entity for United States federal income tax purposes, and after first providing such supporting documentation as Lender may request (including the personal state and federal tax returns (and all related schedules)) of each owner of Borrower net of any prior year loss carry-forward, Borrower may pay Tax Distributions.

(c)     Borrower may declare and pay cash dividends to its owners in an amount not to exceed 50% of Borrower's after-tax net income if, and only if, on the date of any such payment, (1) no Default or Event of Default has occurred and is continuing or will result from such payment, (2) both immediately before and immediately after giving effect to such payment, availability under Section 2.1 is at least 10% of the lesser of (i) the Line of Credit Commitment, or (ii) the Borrowing Base, and (3) all of Borrower's accounts payable are paid within 60 days of terms.

(d)     Borrower may issue securities pursuant to shareholder approved stock option plans.

7.10    [Reserved.]

7.11    **Guaranty.** Assume, guaranty, endorse (other than checks and drafts received by Borrower in the ordinary course of business), or otherwise be or become directly or contingently responsible or liable for the obligations of any other Person, or pledge or hypothecate any of its Assets as security for any liabilities or obligations of any other Person.

7.12    **Transactions with Affiliates.** Enter into any transaction, including borrowing or lending and the purchase, sale, or exchange of property or the rendering of any service (including management services), with any affiliate of Borrower, other than in the ordinary course of and pursuant to the reasonable requirements of Borrower's business and upon fair and reasonable terms no less favorable to Borrower than would obtain in a comparable arm's length transaction with a Person not an affiliate.

7.13    **Accounting.** Adopt any material change in accounting principles except as permitted by GAAP, consistently applied. Borrower shall not change its fiscal year.

7.14    **Discounts, etc.** After notice from Lender, not grant any discount, credit or allowance to any customer of Borrower or accept any return of goods sold. Borrower shall not at any time modify, amend, subordinate, cancel or terminate any Account.

7.15    **Constituent Documents; S Corporation Status; Change of Name.** Not amend its Governing Documents. Borrower shall not change its legal name or change the state of its incorporation or formation. If Borrower is an S Corporation, Borrower shall not change or rescind its status as an S Corporation. If Borrower is not an S Corporation, Borrower shall not become an S Corporation.

## ARTICLE 8

## EVENTS OF DEFAULT AND REMEDIES

8.1     **Events of Default.** The occurrence of any one or more of the following events, acts or occurrences shall constitute an event of default (an "Event of Default") hereunder:

(a)     Borrower fails to pay when due any payment of principal or interest due on the Loans, the Fees, any Expenses, or any other amount payable hereunder or under any Loan Document;

(b)     Borrower fails to observe or perform any of the covenants and agreements set forth in Section 6.3, or any Section within Article 7;

(c)     Borrower fails to observe or perform any covenant or agreement set forth in this Agreement or the Loan Documents (other than those covenants and agreements described in Sections 8.1(a) and 8.1(b)), and such failure continues for five (5) days after the earlier to occur of (i) Borrower obtaining knowledge of such failure or (ii) Lender's dispatch of notice to Borrower of such failure;

(d)     Any representation, warranty or certification made by Borrower or any officer or employee of Borrower or any Guarantor in this Agreement or any Loan Document, in any certificate,

BN 20990225v7

financial statement or other document delivered pursuant to this Agreement or any Loan Document proves to have been misleading or untrue in any material respect when made or if any such representation, warranty or certification is withdrawn;

(e)     Borrower fails to pay when due any payment in respect of its indebtedness (other than under this Agreement);

(f)     Any event or condition occurs that: (i) results in the acceleration of the maturity of any of Borrower's indebtedness described in Section 8.1(e); or (ii) permits (or, with the giving of notice or lapse of time or both, would permit) the holder or holders of such indebtedness or any Person acting on behalf of such holder or holders to accelerate the maturity thereof;

(g)     Borrower commences a voluntary Insolvency Proceeding seeking liquidation, reorganization or other relief with respect to itself or its indebtedness or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official over it or any substantial part of its property, or consents to any such relief or to the appointment of or taking possession by any such official in an involuntary Insolvency Proceeding or fails generally to pay its indebtedness as it becomes due, or takes any action to authorize any of the foregoing;

(h)     An involuntary Insolvency Proceeding is commenced against Borrower seeking liquidation, reorganization or other relief with respect to it or its Debt or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property and any of the following events occur: (i) the petition commencing the Insolvency Proceeding is not timely controverted, (ii) the petition commencing the Insolvency Proceeding is not dismissed within 30 calendar days of the date of the filing thereof, (iii) an interim trustee is appointed to take possession of all or a substantial portion of the assets of, or to operate all or any substantial portion of the business of, Borrower, or (iv) an order for relief shall have been issued or entered therein;

(i)     Borrower suffers (i) one or more money judgments over applicable insurance coverage (including any reasonable deductible) or (ii) one or more writs, warrants of attachment, or similar process;

(j)     A judgment creditor obtains possession of any of the assets of Borrower;

(k)     Any order, judgment or decree is entered decreeing the dissolution of Borrower or Borrower is enjoined, restrained or in any way prevented by court order from continuing to conduct all or any material part of its business affairs;

(l)     A notice of lien, levy or assessment is filed of record with respect to any or all of Borrower's assets by any Governmental Authority, or any taxes or debts owing at any time hereafter to any Governmental Authority becomes a Lien, whether inchoate or otherwise, upon any or all of Borrower's or any Guarantor's assets and the same is not paid on the payment date thereof;

(m)     Borrower makes any payment on account of any subordinated debt except as otherwise permitted under the terms of any applicable subordination agreement;

(n)     Any Change of Control occurs without Lender's approval, which approval will not be unreasonably withheld;

(o)     Any of the Loan Documents fails to be in full force and effect for any reason, or Lender fails to have a perfected, first priority Lien in and upon all of the Collateral, or a breach, default or an event of default occurs under any Loan Document;

BN 20990225v7

**037**

(p)    Any loss, theft, substantial damage, destruction, or misappropriation of any Collateral or other assets or property of Borrower that is not fully covered (subject to applicable reasonable deductibles or retentions) by insurance;

(q)    Any misappropriation, conversion, diversion or fraud as to Lender or its interests;

(r)    Lender shall, at any time, deem itself insecure or unsafe or shall fear diminution, removal or waste of the Collateral;

(s)    The indictment of Borrower by any governmental authority under any criminal statute or the commencement of any civil proceedings or administrative authority against Borrower where the remedies sought or available include the forfeiture of any property of Borrower; or

(t)    Any other Material Adverse Effect occurs.

8.2    **Termination of Commitments; Acceleration.**  Upon the occurrence of any Event of Default described in Section 8.1(g) or 8.1(h), Lender's obligation hereunder to make Loans to Borrower shall immediately terminate and the Obligations shall become immediately due and payable without any election or action on the part of Lender without presentment, demand, protest or notice of any kind, all of which Borrower hereby expressly waives.  Upon the occurrence and continuance of any other Event of Default, either or both of the following actions may be taken: (i) Lender may, without notice of the election and without demand, immediately terminate its obligation to make Loans to Borrower; and (ii) Lender may, without notice of its election and without demand, declare the Obligations to be due and payable, whereupon the Obligations shall become immediately due and payable, without presentment, demand, protest or notice of any kind, all of which Borrower hereby expressly waives.

8.3    **Rights Against Collateral.**  Upon the occurrence of any Event of Default, Lender may, without notice or demand, do any one or more of the following, all of which are authorized by Borrower, and all of which Borrower agrees are commercially reasonable:

(a)    Lender may proceed directly against Borrower to collect the Obligations without prior recourse to any of the Collateral.

(b)    Lender may require Borrower to assemble the Collateral and make it available to Lender at a place to be designated by Lender which is reasonably convenient to both parties, and Lender shall have the right to take immediate possession of the Collateral and may enter any of the premises of Borrower or wherever the Collateral shall be located with or without process of law wherever the Collateral may be and to keep and store the same on said premises until sold (and if said premises be the property of Borrower, Borrower agrees not to charge Lender for storage thereof).  Borrower and Lender agree that ten days' notice to Borrower of any public or private sale or other disposition of Collateral shall be reasonable notice thereof, and any such public sale shall be at such location(s) as Lender shall designate in said notice.  Lender shall have the right to bid at any such public sale on its own behalf.  Out of proceeds arising from such sale, Lender shall retain all costs and charges, including attorneys' fees for advice, counsel or other legal services or for pursuing, reclaiming, seeking to reclaim, taking, keeping, removing, storing and advertising the Collateral for sale, selling and any and all other charges and expenses in connection therewith and any prior liens thereon, and any balance shall be applied upon the Obligations of Borrower, and Borrower shall remain liable to Lender for any deficiency.  In the event of any surplus, such surplus shall be paid to Borrower or such other person as may be legally entitled thereto.  If any of the Collateral is sold or leased by Lender upon credit terms or for future delivery, the Obligations shall not be reduced as a result thereof until payment in cash therefor is finally collected by Lender.  In the event Lender institutes an action to recover any Collateral or seeks recovery of any Collateral by way of prejudgment remedy, Borrower waives the posting of any bond which might otherwise be required.

(c)    Lender may enforce Borrower's rights against any Account Debtor, secondary obligor or other obligor in respect of any of the Accounts.  Without limiting the generality of the foregoing, Lender may at such time or times, (i) notify any or all Account Debtors, secondary obligors or other obligors in respect thereof that the Accounts have been assigned to Lender and that Lender has a security interest therein, and Lender may direct any or all Account Debtors, secondary obligors and other obligors to make payment of the Accounts directly to Lender, (ii) extend the time of payment of, compromise, settle or adjust for cash, credit, return of merchandise or otherwise, and upon any terms or conditions, any and all receivables or other obligations included in the Collateral and thereby discharge or release the Account Debtor or any secondary obligors or other obligors in respect thereof without affecting any of the Obligations, (iii) demand, collect or enforce payment of any receivables or such other obligations, but without any duty to do so, and Lender shall not be liable for its failure to collect or enforce the payment thereof nor for the negligence of its agents or attorneys with respect thereto, and (iv) take whatever other action Lender may deem necessary or desirable for the protection of its interests.  At Lender's request, all invoices and statements of interest sent to the Account Debtor shall state that the Accounts and such other obligations have been assigned to Lender and are payable directly and only to Lender and Borrower shall deliver to Lender such originals of documents evidencing the sale and delivery of goods or the performance of services giving rise to any Accounts as Lender may require.  Lender shall not be required (i) to incur expenses to exercise collection remedies against Account Debtors, secondary obligors or other persons obligated on Collateral or to remove liens or encumbrances on any adverse claims against Collateral.

(d)    Lender shall not be required (i) to incur expenses to prepare Collateral for disposition, (ii) to obtain third party consents for access to Collateral to be disposed of, or to obtain consents of any governmental authority or other third party for the collection or disposition of Collateral to be collected or disposed of, or (iii) to exercise collection remedies against Account Debtors, secondary obligors or other persons obligated on Collateral or to remove liens or encumbrances on any adverse claims against Collateral.

(e)    Lender may (i) exercise collection remedies against Account Debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (ii) advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (iii) contact other persons, whether or not in the same business as Borrower for expressions of interest in acquiring all or any portion of the Collateral, (iv) hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (v) dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types involved in other dispositions by commercial and other persons, or that match buyers and sellers of assets, (vi) dispose of assets in wholesale rather than retail markets, (vii) disclaim any warranties of title or like disposition warranties, (viii) purchase insurance or credit enhancements to insure Lender against risks of loss, collection or disposition of Collateral or to provide to Lender a guaranteed return from the collection or disposition of Collateral, or (ix) to the extent deemed appropriate by Lender, obtain the services of other brokers, investment bankers, consultants and other professionals to assist Lender in the collection or disposition of any of the Collateral.

(f)    For the purpose of enabling Lender to exercise the rights and remedies hereunder, Borrower hereby grants to Lender, to the extent assignable, an irrevocable, non-exclusive license to use, assign, license or sublicense any of the trademarks, service-marks, trade names, business names, trade styles, designs, logos and other source of business identifiers and other intellectual property and general intangibles now owned or hereafter acquired by Borrower, wherever the same maybe located, including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout thereof.

(g)    All expenses of protecting, storing, warehousing, insuring, handling and shipping the Collateral, any and all excise, property, sales and use taxes imposed by any state, federal or local authority on any of the Collateral in respect of the sale thereof, shall be borne and paid by Borrower.  If Borrower fails to promptly pay any portion thereof when due, Lender may, at its option, but shall not be required to, pay the same and charge Borrower's account thereof.

**8.4   Delinquent Taxes.** Upon the occurrence of an Event of Default or upon notification from any taxing authority, or if any notice is received by Lender with respect to delinquent taxes outstanding, Borrower shall furnish Lender as requested with proof satisfactory of Borrower's making payment or deposit of F.I.C.A. withholding and other taxes required by or applicable law. Such proof shall be furnished within five days after the due date for each such payment or deposit. If Borrower fails to make any such payment or deposit when due, or furnish such proof when due, Lender may, in its sole discretion, and without notice to Borrower (a) make payment of same or any part thereof, or (b) set up such additional reserves in Borrower's account as may be necessary to satisfy the liability therefor. Each amount so paid or deposited by Lender shall constitute an Advance under this Agreement. The setting up of a reserve for delinquent payment shall not constitute a waiver of any default under the terms of this Agreement, nor shall Lender be obligated to make such payments or set up reserves in the future.

**8.5   Appointment of Receiver or Trustee.** Borrower hereby irrevocably agrees that Lender has the right, under this Agreement, upon the occurrence of an Event of Default, to seek the appointment of a receiver, trustee or similar official over Borrower to effect the transactions contemplated by this Agreement, and that Lender is entitled to seek relief, Borrower hereby irrevocably agrees not to object to such appointment on any grounds.

**8.6   Remedies Cumulative.** The rights and remedies of Lender herein and in the Loan Documents are cumulative and are not exclusive of any other rights, powers, privileges, or remedies, now or hereafter existing, at law, in equity or otherwise. The failure or delay of Lender to exercise or enforce any rights, liens, powers or remedies hereunder or under any of the aforesaid agreements or other documents or security or collateral shall not operate as a waiver of such liens, powers and remedies, but all such liens, rights, powers and remedies shall continue in full force and effect until all loans and advances and all other Obligations owing or to become owing from Borrower to Lender shall have been fully satisfied, and all liens, rights, powers and remedies herein provided are cumulative and none is exclusive. All acts by Lender or its designee are hereby ratified and approved, and neither Lender nor its designee shall be liable for any acts or omissions, nor for any error of judgment or mistake of fact or law other than for gross negligence or willful misconduct by Lender.

**ARTICLE 9**

**TERMINATION**

**9.1   Initial Maturity Date; Final Maturity Date.** Except as provided in Section 9.2, this Agreement shall continue in full force and effect until 12:00 p.m., Pacific time, on the Initial Maturity Date. Unless either Borrower or Lender has sent to the other party a written notice, not less than 60 days prior to the Initial Maturity Date, of such party's intention to terminate this Agreement on the Initial Maturity Date, this Agreement will continue in full force and effect after the Initial Maturity Date on a year-to-year basis unless and until either Borrower or Lender has sent to the other party a written notice, not less than 60 days prior to the next anniversary of the Initial Maturity Date, of such party's intention to terminate this Agreement on such anniversary of the Initial Maturity Date. The Initial Maturity Date, or any applicable anniversary thereof so designated by Borrower or Lender as the date this Agreement shall terminate, or any date this Agreement is terminated pursuant to Section 9.2, is herein referred to as the "Final Maturity Date". Notwithstanding anything to the contrary, all of Lender's rights and remedies hereunder and under the Loan Documents, at law and at equity, Lender's security interest in the Collateral granted by Borrower hereunder and under the Loan Documents, and all of Borrower's obligations, agreements and covenants hereunder and under the Loan Documents, shall continue in full force and effect until the Obligations have been paid in full in cash and Lender has terminated its UCC-1 financing statement. Borrower further agrees that to the extent either Borrower or any Guarantor makes a payment or payments to Lender, which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy act, state or federal law, common law or equitable cause, then, to the extent of such payment or repayment, the obligation or part thereof intended to be satisfied shall be revived and continue in full force and effect as if said payment had not been made.

20

BN 20990225v7

---

(h)   Lender shall not be liable or responsible in any way for the safekeeping of any of the Collateral or for any loss or damage thereto or for any diminution in the value thereof, or for any act or default of any warehouseman, carrier, forwarding agency or other person whomsoever, but the same shall be at Borrower's sole risk.

(i)   Lender may terminate the authority of Borrower to collect Collateral, including without limitation Accounts, at any time whereupon Lender is authorized, without further act, to notify any and all Account Debtors and other obligors to make payment thereon directly to Lender, and to take possession of all proceeds from the Collateral, and to take any action which Borrower might or could take to collect the Collateral, including without limitation the right to make any compromise, discharge, or extension. Upon request of Lender, Borrower shall execute and deliver to Lender a notice to Account Debtors and other obligors instructing such obligors to pay Lender. Borrower further agrees to execute and deliver to Lender, all other notices and similar documents requested by Lender to facilitate collection of the Collateral. All costs of collection of the Collateral, if any, including, without limitation, attorneys' fees and legal expenses, shall be borne solely by Borrower, whether such costs are incurred by or for Borrower or Lender. Borrower agrees to deliver to Lender, if so requested, all books, records, and documents in Borrower's possession or under its control as may relate to the Collateral or as may be helpful to facilitate such collection. Lender shall have no obligation to cause an attorney's demand letter to be sent, to file any lawsuit, or to take any other legal action in collection of the Collateral. It is agreed that collection of the Collateral in a commercially reasonable manner does not require that any such legal action be taken.

(j)   Borrower does hereby make, constitute, and appoint Lender and its designees as Borrower's true and lawful attorney in fact, with full power of substitution, such power to be exercised only upon an Event of Default and in the following manner:  (i) Lender may receive and open all mail addressed to Borrower and remove therefrom any payments of the Collateral, if any;  (ii) Lender may cause mail relating to the Collateral to be delivered to a designated address of Lender where Lender may open all such mail and remove therefrom any payments of the Collateral;  (iii) Lender may endorse Borrower's name upon notes, checks, acceptances, drafts, money orders, or other forms of payment of the Collateral;  (iv) Lender may settle or adjust disputes or claims in respect to the Collateral for amounts and upon such terms as Lender, in its sole discretion and in good faith, deems to be advisable, in such case creating Lender with only the proceeds received and collected by Lender after deduction of Lender's costs, including, without limitation, reasonable attorneys' fees and legal expenses, and  (v) Lender may do any and all other things necessary or proper to carry out the intent of this Agreement and to perfect and protect the liens and rights of Lender created under this Loan and Security Agreement. This power of attorney is irrevocable and coupled with an interest.

(k)   Lender shall have all the rights and remedies available under the UCC.

(l)   Lender shall have the right to enter upon any premises where the Collateral or records relating thereto may be and take possession of the Collateral and such records.

(m)   Upon request of Lender, Borrower shall, at the expense of Borrower, assemble the Collateral and records relating thereto at a place designated by Lender and tender the Collateral and such records to Lender.

(n)   Lender may sell, lease or otherwise dispose of any or all of the Collateral and, after deducting the Liquidation Costs, apply the remainder to pay, or to hold as a reserve against, the obligations secured by this Loan and Security Agreement.

(o)   Lender may credit bid at any UCC, bankruptcy, trustee or other sale, including, without limitation, any sale under Section 363 of the United States Bankruptcy Code.

(p)   Borrower shall be liable for all deficiencies owing on any obligations secured by this Agreement after liquidation of the Collateral. Lender shall not have any obligation to clean-up or otherwise prepare any Collateral for sale, lease, or other disposition.

19

BN 20990225v7

**039**

**9.2    Early Termination.**  Notwithstanding Section 9.1, either Borrower or Lender may terminate this Agreement at any time upon sixty days' prior written notice.  In the event of such termination by Borrower pursuant to this Section 9.2, or in the event of a termination in accordance with Section 9.1 due to an Event of Default, or in the event this Agreement is terminated in accordance with Section 9.1 but Borrower fails to pay the Obligations in full on the Final Maturity Date, Borrower shall pay to Lender the Early Termination Fee set forth in Section 2.6(o).

**9.3    Obligations Due and Payable on Final Maturity Date.**  On the Final Maturity Date, Borrower shall pay to Lender the outstanding principal balance of the Loans, all accrued but unpaid interest thereon, all Fees and Expenses, and all other Obligations, in full, in cash.

**9.4    Revival and Reinstatement of Obligations.**  If the incurrence or payment of the Obligations by Borrower or the transfer to Lender of any property should for any reason subsequently be asserted, or declared, to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (each, a "**Voidable Transfer**"), and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that Lender is required or elects to repay or restore, and as to all reasonable costs, expenses, and attorneys fees of Lender related thereto, the liability of Borrower or Guarantors automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

## ARTICLE 10

## MISCELLANEOUS

**10.1    Notices.**  All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission or similar writing) and shall be given to such party at its address or facsimile number set forth on the signature pages hereof or such other address or facsimile number as such party may hereafter specify by notice to the other party in accordance with this Section 10.1.  Each such notice, request or other communication shall be effective (a) if delivered in person, when delivered, (b) if delivered by facsimile transmission, on the date of transmission if transmitted on a Business Day before 4:00 p.m. Pacific time, otherwise on the next Business Day, (c) if delivered electronically, upon receipt thereof by the recipient; (d) if delivered by overnight courier, one Business Day after delivery to the courier properly addressed, and (e) if mailed, upon the third Business Day after the date deposited into the U.S. Mail, certified or registered; provided that actual notice, however and from whomever given or received, shall always be effective on receipt; provided further that notices sent by Lender in connection with Lender's exercise of its enforcement rights against any Collateral shall be deemed given when deposited in the mail or personally delivered, or, where permitted by law, transmitted by facsimile.

**10.2    Expenses; Documentary Taxes; Indemnification.**

(a)    Borrower shall pay all Expenses on demand.

(b)    Borrower shall pay all and indemnify Lender against any and all transfer taxes, documentary taxes, assessments, or charges made by any Governmental Authority and imposed by reason of the execution and delivery of this Agreement, any of the Loan Documents, or any other document, instrument or agreement entered into in connection herewith.

(c)    Borrower shall and hereby agrees to indemnify, protect, defend and hold harmless Lender and its directors, officers, agents, employees and attorneys (collectively, the "**Indemnified Persons**" and individually, an "**Indemnified Person**") from and against (i) any and all losses, claims, damages, liabilities, deficiencies, judgments, costs and expenses (including, reasonable attorneys' fees and reasonable attorneys' fees incurred pursuant to Insolvency Proceedings) incurred by any Indemnified Person caused by, or to the extent that is finally judicially determined to have resulted from

---

the gross negligence or willful misconduct of any Indemnified Person) arising out of or by reason of any litigations, investigations, claims or proceedings (whether administrative, judicial or otherwise), including discovery, whether or not Lender is designated a party thereto, which arise out of or are in any way related to (1) this Agreement, the Loan Documents or the transactions contemplated hereby or thereby, (2) any actual or proposed use by Borrower of the proceeds of the Loans, or (3) Lender's entering into this Agreement, the Loan Documents or any other agreements and documents relating hereto; (ii) any such losses, claims, damages, liabilities, deficiencies, judgments, costs and expenses arising out of or by reason of the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence on or under the real property of Borrower's operations or property leased by Borrower of any material, substance or waste which is or becomes designated as Hazardous Materials; (iii) any such losses, claims, damages, liabilities, deficiencies, judgments, costs and expenses incurred in connection with any remedial or other action taken by Borrower or Lender in connection with compliance by Borrower with any federal, state or local environmental laws, acts, rules, regulations, orders, directions, ordinances, criteria or guidelines (except to the extent that it is finally judicially determined to have resulted from the gross negligence or willful misconduct of any Indemnified Person).  If and to the extent that the obligations of Borrower hereunder are unenforceable for any reason, Borrower hereby agrees to make the maximum contribution to the payment and satisfaction of such obligations to Lender which is permissible under applicable law.

(d)    Borrower's obligations under this Section 10.2 shall survive the Termination Date, and the payment in full of the Obligations, and are in addition to, and not in substitution of, any other of its obligations set forth in this Agreement.

**10.3    Amendments and Waivers.**  Neither this Agreement nor any Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 10.3.  Lender may from time to time, (a) enter into with Borrower or any other Person written amendments, supplements or modifications hereto and to the Loan Documents or (b) waive, on such terms and conditions as Lender may specify in such instrument, any of the requirements of this Agreement or the Loan Documents or any Event of Default and its consequences, if, but only if, such amendment, supplement, modification or waiver is in writing and is signed by the party assented to be bound thereby, and then such amendment, supplement, modification or waiver shall be effective only in the specific instance and specific purpose for which given.

**10.4    Successors and Assigns; Participations; Disclosure.**

(a)    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, except that Borrower may not assign or transfer any of their rights or obligations under this Agreement without the prior written consent of Lender and any such prohibited assignment or transfer by Borrower shall be void.

(b)    Lender may, at its own expense, assign all or a portion of its rights (including voting rights) and obligations under this Agreement and the Loan Documents.  In the event of any such assignment by Lender pursuant to this Section 10.4(b), Lender's obligations under this Agreement arising after the effective date of such assignment shall be released and concurrently therewith, transferred to and assumed by Lender's assignee to the extent provided for in the document evidencing such assignment.

(c)    Lender may at any time sell to one or more banks or other financial institutions (each a "**Participant**") participating interests in the Loans.  In the event of any such sale by Lender hereunder, Lender's obligations under this Agreement shall remain unchanged, Lender shall remain solely responsible for the performance thereof, and Borrower shall continue to deal solely and directly with Lender in connection with Lender's rights and obligations under this Agreement.  Borrower agrees that each Participant shall, to the extent provided in its participation agreement, be entitled to the benefits of Section 2.11 with respect to its participating interest.

**10.9    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.**

(a)    THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT WITH RESPECT TO AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF CALIFORNIA, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.

(b)    THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE LENDER ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. BORROWER AND LENDER WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 10.9(b).

(c)    BORROWER AND LENDER EACH HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. BORROWER AND LENDER REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

10.10    **Reference Provision.**    In the event the Jury Trial Waiver set forth above is not enforceable, the parties elect to proceed under this Judicial Reference Provision.

(a)    With the exception of the items specified in clause (b) below, any controversy, dispute or claim (each, a "**Claim**") between the parties arising out of or relating to this Agreement or any other Loan Document will be resolved by a reference proceeding in California in accordance with the provisions of Sections 638 et seq. of the California Code of Civil Procedure ("**CCP**"), or their successor sections, which shall constitute the exclusive remedy for the resolution of any Claim, including whether the Claim is subject to the reference proceeding. Except as otherwise provided in the Loan Documents, venue for the reference proceeding will be in the state or federal court in the county or district where the real property involved in the action, if any, is located or in the state or federal court in the county or district where venue is otherwise appropriate under applicable law (the "**Court**").

(b)    The matters that shall not be subject to a reference are the following: (i) nonjudicial foreclosure of any security interests in real or personal property, (ii) exercise of self-help remedies (including, without limitation, set-off), (iii) appointment of a receiver and (iv) temporary, provisional or ancillary remedies (including, without limitation, writs of attachment, writs of possession, temporary restraining orders or preliminary injunctions). This reference provision does not limit the right of any party to exercise or oppose any of the rights and remedies described in clauses (i) and (ii) or to seek or oppose from a court of competent jurisdiction any of the items described in clauses (iii) and (iv). The exercise of, or opposition to, any of those items does not waive the right of any party to a reference pursuant to this reference provision as provided herein.

24

BN 20990225v7

---

any Participant (either, a "**Transferee**") and any prospective Transferee any and all financial information in Lender's possession concerning Borrower which has been delivered to Lender by Borrower pursuant to this Agreement or which has been delivered to Lender by Borrower in connection with Lender's credit evaluation prior to entering into this Agreement.

10.5    **Counterparts; Effectiveness; Integration.**    This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall be effective when executed by each of the parties hereto. This Agreement constitutes the entire agreement and understanding among the parties hereto and supersedes any and all prior agreements and understandings, oral or written, relating to the subject matter hereof.

10.6    **Severability.**    The provisions of this Agreement are severable. The invalidity, in whole or in part, of any provision of this Agreement shall not affect the validity or enforceability of any other of its provisions. If one or more provisions hereof shall be declared invalid or unenforceable, the remaining provisions shall remain in full force and effect and shall be construed in the broadest possible manner to effectuate the purposes hereof.

10.7    **Additional Waivers.**

(a)    Borrower agrees that checks and other instruments received by Lender in payment or on account of the Obligations constitute only conditional payment until such items are actually paid to Lender and Borrower waives the right to direct the application of any and all payments at any time or times hereafter received by Lender on account of the Obligations, and Borrower agrees that Lender shall have the continuing exclusive right to apply and reapply such payments in any manner as Lender may deem advisable, notwithstanding any entry by Lender upon its books.

(b)    Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, documents, instruments, chattel paper, and guarantees at any time held by Lender on which Borrower may in any way be liable.

(c)    Lender shall not in any way or manner be liable or responsible for (a) the safekeeping of Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency or other person whomsoever. All risk of loss, damage or destruction of Inventory shall be borne by Borrower.

(d)    Borrower waives the right and the right to assert a confidential relationship, if any, it may have with any accountant, accounting firm and/or service bureau or consultant in connection with any information requested by Lender pursuant to or in accordance with this Agreement, and agrees that an Lender may contact directly any such accountants, accounting firm and/or service bureau or consultant in order to obtain such information.

(e)    Borrower waives all rights to interpose any claims, deductions, setoffs or counterclaims of any nature (other than compulsory counterclaims) in any action or proceeding with respect to this Agreement, the Collateral or any matter arising therefrom or relating hereto or thereto.

10.8    **Destruction of Borrower's Documents.**    Any documents, schedules, invoices or other papers delivered to Lender may be destroyed or otherwise disposed of by Lender six months after they are delivered to or received by Lender, unless Borrower requests, in writing, the return of the said documents, schedules, invoices or other papers and makes arrangements, at Borrower's expense, for their return.

23

BN 20990225v7

**041**

(c)    The referee shall be a retired judge or justice selected by mutual written agreement of the parties. If the parties do not agree within ten (10) days of a written request to do so by any party, then, upon request of any party, the referee shall be selected by the Presiding Judge of the Court (or his or her representative). A request for appointment of a referee may be heard on an ex parte or expedited basis, and the parties agree that irreparable harm would result if ex parte relief is not granted. Pursuant to CCP § 170.6, each party shall have one peremptory challenge to the referee selected by the Presiding Judge of the Court (or his or her representative).

(d)    The parties agree that time is of the essence in conducting the reference proceedings. Accordingly, the referee shall be requested, and, subject to legal constraints, the order of presentation set for good cause shown, to (i) set the matter for a status and trial-setting conference within fifteen (15) days after the date of selection of the referee, (ii) if practicable, try all issues of law or fact within one hundred twenty (120) days after the date of the conference and (iii) report a statement of decision within twenty (20) days after the matter has been submitted for decision.

(e)    The referee will have power to expand or limit the amount and duration of discovery. The referee may set or extend discovery deadlines or cutoffs for good cause, including a party's failure to provide requested discovery for any reason whatsoever. Unless otherwise ordered based upon good cause shown, no party shall be entitled to "priority" in conducting discovery, depositions may be taken by either party upon seven (7) days written notice, and all other discovery shall be responded to within fifteen (15) days after service. All disputes relating to discovery which cannot be resolved by the parties shall be submitted to the referee whose decision shall be final and binding.

(f)    Except as expressly set forth herein, the referee shall determine the manner in which the reference proceeding is conducted including the time and place of hearings, the order of presentation of evidence, and all other questions that arise with respect to the course of the reference proceeding. All proceedings and hearings conducted before the referee, except for trial, shall be conducted without a court reporter, except that when any party so requests, a court reporter will be used at any hearing conducted before the referee, and the referee will be provided a courtesy copy of the transcript. The party making such a request shall have the obligation to arrange for and pay the court reporter. Subject to the referee's power to award costs to the prevailing party, the parties will equally share the cost of the referee and the court reporter at trial.

(g)    The referee shall be required to determine all issues in accordance with existing case law and the statutory laws of the State of California. The rules of evidence applicable to proceedings at law in the State of California will be applicable to the reference proceeding. The referee shall be empowered to enter equitable as well as legal relief, enter equitable orders that will be binding on the parties and rule on any motion which would be authorized in a court proceeding, including without limitation motions for summary judgment or summary adjudication. The referee shall issue a decision at the close of the reference proceeding which disposes of all claims of the parties that are the subject of the reference. Pursuant to CCP § 644, such decision shall be entered by the Court as a judgment or an order in the same manner as if the action had been tried by the Court and any such decision will be final, binding and conclusive. The parties reserve the right to appeal from the final judgment or order or from any appealable decision or order entered by the referee. The parties reserve the right to findings of fact, conclusions of law, a written statement of decision, and the right to move for a new trial or a different judgment, which new trial, if granted, is also to be a reference proceeding under this provision.

(h)    If the enabling legislation which provides for appointment of a referee is repealed (and no successor statute is enacted), any dispute between the parties that would otherwise be determined by reference procedure shall be resolved and determined by arbitration. The arbitration will be conducted by a retired judge or justice, in accordance with the California Arbitration Act § 1280 through § 1294.2 of the CCP as amended from time to time. The limitations with respect to discovery set forth above shall apply to any such arbitration proceeding.

(i)    THE PARTIES RECOGNIZE AND AGREE THAT ALL CONTROVERSIES, DISPUTES AND CLAIMS RESOLVED UNDER THIS REFERENCE PROVISION WILL BE DECIDED BY

25

A REFEREE AND NOT BY A JURY AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS, HIS OR HER OWN CHOICE. EACH PARTIES KNOWINGLY AND VOLUNTARILY, AND FOR THE MUTUAL BENEFIT OF ALL PARTIES, AGREES THAT THIS REFERENCE PROVISION WILL APPLY TO ANY CONTROVERSY, DISPUTE OR CLAIM BETWEEN OR AMONG THEM ARISING OUT OF OR IN ANY WAY RELATED TO, THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS.

10.11    **Patriot Act Notification.** Lender is subject to the USA Patriot Act, Title III of Pub. L. 107-56, signed into law October 26, 2001 (the "**Patriot Act**") and hereby notifies Borrower that pursuant to the requirements of the Patriot Act, Lender is required to obtain, verify and record information that identifies Borrower, which information includes the names and addresses of Borrower and other information that will allow Lender to identify Borrower in accordance with the Patriot Act.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

26

**042**

SCHEDULE A
TO
AMENDED AND RESTATED
LOAN AND SECURITY
AGREEMENT

**DEFINED TERMS**

POINT.360,
a California corporation,
as "Borrower"

As used in the Amended and Restated Loan and Security Agreement to which this Schedule A is attached, the following terms shall have the meanings indicated:

"Account" and "Account Debtor" are defined in the UCC.

"Accounts Advance Rate" is defined in Section 2.1 of Schedule B.

"Advance" means the revolving advances extended to Borrower by Lender pursuant to Section 2.1.

"Assignment Agreement" is defined in the Recitals to the Agreement.

"Assignor" is defined in the Recitals to the Agreement.

"Bankruptcy Code" means the United States Bankruptcy Code (11 U.S.C. Sections 101 et seq.).

"Borrower" is defined in the Preamble.

"**Borrowing Base**" means the sum of: (a) up to the Accounts Advance Rate or such lesser percentage of the Net Amount of Eligible Accounts as Lender in its sole discretion may deem appropriate if it determines that there has been a Material Adverse Effect; less a dilution reserve as determined by Lender in its sole discretion, plus (b) the lesser of (i) up to the Inventory Advance Rate or such lesser percentage of Eligible Inventory as Lender in its sole discretion may deem appropriate if it determines that there has been a Material Adverse Effect, or (ii) the Inventory Sublimit, minus (c) the Borrowing Base Reserve.

"**Borrowing Base Reserve**" means, as of any date of determination, an amount or a percent of a specified category or item that Lender establishes in its sole discretion from time to time to reduce availability under the Borrowing Base (a) to reflect events, conditions, contingencies or risks which affect the assets, business or prospects of Borrower, or the Collateral or its value, or the enforceability, perfection or priority of Lender's security interest in the Collateral, as the term "Collateral" is defined in this Agreement, or (b) to reflect Lender's judgment that any collateral report or financial information relating to Borrower and furnished to Lender may be incomplete, inaccurate or misleading in any material respect.

"**Business Day**" means any day other than a Saturday, a Sunday, or a day on which commercial banks in the City of Los Angeles, State of California, are authorized or required by law or executive order or decree to close.

"**Change of Control**" means (a) if there shall be a sale or sales in the aggregate of more than 49% of the issued and outstanding shares of capital stock or other equity interests of Borrower held by Haig S. Bagerdjian (or related entity) and his successors and his assigns, (b) any of the individuals performing the functions of the Chief Executive Officer, President or Chief Financial Officer, respectively, on the Closing Date shall cease for any reason to perform such functions, whether by reason of death, disability, resignation, action by the Board of Directors or shareholders of Borrower, or otherwise.

1

BN 21003147v5

---

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

AUSTIN FINANCIAL SERVICES, INC.,
a Delaware corporation

By: _____
Name:  Donald Caskey
Its:   Senior Vice President

Address for notices:

Austin Financial Services, Inc.
11111 Santa Monica Blvd. Suite 900
Los Angeles, CA 90025-9823
Attn:  Donald Caskey
Telephone: (310) 444-7939
Facsimile: (310) 444-7959

POINT.360,
a California corporation

By: _____
Name:  Alan R. Steel
Its:   Chief Financial Officer

Address for notices:

Point.360
2701 Media Center Drive
Los Angeles, CA 90065
Attn:  Alan Steel
Telephone: 323-987-8444
Facsimile: 818-847-2503

S-1
Loan And Security Agreement

BN 20996225v7

*043*

"Closing Date" means the date of the assignment of the Financing and the "Financing Documents" (defined in the Assignment Agreement) by Assignor to Lender pursuant to that certain Assignment Agreement.

"Collateral" means the following personal property of Borrower, wherever located, now owned or existing or hereafter acquired or created, all additions and accessions thereto, all replacements, insurance or condemnation proceeds, all documents covering any of the Collateral, all leases of any of the Collateral, all rents, revenues, issues, profits and proceeds arising from the lease, license, sale, encumbrance, collection, or any other temporary or permanent disposition of any of the Collateral or any interest therein, all amendments, modifications, renewals, extensions, and replacements thereof, and all products and proceeds thereof: (a) all Inventory, (b) all Accounts, (c) all equipment, goods and motor vehicles (collectively, the "Equipment"); (d) all general intangibles, including, without limitation, any and all patents, trademarks and copyrights (registered or unregistered), trade secrets, domain names and addresses, and intellectual property licenses; (e) any and all promissory notes and instruments payable to or owing to Borrower or held by Borrower; any and all leases under which Borrower is the lessor; any and all chattel paper in favor of, owing to, or held by Borrower, including, without limitation, any and all conditional sale contracts or other sale agreements, whether Borrower is the original party or the assignee; and any and all security agreements, collateral and titles to motor vehicles which secure any of the foregoing obligations; all deposit accounts, including, without limitation, all interest, dividends or distributions accrued or to accrue thereon, whether or not due, all investment property, including, without limitation, all interest, dividends or distributions accrued or to accrue thereon, whether or not due, all documents, all letter-of-credit rights; and all other Obligations; and (f) all balances, deposits, debts or any other amounts or obligations of Lender owing to Borrower, including, without limitation, any reserve, whether or not due.

"Collateral Access Agreement" means a landlord waiver, mortgagee waiver, bailee letter, or acknowledgment agreement of any warehouseman, processor, lessor, consignee, or other Person in possession of, having a Lien upon, or having rights or interests in the Collateral, in each case, in form and substance satisfactory to Lender.

"Collection Account" means Lender's deposit account for purposes or receiving payments from Borrower.

"Daily Availability Report" means Lender's standard form of Daily Availability Report.

"Default" means any condition or event which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Rate" means the sum of the Interest Rate plus three (3.0) percentage points.

"Dollars" and "$" means lawful currency of the United States of America.

"Eligible Accounts" means those Accounts created by Borrower in the ordinary course of business, that arise out of Borrower's sale of goods or rendition of services, that strictly comply with each and all of the representations and warranties respecting Accounts made by Borrower to Lender in this Agreement, and that are and at all times continue to be acceptable to Lender in all respects; provided, however, that standards of eligibility may be fixed and revised from time to time by Lender in Lender's sole and absolute discretion. In determining the amount to be included, Eligible Accounts shall be calculated net of customer deposits and unapplied cash remitted to Borrower. Eligible Accounts shall not include the following:

(i)     Accounts that the Account Debtor has failed to pay within 90 days of invoice date or Accounts with selling terms of more than 60 days;

IN 21003147v.5

(ii)     Accounts owed by an Account Debtor or its affiliates where 30% or more of all Accounts owed by that Account Debtor (or its affiliates) are deemed ineligible under clause (i) above;

(iii)     Accounts owed by an Account Debtor which is an officer, director, shareholder, employee, affiliate, or agent of Borrower;

(iv)     Accounts with respect to which goods are placed on consignment, guaranteed sale, sale or return, sale on approval, bill and hold, or other terms by reason of which the payment by the Account Debtor may be conditional;

(v)     Accounts that are not payable in Dollars or with respect to which the Account Debtor: (i) does not maintain its chief executive office in the United States or Canada, or (ii) is not organized under the laws of the United States or any state thereof, or (iii) is the government of any foreign country or sovereign state, or of any state, province, municipality, or other political subdivision thereof, or of any department, agency, public corporation, or other instrumentality thereof, unless (y) the Account is supported by an irrevocable letter of credit satisfactory to Lender (as to form, substance, and issuer of such domestic confirming bank) that has been delivered to Lender and is directly drawable by Lender;

(vi)     Accounts with respect to which the Account Debtor is either (i) the United States or any department, agency, or instrumentality of the United States (exclusive, however, of Accounts with respect to which Borrower has complied, to the reasonable satisfaction of Lender, with the Assignment of Claims Act, 31 USC § 3727), or (ii) any state of the United States (exclusive, however, of (y) Accounts owed by any state that does not have a statutory counterpart to the Assignment of Claims Act, or (z) Accounts owed by any state that does have a statutory counterpart to the Assignment of Claims Act as to which Borrower has complied to Lender's satisfaction);

(vii)     Accounts with respect to which the Account Debtor is a creditor of Borrower, has or has asserted a right of setoff, has disputed its liability, or has made any claim with respect to the Account, to the extent of such setoff, dispute or claim;

(viii)     Accounts with respect to the Account Debtor whose total obligations owing to Borrower exceed 30% of all Eligible Accounts (except as otherwise provided in Section B of **Schedule B**), to the extent of the obligations owing by such Account Debtor in excess of such percentage;

(ix)     Accounts with respect to which the Account Debtor is subject to an Insolvency Proceeding, is not solvent, has gone out of business, or as to which Borrower has received notice of an imminent Insolvency Proceeding or a material impairment of the financial condition of such Account Debtor, or whose credit standing is unacceptable to Lender;

(x)     Accounts the collection of which Lender, in its sole and absolute discretion, believes to be doubtful by reason of the Account Debtor's financial condition;

(xi)     Accounts not supported by any written contract;

(xii)     Accounts which are in default or collection;

(xiii)     Accounts on C.O.D. terms;

(xiv)     Accounts with respect to which the goods giving rise to such Account have not been shipped and billed to the Account Debtor, the services giving rise to such Account have not been performed and accepted by the Account Debtor, or the Account otherwise does not

IN 21003147v.5

**044**

represent a final sale.

Lender;

(xv)   Accounts that are not subject to a valid and perfected first priority Lien in favor of Lender;

(xvi)   Accounts with respect to which the Account Debtor is located in the states of New Jersey, Minnesota, Indiana, or West Virginia (or any other state that requires a creditor to file a Business Activity Report or similar document in order to bring suit or otherwise enforce its remedies against such Account Debtor in the courts or through any judicial process of such state), unless Borrower has qualified to do business in New Jersey, Minnesota, Indiana, West Virginia, or such other states, or has filed a Notice of Business Activities Report with the applicable division of taxation, the department of revenue, or with such other state offices, as appropriate, for the then-current year, or is exempt from such filing requirement;

(xvii)   Accounts that represent progress payments or other advance billings that are due prior to the completion of performance by Borrower of the subject contract for goods or services;

(xviii)   Accounts evidenced by chattel paper or an instrument (as such terms are defined in the UCC) unless such chattel paper or instrument has been duly assigned and delivered to Lender; and

(xix)   Any other Accounts that Lender in its sole discretion deems ineligible.

"Event of Default" is defined in Section 8.1.

"Expenses" means (i) all reasonable expenses of Lender paid or incurred in connection with their due diligence and investigation of Borrower, including appraisal, filing, recording, documentation, publication and search fees and other such expenses, and all reasonable attorneys' fees and expenses (including reasonable attorneys' fees incurred pursuant to proceedings arising under the Bankruptcy Code) incurred in connection with the structuring, negotiation, drafting, preparation, execution and delivery of this Agreement, the Loan Documents, and any and all other documents, instruments and agreements entered into in connection herewith; (ii) all reasonable expenses of Lender, including reasonable attorneys' fees and expenses (including reasonable attorneys' fees incurred pursuant to proceedings arising under the Bankruptcy Code) paid or incurred in connection with the negotiation, preparation, execution and delivery of any waiver, forbearance, consent, amendment or addition to this Agreement or any Loan Document, or the termination hereof and thereof; (iii) all costs or reasonable expenses paid or advanced by Lender which are required to be paid by Borrower under this Agreement or the Loan Documents, including taxes and insurance premiums of every nature and kind of Lender, and (iv) if an Event of Default occurs, all expenses paid or incurred by Lender, including reasonable attorneys' fees and expenses (including reasonable attorneys' fees incurred pursuant to proceedings arising under the Bankruptcy Code), costs of collection, suit, arbitration, judicial reference and other enforcement proceedings, and any other out-of-pocket expenses incurred in connection therewith or resulting therefrom, whether or not suit is brought, (v) all reasonable expenses paid or incurred by Lender or in connection with any refinancing or restructuring of the Obligations, any of the Loan Documents, or any other document, instrument or agreement entered into in connection herewith in the nature of a workout, (vi) the reasonable costs and expenses incurred if Lender shall hire or pay someone else to help enforce this Agreement and/or the Loan Documents; and (vii) all court costs and such additional fees as may be directed by the court.

"Fees" means the various fees owing by Borrower to Lender set forth in Section 2.6.

"Financing" is defined in the Recitals to the Agreement.

BN 21003147v5

"Final Maturity Date" is defined in Section 9.1.

"GAAP" means generally accepted accounting principles in the United States of America, consistently applied, which are in effect as of the date of this Agreement.

"Governing Documents" means the certificate or articles or certificate of incorporation, by-laws, articles or certificate of organization, operating agreement, or other organizational or governing documents of any Person.

"Governmental Authority" means any federal, state, local or other governmental department, commission, board, bureau, agency, central bank, court, tribunal or other instrumentality or authority or subdivision thereof, domestic or foreign, exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Initial Maturity Date" is defined in Section 9.1 of Schedule B.

"Insolvency Proceeding" means any proceeding commenced by or against any Person, under any provision of the Bankruptcy Code, or under any other bankruptcy or insolvency law, including, but not limited to, assignments for the benefit of creditors, formal or informal moratoriums, compositions, or extensions with some or all creditors.

"Interest Rate" is defined in Section 2.7(a) of Schedule B.

"Inventory" is defined in the UCC.

"Lender" is defined in the Preamble.

"Lien" means any mortgage, deed of trust, pledge, security interest, hypothecation, assignment, deposit arrangement or other preferential arrangement, charge or encumbrance (including, any conditional sale or other title retention agreement, or finance lease) of any kind.

"Line of Credit Commitment" is defined in Section 2.1 of Schedule B.

"Loans" means the Advances and any other loans or extensions of credit that Lender, in its sole discretion, may determine to provide to Borrower (each, a "Loan").

"Loan Documents" means this Agreement, any Guarantees, together with every other agreement, note, document, contract or instrument to which Borrower now or in the future may be a party and which may be required by Lender in connection with, or as a condition to, the execution of this Agreement.

"Material Adverse Effect" means a material adverse effect on (i) the business, Assets, condition (financial or otherwise), or results of operations of Borrower; (ii) the ability of Borrower to perform its obligations under this Agreement and the Loan Documents to which it is a party (including, without limitation, repayment of the Obligations as they come due), or the ability of any Guarantor to perform its obligations under the Loan Documents to which it is a party, (iii) the validity or enforceability of this Agreement, the Loan Documents, or the rights or remedies of Lender hereunder and thereunder, (iv) the value of the Collateral, or (v) the priority of Lender's Liens in the Collateral.

"Minimum Interest" is defined in Section 2.7(c) of Schedule B.

"Minimum Interest Rate" is defined in Section 2.7(f) of Schedule B.

"Net Amount of Eligible Accounts" means the gross amount of the Eligible Accounts

BN 21003147v5

less returns, discounts, credits or offsets of any nature.

"**Obligations**" means any and all indebtedness, liabilities, and obligations of Borrower owing to Lender and to its successors and assigns, previously, now, or hereafter incurred, and however evidenced, whether direct or indirect, absolute or contingent, joint or several, liquidated or unliquidated, voluntary or involuntary, due or not due, legal or equitable, whether incurred before, during, or after any Insolvency Proceeding and whether recovery thereof is or becomes barred by a statute of limitations or is or becomes otherwise unenforceable or unallowable as claims in any Insolvency Proceeding, together with all interest thereupon (including interest accruing at the Default Rate) and including any interest that, but for the provisions of the Bankruptcy Code, would have accrued during the pendency of an Insolvency Proceeding.  The Obligations shall include, without limiting the generality of the foregoing, all principal and interest and other payment obligations owing under the Loans, all Expenses, the Fees, any other fees and expenses due hereunder and under the Loan Documents (including any fees or expenses that, but for the provisions of the Bankruptcy Code, would have accrued during the pendency of an Insolvency Proceeding), and all other indebtedness evidenced by this Agreement and/or the Loan Documents.

"**Overadvance**" is defined in Section 2.2.

"**Owner**" means each Person having legal or beneficial title to an ownership interest in Borrower, or a right to acquire such an interest.

"**Permitted Liens**" means (i) Liens for current taxes, assessments or other governmental charges which are not delinquent or remain payable without any penalty, or are being contested in good faith by appropriate proceedings, provided that, if delinquent, adequate reserves have been set aside with respect thereto as required by GAAP and, by reason of nonpayment, no property is subject to a material risk of loss or forfeiture; (ii) Liens in favor of Lender, in accordance with the Loan Documents, (iii) statutory Liens, such as inchoate mechanics', inchoate materialmen's, landlord's, warehousemen's, and carriers' liens, and other similar liens, other than those described in clause (i) above, arising in the ordinary course of business with respect to obligations which are not delinquent or are being contested in good faith by appropriate proceedings, provided that, if delinquent, adequate reserves have been set aside with respect thereto as required by GAAP and, by reason of nonpayment, no property is subject to a material risk of loss or forfeiture, (iv) a Lien in favor of Bank of the West on Collateral consisting of certain real property located at 1133 and 1122 N. Hollywood Way, Burbank CA 91505, (v) a Lien in favor of Medley Capital Corporation and Medley Opportunity Fund II, LP pursuant to that Term Loan Agreement dated as of July 8, 2015, and (vi) Liens pursuant to certain capital lease financing agreements relating to specific equipment not financed, in whole or in part, by funds loaned or provided by Lender.

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability partnerships, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"**Premises**" is defined in Section 3.5(a).

"**Prime Rate**" means that variable interest rate which is subject to change from time to time based upon changes in the independent index which is the Prime Rate as published in the Money Rates Section of the Western Edition of the Wall Street Journal (the "**Index**"). The Index is not necessarily the lowest rate charged by Lender on its commercial loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notice to Borrower. Lender will advise Borrower of the current Index rate upon request.  The Prime Rate shall be rounded to the closest ½th of 1% with no adjustments to be made in the rate for changes

of less than ⅛th of 1%.  All adjustments will be made on the last day of each month based on the highest Prime Rate announced at any time during that month.

"**Summit Loan and Security Agreement**" is defined in the Recitals to the Agreement.

"**Tax Distributions**" means distributions declared and paid by Borrower to its Owners, or which could have been declared and paid by Company, in an amount not to exceed the lesser of 40% of Company's Pre-Tax Distribution Net Income, determined as at the end of each fiscal year of Company, or the Pass-Through Tax Liabilities.

"**Termination Date**" means the date when this Agreement has been terminated and Lender has received the payment, performance and satisfaction in full in cash of the Obligations.

"**Total Commitment**" is defined in Section A of **Schedule B**.

"**UCC**" means the California Uniform Commercial Code, as amended or supplemented from time to time.

"**Unused Line Fee**" is defined in Section 2.6(b).

"**Unused Line Fee Percentage**" is defined in Section 2.6(b) of **Schedule B**.

**SCHEDULE B**
**TO**
**AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT**

**POINT.360,**
**a California corporation, as "Borrower"**

**CERTAIN CREDIT TERMS**

| Amended and Restated Loan and Security Agreement Section | Credit Terms |
|---|---|
| Section A – Total Commitment | $4,000,000 |
| Section B – Exceptions to Concentration Limit: | Concentration limits for certain Account Debtors: (a) Disney: 50% (b) Warner Bros.: 50% (c) Twentieth Century Fox: 50% |
| Section 2.1 – Line of Credit Commitment: | $4,000,000.00 |
| Section 2.1 – Accounts Advance Rate: | 80% of Eligible Accounts Receivable |
| Section 2.6(a) – Annual Facility Fee: | An amount equal to one-half percent (0.50%) of the Line of Credit Commitment as of the Closing Date; One-half percent (0.50%) of the Line of Credit Commitment upon renewal at the first anniversary date after the Closing Date; and Four-tenths of one percent (0.40%) of the Line of Credit Commitment upon renewal at the second anniversary date after the Closing Date and each anniversary date thereafter. |
| Section 2.6(b) – Unused Line Fee Percentage: | 0.00% |
| Section 2.6(d) – Collateral Management Fee Percentage: | Forty-two hundredths of one percent (0.42%) |
| Section 2.6(e) – Line of Credit Termination and/or Reduction Fees: | Two percent (2.00%) if the termination or reduction occurs on or before the first anniversary of the Closing Date; One percent (1.00%) if the termination or reduction occurs after the first anniversary of the Closing Date, but on or before the second anniversary of the Closing Date; and The lesser of (i) One-half percent (0.50%) or (ii) the product of the number of months remaining prior to the Final Maturity Date multiplied by the minimum monthly charge. |
| Section 2.7(a) – Interest Rate: | The Interest Rate for all Advances shall be the sum of the Prime Rate plus one percent (1.0%). |

1
BN 21003181v3

| Amended and Restated Loan and Security Agreement Section | Credit Terms |
|---|---|
| Section 2.7(c) – Minimum Interest: | $3,000.00, inclusive of interest and fees earned on the Line of Credit. |
| Section 2.7(d) – Clearance Days: | Four (4) Business Days |
| Section 2.7(d)(i) – Minimum Interest Rate for Advances: | Four and one-half percent (4.50%) per annum |
| Section 5.9 Financial Statements Delivered at Closing: | Audited financial statements for its fiscal year ended June 30, 2015, and Borrower prepared financial statements for the fiscal-year-to-date period ended March 31, 2016. |
| Section 6.3(f) – Annual Financial Statements. | Audited |
| Section 9.1 – Initial Maturity Date: | July 13, 2019 |

2
BN 21003181v3

in whole or in part, by funds loaned or provided by Lender

(d) trade accounts payable of Borrower incurred in the ordinary course of Borrower's business and consisting of customary terms in the industry and to the extent not secured by a lien or security interest in favor of such credit

Section 5.10 – Litigation:

| Litigation |
| --- |
| POINT 360 vs CA-COLORADO CENTER, LLC |
| Los Angeles County Superior Court Case # BC595088 |

Section 5.16 – Environmental Condition:

| Environmental Condition |
| --- |
| None |

Section 5.21 – Deposit Accounts:

| Bank Name and Address | Account Number(s) |
| --- | --- |
| BANK OF THE WEST | ACCT # 028287375 |
| 1977 Saturn St., Monterey Park, CA 91755 | ACCT # 028287474 (payroll) |
| ROUTING# 121100782 | |
| SWIFT: BWSTUS66 | |
| POINT 360 | |

Section 5.22 – Securities and Commodities Accounts:

| Brokerage Name and Address | Account Number(s) |
| --- | --- |
| None | |

2

BN 21033635v4

---

SCHEDULE C
TO
LOAN AND SECURITY AGREEMENT

POINT 360,
a California corporation,
as "Borrower"

DISCLOSURE SCHEDULE

Section 5.1 – Legal Status:

| Borrower's Exact Legal Name | Jurisdiction of Organization or Formation | Organizational Identification Number | FEIN |
| --- | --- | --- | --- |
| Point 360 | CA | 2967825 | 01-0893376 |

Section 5.2 – Locations of Chief Executive Office, Books and Records, Collateral:

| Location of Borrower's Chief Executive Office | Location of Books and Records | Other Locations Where Collateral is Kept |
| --- | --- | --- |
| 2701 Media Center Drive, Los Angeles, CA 90065 | 2701 Media Center Drive, Los Angeles, CA 90065 | |
| | 1133 N. Hollywood Way, Burbank, CA 91505 | |
| | 2300 Empire Avenue, Burbank, CA 91505 | |

Section 5.3 – Trade Names; Trade Styles:

| Trade Names, Fictitious Business Names |
| --- |
| Point 360 |
| Digital Film Labs |
| Visual Sound Closed Captioning Services, Inc. |
| Eden FX |
| Movie >Q |
| International Video Conversions, Inc. |
| DVDs on the Run, Inc. |
| Modern VideoFilm |

Section 5.8 – Indebtedness:

Other Indebtedness:

(a) a debt owed to Bank of the West in the principal amount of $4,716,800, secured by a Lien on Collateral consisting of certain real property located at 1133 and 1122 N. Hollywood Way, Burbank, CA 91505

(b) a debt not to exceed the sum of a principal amount of $6,000,000.00 and PIK owed to Medley Capital Corporation and Medley Opportunity Fund II, LP pursuant to that Term Loan Agreement dated as of July 8, 2015

(c) certain debt pursuant to certain capital lease financing agreements relating to leases of or secured by liens encumbering specific equipment financed by such agreements and not financed,

1

BN 21033635v4



Point 360

**Financial Services, Inc.**

September 8, 2016

Mr. Alan Steel, CFO
Point 360
2701 Media Center Drive
Los Angeles, CA 90065

Dear Mr. Steel:

Reference is made to that certain Amended and Restated Loan and Security Agreement dated July 13, 2016 (as amended, modified, supplemented and restated, the "Loan Agreement") by and between **Austin Financial Services, Inc.** ("Lender") and **Point.360 ("Borrower")**. Defined terms herein are used with the same sense and meaning as used and defined in the Loan Agreement unless otherwise noted.

This agreement confirms Borrower's request and Lender's agreement with respect to the following: 1) an increase of the Accounts Receivable Advance Rate to 85% of Eligible Accounts Receivable; 2) a temporary Permitted Overadvance in an amount not to exceed the lesser of $150,000 or an amount equal to 5% of availability under the Borrowing Base; 3) an increase of the Collateral Management Fee to 0.55%; and 4) modification of the Line of Credit Termination Fee to 2.25% of the Total Commitment prior to the first anniversary date, 1.5% prior to the second anniversary date and 1.0% prior to the Final Maturity Date.

In consideration of the premises and of the mutual covenants and agreements herein contained, Lender and Borrower agree as follows:

Section 2.1 of the Loan Agreement is hereby amended by deleting that section in its entirety and replacing it with the following:

### 2.1 Revolving Advances.

(a)    Provided that no Default or Event of Default has occurred and is continuing and subject to the terms and conditions of this Agreement, Lender hereby agrees to make revolving Advances to Borrower from time to time up to but not including the Final Maturity Date. The aggregate amount of Advances outstanding after giving effect to any proposed new Advance shall not exceed the lesser of (i) the Line of Credit Commitment, or (ii) the Borrowing Base plus the Permitted Overadvances. Borrower may repay outstanding Advances and, subject to the terms and conditions of this Agreement, any amounts so repaid may be reborrowed. On the Final Maturity Date, Borrower shall pay to Lender the entire unpaid principal balance of the Advances together with all accrued but unpaid interest thereon. The Advances, and Borrower's obligation to repay the same, shall be evidenced by this Agreement and the books and records of Lender.

(b)    Borrower may request one or more Advances on any Business Day. Concurrent with such request, Borrower shall provide to Lender a duly completed and signed Daily Availability Report that supports the requested Advance amount. Provided that the terms and conditions for the requested Advance have been met, Lender will make the requested Advance available to Borrower on the Business Day of request; provided that the request is received by 9:20 a.m., Pacific time, and Borrower has provided to Lender a Daily Availability Report on a daily basis for the prior 30 days. In all other cases, Lender will

BN 21474336v2

---

Modification Agreement Number One

Point 360

make the requested Advance available to Borrower on the Business Day following the Business Day of request, provided that the request is received by 12:00 p.m., Pacific time.

Section 2.2 of the Loan Agreement is hereby amended by deleting that section in its entirety and replacing it with the following:

**2.2    Overadvances.** If, at any time or for any reason, the amount of Advances outstanding exceeds the lesser of the Line of Credit Commitment or the Borrowing Base (an "Overadvance"), Borrower shall immediately pay to Lender, upon Lender's election and demand, in cash, the amount of each Overadvance to be used by Lender to repay outstanding Advances; provided, however, with respect to any Overadvance existing or arising after September 8, 2016, through January 15, 2017, Borrower shall pay such Overadvance in full on or before the earlier of (i) the 90th day after the first day any Overadvance exists or (ii) January 15, 2017, pursuant to the reduction payment schedule set forth in Section 2.2(a) of Schedule B (each such Overadvance, a "Permitted Overadvance") and (b) is satisfied. All Overadvances, including Permitted Overadvances, are subject to the Overadvance Fee.

Schedule B to the Loan Agreement is hereby amended by adding the following definition:

"Permitted Overadvance" is defined in section 2.2 of the Loan Agreement.

Schedule B to the Loan Agreement is hereby amended by deleting such Schedule "B" in its entirety and replacing it with Schedule "B" attached hereto.

Borrower shall pay to Lender a one-time modification fee of $1,000.00, which fee shall be charged as a loan under the Loan Agreement, on the Modification Agreement Number One Effective Date.

Except as so modified above, all other terms, conditions, and provisions of the Loan Agreements, including any and all modifications thereto, shall remain unchanged and in full force and effect.

The execution of this Modification Agreement Number One and the acceptance of all other agreements and instruments related hereto is not deemed to be a waiver of any Default or Event of Default under the Loan Agreement, or a waiver of any breach, default or event of default under any Loan Document or other document held by or in favor of Lender, whether or not known to Lender and whether or not existing on the date of this Amendment. The Loan Agreement is amended by this Modification Agreement Number One compliance the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and thereof, and supersedes any and all prior agreements and understandings, oral or written, relating to the subject matter hereof and thereof. This Modification Agreement Number One may be executed in any number of counterparts, each of which when so executed and delivered is deemed an original and all of which counterparts, taken together, constitutes one and the same instrument.

All credit lines, modifications and extensions of credit granted by Lender are subject to review and re-negotiation on the renewal and/or anniversary date of the existing Agreement.

This Modification Agreement Number One is effective upon the date of full execution by all the parties hereto (the "Modification Agreement Number One Effective Date").

Accepted and agreed to this 8th day of September, 2016:

AUSTIN FINANCIAL SERVICES, INC.,
a Delaware corporation

By:
Name: Donald Caskey
Its: Senior Vice President

POINT.360,
a California corporation

By:
Name: Alan Steel
Its: Chief Financial Officer

Page 2 of 2

BN 21474336v2

| Amended and Restated Loan and Security Agreement Section | Credit Terms |
| --- | --- |
| | Date, but on or before the second anniversary of the Closing Date; and |
| | One percent (1.00%) if the termination or reduction occurs after the second anniversary date of the Closing Date, but before the Final Maturity Date. |
| Section 2.7(a) – Interest Rate: | The Interest Rate for all Advances shall be the sum of the Prime Rate plus one percent (1.0%). |
| Section 2.7(c) – Minimum Interest: | $3,000, inclusive of interest and fees earned on the Line of Credit. |
| Section 2.7(d) – Clearance Days: | Four (4) Business Days |
| Section 2.7(f)(i) – Minimum Interest Rate for Advances: | Four and one-half percent (4.50%) per annum |
| Section 5.9 Financial Statements Delivered at Closing: | Audited financial statements for its fiscal year ended June 30, 2015, and Borrower prepared financial statements for the fiscal-year-to-date period ended March 31, 2016. |
| Section 6.3(f) – Annual Financial Statements: | Audited |
| Section 9.1 – Initial Maturity Date: | July 13, 2019 |

SCHEDULE B
TO
AMENDED AND RESTATED
LOAN AND SECURITY
AGREEMENT

POINT 360,
a California corporation,
as "Borrower"

CERTAIN CREDIT TERMS

| Amended and Restated Loan and Security Agreement Section | Credit Terms |
| --- | --- |
| Section A – Total Commitment: | $4,000,000 |
| Section B – Exceptions to Concentration Limit: | Concentration limits for certain Account Debtors: (a) Disney: 50% (b) Warner Bros.: 50% (c) Twentieth Century Fox: 50% |
| Section 2.1 – Line of Credit Commitment: | $4,000,000 |
| Section 2.1 – Accounts Advance Rate: | 85% of Eligible Accounts Receivable |
| Section 2.2 – Permitted Overadvance: | An amount not to exceed the lesser of: (i) $150,000, or (ii) 5% of the Borrowing Base. |
| Section 2.2 (e) – Weekly Permitted Overadvance Reduction Payments: | Weekly payments on the first day of each week in an amount of not less than $15,000 each week, and a payment in an amount equal to the remaining Permitted Overadvance commencing on the earlier of (a) the 90th day after the first day any Overadvance exists or (b) January 15, 2017. |
| Section 2.6(a) – Annual Facility Fee: | An amount equal to one-half percent (0.50%) of the Line of Credit Commitment as of the Closing Date. One-half percent (0.50%) of the Line of Credit Commitment upon renewal at the first anniversary date after the Closing Date; and Four-tenths of one percent (0.40%) of the Line of Credit Commitment upon renewal at the second anniversary date after the Closing Date and each anniversary date thereafter. |
| Section 2.6(b) – Unused Line Fee Percentage: | 0.00% |
| Section 2.6(d) – Collateral Management Fee Percentage: | Fifty-five hundredths of one percent (0.55%) |
| Section 2.6(g) – Line of Credit Termination and/or Reduction Fees: | Two and one-half percent (2.50%) if the termination or reduction occurs on or before the first anniversary of the Closing Date; One and one-half percent (1.50%) if the termination or reduction occurs after this first anniversary of the Closing |

Point360

Modification Agreement Number Two

Accepted and agreed this 5th day of October, 2016:

AUSTIN FINANCIAL SERVICES, INC.,
a Delaware corporation

By: _____
Name: Donald Caskey
Its: Senior Vice President

POINT.360
a California corporation

By: _____
Name: Alan Steel
Its: Chief Financial Officer

Page 2 of 2

10124/95426v2

---



Financial Services, Inc.

October 5, 2016

Mr. Alan Steel, CFO
Point.360
2701 Media Center Drive
Los Angeles, CA 90065

Dear Mr. Steel:

**Re: Modification Agreement Number Two**

Reference is made to that certain Amended and Restated Loan and Security Agreement dated July 13, 2016 (as amended, modified, supplemented and restated, the "Loan Agreement") by and between **Austin Financial Services, Inc. ("Lender")** and **Point.360 ("Borrower")**. Defined terms herein are used with the same sense and meaning as used and defined in the Loan Agreement unless otherwise noted.

This agreement confirms Borrower's request and Lender's consent to the Borrower's creation of a second mortgage in the amount of $2,000,000 secured by the property located at 1122 & 1133 N. Hollywood Way, Burbank, CA 91505 ("Hollywood Way Property") and the sale and leaseback of the Hollywood Way Property.

In consideration of the premises and of the mutual covenants and agreements herein contained, Lender and Borrower agree as follows:

Schedule C to the Loan Agreement is hereby amended by deleting such Schedule "C" in its entirety and replacing it with Schedule "C" attached hereto.

Borrower shall pay to Lender a one-time modification fee of $1,000.00, which fee shall be charged as a loan under the Loan Agreement, the Modification Agreement Number Two Effective Date.

Except as so modified above, all other terms, conditions, and provisions of the Loan Agreement, including any and all modifications thereto, shall remain unchanged and in full force and effect.

The execution of this Modification Agreement Number Two and the acceptance of all other agreements and instruments related hereto is not deemed to be a waiver of any Default or Event of Default under the Loan Agreement, or a waiver of any breach, default or event of default under any Loan Document or other document held by or in favor of Lender, whether or not known to Lender and whether or not existing on the date of this Amendment. The Loan Agreement as amended by this Modification Agreement Number Two constitutes the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and thereof, and supersedes any and all prior agreements and understandings, oral or written, relating to the subject matter hereof and thereof. This Modification Agreement Number Two may be executed in any number of counterparts, each of which when so executed and delivered is deemed an original and all of which counterparts, taken together, constitutes one and the same instrument.

All credit lines, modifications and extensions of credit granted by Lender are subject to review and re-negotiation on the renewal and/or anniversary date of the existing Agreement.

This Modification Agreement Number Two is effective upon the date of full execution by all the parties hereto (the "Modification Agreement Number Two Effective Date").

10124/95426v2

**051**

| | SCHEDULE C TO LOAN AND SECURITY AGREEMENT | POINT.360, a California corporation, as "Borrower" |
|---|---|---|

**DISCLOSURE SCHEDULE**

Section 5.1 – Legal Status:

| Borrower's Exact Legal Name | Jurisdiction of Organization or Formation | Organizational Identification Number | FEIN |
|---|---|---|---|
| Point.360 | CA | 2967825 | 01-0893376 |

Section 5.2 – Locations of Chief Executive Office, Books and Records, Collateral:

| Location of Borrower's Chief Executive Office | Location of Books and Records | Other Locations Where Collateral is Kept |
|---|---|---|
| 2701 Media Center Drive, Los Angeles, CA 90065 | 2701 Media Center Drive, Los Angeles, CA 90065 | |
| | 1133 N. Hollywood Way, Burbank, CA 91505 | |
| | 2300 Empire Avenue, Burbank, CA 91505 | |

Section 5.3 – Trade Names; Trade Styles:

**Trade Names, Fictitious Business Names**

Point.360
Digital Film Labs
Visual Sound Closed Captioning Services, Inc.
Eden FX
Movie >Q
International Video Conversions, Inc.
DVDs on the Run, Inc.
Modern Video/Film

Section 5.8 – Indebtedness:

**Other Indebtedness**

(a) a debt owed to Bank of the West in the principal amount of $4,716,800, secured by a Lien on Collateral consisting of certain real property located at 1133 and 1122 N. Hollywood Way, Burbank, CA 91505

(b) a debt not to exceed the sum of a principal amount of $6,000,000.00 and PIK owed to Medley Capital Corporation and Medley Opportunity Fund II, LP pursuant to that Term Loan Agreement dated as of July 8, 2015

(c) certain debt pursuant to certain capital lease financing agreements relating to leases of or secured by liens encumbering specific equipment financed by such agreements and not financed

BN 21033635v4 Modification Agreement Number Two

---

in whole or in part, by funds loaned or provided by Lender

(d) trade accounts payable of Borrower incurred in the ordinary course of Borrower's business and consisting of customary terms in the industry and to the extent not secured by a lien or security interest in favor of such credit

(e) a debt owed in the principal amount of $2,000,000, secured by a Second Lien on Collateral consisting of certain real property located at 1133 and 1122 N. Hollywood Way, Burbank, CA 91505

Section 5.10 – Litigation:

**Litigation**

POINT.360 vs CA-COLORADO CENTER, LLC
Los Angeles County Superior Court Case # BC595088

Section 5.16 – Environmental Condition:

**Environmental Condition**

None

Section 5.21 – Deposit Accounts:

| Bank Name and Address | Account Number(s) |
|---|---|
| BANK OF THE WEST 1977 Saturn St., Monterey Park, CA 91755 ROUTING# 121100782 SWIFT: BWSTUS66 POINT.360 | ACCT # 02828/7375 ACCT.# 028287474 (payroll) |

Section 5.22 – Securities and Commodities Accounts:

| Brokerage Name and Address | Account Number(s) |
|---|---|
| None | |

BN 21033635v4 Modification Agreement Number Two

# EXHIBIT 3

*Note, this report includes insider payments that will not be paid and are subject to insider compensation approval procedures.*

**Point360 Confidential**    10/10/2017    Page 1

| Payroll Name | Gross Earnings |
|---|---|
| ██████ | $1,832.52 |
| ██████ | $1,877.27 |
| ██████ | $1,554.75 |
| ██████ | $1,372.75 |
| ██████ | $1,971.83 |
| ██████ | $4,000.00 |
| ██████ | $1,598.59 |
| ██████ | $1,405.19 |
| ██████ | $1,687.88 |
| ██████ | $12,815.40 |
| ██████ | $2,100.00 |
| ██████ | $1,179.63 |
| ██████ | $6,923.08 |
| ██████ | $1,306.88 |
| ██████ | $2,608.00 |
| ██████ | $1,707.75 |
| ██████ | $2,371.16 |
| ██████ | $3,116.43 |
| ██████ | $2,000.00 |
| ██████ | $6,153.85 |
| ██████ | $1,703.63 |
| ██████ | $6,153.85 |
| ██████ | $1,440.00 |
| ██████ | $1,108.50 |
| ██████ | $3,290.00 |
| ██████ | $2,033.63 |
| ██████ | $4,615.39 |
| ██████ | $3,068.15 |
| ██████ | $247.00 |
| ██████ | $1,400.00 |
| ██████ | $1,440.00 |
| ██████ | $4,273.08 |
| ██████ | $2,500.00 |
| ██████ | $4,615.38 |
| ██████ | $1,743.00 |
| ██████ | $1,943.50 |
| ██████ | $3,461.54 |
| ██████ | $520.00 |
| ██████ | $3,150.00 |
| ██████ | $960.00 |
| ██████ | $1,288.14 |
| ██████ | $2,128.25 |
| ██████ | $1,851.60 |
| ██████ | $6,400.00 |
| ██████ | $2,720.00 |
| ██████ | $1,147.62 |

**Point360 Confidential**    10/10/2017    Page 2

| | Gross Earnings |
|---|---|
| ██████ | $2,061.39 |
| ██████ | $1,809.50 |
| ██████ | $4,060.00 |
| ██████ | $2,367.13 |
| ██████ | $1,520.00 |
| ██████ | $3,653.84 |
| ██████ | $3,000.00 |
| ██████ | $948.00 |
| ██████ | $3,277.59 |
| ██████ | $3,677.31 |
| ██████ | $2,003.13 |
| ██████ | $1,440.00 |
| ██████ | $1,915.55 |
| ██████ | $3,073.60 |
| ██████ | $804.00 |
| ██████ | $1,902.00 |
| ██████ | $8,653.85 |
| ██████ | $2,454.22 |
| ██████ | $1,899.00 |
| ██████ | $2,014.80 |
| ██████ | $2,521.88 |
| ██████ | $3,461.54 |
| ██████ | $1,908.91 |
| ██████ | $1,595.00 |
| ██████ | $2,884.62 |
| ██████ | $2,860.00 |
| ██████ | $1,527.13 |
| ██████ | $3,099.95 |
| ██████ | $2,577.01 |
| ██████ | $4,120.81 |
| ██████ | $2,800.58 |
| ██████ | $1,872.62 |
| ██████ | $2,297.70 |
| ██████ | $1,510.50 |
| ██████ | $1,198.13 |
| ██████ | $2,347.60 |
| ██████ | $2,596.16 |
| ██████ | $960.80 |
| ██████ | $1,440.00 |
| ██████ | $960.00 |
| ██████ | $1,923.08 |
| ██████ | $4,477.49 |
| ██████ | $2,692.31 |
| ██████ | $1,260.00 |
| ██████ | $2,139.38 |
| ██████ | $1,000.50 |
| ██████ | $1,380.00 |

Page 4

10/10/2017

| Amount |
|---|
| $2,589.38 |
| $1,452.25 |
| $1,540.00 |
| $1,440.00 |
| $1,600.00 |
| $1,440.00 |
| $1,198.50 |
| $1,091.25 |
| $2,307.69 |
| $989.00 |
| $1,563.75 |
| $1,722.50 |
| $964.50 |
| $2,050.00 |
| $987.00 |
| $2,012.50 |
| $1,440.00 |
| $1,497.11 |
| $1,837.37 |
| $1,712.38 |
| $1,503.25 |
| $980.00 |
| $3,269.24 |
| $2,927.55 |
| $1,848.40 |
| $2,884.62 |
| $5,769.30 |
| $1,440.00 |
| $700.00 |
| $3,244.80 |
| $2,307.70 |
| $2,961.54 |
| $1,622.50 |
| $2,230.77 |
| $2,280.00 |
| $2,750.00 |
| $2,170.13 |
| $1,580.00 |
| $3,773.11 |
| $1,807.50 |
| $2,043.75 |
| $1,446.75 |
| $2,322.81 |
| $1,257.60 |
| $2,423.08 |
| $1,338.75 |
| $5,050.00 |

**Point360 Confidential**

Page 3

10/10/2017

| Amount |
|---|
| $3,588.75 |
| $330.00 |
| $2,692.30 |
| $2,500.00 |
| $1,625.69 |
| $2,961.54 |
| $978.00 |
| $2,828.25 |
| $297.00 |
| $2,364.39 |
| $4,230.77 |
| $5,690.00 |
| $836.25 |
| $4,153.84 |
| $967.50 |
| $2,085.37 |
| $385.00 |
| $2,384.62 |
| $9,269.23 |
| $2,648.00 |
| $3,653.84 |
| $2,512.50 |
| $2,423.08 |
| $2,307.70 |
| $1,440.00 |
| $1,788.76 |
| $1,735.25 |
| $3,078.12 |
| $1,440.00 |
| $3,076.93 |
| $2,024.10 |
| $3,490.29 |
| $1,058.35 |
| $1,680.00 |
| $4,569.24 |
| $1,591.88 |
| $1,680.00 |
| $1,014.00 |
| $1,520.00 |
| $1,198.25 |
| $2,664.00 |
| $6,820.00 |
| $1,142.00 |
| $2,760.00 |
| $381.00 |
| $1,188.25 |
| $1,759.50 |

**Point360 Confidential**

10/10/2017

**Totals**

$1,923.08
$1,608.63
$2,730.77
$3,813.13
$1,336.88
$1,750.88
$6,769.23
$1,280.00
$1,012.50
$1,711.60
$2,722.40
$1,939.97
$1,882.07

**$579,309.39**

**Point360 Confidential**

10/10/2017

$1,798.13
$1,590.00
$1,311.50
$3,813.13
$1,608.10
$1,280.00
$1,760.00
$3,220.00
$3,169.24
$1,644.38
$2,301.88
$1,607.50
$5,192.30
$1,332.38
$2,692.31
$2,360.00
$1,215.11
$1,211.25
$913.96
$7,692.31
$2,294.63
$2,576.25
$2,167.50
$1,600.00
$2,692.31
$2,500.00
$2,038.47
$2,060.37
$3,220.35
$2,176.09
$2,340.00
$987.00
$1,440.00
$13,200.00
$1,599.21
$2,479.13
$1,900.00
$3,466.53
$1,436.88
$2,118.39
$1,600.00
$1,360.00
$1,872.00
$1,680.00
$1,306.88
$5,769.24
$250.00

**Point360 Confidential**

# EXHIBIT 4

*057*

# Micor Analytics

Advance Technologies, Telecom & Media
Valuation, Consulting & Asset Management Services
www.micoranalytics.com

# VALUATION REPORT

## ASSIGNMENT

**Modern VideoFilm**
Empire Center
2300 W. Empire Ave.
Burbank, CA 91504

Colorado Center
2500 Broadway Ave.
Santa Monica, CA 90404

File #15-011

Date of Valuation
July 9, 2015

Date of Report
August 25, 2015

## DEFINED VALUES

**Fair Value 2015**

## COMMISSIONER

John Schweizer
**Point 360**
2701 Media Center Dr.
Los Angeles, CA 90065

_____

## CONTENTS

### EXECUTIVE SUMMARY

Property Interests – Assignment Purpose – Opinion of Value

### INTRODUCTION

Preamble
Preface

### ASSIGNMENT STATEMENTS

Certification
Value Assertion of this Report
Statement of Intended User, Purpose and Type of Report
Effective Date of Valuation and Report
Statement of Property Being Valued & Property Interest
Statement of Definition of Value

### MARKET, TECHNOLOGY, INDUSTRY, & OTHER EXTERNAL FACTORS CONSIDERED TO ASSESS OBSOLESCENCE

Technology Overview
Market & Industry
Other External Factors

### STATEMENT OF WORK: DATA COLLECTION, ASSET ASSESSMENT, CONSIDERATIONS & METHODOLOGY

Property Data
Asset Assessment
Value Considerations and Methodology

### CONCLUSIONS & OPINION OF VALUE

Assumptions and Limiting Conditions
Assignment Conclusions & Opinion of Value

### TABLES, APPENDICES, EXHIBITS, AND SUPPLEMENTS

Appendix A – FV 2015 – Grouped by Site, Sorted by Make and Model - MVF
Appendix B – FV 2015 – Grouped by Site, Sorted by Room and Rack - MVF
Exhibit A – Documentation provided for this valuation
Exhibit P– Asset and Facility Pictures

Micor Analytics, Inc.  7538 Saint Louis Avenue Skokie, Illinois tel: 847 329 8590   services@micoranalytics.com

## AUTHOR PROFILE



JIM.MINCHELLA@MICORANALYTICS.COM

James Minchella ASA is senior analysts and principal of **Micor Analytics, Inc.**

The firm provides consulting, valuation and asset management services in telecommunications, media and advanced technology market sectors since 1989. Micor actively follows the technology and business activities of these sectors.

Micor valuation services include machinery and high tech fixed assets appraisal for financing and accounting, intellectual property valuation, business valuation and appraisal review / management. Mr. Minchella at Micor is a regular consultant to major lenders, investors and businesses of these markets providing opinions of value for acquisitions, accounting, lending as well as court testimony, useful life studies, and market outlooks.

He regularly presents seminars and papers to peer and other professional groups regarding value, business and technology issues. Audiences include the Equipment Lessors Association, American Society of Appraiser and the North Suburban Bar Association of Chicago.

### Micor Analytics

© 2014 Micor Analytics, Inc.
7538 Saint Louis Ave. Skokie, IL 60076
Phone 847 329 8590
Fax 847 328 8599

James M. Minchella ASA has been a designated Accredited Senior Appraiser (ASA) of The American Society of Appraisers since 1999. He has provided valuation services as well as technology and market consulting for over 20 years. He is an active ASA member with a discipline designation in Machinery and Technical Specialties (MTS). He is in compliance with continuing education requirement of the ASA to maintain ASA designation. In 2014 he has earn accreditation extension to the end of 2018.

He holds membership in technical organizations and societies including SMPTE (Society of Motion Picture and Television Engineers) ACM (Association for Computer Machinery), IEEE (institute of Electrical and Electronic Engineers) and ASME (American Society of Mechanical Engineers). He annually attends NAB, (National Association of Broadcast) a major trade show of equipment exhibitors, seminars and panel discussions for cinema, television and radio. He regularly attends seminars, trade shows and reviews trade journals and publications regarding cinema and media technology, lighting technology, computer graphics and computing technology, telematics, additive manufacturing, electronics design and development, RF and light transmission, sensor technology and other advance technology topics.

Mr. Minchella has taken continuing appraisal education courses, seminars and online line presentations regarding appraisal practice and standards for not only MTS but business valuation and appraisal review as well. He makes regular efforts to keep current of ASA, USPAP, GAAP, IRS and ASB issues regarding the valuation of equipment and personal property assets.

He has direct inventory and appraisal experience with the type of equipment in this report. He values cinema and high resolution post-production and distribution equipment regularly. He is knowledgeable about this industry and has followed it for over 15 years. He is familiar with the features, market preference, and work flow the assets in this report service.

Additional background information about Mr. Minchella's expertise and experience is available on request to the users of this report.

# EXECUTIVE SUMMARY

*This Summary presents only the basic elements and opinions of this valuation report. Micor Analytic (Micor) has assembled this report of the assets of Modern VideoFilm in Burbank California. John Schweizer of Point 360 commissioned this report and is its intended user. Reading the entire report is key to understanding the methodology and data used to form the opinion of value in this report. This executive summary DOES NOT contain important facts, background information, assumptions and considerations the intended user of this report needs to understand the value and risk associated with these assets. Please read the entire report.*

## INTERESTS

The opinion of value in this report is based on the cinema and high resolution post-production and distribution assets, their related accessories, and options of Modern VideoFilm at the time of the acquisition of these companies, defined as a business combination under ASC standard of accounting practice. Modern VideoFilm at the time of acquisition provides cinema and high resolution post production and finishing of audio and visual element for productions. Modern VideoFilm provides editing, picture color correction, graphics, and other post production services that provide a work-flow that take captured images and sound to a finish production product. Modern VideoFilm is an established company in the post-production industry with a long history and strong reputation.

The fixed asset (equipment) interests are the ownership and rights of the production fixed assets of Modern Video. This includes film, digital cinema, computer processing, networking and data storage equipment

## VALUE

Based upon the data and conclusions presented in this report, it is our opinion that the assets listed in this report (File #15-011) on, July 09, 2015 has

**Fair Value Cr 2015:  $5,074,917.00 for Modern VideoFilm**

For values of specific items, please refer to Appendix A.

## PURPOSE

It is understood that this report will be used to establish an opinion of Fair Value of the assets of Modern VideoFilm for use in establishing the purchase price allocation among the various assets included in the acquisition transaction.

THIS PAGE INTENTIONALLY LEFT BLANK

# INTRODUCTION

## PREAMBLE

*The value of equipment is defined by its economic benefit to an owner. To understand the value of that benefit requires knowledge of the function the asset provides, and the workflow it facilitates that generates income for its owner. In identifying the assets and their attributes, explaining the rendering of opinion of value, addressing the technical, physical and economic obsolescence, reviewing pertinent market and industry data, this report narrative works to provides its intended users a relevant economic context in which to use this opinion in their decision process.*

## PREFACE

This report provides a researched opinion of value for the assets of Point 360 and Modern VideoFilm as of the date of this valuation. This valuation report provides the reader with pertinent data, research, context, and the process I used to arrive at the stated opinion of value. John Schweizer of Point 360 is the commissioner and intended user of this report. The report is intended for use in evaluating these tangible assets for financial reporting purposes in a business combination (acquisition) of Point 360 and Modern VideoFilm, both providers of cinema production equipment for theatrical features, television, advertisement, and other high profile, professional media production, as of 07/09/2015

The list of equipment considered and some data used for this valuation have been provided by Point 360 and Modern VideoFilm as facilitated by Point 360. The assets in this report are assets purchased and in use in Modern VideoFilm facilities as of July 09, 2015. Micor conducted an inventory and inspection of Modern VideoFilm facilities at 2300 West Empire Burbank, CA and 2500 Broadway Ave., Santa Monica, CA.

This report provides the user with Fair Value of the tangible assets listed in this report. The report provides reference for the intended users for technology and industry issues key to asset value, methodology used render the opinion of value, the scope of work and due-diligence taken to provide a report opinion that reflects the reality of the assets' value and the market.

I believe this report conforms to USPAP standards for an Appraisal Report and Fair Value measure as discussed in ASC820, but it is not limited to only those requirements. There is additional information, discussions and topics not required by USPAP standards for a Personal Property Appraisal Report. These topics may address issues usually associated with other type of appraisals (such as "highest and best use"), but have relevance for the use of this report for its intended purpose.

This report addresses the need for a review of assets and provides a supportable opinion of Fair Value for evaluating tangible fixed assets for transfer of ownership in this financial transaction.

James M Minchella ASA

THIS PAGE LEFT BLANK INTENTIONALLY

# ASSIGNMENT STATEMENTS

THIS SECTION BEGINS WITH A <u>CERTIFICATION</u> OF MY DISPOSITION AS THE APPRAISER AND AUTHOR OF THIS REPORT. THE CERTIFICATION CONTENT FULFILLS THE REQUIRED FORM AND CONTENT REQUIREMENT OF USPAP AS WELL AS THE ASA AND OTHER STATEMENTS I FEEL ARE RELEVANT FOR THE INTENDED USER OF THIS REPORT TO KNOW.

ALSO IN THIS SECTION ARE <u>STATEMENTS</u> AND SUMMARIES THAT DEFINE THE OBJECTIVES AND PARAMETERS OF THE ASSIGNMENT AS DISCUSSED AND OUTLINED IN THE ENGAGEMENT AGREEMENT BETWEEN POINT 360 AND MICOR ANALYTICS. IT IS IN THE FORMAT SET OUT ACCORDING TO APPRAISAL PRACTICE STANDARDS AS I UNDERSTAND THEM.

## CERTIFICATION[1]

I certify that, to the best of my knowledge and belief:

— The statements of fact contained in this report are true and correct.

— The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

— I have no (or the specified) present or prospective interest in the property that is the subject of this report, and I have no personal interest with respect to the parties involved.

— I have performed a full inspection and appraisal of the property that is the subject of this report in 2013. This was disclosed to all known users of this report preceding acceptance of this assignment.

— I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

— My engagement in this assignment was not contingent upon developing or reporting predetermined results.

— My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

— My analyses, opinions, and conclusions were developed and this report has been prepared in conformity with the Uniform Standards of Professional Appraisal Practice.

— No one provided significant personal property appraisal assistance to me but I have had assistance. Under my supervision and review Christopher Minchella has conducted due-diligence, research and data review. The value opinion decisions in this report are solely mine.

— The American Society of Appraisers has a mandatory recertification program for all of its senior members. I am in compliance with that program.

_____     [SEAL]
James M. Minchella ASA
Micor Analytics, Inc.

## Value Assertion of this Report

Point 360, seeks a supportable opinion the Fair Value of the Tangible Fix Assets of Modern VideoFilm to recognize and measure the identifiable assets acquired as discussed in Accounting Standards Codification ("ASC") 805. The "Opinion of Fair Value" of the Tangible Fix Assets of Modern VideoFilm acquired by Point360 on July 09, 2015 is $5,074,917.00.

## Statement of Intended User[2], Purpose[3] and Type of Report[4]

This appraisal report is prepared for John Schweizer of Point 360, the commissioner and intended user of this report. John Schweizer of Point 360 is Point 360's authorized contact and agent for this assignment. Others involved in stated purpose of this assignment (Intended User) may also be users of this report. The audit team involved in the transaction may be users as well. No other users were disclosed before or during this engagement.

The purpose of this appraisal report is to establish an opinion of Fair Value of the post production processing assets Modern VideoFilm. This opinion is intended for use in establishing the purchase price allocation among the various tangible and intangible assets included in the acquisition transaction under financial accounting standards ASC 805

This Valuation Report was prepared as a USPAP Appraisal Report and designed to conform to USPAP Standards, Statements, and Advisory Opinions regarding an Appraisal Report. This is not a USPAP Restricted Appraisal Report. This Report contains only retrospective values.

## Effective Date of Valuation and Report[5]

The effective date of this valuation is July 09, 2015. The date of this report is August 25, 2015.

## Summary of Property Being Valued[6] and Property Interests[7]

The assets valued in this report are Modern VideoFilm's  computer processing, networking and data storage equipment used for digital cinema and media processing, film and video tape equipment used to convert recorded images to digital media, audio processing and editing equipment, display and sound reinforcement for monitoring and processing, general furniture and fixtures.  It only includes the assets listed in this report. It does not represent any other tangible or intangible assets outside of the stated inventory.

These assets are part of an integrated production facility.  Howwever, these assets may be used in the facility work flow as individual pieces or sub-systems. They are not permanently engineered into an interdependent system. The assets can be removed, replace, moved with the facility or upgraded without downing the facility or materially impeding work flow. The assets represent the income producing equipment of the company much as a production asset would at a manufacturing firm.

The inventory represents many items that are part of, or an accessory to, an asset that is used in the production work flow. This one item in the inventory is the anchor item, with several others that are attached to it in order to form a working unit of value to the end user. This is important for the user of

this report to know, because this assembly of assets into a system represents both how these companies identifies the asset's income and how it would be sold in the open market in a transaction. A simplified example of this is a video camera. To be a useful complete system, it would require the camera itself, a viewfinder to see what is being recorded, a plate to hold the camera on a tripod, and a cable to supply power to the unit. Apart from the main asset, these other assets have little or no value at all, yet their absence can significantly affect the value of the main asset. In the appendices to this report, these items have no value assigned to them.

Identifying the core technology of assets in this report was important for forming the opinion of value. Core technologies affect every item and include not just the assets or components of the assets, but the manufacturing process as well. This knowledge is essential to determining useful life and market desirability of a product. A great income-producing asset today may be on the brink of obsolescence if its core technology is changing. A low-income asset may just be garnering market share as its acceptance is beginning to bloom. Such information helps to explain discrepancies between approaches to value, and which one is most appropriate.

Industry growth and key economic factors that affect the industry using this equipment were considered as well. The current and long-term outlook for cinema and electronic media shows consistent growth with a diverse and segmented end market that can be reached in array of distribution channels with a wide choice of production workflows and technologies. Today's industry features more end products, with less labor and capital costs. It services smaller, targeted markets. Obviously, a major economic depression or cataclysmic event such as a major war or natural disaster could drastically change these growth and economics forecasts.

For a detailed list of equipment, see Appendices A. For a discussion of physical, technological, and economic characteristics of the assets in this report, see the "Market, Technology, Industry" and "Asset Assessment" sections of this report.

### STATEMENT OF DEFINITION OF VALUE[8]

**Fair Value** is the **"the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."** (ASC 820) FASB) This definition of value was chosen in consultation with Point 360 and its audit team. The definition is compliant with GAAP standards as we understand them. We agreed that the definition reasonably defines the scenario Point 360 considers in assessing these assets for it financial statement. The definition uses terminology and language accepted and familiar to a large body of finance and accounting practices and management. Please refer to "Summary of Value Considerations" later in this report for important additional issues addressing Fair Value measurement.

# MARKET, TECHNOLOGY, INDUSTRY, & OTHER EXTERNAL FACTORS CONSIDERED TO ASSESS OBSOLESCENCE

*A basic concept of Technology and Industry Issues for Media is key to understanding the obsolescence and desirability of assets. These issues provide insight into useful life and other issues helpful in rendering opinion of value. They are important to the intended user of this report to assess risk in their decision process.*

*The following sections provide summaries of the research, issues and analysis considered. They provides a foundation for understanding the assets, market, depreciation factors and methodology used to arrive at the opinions of value listed in this report and its appendices. The reader is encouraged to follow up these readings with research of their own or a discussion with myself or Micor staff.*

## TECHNOLOGY OVERVIEW

The technology of audio and video is no longer limited to discreet appliances. It is ubiquitous in our lives and constantly changing. We can see it in the features of our cell phone, tablet and that "smart" TV. We can see it in how we purchase, store, listen to and view our music and movies. We can see it in the new ways we take pictures and movies of our lives and easily distribute them to our friends and family. We see it change with that new cell phone tablet or display model release within 1 year or two of the one just purchased. The evidence is everywhere how these core technologies that so quickly brought this ubiquity to us and constantly changes it drives depreciation and useful life of all media assets at all market levels and applications.

Considering the core technology of assets in this report was important for forming the opinion of value. Core technologies affect every item and include not just the assets or components of the assets, but the manufacturing process as well. This knowledge is essential to determining useful life and market desirability of a product. A great income-producing asset today may be on the brink of obsolescence if its core technology is changing. A low-income asset may just be garnering market share as its acceptance is beginning to bloom. Such information helps to avoid misleading data and points out depreciation factors otherwise not readily apparent.

Media production has always consisted of **3 core activities: Capture, Process, and Display**. This can be for sound, picture, or both. This is the basic work flow. In an industry once dominated by specialty equipment, Process (the workflow between Capture and Display) is now dominated by enterprise and personal computing equipment. This is the same equipment used in Telco and ISP businesses, as well as other high tech applications besides media. Capture and display have yet to be consumed into computing equipment common to other fields but is under assault.

Image **capture** is now dominated by an assortment of active-pixel sensors (APS) that have all but replace film. These APS's include the familiar CCD and CMOS sensors that have been in production for over 20 years now. They consist of an integrated circuit that holds thousands of tiny photodetectors with an active amplifier attached to each. This capture technology is found in everything from your cell phone still camera to highest resolution cinema cameras. CMOS technology has produced successive generations of larger, cost effective sensors with greater resolution and sensitivity. This has allowed the development of digital cameras that can now surpass the resolution and color attributes of film. A resolution standard that barely changed for generation using film is now dynamic using APS's making depreciation factors equally dynamic.

Many media industry workflows to **process** image and sound rely on DSP technology and its use of common enterprise and PC computing platforms. This is often referred to as "COTS" (commercial off the shelf) hardware. COTS based equipment and its core technologies now offer the performance, reliability and price points that make it a serious contender beyond post production to now live production. Multi stream bandwidth processing is essential for these higher resolution formats and there is the COTS hardware in place to do so. COTS establish computer depreciation factors for many cinema and media assets.

**Displays** in both small and large screen are constantly offering more resolution and enhance picture attributes. Projectors are on the verge of using laser light for digital projection that will offer brighter and clearer attributes. Laser Projectors will offer a new generation of theater exhibition options to it audience. Home viewer will this year see the first of 4K TFT LCD displays (about 4 times the resolution of HDTV) at very reasonable prices for first generation models. These displays and projectors not only introduce depreciation to the models they replace but they complete the cycle of capture, process, and display for 4K technology.

These core technology changes can be seen in a number of **products and innovations** coming to production cycle.

**Live Production** is now transitioning to a completely computer based networking of signal routing and processing to support this specialized real time workflow. Digital Signal Processing (DSP) in computing has been in deployment for over 20 years. It is well into its 4th and 5th generation of development. Now, computing technology using DSP can offer the speed and bandwidth to reliably service not just the current HD specification but Ultra HDTV that offers 4K resolution (the next generation of display and projection).

**Post Production** workflows have long relied on DSP technology and its use of common enterprise and PC computing platforms. Now, COTS equipment offers the performance, reliability and price points that make it a serious contender in live production. Multi stream bandwidth processing is essential for these higher resolution formats and there is the COTS hardware in place to do so. The Expanded Bandwidth of 10G and even 100G Ethernet are additional factors. The advancing production techniques in data storage have broken the bus speed "log jam" computing has faced in the last few year where date drive held back fast processor and bus designs. Thus a greater and greater portion of post and live production processes of 4K will hold assets with computer useful life and deprecation factors.

**Laser Projectors** have already been demonstrated to the public and are beginning delivery. Current digital projectors can be upgraded to laser technology making the transition less invasive and costly. **4K Displays** (monitors and TVs) are already available in the consumer distribution channels at affordable pricing.

It is important to understand **why resolution is so important** to visual production. Greater resolution does not only mean a bigger picture screen. More resolution pixels are the building blocks for other visual attribute controls such as depth perception and color. More pixel resolution opens up possibilities for more realistic and natural looking 3D and greater color control. Wide vistas have less blur. Viewers have more freedom to look anywhere they want on the screen. New tools for live production and storytelling cinema become available and economical with higher resolutions.

4K technology is readily available now throughout the entire work flow of production and distribution. Its eminent establishment as a standard will initiate an ever declining useful life for HDTV and 2K standards assets.

## MARKET & INDUSTRY

Technology development alone is often not sufficient to displace existing assets. Market and Industry forces can accelerate or even kill a technology's acceptance, extending or cutting short an existing product's useful life. For this discussion we will define the forces we identify as "Market" and "Industry" based and their influence on useful life and depreciation.

### A DEFINITION OF MARKET, INDUSTRY AND SECTOR

**Market** activities and issues directly influence asset purchase and use decision. These include make and model preferences, work flow preferences, financial and market strength of manufacturer, cost, and competing technologies influences. Market forces can influence Functional Obsolescence.

> *Do I buy an iPhone or Android cell? Which one works best with my job or fits best into my life style? If I don't buy a Samsung Android is this other company trustworthy? Will they still be around in 2 years? 5 years? 10 years? Will I pay more for a product that answers these questions? How loyal am I to my brand?*

**Industry** issues include technology and manufacturing issues that change the manufacture techniques of an item, its core technology. Also, it can include industry standards under development, government regulation and industry licensing authorities (LAs*). Industry forces can affect technical obsolescence.

> *Which phone has the better features and performance? The new model is made a different way with better parts. The new industry standard makes my existing phone obsolete. Apple won't license that feature to any other phone maker.*

It is easy to see how the **Media Sector** has diversified. The current and long-term outlook shows consistent growth with a diverse and segmented end market that can be reached in array of distribution channels with a wide choice of production workflows and technologies to provide it. But

this growth has fewer participants (businesses) using less labor and less equipment at lower capital costs. Industry statistics and a review of sector participants confirm this trend. It is regularly discussed by key industry trade groups such as National Association of Broadcasters (NAB) at their annual convention.

In summary it is a stable but smaller ecosystem for high-end, professional production assets. Obviously, a major economic depression or cataclysmic event such as a major war or natural disaster could drastically change these growth and economics forecasts.

### Market Issues Discussion

In January of 2014 CES (Consumer Electronics Show in Las Vegas) established 4K on the Market horizon with the announcement of 4K consumer displays by several manufactures. In 2014, CES set 4K as the new standard. During that year major manufacturers, producer and distributors make clear announcements that future media (whether video or cinema) would be at least 4K. In 2015, CES was almost exclusively 4K products. Yet, there are still challenges to be addressed. While all market influences call for 4K, live production is still missing key integration and capture capability. No live 4K camera for sports production has yet to be released (but some are eminent by year's end). No such obstacles face the cinema or post production video markets.

Professional and trade organizations are finalizing standards and work flows for both 4 and 8K. Capabilities for 4K are in place in all 3 segments of the work flow (capture, process, display) at affordable costs.

The Cinema and Video Production **Markets** have set a clear preference for 4k resolution digital production. **Display** is an equal participant in the push for higher resolution. The capability of equipment and technology to credibly support 4K resolution is at hand. Major equipment manufacturers are now offering production models with 10G Ethernet routing and multi-stream 4K processing for live production and influential industry production leaders articulated a deployment path and timeframe for Ultra HD (4K) production by the 2010 Japan Olympic Games.

Delivery to consumers is still not settled but distributors such as Netflix and other sources are demanding content delivery in 4K. Business models of pay per view in cinema theaters using digital projectors has garnered enthusiasm from exhibitor and shown a potential business model. Other compression and buffering technologies show promise for IP delivery of 2K and 4K programming to the home. 2014 saw some of the first 2K and 4K production in high profile sporting and live events. 4K consumer televisions are now in distribution.

4K capability is affordable for production and the cost of HD and 2K equipment is falling. However it is important for the user of this report to know HD and 2K production are still far from free-fall, they are still dominant for TV and reality production but its time is ending.

### DISCUSSION OF INDUSTRY ISSUES

**Industry** production technology now offers equipment entering the market at price points significantly lower than the historic costs for higher resolution assets with similar function and position in the media workflow. This equipment includes cameras, signal routing as well as audio and video processing. All of these categories have benefited from new core technologies and/or manufacturing advances that made small volume manufacturing very cost effective. Advances in manufacturing techniques, sensors, and displays make higher resolution reliable and cost effective. COTS computing takes away the cost of developing dedicated equipment for small markets. 3D printing has reduced the cost of small volume mechanical parts productions, inkjet circuit printing and FPG chips has done the same the electronics. These advancements in general manufacturing has significantly reduced both the time to market and cost of development and production for a sector that traditionally face very high introduction overhead for technological advancements.

A set of production and format standards remain to be built. That is a tough technical and political task. History has shown that often this process can hold back deployment as licensing groups fight and sue each other over Intellectual Property rights. Technical committees are subverted by manufactures who want their format to become the standard. The Olympic deadline in 2020 should mitigate this and begin a consensus within a few years. The politics of business could hold off this technical advancement and extend the useful life of existing format equipment. But that seems unlikely with the pressure of 4k equipment ready for market, commitment of governments, consumer manufacturers, sports broadcasters and distributors to the home, cinema and other entertainment ventures to this format.

### OTHER EXTERNAL FACTORS

There were no known relevant external factors found for consideration in rendering the opinion of value in this report.

❧ ❧ ❧ ◆ ❧ ❧ ❧

# Statement of Work: Property Data, Asset Review, Value Considerations & Methodology[9]

*This section provides a review of how the asset data was acquired prepared for analysis on the valuation process. There is a review of the subject assets grouped by type, use and attributes considered in assessing value. Lastly, is a discussion of the value methodology and consideration process to arrive at the opinion in this report.*

## Property Data

### Data Acquisition & Ingest

The list of assets valued for this report is based in the inventory data provided by P360 and Modern VideoFilm as well as an appraisal inspection and inventory conducted for this report.

From July 21st to 23rd, Micor Inspected and confirmed the inventory provided by scanning, written inventory and confidence spot checks  at the Modern Video Facilities at Burbank and Santa Monica. Both facilities were operating and the visit had to consider work flow and client activity, but all areas of both facilities were inspected.

The data ingested for this report r included make, model, a description, serial number (if available), Modern VideoFilm's asset tracking number (if available), purchase price, date of purchase and other data not included in the appendices of this report but helpful in tracking and researching asset information. Other data was added to the provided data such as status and relationship fields; which identify assets that comprise a system that is a separate purchase option or accessory to another item in this report or assets that were purchased to support another asset not included in this report.

The data was checked for accuracy and consistency to assure data integrity for sorting and reporting against the purchase/delivery data that was provided for accuracy in descriptions, quantity and purchase pricing. The data was also checked against published manufacturer and trade data for consistency in descriptions, features and function, offering and support (legacy check), and market pricing for the product when purchased new or in similar condition. Data may have been updated or changed to reflect a more accurate description of the asset using this process.

This data ingest process represents reasonable measures to assure data integrity and clear descriptions of the assets for rendering an opinion of value and providing the user of the report, a clear understanding of the physical assets the comprise the assignment.

**Inventory and Financial data** was provided by P360 and Modern Video. This included a list of production assets from both facilities. The data included make, model, description, quantity, some degree of categorization, some historical costs. Modern Video was able to provide historical purchase dates for their inventory. The data was adequate to reasonably define the asset, its function, features and accessories, its model vintage, market position and use in the workflow for it intended user. Revision and additions and deletions from the inspection refine the data further and provided

additional data, upgrades and attributes that added value consideration in forming the opinion of value.

This data was ingested into a database where it was checked for accuracy, groomed for consistency, and augmented with addition data collected from the due-diligence process. This data was key for identifying the type, age and application of the asset in the valuation approaches used in the assignment. In addition, Modern Video revenue data provided a valuable reference when analyzing the results of applied methodologies. P360 had no such data available.

It is important to note that no assumption of equipment, options or age was made outside of the description provided or collected. Thus, accessories not listed are not assumed unless basic to the asset's configuration are based on the known accessories only.

## Facility & Maintenance Review

The Burbank and Santa Monica sites maintain a secure, clean and organized environment. Engineering for both media and data are well designed and able to support the current work load, change and growth within the existing infrastructure. Assets are in good working and cosmetic condition, appear to have requisite maintenance and updates to keep them productive and able to perform the function in the work flow for which they are intended. From these observations we consider asset listed in the report to be in good operating and physical condition unless otherwise noted in the asset description

## Due-diligence data

Due diligence data was collected by Micor Analytics and included replacement costs new, equipment legacy checks, market comparable, equipment reviews and technical information. This data provide facts on equipment cost and depreciation factors used in applying Cost and Market approach methodologies.

## Asset Assessment

Measuring the physical deterioration of an asset is fundamental to rendering an opinion of value. In this valuation assignment condition is deem to be good for both functional operation and cosmetic appearance (See Facility and Maintenance Review).

The assets being valued in this report are digital media processing equipment, "commercial off the shelf" computing and networking equipment. Film scanning and projection equipment, sound and video editing and processing equipment and some common furniture and electric generator assets and the accessories and options all of them use. Most of these assets are commercially available items, offered by established manufacturers and well known in the marketplace. All these assets are of professional quality and made to standards for use in media production for cinema and video.

All of the production assets owned by Modern Video are in this report. This company may have other assets in their inventory that are not owned by them and are not part of this report. Also, there is non-production equipment necessary to facilitate a working business operation that is not part of this report and not included in the opinion of value in this report. Most of the equipment in this report has been in use for at least 1 year or more as of the appraisal date.

Modern VideoFilm has a significant volume of old tape format recording and post production equipment, legacy computer and film equipment. These older assets would most likely be fully depreciated and unlikely to be producing much revenue but are key to their digital production work when access to legacy material is necessary

The following is a discussion of Modern Video and P360 assets by asset category (equipment type).

## DIGITAL MEDIA PROCESSING

This category includes COTS computer equipment as well as dedicated digital media processing equipment.



COTS (Commercial Off The Shelf) assets include an established server, storage and network switches from manufactures such as HP, Dell, Apple, Cisco. The industry is now dominiated by manufacturers that rely on these platforms, adding a specialty card and software to create a system. They are then are able to use established computers to process video. It is important to note that these assetd are not altered outside of OEM specs for their use at Modern VideoFilm and can be repurposed for any other computing applications easily. These assets follow the usual usful life for 3 to 5 years. Useful life can be extended with upgrades in some cases.

Media processing and storage assets include Omneon media servers and digital processing and editing systems from DVS and Utah that are specifically designedto do media work and nothing else. These system are usually engineered with established upgrades and provide a proprietry workflow that distingushes them from comoddity computing assets. The unit ususal have a useful life of 5 to 7 year but rely heavily on annual service contracts and regular upgrades.

## VIDEO TAPE RECORDER



This category includes video and audio tape recorders as well as optical disk recorders  and  the processing equipment to monitor and use their content in Modern VideoFilms work flow.

Many of the Tape and Optical disk system are legacy equipment that have fully outlived their traditiona luseful life.  Their their technology and operation is need as a gateway to legacy media programs and entertainment being conveted for use in a digital high resolution market.  While manufactue support for most product is gone. these systms can keep on as long as parts are available. Their remaining useful life for the purpose of our report is 1 -2 years, in reality it is for as long as part s can be found.

## FILM SCANNING

Film scanning provides the  tranfer of celuloid images to a digital format.

Modern VideoFilm has Northlight and Philips films scanner capable of nore more 2 to 4k resolution. These scanners will need to compete in the med ia production process that is rapidly becoming 4k

August 25, 2015                                    Application of Considerations & Methodology



resolution and moving to 8k permitted by the digital cameras, processing and display systems now establishing themselves in the market.  The Philips scanners are well beyond their manufactued useful life with not support or spare parts.  The Filmlight scanner is still supported and has a upgrade path to 4/8k with dimished  speed performhance.  These asssets have a 2 to 3 year remaining useful life.

## Sound Processing and Editing

Equipment in this category is part of a a workflow that edits and processing the captured images from the camera. Processed including in post-production include editing, audio mixing, color correcting, titleing and graphic creation and special effect processing.



Post production is dominated of computer based systems using digital signal processing. Many systems use a "COTS" platform with specialized software, Many computer based systems that used propietary platform had moved to COTS platfrom by 2013 included the Quantel, Avid, DVS, and other enterprise caliber graphic computing and storage solutions.

These systems' useful lives and values are determined by their core technology (Meridian, Adrenaline, Nitris, etc.), CPU technology, and software version. New model generations constantly feature software versions running on the latest COST platforms and taking advantage of fast ethernet networks that provided faster rendering, storage and workflow sharing solutions at a lower price point than previous models.

Post production editing and graphics system offer a 3 to 5 year useful life that can be extended with often with hardware and software upgrade offer by the manufacturer. The monitoring and test equipment that surround these system offer a 5 to 7 year useful life. Terminal and test generation assets can offer up to a 10 year useful life

## Furniture & Fixtures

Usually this category offer little material value in a facility.  However in many technical facilities power and environmental controls can be significant.  For this report desk top computers, furniture we in small enough numbers,  relatively old in the useful life and offer low or little in exchange value to be considered.  The Burbank facility does feature a





power generator with little wear, and a long remaining useful life. These generators have a 7 to 10+ year useful life. This unit could easily remain in place for the next 10 year and the unit would equally be desirable in an exchange transaction.

systems.

Application of Considerations & Methodology                    Point 360/Modern VideoFilm

## THEATER AND EDIT ROOMS

Theaters and Edit rooms at Modern VideoFilm feature the display, test and control equipment operators need to monitor and operate the audio and images processing equipment in the facilities. This includes film and video display equipment, sound equipment, and test signal monitor equipment.



Theaters hold film and digital projector and the support sound equipment in large room to simulate cinema. Edit rooms are smaller and rely on video display and smaller audio systems.



The assets in both rooms have similar useful life.  Display and digital projectors have a similar useful life of 5 to 7 years.  Film projectors are easily 10 plus but face technical obsolesces.  Sound equipment is 7 years and test monitoring equipment is usually 7 years.

# Value Considerations[10]

Recognized practices and methodology provide assurances to users that the opinion provided has been arrived at in a reasonable and supportable process. Micor makes its best effort to comply and follow the standards, practices, and methodology put forth by USPAP and the American Society of Appraisers. Micor considered the following approaches, premises, and underlying issues to assure that the report reflects the economic reality as of the effective date.

## Market Participants

Market and sales data used to render the opinion of value were based on market participants that are independent and not related to or a part of P360 or Modern VideoFilm's business operation. Participants are knowledgeable about this equipment and the media market this equipment serves. Data is from transactions that participants have the means to purchase and are not forced to sell or buy. The data represents a retail transaction; not a broker, dealer or "wholesale" purchase.

## Value Premise

"In exchange" value premise is used in this report. It is the most appropriate premise for the definition used in this report and the purpose of this report in determining a value of collateral in lending which would depend on an offering in an open market and assets sold "as is". In exchange market data was adequate and reliable for many of the assets being valued. The assets are installed in an integrated facility. In most cases a single assets or a small number of assets can be removed, upgraded or replaced within the integration without significant disruption to operations. Assets are valued "in place", so the cost of installation, etc. is considered if specific to the asset.

Most assets in this report are small individual assets easily shipped at a reasonable to cost just about anywhere worldwide. The most advantageous market for this equipment is computer/data and media production firms looking for equipment. The cost to reach this most advantageous market is small and fairly uniform over most of world-wide.

## Transaction Considerations

Exposure time that was considered appropriate for this appraisal varied little by item or item type. The usual and customary exposure for this production equipment and these assets fell between 2 and 6 months.

No sale or transfer data between related parties or corporate divisions within Modern VideoFilm or similar transactions by other companies were considered. No data was used involving the sale of partial interest in an asset or in the sale of an asset that was sold as part of a system.

Transactions considered were in resale markets where Modern VideoFilm and other industry users of media production equipment users would normally sell or purchase these assets (such as trade web sites, periodicals and user groups. This is not a geographically limited market, sales regularly transact worldwide as discussed in the Value Premise section of this report. Sales of whole systems of this type are usually limited to North America.

System sales are more complex than equipment sale transactions. System value can have additional considerations. Values of system under valid existing contracts will tend to have values closely related

to that contract value. Thus a system obligated to an underpaying contract may have a lower value than if sold "as is". The reverse may be true as well.

### APPROACHES TO VALUE

Micor considered and tested Cost and Market/Sales Comparison Approaches for material assets in this report. The following is a review of the recognized methods and techniques incorporated into these approaches and how they were considered and applied in the due-diligence of this assignment.

The **Market Approach**, or Sales Comparison Approach, focuses on the action of buyers and sellers and the data from those transactions. While a direct match is preferred, often only a comparable match is found. It is adjusted for capacity, type of transaction, technology, work flow and a number of other factors so as to closely represent the asset being valued in the appraiser's opinion. In using the market approach, the percent-to-cost ratio technique was used for assets of similar age, technology and utility. In this established technique, a ratio developed from the sales comparison of a representative asset of similar technology and utility is applied to the current new cost of the similar assets in order to calculate the opinion of value.

The due-diligence performed for this assignment used adjusted market comparable and observable price quotes, as well as purchase data provided by Modern VideoFilm, for calculation and/or research.

Market participants who would be interested in buying or selling the equipment listed in this report are video and audio production companies, independent contractor providing audio and video recording services, video and audio equipment companies as well as industrial, business and armature users.

During the course of market due-diligence, no "blue-book" data for media and computing assets was used. Micor finds this data unreliable and dated. Besides current market comps, interviews with end users, resellers, and industry experts were sought as additional input. When possible, comparable data had to be verified with follow-up phone calls to confirm actual sale or selling price. In many instances, sellers would only confirm the sale, and if the equipment sold for the asking price. Thus, in many situations, research would only confirm for what value an item would **NOT** sell.

The **Cost Approach** to value is an estimate of the present replacement cost of an asset, less all forms of depreciation. The technological obsolescence and physical deterioration of assets were the key factors that affected our opinion of value in this report, and our focus when testing this approach.

The Principle of Substitution establishes the assumption that no informed market participant would pay more for a property than the cost of acquiring a substitute property of equivalent utility. Technological advancement for this equipment has been rapid and significant, resulting in lower replacement cost, significant capacity improvement, or both.

In most cases, determining cost was established by one or more of three methods: getting a quote from the manufacturer or from an on-line seller (for small value or commodity items); getting MSRP and discounting the known industry standard; or, estimating reproduction cost from the subject's data.

Next, depreciation was deducted based on physical use. Most assets in this report are electronic assets that are housed hard travel cases. In general, they receive very little physical use compared to

construction or machinery fixed assets. There are limited assets that incur regular mechanical wear (such as video tape players the need regular tape path parts replaced, monitors that lose their brightness). Tripods, cameras, lights and other field assets can incur significant physical wear and may regularly require technical and cosmetics maintenance. Most physical wear shows in cosmetic condition in the form of surface scratches, worn button or chipped handles. Please refer to the extraordinary assumption in this report that addresses these issues in this report.

It is important at this point to draw the distinction between Functional Obsolescence and Technical Obsolescence as observed and considered in the approaches in this report. Functional Obsolescence is observed as a loss in value resulting from differences in capacity of a new asset over the appraised asset. For the assets in this report Functional Obsolescence could be pointed out as enhanced resolution and users' features in the latest camera that result in better quality and efficiency in workflow. Technical Obsolescence is observed as a loss in value resulting from the difference in design, construction, materials or core technology in a new unit over the asset being value. For assets in this report, Technical Obsolescence can pointed out in cameras and recorders that use MPEG2 compression in their processing when compared to newer units using MPEG4 compression that results in greater capabilities and better end picture quality.

Functional Obsolescence was an important consideration. Functional Obsolescence is often observed in change of workflows, time, and/or cost savings that shorten the useful life of an asset. These changes are not uniform across all assets in this report. Thus, small groups of assets with common technological attributes were identified and these groups were reviewed to identify specific, observable factors and how their effective could be quantified.

Technical Obsolescence for this type of equipment is major factor and can often be the key factor to an assets value and remaining useful life. Technical obsolesce can be observed in such examples of the change in camera sensors from CCD to CMOS, processing assets change compression algorithm from MPEG2 to MPEG4, high density CPLD (Complex Programmable Logic Device) replace PCB (Printed Circuit Board) components in cameras and recorders. Technical Obsolescence for the type of assets in this report can be more disruptive and devastating to useful life and value than any other form of obsolesce or depreciation.

Please refer to the Subject Review section of this report for a more detailed discussion on specific groups of assets. Therefore, the cost approach used for this reports results are the credible replacement value less the depreciation factors. It was applied in an instance where assets models were so new in the market place that no reason adjusted market comparable produced a credible input.

The **Income Approach** was not considered for this appraisal because of the appraisal purpose and the lack of income data that could be attributed to specific assets to form a reliable opinion of value. In the loan making decision process that this report is used for, there is no consideration of income or revenue that would accompany assets returned to or recovered by the lender.

### HIGHEST AND BEST USE

The highest and best use is the use by market-participants that maximizes the value of the asset or group of assets. The different ways of utilizing the individual asset as well as whether the maximum

Application of Considerations & Methodology                    Point 360/Modern VideoFilm

value is on a stand-alone basis or in combination with other assets (value as a system) The use or intended use of the business acquirer was not considered but if that use was a consideration of non-related market –participants it was not excluded because it was the business acquirer's intended use.

### DATA RELIANCE

In performing the inventory data review and due-diligence for this report observable and unobservable input were used. Unobservable input (inputs that reflect the report subject's own assumptions about the market and its participant base on their best information available) were sought and considered, they were never the sole basis for rendering an opinion of value for any item in this report. Observable data included documented comparable sales data; replacement cost data, interview with knowledgeable, disinterested third parties, technical and market data pertinent to the manufacture and use of the assets.



### METHODOLOGY[11]

To arrive at an opinion of value for the volume and variety of tangible assets in this assignment, the analysis generally followed the procedure outline below:

### DUE-DILIGENCE

Identifying the core technology of assets in this report was important for forming the opinion of value. Core technologies affect every item and include not just the assets or components of the assets, but the manufacturing process as well. This knowledge is essential to determining useful life and market desirability of a product. A great income-producing asset today may be on the brink of obsolescence if its core technology is changing. A low-income asset may just be garnering market share as its acceptance is beginning to bloom. Core technologies of the production assets in this report have produced disruptive permanent change to this industry's workflows, cost structures and workforce. This due-diligence produced measurable for Technical and Functional obsolescence illustrated by lower selling prices or extended features for models or technical standards and work flows that include or exclude the use and technology of existing assets.

During the ingest process when assets were verified for make and model, additional due-diligence was taken to determine an assets generation and remaining supported life, new product or replacement technologies. User groups and reviews were used as well to date both an items approximate age and/or it continued market appeal.

Additional time was taken to assess the description of the assets to group systems assets and review the most likely configuration of the assets based on the historic acquisition date, purpose, and the known work flow and market preferences known as of the appraisal date. These were important considerations in determining the most likely replacement costs as well as determining use and depreciation assessments in the valuation process.

Such information helps to explain discrepancies between approaches to value, and which one is most appropriate. It is key consideration in adjusting market comparable in the application of the approach to value as outlined earlier and assessing depreciation factor in the cost approach.

For a detailed list of equipment, see Appendix A. For a discussion of physical, technological, and economic characteristics of the assets in this report, see the "Overview" and "Asset Review" sections of this report.

### ANALYSIS

In commencing the analysis of the data and due diligence, the first step taken was to determine which approach the known facts would best support to provide a credible opinion reflective of the market reality. Replacement cost new, any known market, technology, industry or external factor, and sales transaction issues (new manufacture discounts, new model pricing, currency trade issues) were reviewed. This reivew provided a base line to identify issues with market comparable, supplied purchase data and collected due-dilgence that would yield a false conclusion (example: a model price drop 30 days ago would render a 45 days old direct comp questionable for use as is).

Next follow a reivew of the asset grouping the make sure the asset shared enough key attributes (capacity, functions, technology, etc.) to asssure a group value approach would yield an appropriate, crediable result.

Following this a determinaition of which approach would yeild an appropriate, crediable result. As discussed earlier an income appoach was never considered. The decision between a market or cost approach for the group or item was based on date and due diligence that was determined reliable and capabile of supporting the chose method to yeild a credible opinion. Credible purchase, replacement cost and obsolescence factors were researched for all items in the inventory. Market data was collected for many assets as well in an effort to even better validate an opinion of value base on a adjusted analysis for a group of assets.

When sufficient market data and due-diligence was available to provide a credible opinion with the highest value for an asset group or item, the market  approach was chosen. When insufficient market data and due-diligence was found, the cost approach was used for that item or group of assets.

In the analysis for the market approach as applied in this assignment, there are several factors considered for adjusting a market comparable to the group of assets. These include: technology, workflow application, capacity, model generation, maintenance and overhauls, upgrades and options, manufacturer support and reputation. The adjustments take the form of a monitary addition or reduction in the opinion of value. This adjustments were based on the conclusion from due-diligence sources that included auction data, user group correspondence, resale site data, interviews with manufacturers, engineers, resellers, and end users.

In the analysis for the cost approach as applied in this assignment, replacement cost new was determined based on a comparable replacment unit with comparable specification and untility and acceptpptable in the market place work flow (if the replacement was not the exact same make and model) as the inventory assets at the approximate appraisal date. Next all revalent forms of obsolecnese were considered for adjusting a replacement cost new for the assets. These include: technology, workflow application, capacity, model generation, maintenance and overhauls, upgrades and options, manufacturer support and reputation. The adjustments take the form of a monitary addition or reduction in the opinion of value. This adjustments were based on the conclusion from

due-diligence sources that included auction data, user group correspondence, resale site data, interviews with manufacturers, engineers, resellers, and end users as well as the review of the market, technology and industry due-diligence previously discussed.

### Reporting

This report includes the supplied data and follow up interview data, review, and due-diligence narration. It also states an opinion of value for the cinema production and lighting/grip assets in this report for the purpose of allocating the purchase price for accounting purposes in a purchase transaction. With the best information available in the circumstances during the assignment, Micor has made it best efforts to provide relevant and timely information and opinions for this purpose.

This report contains important background and detail information about the assets, their value, their use and relevance to the operations of Modern VideoFilm. The narrative, exhibits, and attachments provide the intended users of this report important and relevant background information that supports the protocols and guidelines followed in developing this report. The appendix groups and sorts the detail data and opinion of value into a format that corresponds with Point 360 and Modern VideoFilm's work flow.

I am available to discuss this appraisal report at a time mutually convenient to the intended report users and myself.



# CONCLUSIONS AND OPINION OF VALUE

## ASSUMPTIONS AND LIMITING CONDITIONS[12]

This valuation is subject to the following limitations and conditions:

a. The opinions of value are valid as of July 09, 2015, and subject to change in the discovery of additional data not available during the assignment or subsequent discovery of non-functional or missing assets.

b. Responsibility for the accuracy of information received from others, e.g., manufacturers, brokers, etc., is waived, but such information was obtained in good faith from normally reliable sources.

c. This valuation makes no warranty as to any matters relating to legal title to the subject equipment. Equipment is assumed to be unencumbered with all ownership rights belonging to the subject companies respectively.

d. The scope of the valuation is limited to the items specified herein and does not include other assets, tangible or intangible.

e. This report may not be abstracted nor shall it be used in whole or in part for any purpose. The opinion of value and data in the report could be misleading or invalid if not the entire report is not available to the user.

f. The assets in this report **are not permanently** tied to any system or real estate.

g. All assets in this report have been valued as if unencumbered and available as working equipment in good condition, except where noted.

.



Conclusions, Opinion of Value, Certification                    Point 360/Modern VideoFilm

## ASSIGNMENT CONCLUSIONS & OPINIONS OF VALUE

This report summarizes the due-diligence, results, conclusions and opinions of a valuation of the equipment list provided by Point 360. John Schweizer is the sole intended user of this report. This report should not be relied on by other users and/or for other purposes.

This Valuation has been prepared from an equipment list of Point 360 and Modern VideoFilm provided by Point 360 for this assignment. The approaches used to form the opinion of value consider the general market, technology and industry conditions affecting deprecation and value as of the appraisal date. Considered as well are specific issues and market comparables for specific assets and/or asset types as of the appraisal date. This due-diligence as applied in the chosen approach to value have produced an opinion of value that is credible and supportable for the stated use of this assignment under the conditions and assumptions set out in the assignment.

Based upon the data and conclusions presented in this report, it is our opinion that the equipment listed in this report (File#15-011) on July 9, 2015 has a

### Fair Value for Modern VideoFilm of: $5,074,917.00;

as defined by ASC 820 of the Financial accounting Standards Board as previously stated in this report.

The opinion of value represents a prospective monetary estimate of the usefulness of these assets to a potential user (not just the user discussed in this report) to make money. As an element in Point 360's decision processes and recording this financial  transaction, the opinion of value the conclusion of  an assessment of technology, market and industry considerations as depreciation factors against the original value of the assets of Modern VideoFilm.



THIS PAGE LEFT BLANK INTENTIONALLY

# TABLES, APPENDICES, EXHIBITS, AND SUPPLEMENTS

DATA ARE ORGANIZED IN THIS REPORT IN TABLES, APPENDICES, EXHIBITS, AND SUPPLEMENTS. A TABLE IS A DEFINED DATA FIELD. SCHEDULES ARE LISTS OF EQUIPMENT SUPPLIED BY THE COMMISSIONER OF THIS REPORT. APPENDICES ARE THE DATA, OPINIONS OF VALUE AND/OR INSPECTION DATA GENERATED BY MICOR FOR THIS REPORT. AN EXHIBIT IS DATA OR INFORMATION FROM A THIRD PARTY (MANUFACTURER DATA, BROCHURES, INDUSTRY NEWS RELEASE) NOT GENERATED BY MICOR BUT INCLUDED FOR THE INTENDED USER OF THIS REPORT TO UNDERSTAND THE ASSETS DISCUSSED IN THIS REPORT.

| | |
|---|---|
| *APPENDIX A* | *FV 2015 GROUPED BY SITE (MODERN VIDEO), SORTED BY MAKE AND MODEL* |
| *APPENDIX B* | *FV 2015 GROUPED BY SITE (MODERN VIDEO), SORTED BY ROOM AND RACK* |
| *EXHIBIT A* | *DOCUMENTATION PROVIDED FOR THIS VALUATION* |
| *EXHIBIT P* | *ASSET AND FACILITY PICTURES* |

## STATUS FIELD TERMS

| STATUS NAME | --------------------Defined Disposition of an asset ----------------------------- |
|---|---|
| Asset | Rental Asset with resale value |
| Part of | Item is values as part of another specific asset of value |
| NRA | Non-remarketable asset |
| NAV | Not able to Value (See note) |
| NBA | Non-production or Rental asset |

## ITEM NOT VALUED

There are items in this appraisal that were NOT valued. This is due to a lack of sufficient information to give a proper opinion of value about a specific piece of equipment. Some reasons for not valuing these items are, but are not limited to: inability to obtain sufficient descriptions or identifications during inspection or with data provided inability to find sufficient cost, technical, and/or reference material, inability to follow up with proper personnel at the facility in the time frame required for this report.  It is important to note that these items have been researched to the best of our ability and while we do have an opinion of a *range of value* it is not sufficient or proper to assign them a specific value based on vague assumptions and limited research. In this report, it is our opinion that these items will not materially affect the aggregate value of this total report. When and if, at a later date, these items can be properly identified, or material can be brought to our attention, Micor will provide a specific value as of the date of this valuation in a new report. The intended user of this report will receive a new report. Opinions of value given to assets in this report will NOT be revised in any future reports.

## REPORT END NOTES:

End notes 1 to 12 notates sections in the narration dedicated to address in the listed Standard of the Uniform Standards of Professional Appraisal Practice (USPAP) effective from January 1, 2014 to December 31, 2015 published by the Appraisal Standards Board.

Standard 8 address Personal Property Appraisal Reporting

_____

[1] USPAP 8-2(a)(xii)
[2] USPAP 8-2(a)(i)
[3] USPAP 8-2(a)(ii)
[4] USPAP 8-2
[5] USPAP 8-2(a)(vi)
[6] USPAP 8-2(a)(iii)
[7] USPAP 8-2(a)(iv)
[8] USPAP 8-2(a)(v)
[9] USPAP 8-2(a)(ix)
[10] USPAP 8-2(a)(viii)
[11] USPAP 8-2(a)(vii)
[12] USPAP 8-2(a)(xi)

# EXHIBIT 5

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Lewis R. Landau, Attorney at Law (SBN 143391)<br>22287 Mulholland Hwy., # 318<br>Calabasas, CA 91302<br>Voice & Fax: (888)822-4340<br>Email: Lew@Landaunet.com | |

☐ *Individual appearing without attorney*
☒ *Attorney for:* Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA -  LOS ANGELES DIVISION** ▼

| In re:<br>Point.360, a California corporation, | CASE NO.: 2:17-bk-22432 WB |
|---|---|
| | CHAPTER: 11 |
| | **STATEMENT REGARDING<br>CASH COLLATERAL OR<br>DEBTOR IN POSSESSION FINANCING<br>[FRBP 4001; LBR 4001-2]** |
| Debtor(s). | DATE:<br>TIME:<br>COURTROOM: 1375; Judge Brand<br>ADDRESS: US Bankrutpcy Court<br>255 E. Temple Street, 13th Floor<br>Los Angeles, CA 90012 |

Secured party(ies):
         Austin Financial Services, Inc.

The Debtor has requested the approval of either (1) a motion for use of cash collateral, or postpetition financing, or both, or (2) through a separately-filed motion, a stipulation providing for the use of cash collateral, or postpetition financing, or both.  The proposed form of order on the motion or the stipulation contains the following provisions or findings of fact:

| | Disclosures Tracking FRBP 4001(c)(1)(B)(i) through (xi) and (d)(1)(B) | Page No.: | Line No.<br>(if applicable) |
|---|---|---|---|
| ☐ | (i): "[A] grant of priority or a lien on property of the estate under § 364(c) or (d)" | | |
| ☐ | (ii): "[T]he providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim" | | |
| | ☐  Cross-collateralization, *i.e.*, clauses that secure prepetition debt by postpetition assets in which the secured party would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law | | |
| | ☐  Roll-up, *i.e.*, provisions deeming prepetition debt to be postpetition debt or using postpetition loans from a prepetition secured party to pay part or all of that secured party's prepetition debt, other than as provided in § 552(b) | | |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

| | | | |
|---|---|---|---|
| *Continued from page 1* | | | |
| | ☐ | Grant a replacement lien in an amount in excess of the dollar amount of the lien on cash collateral as of the petition date | |
| ☐ | (iii): "[A] determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim" | | |
| ☐ | (iv): "[A] waiver or modification of Code provisions or applicable rules relating to the automatic stay" | | |
| | ☐ | Automatic relief from the automatic stay upon occurrence of certain events. | |
| ☐ | (v): "[A] waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request authority to obtain credit under § 364" | | |
| ☐ | (vi): "[T]he establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order" | | |
| ☐ | (vii): "[A] waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien" | | |
| ☐ | (viii): "[A] release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action" | | |
| ☐ | (ix): "[T]he indemnification of any entity" | | |
| ☐ | (x): "[A] release, waiver, or limitation of any right under § 506(c)" | | |
| | ☐ | The granting of any lien on any claim or cause of action arising under § 506(c) | |
| ☐ | (xi): "The granting of any lien on any claim or cause of action arising under §§ 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a)" | | |
| **Additional Disclosures Required by LBR 4001-2** | | **Page No.:** | **Line No. (if applicable)** |
| ☐ | With respect to a professional fee carve out, disparate treatment for professionals retained by a creditors' committee from that provided for the professionals retained by the debtor | | |
| ☐ | Pay down prepetition principal owed to a creditor | | |
| ☐ | Findings of fact on matters extraneous to the approval process | | |

| 10/10/2017 | Lewis R. Landau | /s/ Lewis R. Landau |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*December 2015*                                    Page 2                                    **F 4001-2.STO_FINANCE**

1  **Lewis R. Landau** (CA Bar No. 143391)
   **Attorney-at-Law**
2  22287 Mulholland Hwy., #318
   Calabasas, California 91302
3  Voice and Fax: (888) 822-4340
   *Email:  Lew@Landaunet.com*

4

5  [Proposed] Attorney for Debtor and
   Debtor in Possession

6

7

                **UNITED STATES BANKRUPTCY COURT**
8

9                  **CENTRAL DISTRICT OF CALIFORNIA**

                    **LOS ANGELES DIVISION**
10

11

   In re | Case No.: 2:17-bk-22432 WB
12 | 
   Point.360, a California corporation, | Chapter 11
13 dba DVDs on the Run, Inc.;
   dba Digital Film Labs; | **ORDER GRANTING MOTION RE INERIM**
14 dba International Video Conversions, Inc.; | **USE OF CASH COLLATERAL**
   dba Modern VideoFilm;
15 dba Movie Q; | *Hearing Date and Time to be Set*
   dba Visual Sound Closed Captioning | *Pursuant to Court Order*
16 Services;
   dba Eden FX, | Date:      October ____, 2017 (*to be set*)
17 | Time:     (*to be set*)
                     Debtor. | Place:    Courtroom 1375; Judge Brand
18 |              United States Bankruptcy Court
19 |              255 E. Temple Street, 13th Floor
   Debtor's EIN: 01-0893376 |              Los Angeles, CA 90012
20 Address:  2701 Media Center Drive
             Los Angeles, CA 90065

21

22      The Court has considered the motion filed by Point.360, a California corporation

23 ("Debtor") to use cash collateral [ECF #2] ("Motion").  Appearances were made as noted on the

24 record.

25      The Court, finding good cause therefor, hereby **ORDERS** as follows:

26      1.     The Motion is approved on an interim basis.

27      2.     The Debtor is authorized to use cash collateral as set forth in the Budget attached to

28 the Motion as Exhibit 1, subject to a 5% cumulative variance.

1        3.       To the extent of such use of cash collateral, Austin Financing Services Inc.

2    ("Austin") shall be granted a replacement lien pursuant to 11 U.S.C. § 361 in Debtor's post-

3    petition assets of the same validity, priority and extent as Austin's prepetition liens.

4        4.       A final hearing on the Motion shall be held on _____, 2017 at ____.

5    **IT IS SO ORDERED.**

6                          ###

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*092*

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

22287 Mulholland Hwy., # 318
Calabasas, CA 91302

A true and correct copy of the foregoing document entitled (*specify*): _____
 EXPEDITED FIRST DAY MOTIONS [cash collateral, post-petition financing, prepetition payroll, limiting notice]
_____
_____

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in
the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
 10/11/2017_____ , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that
the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated
below:
 Lewis R Landau on behalf of Debtor Point.360, a California Corporation Lew@Landaunet.com

 United States Trustee (LA) ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____ , I served the following persons and/or entities at the last known addresses in this bankruptcy
case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail,
first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the
judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method
for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*)  10/11/2017_____ , I served
the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to
such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration
that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is
filed.
 Judge Brand, US Bankruptcy Court, 255 E Temple Street, Suite 1382, Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 10/11/2017 | Lewis R. Landau | /s/ Lewis R. Landau |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.