| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Lewis R. Landau (CA Bar No. 143391)<br>Attorney-at-Law<br>22287 Mulholland Hwy., # 318<br>Calabasas, California 91302<br>Voice & Fax: (888) 822-4340<br>Email:  Lew@Landaunet.com<br><br>☐ *Individual appearing without attorney*<br>☒ *Attorney for:*  Debtor in Possession | |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

| In re:<br><br>Point.360, a California corporation,<br><br><br><br><br><br><br><br><br><br><br><br>Debtor(s). | CASE NO.: 2:17-bk-22432 WB<br><br>CHAPTER: 11 |
|---|---|
| | **NOTICE OF MOTION FOR:**<br>(1) APPROVING POST-PETITION FINANCING AND<br>  RELATED LIENS AND ADEQUATE PROTECTION;<br>(2) APPROVING CASH COLLATERAL USE AND<br>  RELATED LIENS AND ADEQUATE PROTECTION; AND<br>(3) GRANTING RELATED RELIEF<br><br>*(Specify name of Motion)* |
| | DATE: 12/14/2017<br>TIME:  10:00 am<br>COURTROOM: 1375; Judge Brand<br>PLACE:  United States Bankruptcy Court<br>        255 E. Temple Street, 13th Floor<br>        Los Angeles, CA 90012 |

1.  TO (*specify name*):  All Parties in Interest: _____

2.  NOTICE IS HEREBY GIVEN that on the following date and time and in the indicated courtroom, Movant in the above-captioned matter will move this court for an Order granting the relief sought as set forth in the Motion and accompanying supporting documents served and filed herewith. Said Motion is based upon the grounds set forth in the attached Motion and accompanying documents.

3.  **Your rights may be affected**. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

4.  **Deadline for Opposition Papers:** This Motion is being heard on regular notice pursuant to LBR 9013-1. If you wish to oppose this Motion, you must file a written response with the court and serve a copy of it upon the Movant or Movant's attorney at the address set forth above no less than fourteen (14) days prior to the above hearing date.  If you fail to file a written response to this Motion within such time period, the court may treat such failure as a waiver of your right to oppose the Motion and may grant the requested relief.

5.  **Hearing Date Obtained Pursuant to Judge's Self-Calendaring Procedure:** The undersigned hereby verifies that the above hearing date and time were available for this type of Motion according to the judge's self-calendaring procedures.

Date:  _11/22/2017_

_Lewis R. Landau, Attorney at Law_
Printed name of law firm

_/s/ Lewis R. Landau_
Signature

_Lewis R. Landau_
Printed name of attorney

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

1    **Lewis R. Landau** (CA Bar No. 143391)
**Attorney-at-Law**
2    22287 Mulholland Hwy., #318
Calabasas, California 91302
3    Voice and Fax: (888) 822-4340
*Email: Lew@Landaunet.com*
4
[Proposed] Attorney for Debtor and
5    Debtor in Possession

6

7
**UNITED STATES BANKRUPTCY COURT**
8
**CENTRAL DISTRICT OF CALIFORNIA**
9
**LOS ANGELES DIVISION**
10

11    In re                                        Case No.: 2:17-bk-22432 WB
12
Point.360, a California corporation,           Chapter 11
13    dba DVDs on the Run, Inc.;
dba Digital Film Labs;                         **MOTION FOR ORDERS:**
14    dba International Video Conversions, Inc.;   **(1) APPROVING POST-PETITION**
dba Modern VideoFilm;                          **FINANCING AND RELATED LIENS AND**
15    dba Movie Q;                                 **ADEQUATE PROTECTION;**
dba Visual Sound Closed Captioning             **(2) APPROVING CASH COLLATERAL USE**
16    Services;                                    **AND RELATED LIENS AND ADEQUATE**
dba Eden FX,                                    **PROTECTION; AND**
17                                                 **(3) GRANTING RELATED RELIEF**

18                     Debtor.

19                                                 Date:        December 14, 2017
Time:        10:00 a.m.
20    Debtor's EIN: 01-0893376                     Place:       Courtroom 1375; Judge Brand
United States Bankruptcy Court
21    Address:  2701 Media Center Drive                        255 E. Temple Street, 13th Floor
Los Angeles, CA 90065                        Los Angeles, CA 90012
22

23

24

25

26

27

28

## CONCISE SUMMARY OF RELIEF REQUESTED

Point.360, a California corporation ("Debtor" or "Point.360"), filed a voluntary chapter 11 petition on October 10, 2017.  Debtor filed for chapter 11 relief to preserve the going concern value of its video post-production business and reorganize its financial affairs.  To maintain Debtor's continuing operations, Debtor moves the court for a final order approving post-petition financing and related liens and adequate protection, approving cash collateral use and related liens and adequate protection and granting related relief (hereinafter "DIP Financing").  The DIP Financing lender is Austin Financial Services, Inc. ("Lender").  Lender was the Debtor's prepetition lender under the July 13, 2016 Amended and Restated Loan and Security Agreement as amended ("LSA") and the DIP Financing requests authority to continue the LSA lending relationship on the terms as set forth herein.  This DIP Financing motion is proposed to facilitate Debtor's continuing operations for the period after expiration of approvals under the Debtor's motion to use cash collateral and orders thereon [ECF # 2, 14, 46] ("Cash Collateral Motion").[1]

The motion is based on this motion and concise statement, the attached Memorandum of Points and Authorities and exhibits hereto, the attached Declaration of Haig S. Bagerdjian ("Bagerdjian Declaration"), all pleadings, papers and records on file with this Court, the Cash Collateral Motion pending concurrently herewith, and upon such other evidence, oral or documentary, as may be presented to this Court at or prior to the hearing on this Motion.

The following concise statements of the relief requested is presented pursuant to the requirements of Federal Rule of Bankruptcy Procedure ("FRBP") 4001(b)(1)(B) and (c)(1)(B):

### DIP Financing Concise Statement:

1.      *The location within the relevant documents of, all material provisions of the proposed credit agreement and form of order, including interest rate, maturity, events of default, liens, borrowing limits, and borrowing conditions.*  All terms of the proposed credit agreement ("DIP Credit Facility") are contained in the following documents:

---

[1] Authorized cash collateral use currently expires on December 7, 2017 pursuant to ECF # 46.  Debtor anticipates an additional stipulation and order that will extend current cash collateral use to December 15, 2017 to coordinate the matter with this motion.

1.  LSA attached to the Cash Collateral Motion as Exhibit 2 thereto.

2.  Proposed order (the "Proposed Order") attached hereto as Exhibit 3.

3.  DIP Postpetition Financing Addendum ("PFA") attached hereto as Exhibit 4.

4.  Continuing Guaranty attached hereto as Exhibit 5.

5.  Guarantor Option Rider attached hereto as Exhibit 6.

The non-default interest rate on the DIP Credit Facility is prime plus 1.5% per annum.  The maturity date of the DIP Credit Facility is October 31, 2018.  Lender shall receive a first priority lien on all of the Debtor's property (the "Collateral," as defined in the DIP Credit Facility) to secure the DIP Credit Facility.  The borrowing limit is $3 million at an advance rate of 85% of eligible receivables.  The critical borrowing conditions include entry of the proposed order attached as Exhibit 3.  Events of default include the following:

- The entry of an order modifying any financing order, any agreement, any loan document, or any right or remedy in favor of Lender;
- The entry of an order authorizing borrower to incur indebtedness or additional financing under section 364(c) or (d) of the Bankruptcy Code other than from Lender, or without the express prior written consent of Lender, unless such financing results in the simultaneous indefeasible payment and satisfaction of all Obligations owed to Lender, in full, in cash;
- The entry of an order in the bankruptcy case authorizing any costs or expenses under section 506(c) of the Bankruptcy Code as a surcharge against the Collateral;
- The entry of an order in the bankruptcy case authorizing the use of cash collateral under section 363(c) of the Bankruptcy Code without Lender's prior written consent or except as otherwise permitted in the Loan Agreement or the financing orders;
- The entry of an order in the bankruptcy case appointing an interim or permanent trustee, or an examiner having enlarged powers relating to the operation of the business or assets of Borrower under section 1106(b) of the Bankruptcy Code;
- The entry of an order dismissing the bankruptcy case or converting the bankruptcy case to a proceeding under chapter 7 of the Bankruptcy Code;
- The entry of an order in the bankruptcy case authorizing or granting relief from, terminating, annulling, or modifying the automatic stay of section 362 of the Bankruptcy Code to permit a party to execute upon or enforce a lien on or exercise any right with respect to any material portion of the Collateral or to the extent it would result in a material adverse effect on borrower, assets of borrower and its estate, or borrower's financial condition or business operations;
- The entry of an order in the bankruptcy case approving or granting priority for any administrative expense priority claim or any other claim (now existing or

hereafter arising of any kind or nature whatsoever) that is equal or superior in priority to the liens and superpriority administrative claims of Lender in respect of the obligations owed to Lender;

- The filing (whether by borrower or any other party) of a chapter 11 plan of reorganization or entry of an order confirming a chapter 11 plan of reorganization in the bankruptcy case that does not provide for the simultaneous indefeasible payment and satisfaction of all obligations owed to Lender, in full, in cash, unless otherwise expressly agreed to by Lender;

- The occurrence of any condition or event that would be a breach of or a default under any financing order, or that would entitle Lender to exercise or pursue enforcement of any right or remedy granted, authorized, acknowledged, or recognized in a Financing Order, including, without limitation, any "Default" or "Event of Default" as provided in the financing orders;

- The demand, termination, or expiration, or an event that would permit or result in the occurrence of the demand, termination, or expiration of any commitment, obligation, or liability of Lender to make or extend advances, loans, and other financial accommodations from Lender to or for the benefit of borrower and its estate, any agreement, or any financing order;

- Borrower suspends, discontinues, or is enjoined by any court or governmental agency from continuing to conduct all or any material part of its business or if a trustee, receiver, or custodian is appointed with respect to borrower or any of asset of borrower;

- The occurrence or threat of the occurrence of any restriction, limitation, or cessation of either the validity, scope, existence, first and senior priority, perfection, or enforceability of the lien in favor of Lender securing the obligations for any reason.

2.    *Description of terms identified in FRBP 4001(c)(1)(B)(i)-(xi).*  All such terms are identified in Local Bankruptcy Rule Form F4001-2 attached hereto as Exhibit A and in section 1(B)(4) herein.

*Wherefore*, Debtor requests approval of this DIP Financing motion.

**Cash Collateral Concise Statement:**

1.    *The name of each entity with an interest in cash collateral.*  The Debtor believes that the only entity having an interest in cash collateral is Lender.  A complete Uniform Commercial Code ("UCC") search report reflecting all financing statements is attached to the Cash Collateral Motion as Exhibit 1 thereto.  Lender is the only creditor with an interest in accounts and proceeds constituting cash collateral.

2.       *The purposes for the use of cash collateral.*  The Debtor requires the use of cash collateral to continue going concern operations in accordance with the Budget, as attached as Exhibit 1 hereto, and to pay Lender pursuant to the DIP Financing.

3.       *The material terms, including duration, of the use of cash collateral.*  The Debtor request authorization to use cash collateral in accordance with the Budget attached hereto as Exhibit 1 on the same terms as Lender's prepetition financing pursuant to the July 13, 2016 Amended and Restated Loan and Security Agreement as amended (a copy of which was attached to the Cash Collateral Motion as Exhibit 2), as amended by the PFA (a copy of which is attached hereto as Exhibit 4), and approved by the Proposed Order (a copy of which is attached hereto as Exhibit 3).  Pursuant to these loan documents, Lender consents to Debtor's use of cash collateral.

4.       *Any liens, cash payments, or other adequate protection that will be provided to each entity with an interest in the cash collateral or, if no additional adequate protection is proposed, an explanation of why each entity's interest is adequately protected.*  Lender shall be granted a first-priority postpetition lien with the following terms:

> The Postpetition Liens are and will continue to be first and senior in priority to all other liens, claims, and interests of every kind and nature, whether existing or arising before or after the Petition Date, or whether created consensually, by an order of any court including this Court, or otherwise, including without limitation liens or interests granted or acknowledged in favor of any other person or entity in conjunction with section 363, 364, or any other section of the Bankruptcy Code; provided, however, the Postpetition Liens are (a) only subject and immediately junior in priority to certain liens and interests, whether in favor of Medley Capital Corporation ("Medley") or Other Secured Parties, existing as of the Petition Date in the Collateral, but only to the extent that such liens and interests, at all times, (i) are not otherwise junior or subordinated in priority, whether as a matter of record or under section 510 or by contract, at law or in equity, as to any obligation or lien in favor of Lender, (ii) are valid, properly perfected, and enforceable, (iii) secure obligations that remain outstanding and valid and not otherwise avoided or satisfied, (iv) are not subject to any claims, counterclaims, defenses, setoffs, recoupment, or deduction, (v) are not subject to avoidance or subordination pursuant to any provisions of the Bankruptcy Code or any other applicable law, and (vi) are specifically designated as "Permitted Liens" pursuant to the Loan Agreement, and (b) first and senior in priority, and not be subject or subordinate to any lien or interest that is avoided and preserved for the benefit of Debtor or its Estate under section 551.

Proposed Order ¶ 3.1.2.

1    The payments proposed to be made to Lender are those same fees and charges Lender is

2    entitled to under the LSA as amended by the PFA.

3    *Wherefore*, Debtor requests approval of this DIP Financing motion, use of cash collateral

4    and related terms.

5    **MEMORANDUM OF POINTS AND AUTHORITIES**

6    **I.**

7    **STATEMENT OF FACTS**

8    **A.    The Chapter 11 Bankruptcy Case and Jurisdiction.**

9    On October 10, 2017 (the "Petition Date"), the Debtor commenced its bankruptcy case by

10   filing in this Court a voluntary petition for relief under chapter 11 of title 11 of the United States

11   Code (the "Bankruptcy Code").  The Debtor continues to operate its business and manage its

12   property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

13   A committee of creditors holding unsecured claims has not been appointed.  The Court has core

14   jurisdiction over this matter under 28 U.S.C. §§ 1334(b) and 157(b)(2)(A), (D), (K), (M) and (O).

15   **B.    The Debtor's Business, Need for Chapter 11 Relief and Reorganization Strategy**

16   *1. Nature of Debtor's Business.*

17   Point.360 provides high definition and standard definition digital mastering, data

18   conversion, video and film asset management, distribution and other services to owners, producers

19   and distributors of entertainment and advertising content. Point.360 provides the services

20   necessary to edit, master, reformat, convert, archive and ultimately distribute its clients' film and

21   video content, including television programming feature films and movie trailers. The Debtor's

22   interconnected facilities provide service coverage to all major U.S. media centers. Clients include

23   major motion picture studios and independent producers.

24   The Debtor presently operates from three post production and administrative office

25   locations: (1) 2701 Media Center Drive, Los Angeles, California ("Media Center"); (2) 1122 and

26   1133 North Hollywood Way, Burbank, California ("HWay"); and (3) 2300 Empire Avenue, Suite

27   100, Burbank, California ("Empire"). Each post production location is electronically tied to the

28   others and serves the same customer base. Depending on the location size, the production

1  equipment consists of tape duplication, editing, encoding, standards conversion, and other

2  machinery. Each location employs personnel with the skills required to efficiently run the

3  equipment and handle customer requirements.

4      Typically, a feature film or television show or related material will be submitted to a

5  facility by a motion picture studio, independent producer, advertising agency, or corporation for

6  processing and distribution. A common sales force markets Point.360's capabilities for all

7  facilities.

8      Debtor is a public company with securities registered under the Securities Exchange Act of

9  1934. Debtor has 12,704,506 shares of its common stock outstanding. Debtor's market symbol is

10 "PTSX." Additional information concerning the Debtor's operations and management is available

11 on its website at **https://www.point.360.com.**

12      2. _Need for Chapter 11 Relief and Reorganization Strategy_.

13      On July 8, 2015, Point.360 acquired certain assets of Modern VideoFilm, Inc. ("MVF")

14 including, but not limited to, MVF's equipment, inventory, and accounts receivable, in a private

15 Article 9 foreclosure sale, and assumed no debts, obligations or liabilities except for agreeing to

16 pay a portion of the rent for each facility of MVF to its landlord on a per diem basis based and

17 certain employee liabilities. The MVF acquisition was intended to add two unique lines of

18 business to augment Debtor's existing businesses and strengthen and synergize the existing

19 business lines by combining operations and optimizing cost efficiencies.

20      Regarding the purchase of the assets of MVF, on July 8, 2015, the Debtor entered into a

21 Term Loan Agreement Medley Opportunity Fund II, LP ("Medley"). The Medley Loan

22 Agreement is comprised of a five-year term loan facility in the amount of $6,000,000, $1,000,000

23 of which was funded on the July 8, 2015 closing date. As of March 31, 2017, the Company had

24 borrowed the $6,000,000 under the Medley Loan Agreement. Debtor has elected to pay interest as

25

26

27

28

1  payment in kind ("PIK") as permitted by the Loan Agreement. The outstanding principal balance

2  and all accrued and unpaid interest on the Term Loan are due and payable on July 8, 2020.[2]

3      The MVF transaction resulted in substantial and unanticipated operating losses requiring

4  that Debtor reorganize its financial affairs.  Point.360 entered into the MVF acquisition in reliance

5  on misleading information concerning MVF's profitability.  For example, Point.360 was given *pro*

6  *forma* projections showing $29 million in sales and $4.1 million in EBITDA for the 2015 - 2016

7  period.  Actual results after the MVF acquisition resulted in $15.6 million in sales and EBITDA of

8  *negative* $6.3 million.  This $10.4 million difference between projected and actual EBITDA for

9  2105 - 2016, which continued into the fiscal 2017 period, has resulted in Debtor's need for

10  financial reorganization.

11      After the initial disappointing results of the MVF acquisition, Debtor initiated a business

12  plan to reduce expenses and reestablish profitability.   The significant changes to Debtor's

13  operations are as follows:

14      1.  Debtor has eliminated approximately 100,000 square feet of rental space by vacating

15         its Santa Monica, Glendale and Empire (second floor) facilities in 2015.

16      2.  Debtor has reduced rent and associated expenses by initiating the pending closure of its

17         37,930-foot Empire facility (first floor).   Rent and CAM charges at this facility

18         exceeded $150,000 monthly.  Debtor has entered into a prepetition stipulation with

19         lessor REEP OFC 2300 Empire CA LLC ("REEP") to vacate the facility by December

20         4, 2017 and will not incur post-petition rent during the period prior to December 4,

21         2017 as long as Debtor vacates by that date.

22      While Debtor was working toward profitability, Debtor received a 3-day notice to pay rent

23  or quit for its Media Center facility on October 6, 2017.  The Debtor presently intends to retain the

24  Media Center facility as a critical component of the reorganized business.  Consequently, Debtor

25

26  _____

27  [2] As further consideration for the MVF foreclosure sale purchase transaction, the Debtor issued 2,000,000 shares of
common stock, and five-year warrants to purchase an aggregate of 800,000 shares of common stock at an exercise

28  price of $0.75 per share. As consideration for the Medley Loan Agreement, the Debtor also issued warrants to Medley
and Medley Capital Corporation to purchase an aggregate of 500,000 shares of common stock.

1   was required to file its chapter 11 petition on October 10, 2017 to maintain its core operating

2   facilities and implement its reorganization plan through the chapter 11 process.

3         Based on the foregoing, Debtor is poised to reorganize its capital structure and gain access

4   to liquidity, reduce costs and liabilities, optimize operations to meet customer needs and create

5   value for employees, customers and creditors.

6         *3.*   *Need for DIP Financing and Amendments to Prepetition Facility.*

7         The Debtor's chapter 11 goal is to stabilize its business, enhance value and internally

8   reorganize from a position of financial strength. While the Debtor presently has sufficient cash

9   from operations to continue in business without post-petition financing, the Debtor projects that its

10   cash reserves will be consumed during the seasonally slow year-end holiday period. Thus,

11   approval of the DIP Credit Facility is both necessary and appropriate to provide the Debtor with

12   operational flexibility during the term of its chapter 11 case.

13         Attached hereto as Exhibit 1 is the Debtor's proposed operating budget for the 12-month

14   post-petition period prepared on an accrual basis. As set forth therein, Debtor is projected to

15   generate at least $700,000 in net income before interest, taxes, depreciation and amortization

16   ("EBITDA"). Attached as Exhibit 2 is a projection of Debtor's cash balance comparing

17   operations under the present use of cash collateral, versus operations under the DIP Facility. As

18   shown in Exhibit 2, the Debtor expects the delta in positive cash balance between operations based

19   on use of cash collateral and under the DIP Facility to be eliminated by December 22, 2017.

20   Essentially, the Debtor loses the benefit of operating based with cash proceeds from accounts

21   receivable versus operating under the DIP Facility. Thus, the Debtor can mitigate the impact of

22   seasonality by returning to operations under the DIP Facility. The DIP Facility makes financing

23   proceeds immediately available upon the creation of a financeable invoice. This immediate

24   availability of cash for operations creates the necessity for the DIP Facility, as well as enhanced

25   predictability of working capital over the term of the case.

26         The proposed DIP Credit Facility incorporates the prepetition LSA among Lender and the

27   Debtor. The LSA supported the Debtor's prepetition operations and Debtor did not default under

28

the LSA.  Under the DIP Credit Facility, the LSA is being amended by the PFA (Exhibit 4 hereto), which provides for the following material changes to the LSA:

1. Commitment set at $3,000,000.

2. Collateral management fee increased by .1% to .65%.

3. Annual Facility Fee equal to approximately 0.5% of the Line of Credit Commitment, due and payable on the date of the first Advance.

4. Elimination of line of credit termination or reduction fee in favor of 3% exit fee.

5. Bankruptcy related defaults waived.

6. Maturity of October 31, 2018.

7. Lender required that the DIP Financing be guaranteed by Haig Bagerdjian and Mr. Bagerdjian has agreed to do so per the Continuing Guaranty and Guarantor Option Rider substantially in the form as attached hereto as Exhibit 5 and 6.

The foregoing summary is for general reference only.  The DIP Credit Facility as attached hereto should be reviewed for all material terms.

*4. Identification of Terms Subject to Special Attention.*

Pursuant to Local Bankruptcy Rule 4001-2, every agreement providing for postpetition financing shall be accompanied by a court-approved form F 4001-2 "Statement Pursuant to Local Bankruptcy Rule 4001-2" that identifies various terms of the stipulation subject to special attention.  The Debtor's LBR form F 4001-2 is attached hereto as Exhibit A and is incorporated herein by reference.  In addition, FRBP 4001(c)(1)(B)(i)-(xi) requires that a motion to obtain credit shall describe the nature and extent of terms requiring special attention.  The eleven (11) provisions set forth in FRBP 4001(c)(1)(B)(i)-(xi) are addressed as follows:

*1. Grant of Priority Lien under § 364(d).*

FRBP 4001(c)(1)(B)(i), a motion to obtain credit must describe the nature and extent of any term providing for a priority lien under § 364(d).  As the DIP Credit Facility contemplates senior secured financing, priority liens are granted under § 364(d).  Proposed Order page 10 ¶ 3.1.2.

1      2.   *Providing Adequate Protection for Claim Arising Before the Case.*

2          FRBP 4001(c)(1)(B)(ii) requires that a motion to obtain credit disclose any "roll up" of

3   pre-petition debt.  Under the DIP Credit Facility, payments will be applied to pre-petition

4   financing to effectively eliminate the pre-petition obligation.  Proposed Order page 7 ¶ 1.6.  Such

5   financing terms are not *per se* prohibited in the Ninth Circuit and are subject to approval providing

6   such terms do not subvert the Code's distribution scheme.  In re Defender Drug Stores, Inc., 145

7   B.R. 312 (B.A.P. 9th Cir. 1992).  The Debtor maintains that the value of the collateral securing the

8   pre-petition obligation owed to Lender is in excess of such pre-petition obligation, and thus there

9   is no prejudice to the estate to permit the "roll up" as contemplated under the DIP Credit Facility.

10      3.   *Lien Validations.*

11          FRBP 4001(c)(1)(B)(iii) requires the disclosure of prepetition lien validations.  The DIP

12   Credit Facility does not contain such validation, but does prohibit the use of cash collateral to

13   challenge such validity.  Proposed Order page 8 ¶ 1.8.1.

14      4.   *Stay Waivers.*

15          FRBP 4001(c)(1)(B)(iv) requires the disclose of stay waivers.  The DIP Credit Facility

16   contains such waivers on a limited basis or defined situations as provided in the Proposed Order.

17   Proposed Order page 13 ¶ 4.3.

18      5.   *Other Waivers.*

19          FRBP 4001(c)(1)(B)(v) requires the disclosure of waivers of plan filing rights, use of cash

20   collateral or alternate credit.  The DIP Credit Facility waives surcharge rights based on the rational

21   that the purpose of the DIP Financing is to provide the Debtor's estate with liquidity and flexabilty

22   to pay expenses, including those relating to the protection of the Collateral, and waives Debtor's

23   right to seek alternate financing other than to pay off the DIP Facility.  Proposed Order page 14 ¶

24   5.1, 5.2.

25      6.   *Mandated Plan Filing Deadlines.*

26          FRBP 4001(c)(1)(B)(vi) requires the disclosure of any deadlines for disclosure statement

27   or plan filing or confirmation.  No such deadlines are contained in the DIP Credit Facility.

28

1        *7.   Waivers of Non-Bankruptcy Law Related to Lien Perfection or Enforcement.*

2        FRBP 4001(c)(1)(B)(vii) requires the disclosure of any waiver of non-bankruptcy law lien

3    perfection requirements or foreclosure or enforcement requirements.  The DIP Credit Facility

4    contains such waivers.  Proposed Order page 11 ¶ 3.1.3.

5        *8.   Waivers of Causes of Action Belonging to the Estate.*

6        FRBP 4001(c)(1)(B)(viii) requires the disclosure of any waiver of causes of action

7    belonging to the estate or modifications of statutes of limitations.  Other than the surcharge

8    waiver, no such waivers or statute of limitations modifications are contained in the DIP Credit

9    Facility.

10        *9.   Indemnifications.*

11        FRBP 4001(c)(1)(B)(ix) requires the disclosure of any indemnification agreements.  The

12    DIP Credit Facility does not contain a requirement that the Debtor indemnify the DIP Lender.

13        *10. Waiver of Surcharge Rights.*

14        FRBP 4001(c)(1)(B)(x) requires the disclosure of any waiver of surcharge rights under 11

15    U.S.C. § 506(c).  The DIP Credit Facility does contain a waiver of surcharge rights based on the

16    rational that the purpose of the DIP Financing is to provide the Debtor's estate with liquidity and

17    flexabilty to pay expenses, including those relating to the protection of the Collateral.  Proposed

18    Order page 14 ¶ 5.2.

19        *11. Granting of Liens on Avoidance Actions.*

20    FRBP 4001(c)(1)(B)(xi) requires the disclosure of any lien granted on avoidance actions.  The DIP

21    Credit Facility does provide for liens on avoidance actions.  Proposed Order page 11 ¶ 3.2.

22                                          **II.**

23        **THE COURT SHOULD APPROVE THE POST-PETITION FINANCING FACILITY**

24              **AND RELATED RELIEF REQUESTED IN THE PROPOSED ORDER**

25        This Motion seeks authority to enter into the DIP Facility and use cash collateral based on

26    Lender's consent.  The Motion is brought pursuant to 11 U.S.C. § 363(c)(2)(A), (e) and 364(d).

27    Section 363 states in relevant part:

28

                                          -12-

(c)(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
    (A) each entity that has an interest in such cash collateral consents; or
(e)  Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362).

11 U.S.C. § 363(c)(2), (e).

Section 364 states in relevant part:

(d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
(A) the trustee is unable to obtain such credit otherwise; and
(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

Under the express terms of 11 U.S.C. § 364(d), the Debtor must carry its burden of proving two requirements to obtain authorization to incur senior secured financing: (1) that the Debtor is unable to obtain such credit otherwise; and (2) that existing lienholders are adequately protected. Both of these requirements are satisfied in regard to the proposed DIP Credit Facility.

By this Motion, the Debtor is seeking Court authority to enter into the DIP Credit Facility with Lender.  The Debtor is requesting this relief as the Debtor needs post-petition financing to mitigate the impact of seasonality on Debtor's cash flows.  The proposed financing is essential to the Debtor's ability to continue operations during the pendency of the Chapter 11 case and continue to work toward confirming a plan of reorganization.  Although Debtor has been able to operate based on use of cash collateral to date, the benefit of doing so is eliminated by December 22, 2017. *See* Exhibit 2.  Consequently, it is the Debtor's business judgment that returning to operations under the terms of the LSA, as modified by the PFA, is in the best interests of the estate.

1    In In re Defender Drug Stores, Inc., 145 B.R. 312 (B.A.P. 9th Cir. 1992), the debtor was

2    authorized to obtain additional secured financing from its pre-petition lender, upon terms which

3    were very favorable to the creditor, including an enhancement fee and superior lien upon

4    encumbered assets.  Id. at 317.  The court specifically recognized that: "[d]ebtors in possession

5    generally enjoy little negotiating power with a proposed lender, particularly when the lender has a

6    pre-petition lien on cash collateral."  Id.  The court in Defender Drug Stores acknowledged that it

7    must, to some extent, defer to the "reasonable exercise of the debtor's business judgment", so long

8    as an "unwarranted benefit of the post-petition lender" does not result.  Id., see also, In re Simasko

9    Production Co., 47 B.R. 444 (Bankr. D. Colo. 1985).

10    As set forth in the Bagerdjian Declaration, the Debtor is unable to obtain financing on an

11    unsecured basis, nor obtain financing on more favorable terms.  Accordingly, the Debtor is

12    entitled to obtain senior secured credit under Bankruptcy Code Section 364(d) and enter into the

13    proposed DIP Credit Facility.

14    For all these reasons, the motion should be granted.

**III.**

15

16    **THE DEBTOR'S REQUESTS ARE CONSISTENT WITH THE**

17    **OBJECTIVES OF CHAPTER 11 RELIEF**

18    This case and the requests set forth herein are consistent with the goals of chapter 11 relief.

19    The principal purposes of chapter 11 reorganization have been summarized by the Ninth Circuit

20    Court of Appeals as follows:

21    Chapter 11 has two major objectives 1) to permit successful
rehabilitation of debtors (NLRB v. Bildisco and Bildisco, 465 U.S.

22    513, 527, 79 L. Ed. 2d 482, 104 S. Ct. 1188 (1984)); and 2) to
maximize the value of the estate (Toibb v. Radloff, 115 L. Ed. 2d

23    145, 111 S. Ct. 2197, 2201 (1991)).

24    ……
[W]hile the protection of creditors' interests is an important purpose

25    under Chapter 11, the Supreme Court has made clear that successful
debtor reorganization and maximization of the value of the estate are

26    the primary purposes.   See Bildisco, 465 U.S. at 527; Toibb v.
Radloff, 111 S. Ct. at 2201. Chapter 11 is designed to avoid

27    liquidations under Chapter 7, since liquidations may have a negative

28    impact on jobs, suppliers of the business, and the economy as a

whole.  See United States v. Whiting Pools, Inc., 462 U.S. 198, 203,
76 L. Ed. 2d 515, 103 S. Ct. 2309 (1983).

Bonner Mall Partnership v. U.S. Bancorp Mortgage Co. (In re Bonner Mall Partnership), 2 F.3d

899, 915-916 (9th Cir. 1993), *cert. granted*, 510 U.S. 1039, *vacatur denied and appeal dism'd as*

*moot*, 513 U.S. 18 (1994).

Debtor's case and this motion raise the issues that are at the center of fulfilling the

principal purposes of chapter 11 reorganization.  With the proposed financing, the Debtor will be

able to continue operations and avoid liquidation.  The continuing operation of Point.360's

business result in maintaining approximately 275 full and part time entertainment industry jobs.

The effect of losses occasioned by closing the business will also be felt among the Debtor's

creditors and vendors.  Importantly, the Debtor is in the middle of producing many important

projects that will be severely disrupted by a cessation of the Debtor's business.  These impacts are

mitigated by allowing the continuation of the Debtor's business through approval of this Motion.

For all these reasons, the motion should be granted.

## VI.

## CONCLUSION

**WHEREFORE**, based on all the foregoing, Point.360 respectfully requests that the Court

enter the Proposed Order attached hereto as Exhibit 3 approving the proposed DIP Financing and

related liens and adequate protection, approving cash collateral use and related liens and adequate

protection and granting related relief, and granting such other and further relief as the Court deems

just and proper under the circumstances.

Dated:  November 22, 2017                       Lewis R. Landau
                                                Attorney at Law


                                                By:*/s/ Lewis R. Landau*
                                                Lewis R. Landau
                                                [Proposed] Attorney for the Debtor

### DECLARATION OF HAIG S. BAGERDJIAN

I, Haig S. Bagerdjian, do hereby declare:

      1.      I am the president of Point.360, a California corporation ("Point.360" or "Debtor") and I have personal knowledge of the facts set forth herein. On October 10, 2017 (the "Petition Date"), the Debtor commenced its bankruptcy case by filing in this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor continues to operate its business and manage its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. A committee of creditors holding unsecured claims has not yet been appointed.

      2.      Debtor filed for chapter 11 relief to preserve the going concern value of its video post-production business and reorganize its financial affairs. To maintain Debtor's continuing operations, Debtor moves the court for a final order approving post-petition financing and related liens and adequate protection, approving cash collateral use and related liens and adequate protection and granting related relief (hereinafter "DIP Financing"). The DIP Financing lender is Austin Financial Services, Inc. ("Lender"). Lender was the Debtor's prepetition lender under the July 13, 2016 Amended and Restated Loan and Security Agreement as amended ("LSA") and the DIP Financing requests authority to continue the LSA lending relationship on the terms as set forth herein. This DIP Financing motion is proposed to facilitate Debtor's continuing operations for the period after expiration of approvals under the Debtor's motion to use cash collateral and orders thereon [ECF # 2, 14, 46] ("Cash Collateral Motion").[3]

      3.      All terms of the proposed credit agreement ("DIP Credit Facility") are contained in the following documents:

      a.  LSA (a copy of which was attached to the Cash Collateral Motion as Exhibit 2 thereto).

      b.  Proposed order (the "Proposed Order") attached hereto as Exhibit 3.

      c.  DIP Postpetition Financing Addendum ("PFA") attached hereto as Exhibit 4.

---

[3] Authorized cash collateral use currently expires on December 7, 2017 pursuant to ECF # 46. Debtor anticipates an additional stipulation and order that will extend current cash collateral use to December 15, 2017 to coordinate the matter with this motion.

1    d.  Continuing Guaranty attached hereto as Exhibit 5.

2    e.  Guarantor Option Rider attached hereto as Exhibit 6.

3    4.    The non-default interest rate on the DIP Credit Facility is prime plus 1.5% per

4  annum.  The maturity date of the DIP Credit Facility is October 31, 2018.  Lender shall receive

5  first priority lien on all of the Debtor's property to secure the DIP Credit Facility.  The borrowing

6  limit is $3 million at an advance rate of 85% of eligible receivables.  The critical borrowing

7  conditions include entry of the proposed order attached as Exhibit 3.  ).  The value of the

8  Collateral securing the pre-petition obligation owed to Lender is in excess of such pre-petition

9  obligation, and thus there is no prejudice to the estate to permit the "roll up" as contemplated

10  under the DIP Credit Facility.

11    5.    Point.360 provides high definition and standard definition digital mastering, data

12  conversion, video and film asset management, distribution and other services to owners, producers

13  and distributors of entertainment and advertising content. Point.360 provides the services

14  necessary to edit, master, reformat, convert, archive and ultimately distribute its clients' film and

15  video content, including television programming feature films and movie trailers. The Debtor's

16  interconnected facilities provide service coverage to all major U.S. media centers. Clients include

17  major motion picture studios and independent producers.

18    6.    The Debtor presently operates from three post production and administrative office

19  locations: (1) 2701 Media Center Drive, Los Angeles, California ("Media Center"); (2) 1122 and

20  1133 North Hollywood Way, Burbank, California ("HWay"); and (3) 2300 Empire Avenue, Suite

21  100, Burbank, California ("Empire"). Each post production location is electronically tied to the

22  others and serves the same customer base. Depending on the location size, the production

23  equipment consists of tape duplication, editing, encoding, standards conversion, and other

24  machinery. Each location employs personnel with the skills required to efficiently run the

25  equipment and handle customer requirements.

26    7.    Typically, a feature film or television show or related material will be submitted to

27  a facility by a motion picture studio, independent producer, advertising agency, or corporation for

28

1   processing and distribution. A common sales force markets Point.360's capabilities for all

2   facilities.

3           8.      Debtor is a public company with securities registered under the Securities

4   Exchange Act of 1934.  Debtor has 12,704,506 shares of its common stock outstanding.  Debtor's

5   market symbol is "PTSX."  Additional information concerning the Debtor's operations and

6   management is available on its website at **https://www.point.360.com.**

7           9.      On July 8, 2015, Point.360 acquired certain assets of Modern VideoFilm, Inc.

8   ("MVF") including, but not limited to, MVF's equipment, inventory, and accounts receivable, in a

9   private Article 9 foreclosure sale, and assumed no debts, obligations or liabilities except for

10  agreeing to pay a portion of the rent for each facility of MVF to its landlord on a per diem basis

11  based and certain employee liabilities.  The MVF acquisition was intended to add two unique lines

12  of business to augment Debtor's existing businesses and strengthen and synergize the existing

13  business lines by combining operations and optimizing cost efficiencies.

14          10.     Regarding the purchase of the assets of MVF, on July 8, 2015, the Debtor entered

15  into a Term Loan Agreement Medley Opportunity Fund II, LP ("Medley"). The Medley Loan

16  Agreement is comprised of a five-year term loan facility in the amount of $6,000,000, $1,000,000

17  of which was funded on the July 8, 2015 closing date. As of March 31, 2017, the Company had

18  borrowed the $6,000,000 under the Medley Loan Agreement.  Debtor has elected to pay interest as

19  payment in kind ("PIK") as permitted by the Loan Agreement. The outstanding principal balance

20  and all accrued and unpaid interest on the Term Loan are due and payable on July 8, 2020.[4]

21          11.     The MVF transaction resulted in substantial and unanticipated operating losses

22  requiring that Debtor reorganize its financial affairs.  Point.360 entered into the MVF acquisition

23  in reliance on misleading information concerning MVF's profitability.  For example, Point.360

24

25

26  _____

27  [4] As further consideration for the MVF foreclosure sale purchase transaction, the Debtor issued 2,000,000 shares of
    common stock, and five-year warrants to purchase an aggregate of 800,000 shares of common stock at an exercise
    price of $0.75 per share. As consideration for the Medley Loan Agreement, the Debtor also issued warrants to Medley
28  and Medley Capital Corporation to purchase an aggregate of 500,000 shares of common stock.

1    was given *pro forma* projections showing $29 million in sales and $4.1 million in EBITDA for the

2    2015 - 2016 period.  Actual results after the MVF acquisition resulted in $15.6 million in sales and

3    EBITDA of *negative* $6.3 million.  This $10.4 million difference between projected and actual

4    EBITDA for 2105 - 2016, which continued into the fiscal 2017 period, has resulted in Debtor's

5    need for financial reorganization.

6          12.    After the initial disappointing results of the MVF acquisition, Debtor initiated a

7    business plan to reduce expenses and reestablish profitability.  The significant changes to Debtor's

8    operations are as follows: (1) Debtor has eliminated approximately 100,000 square feet of rental

9    space by vacating its Santa Monica, Glendale and Empire (second floor) facilities in 2015; and (2)

10    Debtor has reduced rent and associated expenses by initiating the pending closure of its 37,930-

11    foot Empire facility (first floor).  Rent and CAM charges at this facility exceeded $150,000

12    monthly.  Debtor has entered into a prepetition stipulation with lessor REEP OFC 2300 Empire

13    CA LLC ("REEP") to vacate the facility by December 4, 2017 and will not incur post-petition rent

14    during the period prior to December 4, 2017 as long as Debtor vacates by that date.

15          13.    While Debtor was working toward profitability, Debtor received a 3-day notice to

16    pay rent or quit for its Media Center facility on October 6, 2017.  The Debtor presently intends to

17    retain the Media Center facility as a critical component of the reorganized business.

18    Consequently, Debtor was required to file its chapter 11 petition on October 10, 2017 to maintain

19    its core operating facilities and implement its reorganization plan through the chapter 11 process.

20          14.    The Debtor's chapter 11 goal is to stabilize its business, enhance value and

21    internally reorganize from a position of financial strength.  While the Debtor presently has

22    sufficient cash from operations to continue in business without post-petition financing, the Debtor

23    projects that its cash reserves will be consumed during the seasonally slow year-end holiday

24    period.  Thus, approval of the DIP Credit Facility is both necessary and appropriate to provide the

25    Debtor with operational flexibility during the term of its chapter 11 case.

26          15.    Attached hereto as Exhibit 1 is a true and accurate accrual based operating budget

27    for the 12-month post-petition period prepared at my direction.  As set forth therein, Debtor is

28

1   projected to generate at least $700,000 in net income before interest, taxes, depreciation and

2   amortization ("EBITDA").

3        16.      Attached as Exhibit 2 is a true and accurate projection of Debtor's cash balance

4   comparing operations under the present use of cash collateral versus operations under the DIP

5   Facility. As shown in Exhibit 2, the Debtor expects the delta in positive cash balance between

6   operations based on use of cash collateral and under the DIP Facility to be eliminated by

7   December 22, 2017. Essentially, the Debtor loses the benefit of operating with cash proceeds

8   from accounts receivable, versus operating under the DIP Facility. Thus, the Debtor can mitigate

9   the impact of seasonality by returning to operations under the DIP Credit Facility. The DIP

10   Facility makes financing proceeds immediately available upon the creation of a financeable

11   invoice. This immediate availability of cash for operations creates the necessity for the DIP

12   Facility, as well as enhanced predictability of working capital over the term of the case.

13        17.      The proposed DIP Credit Facility incorporates the prepetition LSA among Lender

14   and the Debtor. The LSA supported the Debtor's prepetition operations and Debtor did not

15   default under the LSA. Under the DIP Credit Facility, the LSA is being amended by the PFA

16   (Exhibit 4 hereto), which provides for the following material changes to the LSA:

17        a.   Commitment set at $3,000,000.

18        b.   Collateral management fee increased by .1% to .65%.

19        c.   Annual Facility Fee equal to approximately 0.5% of the Line of Credit Commitment,

20            due and payable on the date of the first Advance.

21        d.   Elimination of line of credit termination or reduction fee in favor of 3% exit fee.

22        e.   Bankruptcy related defaults waived.

23        f.   Maturity of October 31, 2018.

24        g.   Lender required that I guaranty the DIP Financing and I have agreed to do so per the

25            Continuing Guaranty and Guarantor Option Rider substantially in the form as attached

26            hereto as Exhibit 5 and 6.

27

28

1      18.    The Debtor is requesting approval of the DIP Financing because the Debtor needs

2  post-petition financing to mitigate the impact of seasonality on Debtor's cash flows. The proposed

3  financing is essential to the Debtor's ability to continue operations during the pendency of the

4  Chapter 11 case and continue to work toward confirming a plan of reorganization. Although

5  Debtor has been able to operate based on use of cash collateral to date, the benefit of doing so is

6  eliminated by December 22, 2017. *See* Exhibit 2. The DIP Financing offered by Lender is

7  substantially consistent with the financing that was provided by Lender to Debtor prior to the

8  Petition Date, and because in part of that fact, there is no other financing from another lender or

9  funding source that can be obtained on better terms. Consequently, it is the Debtor's business

10  judgment that returning to operations under the terms of the LSA, as modified by the PFA, is in

11  the best interests of the estate.

12      19.    Based on my experience, I am aware of the credit markets available to the Debtor

13  and the Debtor is unable to obtain financing on an unsecured basis, nor obtain financing on more

14  favorable terms. I negotiated the terms of the DIP Credit Facility with Lender on an arm's length

15  basis seeking the reduction of various costs and expenses incurred in connection with the facility.

16  I do not believe that Lender would provide the requested credit on more favorable terms to the

17  Debtor.

18      I declare under penalty of perjury under the laws of the United States of America that the

19  foregoing is true and correct to the best of my knowledge and belief.

20      Executed this 22nd day of November 2017 at Los Angeles, California.

23                     Haig S. Bagerdjian

-21-

# EXHIBIT A

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Lewis R. Landau (CA Bar No. 143391)<br>Attorney-at-Law<br>22287 Mulholland Hwy., # 318<br>Calabasas, California 91302<br>Voice & Fax: (888) 822-4340<br>Email:  Lew@Landaunet.com | |

☐ *Individual appearing without attorney*
☒ *Attorney for:* Debtor in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA -  LOS ANGELES DIVISION

| In re:<br><br>Point.360, a California corporation,<br><br><br><br><br><br><br><br><br>Debtor(s). | CASE NO.:  2:17-bk-22432 WB<br><br>CHAPTER:  11 |
|---|---|
| | **STATEMENT REGARDING<br>CASH COLLATERAL OR<br>DEBTOR IN POSSESSION FINANCING<br>[FRBP 4001; LBR 4001-2]**<br><br>DATE:          12/14/2017<br>TIME:          10:00 am<br>COURTROOM:  1375; Judge Brand<br>ADDRESS:      United States Bankruptcy Court<br>                    255 E. Temple Street, 13th Floor<br>                    Los Angeles, CA 90012 |

Secured party(ies): Austin Financial Services, Inc.

The Debtor has requested the approval of either (1) a motion for use of cash collateral, or postpetition financing, or both, or (2) through a separately-filed motion, a stipulation providing for the use of cash collateral, or postpetition financing, or both.  The proposed form of order on the motion or the stipulation contains the following provisions or findings of fact:

| | Disclosures Tracking FRBP 4001(c)(1)(B)(i) through (xi) and (d)(1)(B) | Page No.: | Line No.<br>(if applicable) |
|---|---|---|---|
| ☒ | (i): "[A] grant of priority or a lien on property of the estate under § 364(c) or (d)" | 10 | 14 |
| ☒ | (ii): "[T]he providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim" | 9 | 25 |
| | ☐  Cross-collateralization, *i.e.*, clauses that secure prepetition debt by postpetition assets in which the secured party would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law | | |
| | ☒  Roll-up, *i.e.*, provisions deeming prepetition debt to be postpetition debt or using postpetition loans from a prepetition secured party to pay part or all of that secured party's prepetition debt, other than as provided in § 552(b) | 7 | 18 |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

023

| | | | |
|---|---|---|---|
| Continued from page 1 | | | |
| ☐ | Grant a replacement lien in an amount in excess of the dollar amount of the lien on cash collateral as of the petition date | | |
| ☐ | (iii): "[A] determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim" | | |
| ☒ | (iv): "[A] waiver or modification of Code provisions or applicable rules relating to the automatic stay"<br>☒   Automatic relief from the automatic stay upon occurrence of certain events. | 13 | 4 |
| ☒ | (v): "[A] waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request authority to obtain credit under § 364" | 14 | 20 |
| ☐ | (vi): "[T]he establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order" | | |
| ☒ | (vii): "[A] waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien" | 11 | 8 |
| ☐ | (viii): "[A] release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action" | | |
| ☐ | (ix): "[T]he indemnification of any entity" | | |
| ☒ | (x): "[A] release, waiver, or limitation of any right under § 506(c)"<br>☐   The granting of any lien on any claim or cause of action arising under § 506(c) | 14 | 27 |
| ☒ | (xi): "The granting of any lien on any claim or cause of action arising under §§ 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a)" | 11 | 19 |
| **Additional Disclosures Required by LBR 4001-2** | | **Page No.:** | **Line No.<br>(if applicable)** |
| ☐ | With respect to a professional fee carve out, disparate treatment for professionals retained by a creditors' committee from that provided for the professionals retained by the debtor | | |
| ☒ | Pay down prepetition principal owed to a creditor | 7 | 18 |
| ☐ | Findings of fact on matters extraneous to the approval process | | |

| | | |
|---|---|---|
| 11/22/2017 | Lewis R. Landau | /s/ Lewis R. Landau |
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

# EXHIBIT 1

**Point.360**
**Profit and Loss Statement Forecast**
**Pro Forma -12 months**

| Period | 10 | 11 | 12 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Seasonality | 9.4936% | 9.5695% | 9.7617% | 8.9494% | 8.4916% | 6.1352% | 7.6493% | 7.5970% | 8.6911% | 8.0995% | 8.2404% | 7.3218% | 100.0000% |
| **Sales** | 1,594,397 | 1,607,142 | 1,639,424 | 1,503,005 | 1,426,119 | 1,030,372 | 1,284,668 | 1,275,878 | 1,459,626 | 1,360,263 | 1,383,926 | 1,229,662 | 16,794,482 |
| **Beechwood:** | | | | | | | | | | | | | |
| Material Cost | 31,888 | 32,143 | 32,788 | 30,060 | 28,522 | 20,607 | 25,693 | 25,518 | 29,193 | 27,205 | 27,679 | 24,593 | 335,890 |
| Wages & Benefits | 770,436 | 618,096 | 541,926 | 522,883 | 522,883 | 522,883 | 522,883 | 522,883 | 522,883 | 522,883 | 522,883 | 522,883 | 6,636,407 |
| Production Equipment | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 420,000 |
| Delivery Costs | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 216,000 |
| Outside Services | 92,000 | 92,000 | 92,000 | 92,000 | 92,000 | 92,000 | 92,000 | 92,000 | 92,000 | 92,000 | 92,000 | 92,000 | 1,104,000 |
| Facility Costs | 26,000 | 26,000 | 26,000 | 26,000 | 26,000 | 26,000 | 26,000 | 26,000 | 26,000 | 26,000 | 26,000 | 26,000 | 312,000 |
| HWAY LLC Rent | - | 67,000 | 67,000 | 67,000 | 67,000 | 67,000 | 67,000 | 67,000 | 67,000 | 67,000 | 67,000 | 67,000 | 737,000 |
| Empire Rent | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Media Center Rent: | - | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 1,265,000 |
| Depreciation - COGS | 47,832 | 48,214 | 49,183 | 45,090 | 42,784 | 30,911 | 38,540 | 38,276 | 43,789 | 40,808 | 41,518 | 36,890 | 503,834 |
| **Totals COGS:** | 1,021,156 | 1,051,453 | 976,897 | 951,033 | 947,189 | 927,402 | 940,117 | 939,677 | 948,864 | 943,896 | 945,079 | 937,366 | 11,530,131 |
| **Gross Profit** | 573,241 | 555,689 | 662,527 | 551,972 | 478,930 | 102,970 | 344,551 | 336,201 | 510,761 | 416,367 | 438,846 | 292,296 | 5,264,351 |
| Sales Personnel Costs | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 360,000 |
| Travel & Entertainment | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 72,000 |
| Advertising & Promo | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Bad Debt Expense | 1,594 | 1,607 | 1,639 | 1,503 | 1,426 | 1,030 | 1,285 | 1,276 | 1,460 | 1,360 | 1,384 | 1,230 | 16,794 |
| **TOTAL SELLING EXP.** | 37,594 | 37,607 | 37,639 | 37,503 | 37,426 | 37,030 | 37,285 | 37,276 | 37,460 | 37,360 | 37,384 | 37,230 | 448,794 |
| Admin Personnel Cost | 300,289 | 300,289 | 300,289 | 300,289 | 300,289 | 300,289 | 300,289 | 300,289 | 300,289 | 300,289 | 300,289 | 300,289 | 3,603,468 |
| Supplies | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 144,000 |
| Professional Fees | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| Legal & Consulting E | - | 50,000 | 50,000 | 50,000 | - | - | - | - | - | - | - | - | 150,000 |
| Facility Costs | 26,904 | 26,904 | 26,904 | 26,904 | 26,904 | 26,904 | 26,904 | 26,904 | 26,904 | 26,904 | 26,904 | 26,904 | 322,848 |
| Other Indirect | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 144,000 |
| Moving & Storage | 30,000 | 30,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 160,000 |
| UST Fees | - | - | - | 13,000 | - | - | 13,000 | - | - | - | - | - | 26,000 |
| Depreciation | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| Amortization | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total SG&A** | 428,787 | 478,800 | 458,832 | 471,696 | 408,619 | 408,223 | 421,478 | 408,469 | 408,653 | 408,553 | 408,577 | 408,423 | 5,119,110 |
| **OPERATING INCOME** | 144,453 | 76,889 | 203,694 | 80,276 | 70,311 | (305,253) | (76,926) | (72,268) | 102,109 | 7,813 | 30,269 | (116,127) | 145,241 |
| **EBITDA:** | 197,285 | 130,103 | 257,877 | 130,366 | 118,095 | (269,342) | (33,386) | (28,992) | 150,898 | 53,621 | 76,787 | (74,237) | 709,075 |
| | 12.4% | 8.1% | 15.7% | 8.7% | 8.3% | -26.1% | -2.6% | -2.3% | 10.3% | 3.9% | 5.5% | -6.0% | 4.2% |

*026*

# EXHIBIT 2



*028*

**Point.360**
**Cash Forecast**
**Cash Collateral vs. DIP Financing**

**Historical Data**

| | Cash Balance - Collateral | Cash Balance - DIP | Delta | Cash Balance | Net Change | | | |
|---|---|---|---|---|---|---|---|---|
| 10/31/2017 | 752,426 | 442,334 | 310,092 | 752,426 | - | Actual | | |
| 11/1/2017 | 770,762 | 468,705 | 302,057 | 770,762 | (8,036) | Actual | | |
| 11/2/2017 | 772,092 | 470,035 | 302,057 | 772,092 | - | Actual | | |
| 11/3/2017 | 1,000,565 | 407,759 | 592,806 | 1,000,565 | 290,750 | Actual | | |
| 11/4/2017 | 1,000,565 | 407,759 | 592,806 | 1,000,565 | | | | |
| 11/5/2017 | 1,000,565 | 407,759 | 592,806 | 1,000,565 | | | | |
| 11/6/2017 | 1,023,667 | 483,369 | 540,297 | 1,023,667 | (52,509) | Actual | | |
| 11/7/2017 | 1,122,904 | 532,430 | 590,474 | 1,122,904 | 50,177 | Actual | | |
| 11/8/2017 | 1,057,838 | 504,769 | 553,069 | 1,057,838 | (37,405) | Actual | | |
| 11/9/2017 | 577,987 | 202,647 | 375,340 | 577,987 | (177,729) | Actual | | |
| 11/10/2017 | 396,112 | 153,240 | 242,872 | 396,112 | (132,468) | Actual | | |
| 11/11/2017 | 396,112 | 153,240 | 242,872 | 396,112 | | | | |
| 11/12/2017 | 396,112 | 153,240 | 242,872 | 396,112 | | | | |
| 11/13/2017 | 366,180 | 77,821 | 288,359 | 366,180 | 45,487 | Actual | | |
| 11/14/2017 | 645,662 | 410,795 | 234,867 | 645,662 | (53,492) | Actual | | |
| 11/15/2017 | 686,445 | 441,461 | 244,984 | 686,445 | 10,117 | Actual | | |
| 11/16/2017 | 783,375 | 541,304 | 242,071 | 783,375 | (2,913) | Actual | | |
| 11/17/2017 | 782,586 | 623,898 | 158,688 | 782,586 | (83,383) | Actual | | |
| 11/18/2017 | 782,586 | 623,898 | 158,688 | 782,586 | | | | |
| 11/19/2017 | 782,586 | 623,898 | 158,688 | 782,586 | | | | |
| 11/20/2017 | 817,288 | 623,898 | 193,390 | 817,288 | 34,702 | Forecast | Daily Avg. Change: | 8,336 |
| 11/21/2017 | | | 185,054 | | | | # of Biz Days to Delta: | 23.2 |
| 11/22/2017 | | | 176,718 | | | | | |
| 11/23/2017 | | | 176,718 | | | | | |
| 11/24/2017 | | | 168,382 | | | | | |
| 11/25/2017 | | | 168,382 | | | | | |
| 11/26/2017 | | | 160,046 | | | | | |
| 11/27/2017 | | | 160,046 | | | | | |
| 11/28/2017 | | | 151,711 | | | | | |
| 11/29/2017 | | | 143,375 | | | | | |
| 11/30/2017 | | | 135,039 | | | | | |
| 12/1/2017 | | | 126,703 | | | | | |
| 12/2/2017 | | | 126,703 | | | | | |
| 12/3/2017 | | | 118,367 | | | | | |
| 12/4/2017 | | | 118,367 | | | | | |
| 12/5/2017 | | | 110,031 | | | | | |
| 12/6/2017 | | | 101,695 | | | | | |
| 12/7/2017 | | | 93,359 | | | | | |
| 12/8/2017 | | | 85,023 | | | | | |
| 12/9/2017 | | | 85,023 | | | | | |
| 12/10/2017 | | | 76,688 | | | | | |
| 12/11/2017 | | | 76,688 | | | | | |
| 12/12/2017 | | | 68,352 | | | | | |
| 12/13/2017 | | | 60,016 | | | | | |
| 12/14/2017 | | | 51,680 | | | | | |
| 12/15/2017 | | | 43,344 | | | | | |
| 12/16/2017 | | | 43,344 | | | | | |
| 12/17/2017 | | | 35,008 | | | | | |
| 12/18/2017 | | | 35,008 | | | | | |
| 12/19/2017 | | | 26,672 | | | | | |
| 12/20/2017 | | | 18,336 | | | | | |
| 12/21/2017 | | | 10,000 | | | | | |
| 12/22/2017 | | | 1,665 | | | | | |
| 12/23/2017 | | | | | | | | |
| 12/24/2017 | | | | | | | | |
| 12/25/2017 | | | | | | | | |
| 12/26/2017 | | | | | | | | |
| 12/27/2017 | | | | | | | | |
| 12/28/2017 | | | | | | | | |
| 12/29/2017 | | | | | | | | |
| 12/30/2017 | | | | | | | | |
| 12/31/2017 | | | | | | | | |

*029*

# EXHIBIT 3

1  Lewis R. Landau (State Bar No.143391)
   22287 Mulholland Hwy., #318
2  Calabasas, California 91302
   Telephone: (888) 822-4340
3  Facsimile: (888) 822-4340
   Email: lew@landaunet.com
4
   Proposed Attorney for Debtor and Debtor in
5  Possession

6

7

8                    **UNITED STATES BANKRUPTCY COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10                            **CENTRAL DIVISION**

11  In re                              ) Case No. 2:17-bk-22432-WB
                                       )
12  POINT.360, a California corporation, ) Chapter 11
                                       )
13                                     ) **ORDER ON MOTION FOR ENTRY OF**
        Debtor and Debtor in Possession. ) **ORDERS (1) APPROVING POST-**
14                                     ) **PETITION FINANCING AND RELATED**
                                       ) **LIENS AND ADEQUATE PROTECTION;**
15                                     ) **(2) APPROVING CASH COLLATERAL**
                                       ) **USE AND RELATED LIENS AND**
16                                     ) **ADEQUATE PROTECTION, AND (3)**
                                       ) **GRANTING RELATED RELIEF**
17                                     )
                                       ) Date:      October 31, 2017
18                                     ) Time:      2:00 p.m.
                                       ) Place:     Courtroom 1375
19                                     )            255 E. Temple Street
                                       )            Los Angeles, CA 90012
20  _____   )

21          On December 14, 2017, a hearing (the "<u>Hearing</u>") was held before this Court, the

22  Honorable Julia W. Brand presiding, regarding the Motion for Entry of Orders (1) Approving

23  Post-Petition Financing and Related Liens and Adequate Protection; (2) Approving Cash

24  Collateral Use and Related Liens and Adequate Protection, and (3) Granting Related Relief (the

25  "<u>Motion</u>")[1] by Point.360, the debtor and debtor in possession ("<u>Debtor</u>") on behalf of the

26  _____

27  [1] Defined terms herein are used with the same meaning as defined in the Motion unless otherwise
28  noted.

BN

                                              1

bankruptcy estate (the "Estate") in the above-captioned bankruptcy case (the "Case").

Upon the record made by Debtor before and at the Hearing, including the Motion and the declarations, pleadings, and papers filed with the Court relating to the Case, and good and sufficient cause appearing therefor,

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACTS AND CONCLUSIONS OF LAW:

A.    Procedural Findings.

1.    Petition.  On October 10, 2017 (the "Petition Date"), Debtor filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")[2] commencing the Case.  Debtor continues to operate its business and manage its assets as a "debtor in possession" pursuant to sections 1107(a) and 1108.

2.    Jurisdiction, Venue.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    Committee.  No official committee of unsecured creditors (upon the appointment thereof, the "Committee"), as provided for under section 1102, has been appointed in the Case as of the date of the Hearing.

4.    Notice.  Under the circumstances, the notice of the Motion and the Hearing has been provided by Debtor to certain parties-in-interest, including: (i) the Office of the United States Trustee; (ii) those creditors holding the 20 largest unsecured claims against Debtor's estate; (iii) counsel to Austin Financial Services, Inc. ("Lender"); (iv) other secured parties of record (the "Other Secured Parties"); and (v) all parties requesting special notice (collectively, the "Notice Parties").  Such notice constitutes due, sufficient, and appropriate notice thereof and complies with section 102(1), Bankruptcy Rule 2002 and 4001(b), and the local rules of the Court.

B.    Findings Relating to Prepetition Obligations and Liens.  Without prejudice to the

---

[2] Statutory references herein are to the Bankruptcy Code unless otherwise noted.

BN31233805v7

*032*

rights of any other party, Debtor admits, stipulates, and agrees as follows:

1.    Prepetition Loan Agreement.  Prior to the Petition Date, Debtor and Lender were parties to that certain Amended and Restated Loan and Security Agreement, dated as of July 13, 2016, and Assignment and Assumption of Financing and Financing Documents, dated as of July 13, 2016 (collectively, as amended, modified, supplemented, and restated, as of the Petition Date, the "Prepetition Loan Agreement") and other related documents (as each amended, modified, supplemented, and restated, as of the Petition Date, collectively and together with the Prepetition Loan Agreement, the "Prepetition Loan Documents");

2.    Prepetition Obligations.  As of the Petition Date, Debtor was obligated to Lender for the obligations arising under or relating to the Prepetition Loan Documents (the "Prepetition Obligations").  The Prepetition Obligations (a) were due and payable to Lender, (b) included indebtedness in the aggregate principal amount of not less than $2,475,676.48 and accrued interest in the amount of not less than $3,464.90, plus additional interest, costs, fees, and charges recoverable under the Prepetition Loan Documents or law, (c) constitute legal, valid, binding, and enforceable obligations of Debtor and against the Estate, and (d) are not subject to any objection, offset, avoidance, subordination, or other claim or challenge of any nature under the Bankruptcy Code, any other applicable law, contract, or otherwise;

3.    Prepetition Liens and Collateral.  As of the Petition Date, the Prepetition Obligations were secured by liens and security interests in favor of Lender (the "Prepetition Liens").  The Prepetition Liens (a) encumber all of Debtor's right, title, and interest in assets described in the Prepetition Loan Agreement and existing as of the Petition Date (the "Prepetition Collateral"), (b) secure performance of the Prepetition Obligations pursuant to the Prepetition Loan Documents, (c) constitute legal, valid, enforceable, non-avoidable, and duly perfected priority security interests and liens in and upon the Prepetition Collateral in favor of Lender subject only to the Permitted Liens (defined in the Prepetition Loan Agreement), (d) are not subject to any objection, offset, avoidance, subordination, or other claim or challenge of any nature under the Bankruptcy Code, any other applicable law, contract, or otherwise, and (e) were

3

033

granted by Debtor in its sound business judgment, for fair and sufficient consideration and reasonably equivalent value, contemporaneously with the making of the loans or commitments to make loans and other financial accommodations secured thereby. The Prepetition Collateral includes Cash Collateral (defined herein).

4.     Prepetition Collateral Value. As of the Petition Date, the value of the Prepetition Collateral is equal to or greater than the amount of the Prepetition Obligations.

5.     No Prepetition Claims. Debtor has no valid claims (as such term is defined in section 101(5)) or causes of action against Lender with respect to any Prepetition Loan Documents, whether arising under contract, at law or at equity, including, without limitation, any recharacterization, subordination, avoidance, or other claims arising under or pursuant to sections 105, 510, 541 or 542 through 553, inclusive.

C.     Findings Supporting the Postpetition Financing.

1.     Postpetition Financing. Debtor has requested from Lender loans, advances, and other financial accommodations on and after the Petition Date (the "Postpetition Financing") upon the findings of fact and conclusions of law made herein and upon the terms and conditions of the Prepetition Loan Agreement, as amended and assumed by Debtor (as debtor and debtor in possession) by the DIP Postpetition Financing Addendum, dated as of November _____, 2017, between Lender and Debtor on behalf of the Estate, substantially in the form filed with the Court on November _____, 2017 (the "Loan Agreement," and collectively with this Order and other documents related to and in furtherance of the Loan Agreement and the Postpetition Financing, the "Loan Documents");

2.     Need for Postpetition Financing. Debtor has an immediate need to obtain the funds to be provided by the Postpetition Financing pursuant to the Loan Documents in order to, among other tasks, permit the orderly continuation of the operation of Debtor's business, minimize the disruption of its business operations, and manage and preserve the assets of the Estate, the absence of which would immediately and irreparably harm Debtor, its Estate, and its stakeholders;

3.    <u>No Credit Available on Other Terms</u>.  Debtor is unable to procure the same amount of financing as contemplated under the Postpetition Financing from any other source or on terms more favorable to the Estate than those offered by Lender pursuant to the Postpetition Financing;

4.    <u>Business Judgment and Good Faith Pursuant to Section 364(e)</u>.  The terms of the Postpetition Financing pursuant to the Loan Documents are fair, just, and reasonable under the circumstances, are ordinary and appropriate for secured financing to a debtor in possession on behalf of its bankruptcy estate, are supported by reasonably equivalent value and consideration, reflect Debtor's exercise of its prudent business judgment consistent with its fiduciary duties, and have been negotiated in good faith and at arms' length by and between Lender and Debtor. Therefore, the Postpetition Financing and credit extended under the terms of the Loan Documents are extended in good faith by Lender as that term is used in section 364(e); and

5.    <u>Adequate Protection</u>.  The proceeds of the Collateral (defined herein) (the "<u>Cash Collateral</u>"), including the proceeds of the Prepetition Collateral, constitutes "cash collateral" of Lender within the meaning of section 363(a).  Lender is entitled to adequate protection of its interests in the Collateral pursuant to section 361 in connection with or resulting from Debtor's use of the Cash Collateral, the Postpetition Financing, and the imposition of the automatic stay.  The adequate protection in favor of Lender as set forth in this Order (the "<u>Adequate Protection</u>") and the use of the Cash Collateral as authorized by this Order are fair and reasonable; provided, however, nothing herein is an acknowledgment or recognition that the Adequate Protection is in fact sufficient, or limits Lender's rights to seek additional or different adequate protection or to contest whether the Adequate Protection constitutes sufficient "adequate protection" within the meaning of section 361.

D.    <u>Good Cause</u>.  The Postpetition Financing and relief and rights granted or acknowledged pursuant to this Order are necessary, essential, and appropriate and are in the best interest of and will benefit Debtor, its creditors, and its Estate as its implementation will, among other effects, provide Debtor on behalf of its Estate with the necessary liquidity to minimize

BN31233805v7

disruption to Debtor's business and on-going operations, preserve and maximize the value of the Estate for the benefit of all creditors of Debtor, and avoid immediate irreparable harm to Debtor, its creditors, its business, its employees, and the Estate.

NOW, THEREFORE, upon the record made by Debtor before and at the Hearing, including the Motion and the pleadings and papers filed with the Court, having made the findings of fact and conclusions of law as set forth herein, and after due consideration and good and sufficient cause appearing therefore;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

Section 1.        Authorization of Postpetition Financing.

1.1        Motion Granted.  The Motion is granted on a final basis pursuant to sections 364, 363, and 362, and Bankruptcy Rule 4001(c), on the terms and conditions of this Order.

1.2        Authorization to Borrow.  Debtor is authorized and empowered to borrow under the Postpetition Financing and incur obligations to Lender on or after the Petition Date (the "Postpetition Obligations") pursuant to the terms and conditions of the Loan Documents and this Order.

1.3        Loan Documents.

1.3.1        Authorization.  Debtor is authorized and empowered to enter into, execute, deliver, perform, and comply with all of the terms, conditions, and covenants of the Loan Documents and make all the representations therein.

1.3.2        Approval.  The Loan Documents, and the terms, conditions, covenants, and provisions therein, are approved and constitute sufficient and conclusive evidence of the Postpetition Financing, the Postpetition Obligations (including the Postpetition Charges (defined herein)), the Postpetition Liens (defined herein), and the other rights, interests, claims, and remedies afforded to or for the benefit of Lender pursuant to the Loan Documents.

1.3.3        Amendments.  Lender and Debtor may amend, modify, supplement, or waive any of the Loan Documents or any term, condition, covenant, or provision therein (a

"Loan Document Modification"), which Loan Document Modification is deemed to be approved by this Order, as follows:  (a) with respect to a Loan Document Modification that is considered non-material or technical in nature by Debtor Lender in their business judgment ("Non-Material Loan Document Modification"), by further agreement of Lender and Debtor without notice, motion, or further order, and (b) with respect to a Loan Document Modification that is not a Non-Material Loan Document Modification, by further agreement of Lender and Debtor effective without notice, motion, or further order 10 days after (i) service of written notice of the proposed Loan Document Modification to the Notice Parties and filing of a notice of the proposed Loan Document Modification with the Court, and (ii) no objection to such proposed Loan Document Modification is filed with the Court within five days after the later of the date of service or filing of the notice of the proposed Loan Document Modification.

　　　　1.4　　Postpetition Obligations.  The Loan Documents constitute and evidence the Postpetition Obligations, which obligations are binding and enforceable against (a) Debtor, and its successors and assigns, trustees, and representatives, (b) its Estate, and any successors or representatives thereof (including without limitation a bankruptcy trustee), (c) its creditors, and each of their successors and assigns, (d) guarantors, and (e) the Committee (if any), and (d) the Other Secured Parties.

　　　　1.5　　Application of Proceeds.  Debtor shall deliver to Lender, and Lender may apply all proceeds of the Collateral, including Cash Collateral (as defined in the Loan Agreement), or any other payments or consideration received by Lender in accordance with the Loan Documents to be applied by Lender first to pay and satisfy Prepetition Obligations (if any) until the Prepetition Obligations are paid and satisfied in full, and then to pay and satisfy Postpetition Obligations.

　　　　1.6　　Payments.  Debtor is authorized and required to make all payments and transfers of interests in property to Lender as provided, permitted, or required under the Loan Documents (including without limitation the transfer and deposit of funds, payments, and proceeds of the Collateral (as defined in the Loan Agreement) into a lock box or other deposit

account if requested by Lender) or as otherwise required pursuant to the Loan Documents.

Lender is entitled to advance, make payment, and deduct for any fees, costs, expenses, and other

charges as may be recoverable or reimbursable to Lender, or as otherwise provided in the Loan

Documents (the "Postpetition Charges"), including without limitation the payment and

reimbursement to Lender of all present and future attorneys' fees, professionals' fees, and other

fees, costs, and expenses paid or incurred by Lender, all of which constitute part of the principal

amount of the Postpetition Obligations.

   1.7 Cash Management Procedures.  Debtor is authorized and directed to

continue to use that certain deposit account at Wells Fargo Bank, Account No. 4438836801 (the

"Collection Deposit Account") that existed prior to the commencement of the Case and deposit

all payments and transfers received by Debtor into the Collection Deposit Account.  The

Collection Deposit Account and all prepetition agreements and procedures with respect to the

dominion, transfer or possession of the Collateral and proceeds thereof (including Cash

Collateral) pertaining to the Collection Deposit Account, including without limitation agreements

with respect to the recognition and perfection of liens and security interests in favor of Lender,

and lock box procedures and arrangements, are approved as a "debtor in possession" deposit

account and shall continue in full force and effect without interruption.

   1.8 Use of Postpetition Financing and Collateral.

    1.8.1 No Use for Adverse Lender Challenges.  Neither loans, advances,

or other proceeds of the Postpetition Financing nor the Collateral, including Cash Collateral, can

be used by Debtor or any party for any purpose relating to or in furtherance of an Adverse Lender

Challenge (as defined in the Loan Agreement), including without limitation the payment of fees

and costs incurred by professionals retained by Debtor or the Committee (if any).

  Section 2. Authorization and Conditions to Use Cash Collateral.

   2.1 Authorization to Use Cash Collateral.  Debtor is authorized to use Cash

Collateral:

    2.1.1 to satisfy the Prepetition Obligations and the Postpetition

Obligations as required or provided under the Loan Documents and this Order; and

2.1.2    to the extent such Cash Collateral is proceeds of Advances by Lender under the Postpetition Financing, to pay the actual, necessary expenses incurred by the Estate to the extent such expenses (a) are set forth, in such amounts and during such intervals, pursuant to the budget attached as Exhibit "1" to the Motion or such modified budget approved and accepted by Lender (the "Budget") with authority for Debtor to (i) exceed the amounts set forth in the Budget by no more than five percent (5%) in the aggregate, and (ii) carry over unused line item allowances from one month to following months; (b) relate solely to the business operations of Debtor, (c) do not relate to goods and services provided to the Estate before the Petition Date, except as provided for in the Budget; (d) do not relate to any expense relating to an Adverse Lender Challenges, or (e) do not relate to any other administrative expense priority claim owed to any other party other than Lender, except as provided for in the Budget.

2.2    Procedure for Use of Cash Collateral.  All Cash Collateral is to be deposited by Debtor in a segregated debtor in possession account (the "Cash Collateral Account"), from which such Cash Collateral is to be transferred to Lender pursuant to the Loan Documents.  The Cash Collateral Account is encumbered by and subject to the Postpetition Liens in favor of Lender.

2.3    Cash Collateral in Lender's Possession.  Lender, whether under its name or the name of Debtor, is authorized to collect upon, convert to cash, endorse, and enforce checks, drafts, instruments, and other forms of payment now or hereafter coming into its possession or under its control and apply such payments in accordance with the Loan Documents.

Section 3.    Postpetition Lien; Superpriority Expense Status; Adequate Protection.

3.1    Postpetition Lien.

3.1.1    Postpetition Lien.  Lender is granted a lien on and security interest in all Collateral (as defined in the Loan Agreement), including Collateral that is property of the

Estate (the "Postpetition Collateral")[3] (a) as postpetition liens granted pursuant to section 364(c)(1) and (c)(2) to secure timely performance and satisfaction of the Postpetition Obligations (the "Postpetition Financing Liens") and (b) as replacement liens pursuant to sections 361 and 363 to provide adequate protection of Lender's interest in the Collateral to the extent of any diminution in value of the Collateral  resulting or arising from the use of Cash Collateral, the Postpetition Financing, the imposition of the automatic stay, and any other consequence of the Case (the "Replacement Liens," and collectively with the Postpetition Financing Liens, the "Postpetition Liens"); provided, however, the Postpetition Collateral does not include any claim or cause of action arising under sections 502(d), 542, 544, 547, 548, 550, or 551, and any recoveries thereof (collectively, "Avoidance Claims"), but does include claims and causes of action arising under section 549 and any recoveries thereof and the proceeds realized by the Estate from the assumption and assignment, or rejection, of any executory contract or unexpired lease under section 365.

   3.1.2 <u>Postpetition Liens Priority</u>.  The Postpetition Liens are and will continue to be first and senior in priority to all other liens, claims, and interests of every kind and nature, whether existing or arising before or after the Petition Date, or whether created consensually, by an order of any court including this Court, or otherwise, including without limitation liens or interests granted or acknowledged in favor of any other person or entity in conjunction with section 363, 364, or any other section of the Bankruptcy Code; provided, however, the Postpetition Liens are (a) only subject and immediately junior in priority to certain liens and interests, whether in favor of Medley Capital Corporation ("Medley") or Other Secured Parties, existing as of the Petition Date in the Collateral, but only to the extent that such liens and interests, at all times, (i) are not otherwise junior or subordinated in priority, whether as a matter of record or under section 510 or by contract, at law or in equity, as to any obligation or lien in favor of Lender, (ii)  are valid, properly perfected, and enforceable, (iii) secure obligations that

---

[3] The Prepetition Collateral and Postpetition Collateral is collectively referred to herein as the "Collateral."

10

remain outstanding and valid and not otherwise avoided or satisfied, (iv) are not subject to any

claims, counterclaims, defenses, setoffs, recoupment, or deduction, (v) are not subject to

avoidance or subordination pursuant to any provisions of the Bankruptcy Code or any other

applicable law, and (vi) are specifically designated as "Permitted Liens" pursuant to the Loan

Agreement, and (b) first and senior in priority, and not be subject or subordinate to any lien or

interest that is avoided and preserved for the benefit of Debtor or its Estate under section 551.

        3.1.3   <u>Postpetition Lien Perfection</u>.  This Order is sufficient and

conclusive evidence of the validity, perfection, and priority of the Postpetition Liens, effective as

of the date and time of entry of this Order, without any further act that may be otherwise required,

acknowledged, or permitted under federal, state, or local ordinances, requirements, or law

requiring notice, filing, registration, recording, or possession of assets or other act to evidence,

notice, validate, or perfect a security interest or lien (each, a "<u>Perfection Act</u>").  Notwithstanding

the foregoing, Lender is authorized to perform a Perfection Act, and Debtor is authorized and

directed to perform such act to the extent requested by Lender, and in such event, the subject

filing or recording office or agency is authorized to accept, file, or record any document in regard

to such act in accordance with applicable law, in which event all such documents shall be deemed

to have been filed or recorded at the time and on the date of entry of this Order.

        3.2   <u>Superpriority Claim</u>.   In addition to and without limiting the Postpetition

Liens, the Postpetition Obligations constitute an allowed superpriority administrative expense

priority claim in favor of Lender with senior priority in payment afforded by section 364(c)(1),

which has priority in right of payment senior to all other obligations, liabilities, indebtedness, and

claims of any kind and nature, now in existence or hereafter incurred by Debtor, including

without limitation any and all administrative expenses of the kinds specified or ordered pursuant

to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(b), 506(c), 507(a), 507(b), 546(c), 726,

1103, 1104, 1113, 1114, and other sections of the Bankruptcy Code, including those resulting

from the conversion of the Case pursuant to section 1112, and at all times are senior to the rights

of Debtor, the Estate, any bankruptcy trustee, any creditor or other party in interest in the Case or

11

041

any subsequent proceedings under the Bankruptcy Code (the "Superpriority Financing Claim").

The Superpriority Claims include all rights in and are not reduced by Avoidance Claims. In

addition, Lender retains its right to a claim under section 507(b) of the Bankruptcy Code

(collectively with the Superpriority Financing Claim, the "Superpriority Claims"

Section 4.    Default; Rights and Remedies; Relief from Stay.

4.1    Events of Default. The occurrence of any of the following events

constitute an "Event of Default" under this Order:

(a)    A breach, default, or failure to perform with respect to any term,

condition, covenant, or obligation under any Loan Document (including without limitation this

Order);

(b)    An "Event of Default" as defined in the Loan Agreement

(excluding any Event of Default occurring as a consequence of the commencement of this Case);

or

(c)    The termination, expiration, restriction, or curtailment of Debtor's

authority or ability to borrow the Postpetition Financing or Lender's commitment to provide the

Postpetition Financing, whether automatically or upon exercise or notice by Lender in accordance

with the Loan Documents (a "Termination Event").

4.2    Rights and Remedies upon Event of Default. Notwithstanding the

occurrence of an Event of Default, Debtor remains obligated to perform and abide by all terms,

conditions, covenants, and obligations of the Loan Documents and remains bound by all

restrictions and prohibitions provided, acknowledged, or authorized under the Loan Documents,

and subject to any applicable cure periods, Lender may elect any and all consequences of such

Event of Default and is entitled to take any act or exercise any right or remedy provided in any

Loan Document, subject to the this Order. Notwithstanding the foregoing, subject to any

applicable cure periods, Lender has no obligation to make loans, advances, or provide other

financial accommodations or otherwise perform its obligations under the Loan Documents

immediately upon or after the occurrence of an Event of Default or an act, event, or condition that

BN

BN31233805v7

with the giving of notice or the passage of time, or both, would constitute an Event of Default,

pursuant to the terms of the Loan Documents.

4.3    Relief from Automatic Stay.  The automatic stay pursuant to section 362 is

terminated, modified, lifted, and vacated without further notice, motion, or order, and without the

14-day stay provided under Bankruptcy Rule 4001(a)(3) (which is waived by this Order), as

follows:

4.3.1    Non-Default.  Effective immediately (a) to implement the

Postpetition Financing pursuant to the Loan Documents, but not with respect to the exercise of

any right or remedy available upon an Event of Default except as provided herein, (b) to take or

permit any Perfection Act, and (c) to assess, charge, advance, deduct, and receive payments with

respect to the Postpetition Obligations, and apply such payments to the Postpetition Obligations

pursuant to the Loan Documents, and

4.3.2    Post-Default.  Upon the occurrence of an Event of Default and

subject to any applicable cure periods, consistent with any applicable cure periods or notice

requirements as may be provided for in any Loan Document:

4.3.2.1 Immediately to take actions and exercise rights as provided

in any Loan Document, including without limitation terminating Debtor's use of Cash Collateral

otherwise authorized by this Order, directing Debtor and any account debtor or other parties that

may have possession of Cash Collateral to deliver such Cash Collateral directly to Lender,

withholding its consent to Debtor's use of Cash Collateral, declaring all Obligations immediately

due and payable, ceasing to provide further advances, loans, and financial accommodations to or

on behalf of Debtor or the Estate, setting off any Obligations with all or any portion of the

Collateral or proceeds thereof, and terminating Lender's commitment to provide any further

advances, loans, and financial accommodations to for the benefit of Debtor, but not including

Collateral Enforcement Rights (defined herein); and

4.3.2.2 Upon Debtor's failure to cure an Event of Default within

two days after the delivery of a notice of an Event of Default to Debtor, counsel for Debtor,

Medley, and the Committee (if any), to take actions and exercise rights and remedies with respect to the Collateral, including foreclosing upon or conducting a sale of any Collateral ("Collateral Enforcement Rights").  Notwithstanding the foregoing, Debtor may seek an order of the Court on an emergency basis extending the automatic stay to stay such exercise by Lender for "cause." Upon Lender's request, the Court shall enter a further Order with respect to the termination of the automatic stay and the grant of relief from the automatic stay consistent with the terms of this Order, although the entry of such further order does not limit the effectiveness of such relief as provided and granted in this Order.

          4.3.3    Limited Post-Default Use of Cash Collateral.  In the event that Debtor's authority to use Cash Collateral as authorized herein is terminated and Lender ceases to provide further advances, loans, and financial accommodations to or on behalf of Debtor or the Estate after the occurrence of an Event of Default, Debtor is authorized to use Cash Collateral to pay unpaid non-insider payroll that accrued through the date of the Event of Default.

          4.4    Right to Credit Bid.  Lender has the right to use any or all of the Postpetition Obligations owed to Lender to credit bid with respect to any sale of all or any portion of the Collateral pursuant to section 363(k).

          4.5    No Duty to Marshall. Neither Lender nor the Collateral are subject to the doctrine of marshaling with respect to the Collateral.

      Section 5.    Representations; Covenants; and Waivers.

          5.1    Debtor's Waivers.  Debtor irrevocably waives any rights (a) to seek authority prior to satisfaction of the Postpetition Obligations in full, to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or (d) other than from Lender unless such authority results in the Postpetition Obligations being indefeasibly paid in full, (b) to challenge the application of any payments authorized by this Order pursuant to section 506(b), and (c) to propose or support a plan of reorganization that is inconsistent with the Loan Documents unless Lender otherwise consent.

          5.2    Section 506(c) Waiver.  No costs or expenses of administration incurred in

the Case may be charged against Lender or the Collateral pursuant to sections 105, 326, 327, 330, 331, 503(b), 506(c), 507(a), or the "equity exception" in section 552(b), section 726, or any other provision of the Bankruptcy Code, or any similar principle of law without the prior written consent of Lender, and no such consent shall be implied from any other action, inaction or acquiescence by Lender.

Section 6.    Other Rights and Obligations.

6.1    No Modification or Stay of this Order.  Notwithstanding any other order of the Court or act by any party, the acts taken by Lender in accordance with this Order, the Postpetition Obligations, and all rights, interests, remedies, benefits, consents, claims, and obligations, including without limitation the Postpetition Obligations, the Postpetition Lien, and the Superiority Claims, shall not be modified, amended, reduced or restricted without the express consent of Lender, shall be governed in all respects by the original provisions of this Order, and shall remain valid, effective, authorized, and in full force and effect pursuant to section 364(e).  If any or all of the provisions of this Order are reversed, modified, vacated, or stayed for any reason, such reversal, modification, vacation, or stay does not affect (i) the validity and existence of any Postpetition Obligations owing to Lender, including obligations arising from loans, advances, or other financial accommodations provided by Lender incurred prior to the actual receipt by Lender, as applicable, of written notice of the effective date of such reversal, modification, vacation, or stay, or (ii) the validity or enforceability of any Postpetition Lien or Superpriority Claim.  For purposes of section 364(e), "appeal" shall include any proceeding for reconsideration, amending, vacating, rehearing, or re-evaluation of this Order by this Court or any other tribunal.

6.2    Power to Waive Rights; Duties to Third Parties.  Lender has the right to waive any interest, claim, right, remedy, or privilege in favor of Lender provided for or acknowledged in any Loan Document including without limitation this Order (collectively, "Lender Rights"), and has no obligation or duty to any other party with respect to or by reason of Lender's exercise or enforcement, or delay or failure to exercise or enforce, Lender Right.

BN31233805v7

*045*

6.3    <u>Reservation of Rights</u>.  This Order is in addition to and without prejudice to the rights of Lender to pursue any and all rights and remedies under the Bankruptcy Code, the Loan Documents, or any other contract or law.

6.4    "<u>Responsible Person</u>."  By accepting any budget submitted by Debtor or by taking any actions pursuant to or authorized by the Postpetition Financing Documents, Lender is not deemed to be (a) in control of the operations or liquidation of Debtor, or (b) a "responsible person" with respect to the operation, management or liquidation of Debtor.

6.5    <u>Binding Effect</u>.  This Order is and continues to be binding upon Debtor, all parties in interest in the Case (including without limitation landlords, lessors, and other parties asserting an interest of real property where Collateral may be located), and each of their respective successors and assigns, including any trustee, notwithstanding any further order, including dismissal of the Case of conversion of the Case to a case under another chapter of the Bankruptcy Code.

6.6    <u>Survival of Order</u>.  The provisions of this Order and any actions taken pursuant thereto (a)  survive the entry of any order: (i) confirming any plan of reorganization in the Case, (ii) converting the Case to a case under chapter 7 of the Bankruptcy Code, or (iii) dismissing the Case; and (b) shall continue in full force and effect notwithstanding the entry of any such order, and the claims, liens, and security interests granted pursuant to this Order maintain its priority as provided by this Order until all of the Postpetition Obligations are indefeasibly paid in full and discharged in accordance with the terms of the Postpetition Financing Documents.  The Postpetition Obligations shall not be discharged by the entry of any order confirming any plan of reorganization in the Case unless such Postpetition Obligations are satisfied in full, in cash, pursuant to such plan of reorganization, and Debtor waives, and is deemed to have waived any such discharge pursuant to section 1141(d)(4).

###

16

**046**

# EXHIBIT 4

## DIP POSTPETITION FINANCING ADDENDUM

This DIP Postpetition Financing Addendum (this "Addendum") to the Amended and Restated Loan and Security Agreement, dated as of July 13, 2016, and Assignment and Assumption of Financing and Financing Documents, dated as of July 13, 2016 (collectively, as amended, modified, restated, and supplemented, the "Loan Agreement"), is entered into as of November ____, 2017, by and among Austin Financial Services, Inc., as successor in interest to Summit Financial Resources, L.P. ("Lender"), and Point.360 ("Borrower"), the debtor and debtor in possession on behalf of the Estate (defined below) in the Bankruptcy Case (defined below), with reference to the following:

A.    Lender and Borrower are parties to the Loan Agreement.

B.    This Addendum is an addendum to and constitutes part of the Loan Agreement.

In consideration of the foregoing and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **DEFINITIONS.**

(a)    All initially capitalized terms used in this Addendum have the meanings given to them in the Loan Agreement unless specifically defined herein.

(b)    In addition to the defined terms set forth in the Loan Agreement, the following terms have the respective meanings set forth below:

"**Adverse Lender Challenge**" means (a) an assertion or act in furtherance of any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek an order, judgment, determination, or similar relief: (i) challenging or contesting the legality, validity, priority, amount, or enforceability of the Obligations, (ii) challenging or contesting the legality, validity, priority, or enforceability, or seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, any Lien or interest in favor of Lender in the Collateral, or (iii) seeking to prevent, hinder, or delay the assertion or enforcement by Lender of any right, remedy, claim, benefit, or privilege of, or lien or interest in favor of Lender in the Collateral or realization upon any Collateral, (b) a request to use cash collateral without Lender's consent, except as provided in the Loan Agreement, (c) any negotiation, solicitation, or attempt to obtain loans or other financial accommodations on or after the Petition Date (other than indebtedness that would be used to pay all Obligations in full or otherwise permitted hereunder) pursuant to section 364(c) or (d) of the Bankruptcy Code other than from Lender or such other party without Lender's consent, (d) the commencement, prosecution, participation, or support of any action or proceeding with respect to any claim, cause of action, or defense against Lender, or any of its officers, directors, employees, agents, attorneys, affiliates, assigns, successors and representatives, including without limitation any attempt to recover on an Avoidance Action from any such party, or (e) any act which has or could have the effect of materially modifying or compromising any right, remedy, claim, benefit, or privilege of Lender, or which is contrary to any term or condition set forth in or acknowledged by the Loan Documents.

1    *048*

"**Avoidance Actions**" mean claims, actions, causes of action, and proceeds thereof arising pursuant to sections 544, 545, 547, 548, 549, 550, or 551 of the Bankruptcy Code and, to the extent applicable under the foregoing, section 550 of the Bankruptcy Code, but specifically excluding claims, actions, or causes of action under section 549 of the Bankruptcy Code and any proceeds relating thereto or arising therefrom.

"**Bankruptcy Case**" means the case commenced by Borrower under chapter 11 of the Bankruptcy Code before the Bankruptcy Court, bearing case no. 2:17-bk-22432-WB.

"**Bankruptcy Code**" means title 11 of the United States Code.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Central District of California, Central Division.

"**Budget**" means the budget attached to this Addendum as <u>Schedule A</u> and such future and modified budgets acceptable in form and substance to Lender in its sole discretion.

"**Cash Collateral**" means the cash rents, issues, profits, products, and proceeds of the Collateral, of any kind and nature, within the meaning of section 363(a) of the Bankruptcy Code.

"**Committee**" means any official committee appointed in the Bankruptcy Case under section 1102 of the Bankruptcy Code.

"**Estate**" means the estate created pursuant to section 541 of the Bankruptcy Code with respect to the Bankruptcy Case, which includes all assets and interests in assets contained therein.

"**Final Financing Order**" means a Financing Order after a final hearing pursuant to Bankruptcy Rule 4001(c)(2).

"**Financing Order(s)**" means, individually and collectively, orders of the Bankruptcy Court entered in the Bankruptcy Case, and related findings of fact and conclusions of law in support thereof, authorizing the incurrence of indebtedness by Borrower and its Estate to Lender, the provision of Advances, Loans, and other financial accommodations from Lender to or for the benefit of Borrower and its Estate, the granting and approving of liens, interests, priority claims, and other rights in favor of Lender pursuant to the Loan Documents, on an emergency, interim, final, or other basis pursuant to section 364 of the Bankruptcy Code and other applicable sections of the Bankruptcy Code as may be issued or entered in the Bankruptcy Case, each and all in form and substance acceptable to Lender in its sole and absolute discretion, as the same may be amended, supplemented, or otherwise modified from time to time with the express written consent of Borrower and Lender as may be required to approve such modifications, and that is not subject to any stay or injunction pending any appeal or petition for certiorari, review, rehearing, or reconsideration, or otherwise.

"**Loan Agreement**" has the meaning as set forth in the preamble of this Addendum.

"**Obligations**" means all "Obligations" as defined in the Loan Agreement and all other obligations, indebtedness, and liabilities owed by Borrower or the Estate to Lender.

"**Petition Date**" means October 10, 2017, the date Borrower filed its voluntary petition commencing the Bankruptcy Case.

"**Professionals**" means any and all attorneys, accountants, advisors, consultants, appraisers, brokers, investment bankers, and other professionals retained or employed under section 327 or 1103(a) by Borrower or any Committee.

2.      **AMENDMENTS**.  The Loan Agreement is hereby amended as follows:

(a)      The following definitions set forth in the Loan Agreement are deleted and amended as follows:

"**Borrower**" has the definition as defined in the Loan Agreement and includes Borrower as the debtor and debtor in possession on behalf of the Estate in the Bankruptcy Case.

"**Final Maturity Date**" means the Initial Maturity Date or any date this Agreement is terminated pursuant to Section 9.2 of the Loan Agreement.

"**Initial Maturity Date**" means October 31, 2018.

"**Loan Documents**" has the definition as defined in the Loan Agreement and includes this Addendum and the Financing Orders.

(b)      Schedule B to the Loan Agreement is hereby amended by deleting that schedule and replacing it with "Schedule B to Amended and Restated Loan and Security Agreement – Certain Credit Terms" attached hereto.

3.      **CONDITIONS PRECEDENT**.  Lender's obligation or commitment to make or extend Advances, Loans, and other financial accommodations to or for the benefit of Borrower and its Estate, pursuant to the Loan Agreement or otherwise is subject to and contingent upon the fulfillment of each of the following conditions to the satisfaction of Lender:

(a)      No Default.  The fact that, both immediately before and immediately after the making of any Advance or Loan after the Petition Date, no Default or Event of Default (other than and excluding any Default or Event of Default resulting from or as consequence of the filing of the Bankruptcy Case);

(b)      Representations.  Other than representations and warranties relating to insolvency or bankruptcy, all representations and warranties of Borrower in the Loan Agreement and other Loan Documents are true and correct on and as of the date of making of an Advance or

Loan, except to the extent that any such representation or warranty expressly and specifically relates to an earlier date.

(c)    <u>Final Financing Order</u>.  The Final Financing Order has been entered by the Bankruptcy Court in the Bankruptcy Case and is in full force and effect, and not subject to any stay, reconsideration, or appeal.

(d)    <u>Loan Documents</u>.  Lender has received all Loan Documents, including this Addendum and the Financing Orders, each and all in form and substance satisfactory to Lender, duly executed by all parties thereto, and each such document is in full force and effect, provided that the Lender may make or extend Advances, Loans, and other financial accommodations to or for the benefit of Borrower upon entry of the Final Financing Order.

(e)    <u>Guaranty</u>.  Lender has received a duly executed guaranty by Haig Bagerdijian of the obligations of Borrower owed to Lender, all such documents in form and substance acceptable to Lender, which guaranty shall include a right of first refusal that affords guarantor to satisfy all obligations by payment or assignment of the Loan Documents to guarantor prior to Lender's assignment of the Loans and Loan Obligations to another party.

(f)    <u>Fees</u>.  Lender has received payment of all fees and expenses (including, without limitation, fees and expenses of counsel) required to be paid to Lender as of the date of such Advance or Loan.

4.    **ASSUMPTION**.  Lender, on behalf of itself and its Estate, hereby assumes and accepts all of Lender's rights, titles, claims, interests, and obligations in and to the Loan Agreement as amended hereby.

5.    **AFFIRMATIVE COVENANTS**.  In addition to the affirmative covenants set forth in the Loan Agreement, so long as Lender shall have any commitment or obligation, if any, to make or extend Advances, Loans, and other financial accommodations from Lender to or for the benefit of Borrower and its Estate, and/or so long as any Obligations remains unpaid and outstanding, Borrower covenants and agrees that it shall:

(a)    <u>Financing Orders</u>.  Take all reasonable acts and make reasonable effort to request and obtain approval by the Bankruptcy Court in the Bankruptcy Case of the Loan Documents, and the transactions, rights, interests, claims, remedies, privileges, waivers, and protections contemplated or provided thereunder, and entry of the Financing Orders.

(b)    <u>Bankruptcy Documents</u>.  Promptly furnish to counsel for Lender all documents filed in the Bankruptcy Case.

(c)    <u>Budget Compliance</u>.  (i) Take all reasonable acts and make reasonable effort to realize revenue in accordance with the Budget and (ii) pay expenses incurred by Borrower in accordance with the Budget, with authority for Borrower to (y) exceed any line item on the Budget by an amount not to exceed five percent (5%) of any such line item, provided that in all events and circumstances the total of all amounts in excess of all line items in the  Budget does not exceed ten percent (10%) in the aggregate of the total Budget, and (z) carry over unused line item allowances from one month to following months.

(d)    _Additional Reporting_.  In addition to all covenants providing for reporting in the Loan Agreement, timely provide Lender with (a)(i) a current accounts receivable ledger, (ii) a current accounts payable ledger and (iii) a monthly report comparing actual collections and expenditures (by expense category) on a cash basis to those set forth in the Budget (a "Reconciliation Report") to be delivered to Lender not later than 15 days after the last day of each month, (b) an accrual-based profit and loss statement and balance sheet for Borrower measured as of the last day of each month to be delivered to Lender within 5 days after the last day of each month, (c) all documents and information submitted by Borrower to the United States Trustee, and (e) upon the reasonable request of Lender, such other information pertaining to Borrower's operations, financial affairs, the Collateral, and the Bankruptcy Case, including but not limited to bills, invoices, bank statements, cancelled checks, and receipts.

(e)    _Postpetition Financing Fee_.  Pay to Lender a postpetition financing fee equal to 3% of the Total Commitment, which fee is due as of the date of this Addendum, but which fee is only payable upon either the Final Maturity Date or full payment of the obligations owed to Lender.

6.    **NEGATIVE COVENANTS**.  In addition to the negative covenants set forth in the Loan Agreement, so long as Lender shall have any commitment or obligation, if any, to make or extend Advances, Loans, and other financial accommodations from Lender to or for the benefit of Borrower and its Estate, and/or so long as any Obligations remains unpaid and outstanding, Borrower covenants and agrees that it shall not, without the prior written consent of Lender:

(a)    _Financing Orders_.  Request, seek, support, or consent to, and not oppose and contest (unless otherwise consented to by Lender), any amendment, modification, stay, or vacating of any Financing Order or Loan Document.

(b)    _Other Postpetition Debt_.  Request, seek, support, or consent to, and not oppose and contest (unless otherwise consented to by Lender), the incurrence or approval of any postpetition loan or other financial accommodation or indebtedness from any other Person other than Lender pursuant to section 364(c) or (d) of the Bankruptcy Code unless such loan or financing results in the simultaneous indefeasible payment and satisfaction of all Obligations owed to Lender, in full, in cash.

(c)    _Other Administrative Priority Expenses_.  Request, seek, support, or consent to, and not oppose and contest (unless otherwise consented to by Lender), the incurrence, approval, or granting of any administrative expense priority claim or any other claim (now existing or hereafter arising of any kind or nature whatsoever) that is equal or superior in priority to the liens and superpriority administrative claims of Lender in respect of the Obligations owed to Lender.

(d)    _Use of Proceeds and Cash Collateral_.  Use the Advances, Loans, or the proceeds of Collateral, including Cash Collateral, for any purpose relating to or in furtherance of an Adverse Lender Challenge, including without limitation the payment of fees and costs incurred by Professionals.

**052**

(e)  <u>Plan</u>.  File, support, or consent to, and not oppose and contest (unless otherwise consented to by Lender), a chapter 11 plan of reorganization in the Bankruptcy Case that does not provide for the simultaneous indefeasible payment and satisfaction of all Obligations owed to Lender, in full, in cash, unless otherwise expressly agreed to by Lender or otherwise treats Lender as unimpaired under any such plan.

(f)  <u>Cash Collateral</u>.  In the event of the termination of Lender's commitment to make or extend Advances, Loans, or other financial accommodations to or for the benefit of Borrower and its Estate, under the Loan Agreement, request or support any request for the use of Cash Collateral pursuant to section 363 of the Bankruptcy Code or other applicable law without Lender's express written consent, except for the limited purposes of proceeding with a wind down and liquidation of Borrower's assets pursuant to a budget acceptable to Lender.

(g)  <u>Surcharge Waiver</u>.  After entry of the Final Financing Order, seek or support any request to surcharge the Collateral under section 506(c) of the Bankruptcy Code.

7.  **EVENTS OF DEFAULT**.  In addition to the Events of Default set forth in the Loan Agreement, an "Event of Default" is deemed to have occurred or exist under the Loan Agreement and all other Loan Documents upon the occurrence and/or existence of any of the following additional conditions or events:

(a)  <u>Financing Orders</u>**.**  The entry of an order in the Bankruptcy Case amending, supplementing, staying, reversing, vacating, or otherwise modifying any Financing Order, any Agreement, any Loan Document, or any right, interest, lien, security interest, claim, benefit, privilege, or remedy in favor of Lender;

(b)  <u>Other Postpetition Debt</u>.  The entry of an order in the Bankruptcy Case authorizing Borrower in the Bankruptcy Case to incur indebtedness or additional financing under section 364(c) or (d) of the Bankruptcy Code other than from Lender, or without the express prior written consent of Lender, unless such loan or financing results in the simultaneous indefeasible payment and satisfaction of all Obligations owed to Lender, in full, in cash;

(c)  <u>Surcharge of Collateral</u>.  The entry of an order in the Bankruptcy Case authorizing any costs or expenses under section 506(c) of the Bankruptcy Code as a surcharge against the Collateral;

(d)  <u>Unauthorized Use of Cash Collateral</u>.  The entry of an order in the Bankruptcy Case authorizing the use of Cash Collateral under section 363(c) of the Bankruptcy Code without Lender's prior written consent or except as otherwise permitted in the Loan Agreement or the Financing Orders;

(e)  <u>Appointment of Trustee or Examiner</u>.  The entry of an order in the Bankruptcy Case appointing an interim or permanent trustee, or an examiner having enlarged powers relating to the operation of the business or assets of Borrower under section 1106(b) of the Bankruptcy Code;

        (f)    <u>Dismissal or Conversion</u>. The entry of an order dismissing the Bankruptcy Case or converting the Bankruptcy Case to a proceeding under chapter 7 of the Bankruptcy Code;

        (g)    <u>Third Party Relief</u>. The entry of an order in the Bankruptcy Case authorizing or granting relief from, terminating, annulling, or modifying the automatic stay of section 362 of the Bankruptcy Code to permit a party to execute upon or enforce a lien on or exercise any right with respect to any material portion of the Collateral or to the extent it would result in a material adverse effect on Borrower, assets of Borrower and its Estate, or Borrower's financial condition or business operations;

        (h)    <u>Other Administrative Priority Expenses</u>. The entry of an order in the Bankruptcy Case approving or granting priority for any administrative expense priority claim or any other claim (now existing or hereafter arising of any kind or nature whatsoever) that is equal or superior in priority to the liens and superpriority administrative claims of Lender in respect of the Obligations owed to Lender;

        (i)    <u>Chapter 11 Plan</u>. The filing (whether by Borrower or any other party) of a chapter 11 plan of reorganization or entry of an order confirming a chapter 11 plan of reorganization in the Bankruptcy Case that does not provide for the simultaneous indefeasible payment and satisfaction of all Obligations owed to Lender, in full, in cash, unless otherwise expressly agreed to by Lender;

        (j)    <u>Financing Order Default</u>. The occurrence of any condition or event that would be a breach of or a default under any Financing Order, or that would entitle Lender to exercise or pursue enforcement of any right or remedy granted, authorized, acknowledged, or recognized in a Financing Order, including, without limitation, any "Default" or "Event of Default" as provided in the Financing Orders;

        (k)    <u>Termination</u>. The demand, termination, or expiration, or an event that would permit or result in the occurrence of the demand, termination, or expiration of any commitment, obligation, or liability of Lender to make or extend Advances, Loans, and other financial accommodations from Lender to or for the benefit of Borrower and its Estate, any Agreement, or any Financing Order;

        (l)    <u>Business or Asset Interruption</u>. Borrower suspends, discontinues, or is enjoined by any court or governmental agency from continuing to conduct all or any material part of its business or if a trustee, receiver, or custodian is appointed with respect to Borrower or any of asset of Borrower;

        (m)    <u>Postpetition Lien</u>. The occurrence or threat of the occurrence of any restriction, limitation, or cessation of either the validity, scope, existence, first and senior priority, perfection, or enforceability of the Lien in favor of Lender securing the Obligations for any reason.

        8.    **EFFECT.** In the event of a conflict between the terms and provisions of this Addendum and the terms and provisions of the Loan Agreement, the terms and provisions of this

Addendum shall govern.    In all other respects, the Loan Agreement, as amended and supplemented hereby, remain in full force and effect.

9.    **COUNTERPARTS; EFFECTIVENESS.**  This Addendum may be executed in any number of counterparts and by different parties on separate counterparts, each of which when so executed and delivered is deemed to be an original.   All such counterparts, taken together, shall constitute but one and the same Addendum.  This Addendum is a Loan Document and is subject to all the terms and conditions, and entitled to all the protections, applicable to Loan Documents generally.

[*remainder of page left blank intentionally; signatures to follow*]

IN WITNESS WHEREOF, the parties have executed this Addendum as of the day and year first above written.

BORROWER:

POINT.360, a California corporation, as debtor and debtor in possession

By: _____
Name: _____
Title: _____

LENDER:

AUSTIN FINANCIAL SERVICES, INC.

By: _____
Name: _____
Title: _____

9

SCHEDULE A

BUDGET

|     SCHEDULE B<br>TO<br>AMENDED AND<br>RESTATED LOAN AND<br>SECURITY AGREEMENT<br><br>CERTAIN CREDIT<br>TERMS | POINT.360,<br>a California corporation,<br>as "Borrower" |
|---|---|
| **Amended and Restated Loan and Security Agreement Section** | **Credit Terms** |
| Section A – Total Commitment | $3,000,000.00 |
| Section B – Exceptions to Concentration Limit: | Concentration limits for certain Account Debtors:<br>(a) Disney:  50%<br>(b) Warner Bros.:  50%<br>(c) Twentieth Century Fox:  50% |
| Section 2.1 – Line of Credit Commitment: | $3,000,000.00 |
| Section 2.1 – Accounts Advance Rate: | 85% of Eligible Accounts Receivable |
| Section 2.6(a) – Annual Facility Fee: | (A) The difference equal to (i) one percent (1.00%) of the Line of Credit Commitment due and payable as of the date of the first Advance after the Petition Date and (ii) the amount of the Annual Facility Fee paid on July 1, 2017, and (B) one percent (1.00%) of the Line of Credit Commitment due and payable as of the date of the renewal at the first anniversary date after the Closing Date (if any) and each anniversary date thereafter (if any) |
| Section 2.6(b) – Unused Line Fee Percentage: | 0.00% |
| Section 2.6(d) – Collateral Management Fee Percentage: | 0.65% |
| Section 2.6(e) -- Line of Credit Termination and/or Reduction Fees: | N/A |
| Section 2.7(a) – Interest Rate: | The Interest Rate for all Advances shall be the sum of the Prime Rate plus one and one half percent (1.50%). |
| Section 2.7(c) – Minimum Interest: | $3,000.00, inclusive of interest and fees earned on the Line of Credit. |

11

| Amended and Restated Loan and Security Agreement Section | Credit Terms |
|---|---|
|  |  |
| Section 2.7(d) – Clearance Days: | Four (4) Business Days |
| Section 2.7(f)(i) – Minimum Interest Rate for Advances: | Four and one-half percent (4.50%) per annum |
| Section 5.9 Financial Statements Delivered at Closing: | Audited financial statements for its fiscal year ended June 30, 2015, and Borrower prepared financial statements for the fiscal-year-to-date period ended March 31, 2016. |
| Section 6.3(f) – Annual Financial Statements: | Audited |
| Section 9.1 – Initial Maturity Date: | October 31, 2018 |

12

# EXHIBIT 5

|  | **CONTINUING GUARANTY**<br>**(Haig Bagerdijian)** | **Point.360, a California**<br>**corporation**<br>**as "Borrower"** |
|---|---|---|

This CONTINUING GUARANTY (this "**Guaranty**"), dated as of November __, 2017, is executed and delivered by the Persons listed on the signature pages hereof (each, a "**Guarantor**" and collectively, "**Guarantors**"), with reference to the following facts:

## R E C I T A L S

A.      AUSTIN FINANCIAL SERVICES, INC., a Delaware corporation ("**Lender**") and Point.360, a California corporation ("**Borrower**") entered into that certain Amended and Restated Loan and Security Agreement dated July 13, 2016 and that certain Assignment and Assumption of Financing and Financing Documents dated July 13, 2016 (collectively, as the same may be amended, restated, supplemented or otherwise modified from time to time, including without limitation the DIP Financing Addendum (defined below), the "**Loan Agreement**").

B.      On October 10, 2017, Borrower filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**")  in the United States Bankruptcy Court for the Central District of California commencing bankruptcy case number 2:17-bk-22432-WB (the "**Bankruptcy Case**").

C.      Borrower has requested that Lender continue to make financing available under the Loan Agreement during the Bankruptcy Case and Lender has agreed to make such financing available pursuant to the terms of the Loan Agreement as amended and supplemented by that certain DIP Postpetition Financing Addendum, dated November __, 2017 (the "**DIP Financing Addendum**"), entered into by and between Lender and Borrower, as a debtor and the debtor in possession on behalf of its Estate (defined in the DIP Financing Addendum) in the Bankruptcy Case (defined in the DIP Financing Addendum), Financing Orders (as defined in the DIP Financing Addendum) and other Loan Documents.

D.      Each Guarantor acknowledges that such Guarantor will directly and materially benefit from the Loans and other financial accommodations made by Lender to Borrower under the Loan Agreement, and each Guarantor further acknowledges that pursuant to the terms of the Loan Agreement as amended by the DIP Financing Addendum, Guarantors are required to execute and deliver this Guaranty to Lender in consideration of the foregoing.

## A G R E E M E N T

NOW, THEREFORE, in consideration of the foregoing, each Guarantor hereby agrees, in favor of Lender, as follows:

**1.**      **Definitions and Construction**.

(a)      Definitions.  All initially capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Loan Agreement.  In addition, the following terms, as used in this Guaranty, shall have the following meanings:

"**Guaranteed Obligations**" means any and all obligations, indebtedness, or liabilities of any kind or character owed by Borrower to Lender pursuant to the express terms and conditions of the Loan Documents (including without limitation, all principal and interest owing under the Loans, all Expenses, the Fees, any other fees and expenses due under the Loan Agreement, and all other indebtedness evidenced by the Loan Agreement and the other Loan Documents), including all such obligations, indebtedness, or liabilities, whether for principal, interest (including any interest which, but for the application of the provisions of the Bankruptcy Code, would have accrued on such amounts), premium, reimbursement obligations, fees, costs, expenses (including, attorneys' fees and attorneys' fees incurred pursuant to proceedings arising under the Bankruptcy Code), or indemnity obligations, whether

BN 31275400v5

*061*

heretofore, now, or hereafter made, incurred, or created, whether voluntarily or involuntarily made, incurred, or created, whether secured or unsecured (and if secured, regardless of the nature or extent of the security), whether absolute or contingent, liquidated or unliquidated, determined or indeterminate, whether Borrower is liable individually or jointly with others, and whether recovery is or hereafter becomes barred by any statute of limitations or otherwise becomes unenforceable for any reason whatsoever, including any act or failure to act by Lender.

"**Loan Documents**" shall mean the Loan Agreement, this Guaranty, and the other Loan Documents (as defined in the Loan Agreement).

(b) <u>Construction</u>. Unless the context of this Guaranty clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, and the term "including" is not limiting. The words "hereof," "herein," "hereby," "hereunder," and other similar terms refer to this Guaranty as a whole and not to any particular provision of this Guaranty. Any reference herein to any of the Loan Documents includes any and all alterations, amendments, extensions, modifications, renewals, or supplements thereto or thereof, as applicable. Neither this Guaranty nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or any Guarantor, whether under any rule of construction or otherwise. On the contrary, this Guaranty has been reviewed by Guarantor, Lender, and their respective counsel, and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of Lender and Guarantor.

2. **Guaranteed Obligations**. Each Guarantor hereby irrevocably and unconditionally guarantees to Lender, as and for such Guarantor's own indebtedness, until final and indefeasible payment thereof has been made, payment of the Guaranteed Obligations, in each case when and as the same shall become due and payable, whether at maturity, pursuant to a mandatory prepayment requirement, by acceleration, or otherwise; it being the intent of Guarantor that the guaranty set forth herein shall be a guaranty of payment and not a guaranty of collection.

3. **Continuing Guaranty**. This Guaranty includes Guaranteed Obligations arising under successive transactions continuing, compromising, extending, increasing, modifying, releasing, or renewing the Guaranteed Obligations, changing the interest rate, payment terms, or other terms and conditions thereof, or creating new or additional Guaranteed Obligations after prior Guaranteed Obligations have been satisfied in whole or in part. To the maximum extent permitted by law, each Guarantor hereby waives and agrees not to assert any right such Guarantor has under Section 2815 of the California Civil Code, or otherwise, to revoke this Guaranty as to future indebtedness.

4. **Performance Under This Guaranty**. In the event that Borrower shall fail to make any payment of any Guaranteed Obligations on or before the due date thereof, Guarantors immediately shall cause such payment to be made or each of such obligations to be performed, kept, observed, or fulfilled.

5. **Primary Obligations**. This Guaranty is a primary and original obligation of each Guarantor, is not merely the creation of a surety relationship, and is an absolute, unconditional, and continuing guaranty of payment and performance which shall remain in full force and effect without respect to future changes in conditions, including any change of law or any invalidity or irregularity with respect to the Loan Documents. Each Guarantor agrees that such Guarantor is jointly and severally liable with the other Guarantors and any other guarantor of the Obligations, to Lender, that the obligations of each Guarantor hereunder are independent of the obligations of Borrower, the other Guarantors, or any other guarantor of the Obligations, and that a separate action may be brought against any Guarantor whether such action is brought against Borrower, any other Guarantor, or any other guarantor of the Obligations, or whether Borrower or any such other Guarantor or guarantor is joined in such action. Each Guarantor agrees that such Guarantor's liability hereunder shall be immediate and shall not be contingent upon the exercise or enforcement by Lender of whatever remedies it may have against Borrower or any other Guarantor or guarantor, or the enforcement of any Lien or realization upon any security Lender may at any time possess. Each Guarantor agrees that any release which may be given by Lender to Borrower or any other Guarantor or guarantor shall not release such Guarantor. Each Guarantor consents and

agrees that Lender shall be under no obligation to marshal any Assets of Borrower or any other Guarantor or guarantor in favor of such Guarantor, or against or in payment of any or all of the Guaranteed Obligations.

6.    **Waivers**.

(a)    Each Guarantor absolutely, unconditionally, knowingly, and expressly waives:

(i)    (1) notice of acceptance hereof; (2) notice of any loans or other financial accommodations made or extended under the Loan Documents or the creation or existence of any Guaranteed Obligations; (3) notice of the amount of the Guaranteed Obligations, subject, however, to such Guarantor's right to make inquiry of Lender to ascertain the amount of the Guaranteed Obligations at any reasonable time; (4) notice of any adverse change in the financial condition of Borrower or of any other fact that might increase such Guarantor's risk hereunder; (5) notice of presentment for payment, demand, protest, and notice thereof as to any instruments among the Loan Documents; (6) notice of any unmatured or Event of Default; and (7) all other notices (except if such notice is specifically required to be given to such Guarantor hereunder or under the Loan Documents) and demands to which such Guarantor might otherwise be entitled.

(ii)    Such Guarantor's right, under Sections 2845 or 2850 of the California Civil Code, or otherwise, to require Lender to institute suit against, or to exhaust any rights and remedies which Lender have or may have against, Borrower or any third Person, or against any collateral for the Guaranteed Obligations provided by Borrower or any third Person.  In this regard, each Guarantor agrees that such Guarantor is bound to the payment of all Guaranteed Obligations, whether now existing or hereafter accruing, as fully as if such Guaranteed Obligations were directly owing to Lender by such Guarantor.  Each Guarantor further waives any defense arising by reason of any disability or other defense (other than the defense that the Guaranteed Obligations shall have been fully and finally performed and indefeasibly paid) of Borrower or by reason of the cessation from any cause whatsoever of the liability of Borrower in respect thereof.

(iii)    (1) any rights to assert against Lender any defense (legal or equitable), set-off, counterclaim, or claim which such Guarantor may now or at any time hereafter have against Borrower; (2) any defense, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Guaranteed Obligations or any security therefor; (3) any defense such Guarantor has to performance hereunder, and any right such Guarantor has to be exonerated, provided by Sections 2819, 2822, or 2825 of the California Civil Code, or otherwise, arising by reason of:  the impairment or suspension of Lender's rights or remedies against Borrower; the alteration by Lender of the Guaranteed Obligations; any discharge of the Guaranteed Obligations to Lender by operation of law as a result of Lender's intervention or omission; or the acceptance by Lender of anything in partial satisfaction of the Guaranteed Obligations; (4) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement thereof, and any act which shall defer or delay the operation of any statute of limitations applicable to the Guaranteed Obligations shall similarly operate to defer or delay the operation of such statute of limitations applicable to such Guarantor's liability hereunder.

(b)    Each Guarantor absolutely, unconditionally, knowingly, and expressly waives any defense arising by reason of or deriving from (i) any claim or defense based upon an election of remedies by Lender including any defense based upon an election of remedies by Lender under the provisions of Sections 580a, 580b, 580d, and 726 of the California Code of Civil Procedure or any similar law of California or any other jurisdiction; or (ii) any election by Lender under Bankruptcy Code Section 1111(b) to limit the amount of, or any collateral securing, its claim against Borrower.  Pursuant to Section 2856 of the California Civil Code:

(i)    Each Guarantor absolutely, unconditionally, knowingly, and expressly waives all rights and defenses arising out of an election of remedies by the creditor, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed

3

obligation, has destroyed Guarantor's rights of subrogation and reimbursement against Borrower by the operation of Section 580(d) of the California Code of Civil Procedure or otherwise.

(ii)    Each Guarantor absolutely, unconditionally, knowingly, and expressly waives all rights and defenses that such Guarantor may have because the Guaranteed Obligations are secured by real property.  This means, among other things: (x) Lender may collect from such Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower; and (y) if Lender forecloses on any real property collateral pledged by Borrower:  (A) the amount of the Guaranteed Obligations may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and (B) Lender may collect from such Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right such Guarantor may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses each Guarantor may have because the Guaranteed Obligations are secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

(c)    Each Guarantor hereby absolutely, unconditionally, knowingly, and expressly waives:  (i) any right of subrogation such Guarantor has or may have as against Borrower with respect to the Guaranteed Obligations; (ii) any right to proceed against Borrower or any other Person, now or hereafter, for contribution, indemnity, reimbursement, or any other suretyship rights and claims, whether direct or indirect, liquidated or contingent, whether arising under express or implied contract or by operation of law, which such Guarantor may now have or hereafter have as against Borrower with respect to the Guaranteed Obligations; and (iii) any right to proceed or seek recourse against or with respect to any property or asset of Borrower.

(d)    WITHOUT LIMITING THE GENERALITY OF ANY OTHER WAIVER OR OTHER PROVISION SET FORTH IN THIS GUARANTY, EACH GUARANTOR HEREBY ABSOLUTELY, KNOWINGLY, UNCONDITIONALLY, AND EXPRESSLY WAIVES AND AGREES NOT TO ASSERT ANY AND ALL BENEFITS OR DEFENSES ARISING DIRECTLY OR INDIRECTLY UNDER ANY ONE OR MORE OF CALIFORNIA CIVIL CODE SECTIONS 2799, 2808, 2809, 2810, 2815, 2819, 2820, 2821, 2822, 2825, 2839, 2845, 2848, 2849, AND 2850, CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 580a, 580b, 580c, 580d, AND 726, CALIFORNIA UNIFORM COMMERCIAL CODE SECTIONS 3116, 3118, 3119, 3419 AND 3605, AND CHAPTER 2 OF TITLE 14 OF PART 4 OF DIVISION 3 OF THE CALIFORNIA CIVIL CODE.

7.    **Releases**.  Each Guarantor consents and agrees that, without notice to or by such Guarantor, and without affecting or impairing the obligations of such Guarantor hereunder, Lender may, by action or inaction:

(a)    compromise, settle, extend the duration or the time for the payment of, or discharge the performance of, or may refuse to or otherwise not enforce this Guaranty, the other Loan Documents, or any part thereof, with respect to Borrower or any other Person;

(b)    release Borrower or any other Person or grant other indulgences to Borrower or any other Person in respect thereof;

(c)    amend or modify in any manner and at any time (or from time to time) any of the Loan Documents; or

(d)    release or substitute any other guarantor, if any, of the Guaranteed Obligations, or enforce, exchange, release, or waive any security for the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations, or any portion thereof.

8.    **No Election**.  Lender shall have all of the rights to seek recourse against each Guarantor to the fullest extent provided for herein, and no election by Lender to proceed in one form of action or

proceeding, or against any party, or on any obligation, shall constitute a waiver of Lender's right to proceed in any other form of action or proceeding or against other parties unless Lender have expressly waived such right in writing. Specifically, but without limiting the generality of the foregoing, no action or proceeding by Lender under any document or instrument evidencing the Guaranteed Obligations shall serve to eliminate the liability of Guarantors under this Guaranty except to the extent that Lender finally and unconditionally shall have realized indefeasible payment by such action or proceeding.

9.     **Indefeasible Payment**.    The Guaranteed Obligations shall not be considered indefeasibly paid for purposes of this Guaranty unless and until all payments to Lender are no longer subject to any right on the part of any Person, including Borrower, Borrower as a debtor in possession, or any trustee (whether appointed under the Bankruptcy Code or otherwise) of any of Borrower's assets, to invalidate or set aside such payments or to seek to recoup the amount of such payments or any portion thereof, or to declare same to be fraudulent or preferential. Upon such full and final performance and indefeasible payment of the Guaranteed Obligations, whether by Borrower pursuant to the Loan Agreement or by any other Person, Lender shall have no obligation whatsoever to transfer or assign its interests in the Loan Documents to Guarantor. In the event that, for any reason, any portion of such payments to Lender is set aside or restored, whether voluntarily or involuntarily, after the making thereof, then the obligation intended to be satisfied thereby shall be revived and continued in full force and effect as if said payment or payments had not been made, and Guarantors shall be liable for the full amount Lender is required to repay plus any and all costs and expenses (including attorneys' fees and expenses and attorneys' fees and expenses incurred pursuant to proceedings arising under the Bankruptcy Code) paid by Lender in connection therewith.

10.     **Financial Condition of Borrower**.    Each Guarantor represents and warrants to Lender that such Guarantor is currently informed of the financial condition of Borrower and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Guaranteed Obligations. Each Guarantor further represents and warrants to Lender that such Guarantor has read and understands the terms and conditions of the Loan Documents. Each Guarantor hereby covenants that such Guarantor will continue to keep informed of Borrower' financial condition, the financial condition of the other Guarantors, if any, and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Guaranteed Obligations.

11.     **Subordination**.    Other than as set forth below, Guarantor hereby agrees that any and all present and future indebtedness of Borrower owing to Guarantor is postponed in favor of and subordinated to payment, in full, in cash, of the Guaranteed Obligations. In this regard, no payment of any kind whatsoever shall be made with respect to such indebtedness until the Guaranteed Obligations have been indefeasibly paid in full. Notwithstanding the foregoing, prior to the occurrence of an Event of Default under the Loan Agreement, Guarantor does not agree to postpone and subordinate (a) amounts owed by Borrower to Guarantor in connection with Borrower's employment of Guarantor, whether as payment of salary, payment of employment benefits, reimbursement of ordinary business expenses of Guarantor incurred on behalf of Borrower, or otherwise (b) amounts owed by Borrower to HWay LLC, a California limited liability company, as rent or other lease obligations, (c) any other payments by Borrower to Guarantor approved by the Court in the Bankruptcy Case, and (d) any other payments by Borrower that are not reasonably characterized as payment of indebtedness and that do not exceed, in the aggregate, twenty five thousand dollars ($25,000.00).

12.     **Payments; Application**.    All payments to be made hereunder by Guarantors shall be made in lawful money of the United States of America at the time of payment, shall be made in immediately available funds, and shall be made without deduction (whether for taxes or otherwise) or offset. All payments made by any Guarantor hereunder shall be applied as follows: first, to all costs and expenses (including attorneys' fees and expenses and attorneys' fees and expenses incurred pursuant to proceedings arising under the Bankruptcy Code) incurred by Lender in enforcing this Guaranty or in collecting the Guaranteed Obligations; second, to all accrued and unpaid interest, premium, if any, and fees owing to Lender constituting Guaranteed Obligations; and third, to the balance of the Guaranteed Obligations.

5

13.    Each Guarantor hereby represents and warrants to Lender that:

(a)    With respect to Guarantors who are not individuals, such Guarantor is a duly organized and existing under the laws of its state of organization, and has the power and authority to own its own Assets, and to transact the business in which it is engaged, and is properly licensed, qualified to do business and in good standing in every jurisdiction where the conduct of its business requires it to be so qualified.  With respect to Guarantors who are individuals or who are signing this Guaranty in their individual capacity, such Guarantors are domiciled in the state of California.

(b)    The execution, delivery and performance of this Guaranty and the other Loan Documents to which such Guarantor is a party are within such Guarantor's powers, are not in conflict with the terms of the Governing Documents of such Guarantor (with respect to Guarantors who are not individuals), and do not result in a breach of or constitute a default under any contract, obligation, indenture or other instrument to which such Guarantor is a party or by which such Guarantor is bound or affected.  There is no law, rule or regulation, nor is there any judgment, decree or order of any court or governmental authority binding on such Guarantor which would be contravened by the execution, delivery, performance or enforcement of this Guaranty and the other Loan Documents to which such Guarantor is a party.

(c)    Upon their execution and delivery in accordance with their respective terms, this Guaranty and the other Loan Documents to which such Guarantor is a party will constitute legal, valid and binding agreements and obligations of such Guarantor enforceable against such Guarantor in accordance with their respective terms, except as enforceability may be limited by Bankruptcy, insolvency, fraudulent conveyance, and similar laws and equitable principles affecting the enforcement of creditors' rights generally.

(d)    No approval, consent, exemption or other action by, or notice to or filing with, any governmental authority is necessary in connection with the execution, delivery, performance or enforcement of this Guaranty and the other Loan Documents to which such Guarantor is a party except as may have been obtained by such Guarantor and certified copies of which have been delivered to Lender.

**13.    Attorneys' Fees and Costs**.  Guarantor agrees to pay, on demand, all attorneys' fees (including attorneys' fees incurred pursuant to proceedings arising under the Bankruptcy Code) and all other costs and expenses which may be incurred by Lender in the enforcement of this Guaranty or in any way arising out of, or consequential to the protection, assertion, or enforcement of the Guaranteed Obligations (or any security therefor), whether or not suit is brought.

**14.    Notices**.  All notices, requests and other communications to any party hereunder shall be sent in accordance with Section 10.1 of the Loan Agreement, and if to Guarantors, to Guarantors' addresses set forth on the signature pages of this Guaranty.

**15.    Financial Statements**.  Each Guarantor shall deliver to Lender such financial statements and tax returns as may be required pursuant to the terms of the Loan Agreement.

**16.    Cumulative Remedies**.  No remedy under this Guaranty or under any Loan Document is intended to be exclusive of any other remedy, but each and every remedy shall be cumulative and in addition to any and every other remedy given hereunder or under any Loan Document, and those provided by law or in equity.  No delay or omission by Lender to exercise any right under this Guaranty shall impair any such right nor be construed to be a waiver thereof.  No failure on the part of Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.

6

**17.    Books and Records**.  Each Guarantor agrees Lender's books and records showing the account between Lender and Borrower shall be admissible in any action or proceeding and shall be binding upon such Guarantor for the purpose of establishing the items therein set forth and shall constitute prima facie proof thereof.

**18.    Severability of Provisions**.  If any provision of this Guaranty is for any reason held to be invalid, illegal or unenforceable in any respect, that provision shall not affect the validity, legality or enforceability of any other provision of this Guaranty.

**19.    Entire Agreement; Amendments and Waivers**.  This Guaranty constitutes the entire agreement among Guarantors and Lender pertaining to the subject matter contained herein.  Any provision of this Guaranty may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by the party asserted to be bound thereby, and then such amendment or waiver shall be effective only in the specific instance and specific purpose for which given.

**20.    [Reserved.]**

**21.    Separate Property**.  Any married individual who signs this Guaranty in his or her individual capacity hereby expressly agrees that recourse may be had against his or her separate property for all Guaranteed Obligations hereunder.

**22.    Death of Guarantor**.

(a)    The death of any Guarantor shall not terminate this Guaranty.  Within two (2) months after the date of any Guarantor's death, such Guarantor's successor(s)-in-interest shall notify Lender of such event.  Each Guarantor hereby absolutely, unconditionally, knowingly, and expressly waives the benefits of any statute of limitations governing the time limit within which Lender must commence an action to enforce this Guaranty against such Guarantor's successor(s)-in-interest following such Guarantor's death, including under Section 366.2 of the California Code of Civil Procedure, or any similar law of any other jurisdiction.

(b)    To the extent that any Guarantor is the grantor of any trust which is a guarantor of the Guaranteed Obligations, or is otherwise liable for the payment of the Guaranteed Obligations, upon the death of such Guarantor, such Guarantor agrees that Lender shall have the right to obtain accounting for each such trust and obtain judicial review of the actions and proceedings of the trustees of each such trust.

**23.    Successors and Assigns**.  This Guaranty shall bind the heirs, administrators, executors, representatives, successors and assigns of each Guarantor, and shall inure to the benefit of the successors and assigns of Lender; provided, however, no Guarantor may assign this Guaranty or delegate any of his duties hereunder without Lender's prior written consent and any such prohibited assignment shall be absolutely null and void.  Lender reserve their right to sell, assign, transfer, negotiate, or grant participations in all or any part of, or any interest in, the rights and benefits hereunder pursuant to and in accordance with the provisions of the Loan Documents.  In connection therewith, Lender may disclose all documents and information which Lender now or hereafter may have relating to each Guarantor, each Guarantor's business, or this Guaranty to any such prospective or actual Transferee.

**24.    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER**.

**(a)    THE VALIDITY OF THIS GUARANTY AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND**

CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF CALIFORNIA, WITHOUT REGARD FOR PRINCIPLES OF CONFLICTS OF LAWS.

(b)    EACH GUARANTOR AGREES THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS GUARANTY AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE LENDER ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND.  EACH GUARANTOR WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF *FORUM NON CONVENIENS* OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 24.

(c)    EACH GUARANTOR HEREBY WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS GUARANTY OR ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS.  EACH GUARANTOR REPRESENTS THAT IT HAS REVIEWED THIS WAIVER AND KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

25.    **Reference Provision**.  In the event the Jury Trial Waiver set forth above is not enforceable, the parties elect to proceed under this Judicial Reference Provision.

(a)    With the exception of the items specified in clause (b) below, any controversy, dispute or claim (each, a "**Claim**") between the parties arising out of or relating to this Agreement or any other Loan Document will be resolved by a reference proceeding in California in accordance with the provisions of Sections 638 et seq. of the California Code of Civil Procedure ("**CCP**"), or their successor sections, which shall constitute the exclusive remedy for the resolution of any Claim, including whether the Claim is subject to the reference proceeding. Except as otherwise provided in the Loan Documents, venue for the reference proceeding will be in the state or federal court in the county or district where the real property involved in the action, if any, is located or in the state or federal court in the county or district where venue is otherwise appropriate under applicable law (the "**Court**").

(b)    The matters that shall not be subject to a reference are the following: (i) nonjudicial foreclosure of any security interests in real or personal property, (ii) exercise of self-help remedies (including, without limitation, set-off), (iii) appointment of a receiver and (iv) temporary, provisional or ancillary remedies (including, without limitation, writs of attachment, writs of possession, temporary restraining orders or preliminary injunctions). This reference provision does not limit the right of any party to exercise or oppose any of the rights and remedies described in clauses (i) and (ii) and to seek or oppose from a court of competent jurisdiction any of the items described in clauses (iii) and (iv). The exercise of, or opposition to, any of those items does not waive the right of any party to a reference pursuant to this reference provision as provided herein.

(c)    The referee shall be a retired judge or justice selected by mutual written agreement of the parties. If the parties do not agree within ten (10) days of a written request to do so by any party, then, upon request of any party, the referee shall be selected by the Presiding Judge of the Court (or his or her representative). A request for appointment of a referee may be heard on an ex parte or expedited basis, and the parties agree that irreparable harm would result if ex parte relief is not granted.  Pursuant to CCP § 170.6, each party shall have one peremptory challenge to the referee selected by the Presiding Judge of the Court (or his or her representative).

(d)    The parties agree that time is of the essence in conducting the reference proceedings. Accordingly, the referee shall be requested, subject to change in the time periods specified herein for good cause shown, to (i) set the matter for a status and trial-setting conference within fifteen (15) days after the date of selection of the referee, (ii) if practicable, try all issues of law or fact within one hundred twenty (120) days after the date of the conference and (iii) report a statement of decision within twenty (20) days after the matter has been submitted for decision.

(e)    The referee will have power to expand or limit the amount and duration of discovery.  The referee may set or extend discovery deadlines or cutoffs for good cause, including a party's failure to provide requested discovery for any reason whatsoever. Unless otherwise ordered based upon good cause shown, no party shall be entitled to "priority" in conducting discovery, depositions may be taken by either party upon seven (7) days written notice, and all other discovery shall be responded to within fifteen (15) days after service. All disputes relating to discovery which cannot be resolved by the parties shall be submitted to the referee whose decision shall be final and binding.

(f)    Except as expressly set forth herein, the referee shall determine the manner in which the reference proceeding is conducted including the time and place of hearings, the order of presentation of evidence, and all other questions that arise with respect to the course of the reference proceeding.  All proceedings and hearings conducted before the referee, except for trial, shall be conducted without a court reporter, except that when any party so requests, a court reporter will be used at any hearing conducted before the referee, and the referee will be provided a courtesy copy of the transcript. The party making such a request shall have the obligation to arrange for and pay the court reporter. Subject to the referee's power to award costs to the prevailing party, the parties will equally share the cost of the referee and the court reporter at trial.

(g)    The referee shall be required to determine all issues in accordance with existing case law and the statutory laws of the State of California. The rules of evidence applicable to proceedings at law in the State of California will be applicable to the reference proceeding. The referee shall be empowered to enter equitable as well as legal relief, enter equitable orders that will be binding on the parties and rule on any motion which would be authorized in a court proceeding, including without limitation motions for summary judgment or summary adjudication. The referee shall issue a decision at the close of the reference proceeding which disposes of all claims of the parties that are the subject of the reference.  Pursuant to CCP § 644, such decision shall be entered by the Court as a judgment or an order in the same manner as if the action had been tried by the Court and any such decision will be final, binding and conclusive.  The parties reserve the right to appeal from the final judgment or order or from any appealable decision or order entered by the referee.  The parties reserve the right to findings of fact, conclusions of laws, a written statement of decision, and the right to move for a new trial or a different judgment, which new trial, if granted, is also to be a reference proceeding under this provision.

(h)    If the enabling legislation which provides for appointment of a referee is repealed (and no successor statute is enacted), any dispute between the parties that would otherwise be determined by reference procedure will be resolved and determined by arbitration.  The arbitration will be conducted by a retired judge or justice, in accordance with the California Arbitration Act §1280 through §1294.2 of the CCP as amended from time to time. The limitations with respect to discovery set forth above shall apply to any such arbitration proceeding.

(i)    THE PARTIES RECOGNIZE AND AGREE THAT ALL CONTROVERSIES, DISPUTES AND CLAIMS RESOLVED UNDER THIS REFERENCE PROVISION WILL BE DECIDED BY A REFEREE AND NOT BY A JURY. AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS, HIS OR HER OWN CHOICE, EACH PARTY KNOWINGLY AND VOLUNTARILY, AND FOR THE MUTUAL BENEFIT OF ALL PARTIES, AGREES THAT THIS REFERENCE PROVISION WILL APPLY TO ANY CONTROVERSY, DISPUTE OR CLAIM BETWEEN OR AMONG THEM ARISING OUT OF OR IN ANY WAY RELATED TO, THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS.

26.    **Patriot Act Notification**.  Lender is subject to the USA Patriot Act, Title III of Pub. L. 107-56, signed into law October 26, 2001 (the "**Patriot Act**") and hereby notifies Guarantors that pursuant to the requirements of the Patriot Act, Lender is required to obtain, verify and record information that identifies Guarantors, which information includes the names and addresses of Guarantors and other information that will allow Lender to identify Guarantors in accordance with the Patriot Act

27.    **Guarantor Payoff Option Rider**.  Each Guarantor that is a signatory to the Guarantor Payoff Option Rider attached hereto (the "**Rider**") shall have the right, pursuant to the terms of the Rider, to make payment to Lender of the full amount of all obligations and indebtedness owed to Lender under the Loan Documents prior to the sale and assignment by Lender of 100% of its right, title, and interest in and to the Loan and Loan Documents.

*[remainder of this page intentionally left blank]*

BN 31275400v5

**070**

IN WITNESS WHEREOF, each Guarantor has duly executed and delivered this Guaranty as of the date set forth in the first paragraph hereof.

Address for notices:

_____

_____

_____

Email:  []

Telephone:  []                              _____

Facsimile:  []                              Haig Bagerdijian, an individual

11

# EXHIBIT 6

## GUARANTOR OPTION RIDER

This **GUARANTOR OPTION RIDER** (this "Rider") is attached to and made a part of that certain Continuing Guaranty dated as of November __, 2017 (as amended, restated, modified, supplemented, or replaced from time to time, including, without limitation, as supplemented by this Rider, the "Guaranty"), by Haig Bagerdijian (the "Guarantor") in favor of Austin Financial Services, Inc., a Delaware corporation, and its successors and assigns ("Lender"), with respect to Point.360, a California corporation ("Borrower"), the debtor and debtor in possession on behalf of the Estate in the Bankruptcy Case, for the purpose of amending and supplementing the terms of the Guaranty as provided herein.

1.       All initially capitalized terms used in this Rider have the meanings given to them in the Loan Agreement unless specifically defined herein.

2.       Lender agrees that prior to any sale and assignment by Lender of 100% of its right, title, and interest in and to the Loan and Loan Documents to a prospective purchaser/assignee (the "Proposed Assignment"), Lender will provide prior written notice to Guarantor (the "Guarantor Option Notice") and Guarantor has the right and option, but in either case not the obligation, at Guarantor's election, to purchase that 100% of Lender's right, title and interest in and to the Loan and Loan Documents that Lender proposes to sell or assign to a prospective purchaser/assignee as contemplated by the Proposed Assignment (the "Guarantor ROFR Option") by delivery of written notice to Lender no more than seven (7) calendar days following receipt of the Guarantor Option Notice (the "Guarantor ROFR Exercise Notice") that Guarantor desires to exercise the Guarantor ROFR Option, in which case Guarantor shall pay, in cash, to Lender the amount that Lender expects to receive in connection with the Proposed Assignment (as described in the Guarantor Option Notice, which amount shall be certified as true and correct by a duly authorized officer of Lender) within five (5) calendar days of the date of delivery of the Guarantor ROFR Exercise Notice (the "Guarantor ROFR Option Period").

3.       In addition to and not in lieu of Guarantor's rights pursuant to paragraph 2, above, at any time, Guarantor shall have the continuing right and option, but not the obligation, to purchase all of Lender's (and all of any assignee or transferee of Lender's) right, title and interest in and to the Loan and the Loan Documents (the "Guarantor Payoff Option") at any time by delivery of written notice to Lender (the "Guarantor Payoff Exercise Notice") that Guarantor desires to exercise the Guarantor Payoff Option, in which case Guarantor shall pay, in cash, to Lender of the full amount of all obligations and indebtedness owed to Lender under the Loan Documents (the "Guarantor Payoff Amount") within seven (7) calendar days from the date of delivery of the Guarantor Payoff Exercise Notice (the "Guarantor Payoff Option Period").  The date of payment by Guarantor of the Payoff Amount pursuant to this Rider shall be the "Final Maturity Date" under the Loan Agreement.

4.       Lender shall not consummate any Proposed Assignment during the Guarantor Payoff Option Period or the Guarantor ROFR Option Period.  Upon exercise of the Guarantor ROFR Option or the Guarantor Payoff Option, as applicable, Guarantor and Lender shall enter into a Loan Sale Agreement in substantially the form set forth as Exhibit A with respect to the sale and transfer of that the Loan and the Loan Documents being sold to Guarantor upon exercise of the Guarantor ROFR Option or the Guarantor Payoff Option, as applicable.

5.      Guarantor's rights under this Guarantor Option Rider may not be assigned by Guarantor to any unaffiliated third party; provided that Guarantor may assign its rights to any affiliate of Guarantor, other than the Borrower.  This Rider sets forth the entire understanding of the parties with respect to the Guarantor ROFR Option and the Guarantor Payoff Option, and this Rider shall only be amended, supplemented or otherwise modified in a written document signed by the Lender and the Guarantor.  This Rider shall be governed by and construed in accordance with the internal laws of the State of California, without reference to the conflict of laws provisions thereof.

IN WITNESS WHEREOF, the parties have executed this Rider on the date of the Guaranty.

GUARANTOR:

Name:   Haig Bagerdijian

LENDER:

AUSTIN FINANCIAL SERVICES, INC.

By: _____
Name: _____
Title: _____

EXHIBIT A—FORM OF LOAN SALE AGREEMENT

## LOAN SALE AGREEMENT

This LOAN SALE AGREEMENT (this "<u>Agreement</u>") is entered into as of _____, 20__ (the "<u>Effective Date</u>"), by and between Austin Financial Services, Inc., a Delaware corporation ("<u>Lender</u>"), and Haig Bagerdijian, an individual ("<u>Buyer</u>"), with respect to the following facts:

## RECITALS

A.      Lender made a loan and provided other financial accommodations (the "<u>Loan</u>") to Point.360, the debtor and debtor in possession on behalf of the Estate in the Bankruptcy Case ("<u>Borrower</u>") pursuant to the Amended and Restated Loan and Security Agreement, dated as of July 13, 2016, the Assignment and Assumption of Financing and Financing Documents, dated as of July 13, 2016, executed by Lender, Summit Financial Resources, Inc., and Borrower (the "<u>Assignment</u>"), the DIP Postpetition Financing Addendum, dated as of November __, 2017 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "<u>Loan Agreement</u>") and other Loan Documents.

B.      Certain obligations of Borrower under the Loan Agreement and other Loan Documents are guaranteed by a Continuing Guaranty, dated as of November __, 2017 (as amended, restated, extended, supplemented, or otherwise modified in writing from time to time, the "<u>Guaranty</u>"), by Buyer ("<u>Guarantor,</u>" and collectively with Borrower, "<u>Obligors</u>" and each an "<u>Obligor</u>").

C.      On October 30, 2017 (the "<u>Petition Date</u>"), Borrower filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>")[1] commencing the Case.  Debtor continues to operate its business and manage its assets as a "debtor in possession" pursuant to sections 1107(a) and 1108.

D.      On November __, 2017, the Court entered its Interim Order on Emergency Motion for:  Entry of Interim and Final Orders (1) Approving Post-Petition Financing and Related Liens and Adequate Protection; (2) Approving Cash Collateral Use and Related Liens and Adequate Protection and (3) Granting Related Relief in the Case approving the Loan Agreement and Loan Documents and the financing pursuant thereto.

E.      Buyer desires to buy from Lender, and Lender desires to sell to Buyer, all of Lender's right, title, and interest in and to the Loan as evidenced by the Loan Agreement and other Loan Documents, and any and all of Lender's rights, duties, and obligations that may exist with respect thereto, pursuant to the terms and conditions of this Agreement.

## AGREEMENT

---

[1] Statutory references herein are to the Bankruptcy Code unless otherwise noted.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, Lender and Buyer agree as follows:

1.    <u>Definitions</u>.

Any capitalized terms not herein defined have the meaning as defined in the Loan Agreement.  In addition to defined terms contained in this Agreement, the following terms have the meanings specified or referred to in this Section 1:

"<u>Business Day</u>" means a day other than a Saturday, Sunday or other day on which commercial Lenders in the State of California are authorized or required by law to close.

"<u>Claim</u>" has the meaning set forth in Section 5.6(e) of this Agreement.

"<u>Closing</u>" means the consummation of the transactions set forth herein, which, without limitation, will not occur unless and until Lender has received the entirety of the Purchase Price pursuant to the terms and conditions of this Agreement.

"<u>Closing Date</u>" means the date on which the Closing occurs.

"<u>Purchase Price</u>" has the meaning set forth in Section 3 of this Agreement..

2.    <u>Purchase and Sale</u>.  Upon and subject to the terms and conditions of this Agreement, and in consideration of the Purchase Price (as defined in Section 3 hereof), Lender agrees to sell and assign to Buyer, and Buyer agrees to purchase from Lender all of Lender's right, title, interest, in, to, under, and concerning the Loan as evidenced by the Loan Documents and assume the obligations and duties of Lender under the Loan Documents as more specifically provided in this Agreement.

3.    <u>Purchase Price</u>.  The "<u>Purchase Price</u>" for the Loan is the sum of all Obligations due under the Loan and the Loan Agreement (including attorneys' fees incurred by Lender in connection with this Agreement and transactions contemplated hereby) as set forth in the Loan Status Statement presented at Closing by Lender to Buyer, in substantially the form attached hereto as <u>Exhibit A</u>, and made a part hereof, setting forth the information regarding the Loan principal balance, accrued interest, impound and reserve account balances, and any other sums payable under the Loan Agreement and other Loan Documents (the "<u>Loan Status Statement</u>"). The Purchase Price shall be payable by Buyer to Lender as follows:

3.1    <u>Closing Funds</u>.  No later than 11:00 a.m. Pacific Time on the Closing Date, Buyer shall pay to Lender the entire Purchase Price in immediately available federal funds by confirmed wire transfer or cash.

4.    <u>Closing</u>.

4.1    <u>Closing Date</u>.  Except as otherwise herein provided, the Closing shall occur upon the later of (a) the date all conditions to Closing in this Agreement have been satisfied or waived

in writing by Lender and/or Buyer, and (b) the date of the Closing as set forth in the applicable option exercise notice delivered by Buyer to Lender.

4.2    Deliveries.

(a)    Lender Deliveries.  Lender shall execute, and where applicable, duly acknowledge and deliver to Buyer, the following documents, each of which shall be prepared on a non-recourse basis (collectively, "Lender Closing Documents"):

(i)    A copy of the Assignment of Loan Documents, in substantially the form and content set forth on Exhibit B, attached hereto and made a part hereof, executed by Lender ("Assignment of Loan Documents");

(ii)    A notice to Borrower and any other obligors under the Loan of the assignment of the Loan to Buyer in form and content prepared by Lender;

(iii)    The Loan Status Statement;

(iv)    A UCC Financing Statement Amendment for each UCC-1 Financing Statement filed by Lender in connection with the Loan; and

(v)    Copies of all of the Loan Documents in Lender's possession.

(b)    Buyer Deliveries.  Buyer shall deliver to Lender:

(i)    The Purchase Price and all other amounts required of Buyer hereunder;

(ii)    A copy of the Assignment of Loan Documents, executed by Buyer; and

(iii)    All such other documents, instruments, and agreements as Lender may reasonably require in order to comply with this Agreement (collectively, the "Buyer Closing Documents").

4.3    Closing Costs; Loan Proceeds.

(a)    Closing Costs.  As part of Buyer's Closing Funds, in addition to other obligations, Buyer shall pay all filing fees and costs, recording fees, and all stamp and documentary transfer taxes, and all of Buyer's own costs and expenses incurred in connection herewith.

(b)    Loan Proceeds; Reserves and Impounds.  Lender is entitled to, and is entitled to the benefit of, all payments of principal and interest, prepayment penalties or premiums, fees, reimbursements, proceeds (including, without limitation, insurance proceeds, condemnation awards, and proceeds from any Collateral), advances, adequate protection including adequate protection payments, and all other sums and amounts (collectively, the "Loan Proceeds") paid by, or due from Borrower, any other obligors under the Loan, or any other

person or entity with respect to the Loan, or any of them, on or before the Closing. Buyer is entitled to all Loan Proceeds with respect to the Loan that are paid after the Closing Date. At the Closing, Lender shall transfer to Buyer the balances of any impound, reserve and escrow accounts held by or benefiting Lender with respect to the Loan, if any, including without limitation cash collateral of Borrower held by Lender, whether pursuant to the Loan Agreement, other Loan Documents, or otherwise, or shall credit Buyer against the Purchase Price for the balances in any such impound, reserve and escrow accounts or cash collateral.

4.4     Closing.

(a)     At the Closing, Buyer shall (i) disburse to Lender, pursuant to Lender's written wiring instructions, funds in the amount of the Purchase Price; and (ii) disburse to the appropriate public agencies amounts sufficient to pay all recording and other fees arising from or related to this Agreement.

(b)     Within five (5) Business Days after the Closing, Lender shall deliver to Buyer all original Lender Closing Documents, to the extent copies were previously delivered and copies of such documents to the extent originals of such documents do not exist.

4.5     Conditions to Closing.

(a)     Conditions to Buyer's Obligations.     The obligations of Buyer to consummate the transactions contemplated by this Agreement are, in addition to the other terms and conditions of this Agreement, subject to the conditions set forth in this Section 4.5(a), each of which is for the sole benefit of Buyer, and any one or more of which may be waived in whole or in part by Buyer in its sole discretion.

(i)     The representations and warranties of Lender contained in this Agreement shall be true on and as of the Closing Date as if the same were made on and as of the Closing Date.

(ii)     Lender shall have executed and delivered to Buyer all of Lender Closing Documents.

(iii)     Lender shall have fully and timely performed, in all material respects, all covenants and obligations required by this Agreement to be performed by Lender on or prior to the Closing Date.

(b)     Conditions to Lender's Obligations.     The obligations of Lender to consummate the transactions contemplated by this Agreement are, in addition to the other terms and conditions of this Agreement, subject to the conditions set forth in this Section 4.5(b), each of which is for the sole benefit of Lender, and any one or more of which may be waived in whole or in part by Lender in its sole discretion.

(i)     Buyer shall have paid to Lender the full Purchase Price, in cash, together with all other Buyer's Closing Funds, and any and all additional funds required to pay any costs, fees, expenses, or prorations payable by Buyer hereunder.

4

(ii)    The representations and warranties of Buyer contained in this Agreement shall be true on and as of the Closing Date as if the same were made on and as of the Closing Date.

(iii)    Buyer shall have executed and delivered to Lender all of Buyer Closing Documents.

(iv)    Buyer shall have fully and timely performed, in all material respects, all covenants and obligations required by this Agreement to be performed by Buyer on or prior to the Closing Date.

5.    <u>Representations and Warranties of Lender</u>. Lender hereby represents and warrants to Buyer, as of the date hereof and as of the Closing, as follows:

5.1    Lender is duly incorporated, validly existing and in good standing as a domestic corporation under the laws of the State of Delaware and has all requisite corporate power and authority to own its properties and assets and to carry on its business as it is now being conducted and as proposed to be conducted. Lender is duly qualified to transact business as a foreign corporation and is in good standing in each jurisdiction in which the character of the properties owned or leased by it or the nature of its business makes such qualification necessary.

5.2    Lender has the corporate power to execute, deliver and perform its obligations under this Agreement and has taken all necessary action to authorize the execution, delivery and performance by it of this Agreement and to consummate the transactions contemplated hereby. Lender has duly executed and delivered this Agreement. This Agreement constitutes the legal, valid and binding obligations of Lender enforceable against it in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

5.3    The execution, delivery and performance by Lender of this Agreement and the consummation of the transactions contemplated hereby does not and will not violate any statute, rule, regulation, administrative ruling or other law applicable to Lender. The execution, delivery and performance by Lender of this Agreement and the consummation of the transactions contemplated hereby (i) will not (x) violate, result in a breach of or constitute (with due notice or lapse of time or both) a default under any contract, lease, loan agreement, mortgage, security agreement, trust indenture or other agreement or instrument to which Lender is a party or by which any of its properties or assets is subject or (y) result in the creation or imposition of any lien, security interest or other encumbrance upon any of the properties or assets of Lender, and (ii) will not violate any provision of the Lender's certificate of incorporation or bylaws. No consent, authorization or order of, or filing or registration with, any governmental or quasi-governmental agency or authority or other person is required to be obtained or made by Lender for the execution, delivery and performance of this Agreement or the consummation of any of the transactions contemplated hereby.

BN 31283638v5

*080*

5.4     Lender is, and as of the Closing will be, the record and beneficial owner and holder of the Loan and other rights under the Loan Agreement and the other Loan Documents, in each case, free and clear of all liens, security interests or other encumbrances.  No person or entity other than Lender has any legal, record or beneficial ownership interest in or to the Loan, the Loan Agreement or the other Loan Documents whatsoever, and no option, right or other agreement or commitment is currently outstanding or existing with respect to the Loan, the Loan Agreement or the other Loan Documents, or any portion thereof.  Upon consummation of the transactions contemplated by this Agreement, Buyer will acquire good and marketable title to the Loan, the Loan Agreement and the other Loan Documents, free and clear of all liens, security interests or other encumbrances.

5.5     Lender has complied with all material statutes, rules, regulations, administrative rulings and other laws applicable to Lender.

5.6     The provisions set forth in this Section 5 shall survive the Closing.

6.     "AS IS" Sale.

6.1     Other than as expressly set forth in this Agreement, the Loan is being sold "AS IS, WHERE IS AND WITH ALL FAULTS, DEFICIENCIES, AND DEFECTS, LATENT OR PATENT, KNOWN OR UNKNOWN," and except as expressly provided elsewhere in this Agreement, the Loan Documents are assigned without any representation, warranty, or recourse of any kind whatsoever.  Except as expressly provided elsewhere in this Agreement, Lender makes no warranty or representation of any kind whatsoever as to the Loan, the Loan Documents, the Obligations, the Liens, the Collateral, Borrower, Guarantor, other obligors, or any other matters pertaining to any of the foregoing, whether express, implied, by operation of law, or otherwise.  Except as provided elsewhere in this Agreement, Lender does not warrant or represent the collectability, validity, completeness or accuracy of the Loan Documents, or any of them; the title to the Collateral or other property of Borrower or any UCC-1 financing statements filed in connection with the Loan or the lien priority; the condition of the Collateral or any other property of Borrower; the design or construction of the Collateral or any other property of Borrower; any encumbrances on the Collateral or any other property of Borrower; the compliance of the Collateral or any other property of Borrower with any and all zoning, permit, ordinance, or code requirements; the income from, or value of, the Collateral or any other property of Borrower; or the water, soil, geology, environmental condition, and suitability of the Collateral or other property of Borrower for any and all activities and uses which Buyer may elect to conduct thereon should Buyer acquire title to the Collateral or any other property of Borrower.

6.2     Lender makes no representation or warranty of any kind or nature whatsoever, whether express, implied, by operation of law, or otherwise, concerning the Loan, the Loan Documents, the Collateral or other property of Borrower or any matter related thereto, in connection with and/or ancillary to the Loan, the Loan Documents, and/or the Collateral or any other property of Borrower, including, without limitation:  (a) the validity and priority of any and all liens created or assumed by any of the Loan Documents, (b) any Collateral, (c) Buyer's ability to foreclose upon any lien created or arising under any of the Loan Documents, or to pursue any remedy under the Loan Documents, (d) any warranties under the applicable Uniform

6

Commercial Code, or (e) the enforceability or collectability of the Loan Documents and the Loan.

6.3     Buyer is an existing guarantor to and creditor of Borrower and has conducted his own investigation, inspection, review, and appraisal, and otherwise performed his own due diligence relating to, the Loan, Loan Documents, the Collateral, all other property of Borrower, the Case, the Assignment, and the financial condition of Borrower and Guarantor as of the Closing Date.  Lender makes no representations or warranties concerning any of the foregoing and/or the subject matter of this Agreement.  Buyer shall rely solely on his own investigation concerning the foregoing.

6.4     BUYER UNDERSTANDS THAT THE SALE OF THE LOAN DOCUMENTS IS BEING MADE ON AN "AS IS, WHERE IS AND WITH ALL FAULTS, DEFICIENCIES, AND DEFECTS, LATENT OR PATENT, KNOWN OR UNKNOWN" BASIS, AND BUYER EXPRESSLY ACKNOWLEDGES THAT IN CONSIDERATION OF THE AGREEMENTS OF LENDER HEREIN, LENDER MAKES, AND HAS MADE, NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, AND SPECIFICALLY DISCLAIMS ANY SUCH WARRANTY AND REPRESENTATION, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF OWNERSHIP, EXISTENCE, ENFORCEABILITY, QUALITY, QUANTITY, VALUE, CONDITION, HABITABILITY, MERCHANTABILITY, OR FITNESS OF THE COLLATERAL, ALL OTHER PROPERTY OF BORROWER, ANY LEASES COMPRISING ANY PART OF THE COLLATERAL, THE ENVIRONMENTAL CONDITION OF THE COLLATERAL OR ANY OTHER PROPERTY OF BORROWER, BORROWER, ANY REGULATORY APPROVALS REQUIRED BY BORROWER OR ANY OTHER PERSON OR ENTITY TO CONDUCT OPERATIONS ON BEHALF OF BORROWER, ANY LICENSING OR REGULATORY REQUIREMENTS IMPOSED ON BUYER AND/OR ANY THE LOAN DOCUMENTS FOR ANY PARTICULAR PURPOSE.  THE PROVISIONS OF THIS SECTION SURVIVE THE CONSUMMATION OF THE TRANSACTIONS HEREIN PROVIDED.

6.5     Buyer and its successors and assigns shall be forever responsible for the payment of any sales tax, use tax, personal property tax, real property tax, or any other tax of whatsoever nature assessed, levied, or imposed in connection with the transactions contemplated hereunder, the Loan, and the Loan Documents, with the exception that Buyer shall not be liable for any income taxes of Lender, and if the Closing occurs, Buyer and its successors and assigns hereby agree to indemnify (in addition to all other indemnifications given by Buyer pursuant to this Agreement), defend, and hold Lender harmless from the imposition, assessment, levy, payment, and collection of any sales tax, use tax, or personal property tax, in connection with the transactions contemplated by this Agreement, the Loan, and the Loan Documents.

7.     <u>Certain Covenants of Buyer</u>.

7.1     In addition to, and not to be construed in any way as a limitation upon any other agreement by Buyer to indemnify Lender as set forth herein, if the Closing occurs, Buyer hereby covenants and agrees to indemnify, protect, and defend Lender and Lender Parties against, and hold Lender and Lender Parties harmless from, any Claims arising after the Closing and relating to the Loans, the Loan Documents or the Collateral, the servicing of the Loans following the

Closing, any foreclosure or other enforcement actions or proceedings undertaken (or that may be undertaken) in connection with the Loans following the Closing, and any breach of this Agreement by Buyer. Buyer's indemnification obligations under this Agreement, including, as set forth in this Section 6.1, shall be subject to the following provisions:

(a)     Lender shall notify Buyer of any Claim against Lender within ten (10) Business Days after it has notice of such Claim, but failure to notify Buyer shall in no case prejudice the rights of Lender under this Agreement unless Buyer is prejudiced by such failure and then only to the extent of such prejudice. Should Buyer fail to discharge or undertake to defend Lender against such liability, within ten (10) Business Days after Lender gives Buyer written notice of the same, then Lender may engage counsel at Buyer's expense to defend Lender, and Lender may settle such Claim, and Buyer's liability to Lender shall be conclusively established by such settlement, the amount of such liability to include both the settlement consideration and the costs and expenses, including attorneys' fees, incurred by Lender in effecting such settlement.

(b)     Buyer's indemnification obligations under this Agreement covers the costs and expenses of Lender, including attorneys' fees, related to any actions, suits, or judgments incident to any of the matters covered by such indemnities.

(c)     Buyer's indemnification obligations under this Agreement extends to any past, present, or future advisor, trustee, director, officer, partner, employee, beneficiary, shareholder, agent, participant, subsidiary, parent, affiliate, successor, and assign of or in Lender and any entity now or hereafter having a direct or indirect ownership interest in Lender (the "Lender Parties").

(d)     Buyer's indemnification obligations under this Agreement, including, without limitation, as set forth in this Section 6.1, survive the consummation of the transaction contemplated hereunder.

(e)     For purposes hereof, the term "Claim" means, without limitation and in the broadest sense, any obligation, liability, claim (including any claim for damage to property or injury to or death of any persons), lien or encumbrance, loss, damage, cost, or expense, including attorneys' fees.

7.2     Buyer hereby acknowledges that one or more Events of Default (as defined in the Loan Documents) has occurred under the Loan and that he is fully advised of the circumstances resulting in Borrower's inability to meet its obligations under the Loan Agreement and the other Loan Documents. Buyer hereby agrees that once the transactions herein provided have been consummated, Buyer has no basis for rescinding the transactions set forth herein, or seeking damages or recovery of any kind or nature from Lender for any reason whatsoever, including, but not limited to, any bankruptcy, reorganization, suspension of status, failure to be in good standing, dissolution, or insolvency of Borrower and/or any other obligors under the Loan. Buyer hereby waives and agrees not to assert or take advantage of (a) any claim that may arise by reason of the incapacity, lack of authority, death, disability, or dissolution of any other person or entity, or the failure of Lender to file or enforce any claim against any estate (either in administration, bankruptcy, or other proceeding) of any person or entity; (b) any claim based

8

upon an election of remedies by Lender; and/or (c) any claim based upon a duty, if any, on the part of Lender to disclose to Buyer any facts that Lender may now or hereafter know about Borrower or any other obligors under the Loan, or any other person or entity, or about the Collateral or other property of Borrower, or any matter affecting title thereto, or the Loan or the Loan Documents, regardless of whether Lender has reason to believe that such facts or information are known or unknown to Buyer.  Buyer acknowledges and agrees that Buyer assumes all risk concerning the financial condition of Borrower and any other obligors under the Loan, the status of the Collateral and other property of Borrower, and any and all other circumstances that might have a bearing upon the value of the Loan and Loan Documents, the Collateral and other property of Borrower.

7.3    From and after the Closing, Buyer assumes and agrees to be bound by, and to pay and perform any and all obligations, duties, and covenants of Lender under the Loan Documents arising after the Closing.  Buyer shall pay any and all costs, fees (including, but not limited to, attorneys' fees), expenses and/or other sums arising from or pertaining to the performance of its obligations in connection with the Loan and the Loan Documents.

7.4    Buyer may undertake its own investigation and obtain its own third party assurances as to the state of title to the Collateral and other property of Borrower, and the validity and/or enforceability of any liens, if any, securing the Loan, but the existence and/or availability of any and all of such matters or items shall not in any manner or fashion constitute a condition to Buyer's obligations hereunder.

7.5    Buyer acknowledges and understands that information and documents which may have been, or may be, furnished to Buyer by Lender in connection with this Agreement may be incorrect or incomplete, except as otherwise expressly warranted and represented by Lender in this Agreement.  In addition, Lender is not delivering or otherwise disclosing to Buyer Lender's Loan files which include among other things the following documents, correspondence, and communications, and/or notes regarding the same:    appraisals, credit reports, credit authorizations, credit analyses, account summaries, tax and informational returns, financial statements and information, social security numbers, taxpayer identification numbers, notes of Lender's employees, or other internal documents, memoranda, and notes pertaining to Borrower, any other obligors under the Loan, or any other obligors under the Loan Documents, the status of the Loan, the book value of the Loan and related information, reports of examinations and audits of the Loan and of Lender's books and records, records regarding any reserves or charge-offs against the Loan, any information regarding the marketing of the Loan, any attorney-client correspondence, memoranda, and other documents and attorney work-product, and any other information Lender is required to maintain confidential pursuant to applicable law or regulation.

7.6    Until the Closing occurs, except as hereinafter provided, Lender has the sole and exclusive right, power, and authority to service the Loan and deal with Borrower and any other obligors under the Loan in all matters pertaining to the Loan and Loan Documents.  Lender may, but has no duty to, take any action to enforce any right or obligation of Borrower, any obligor under the Loan, or any other obligor under the Loan Documents, and/or to liquidate or pursue any recovery from any security for the Loan, and Lender has no obligation to take any action to preserve, enhance, or protect any right or expectation of Buyer under this Agreement.

BN 31283638v5

*084*

7.7     If, following the Closing, Buyer enters into a settlement agreement, modification agreement, release agreement, forbearance agreement, or any other written agreement with Borrower and/or any obligor under the Loan, or otherwise grants any concession with respect to the Loan or any of the Loan Documents, then in connection therewith, such settlement agreement, modification agreement, release agreement, forbearance agreement, or any other written agreement shall only be valid and effective, and shall be expressly conditioned upon, a general release of any Claims by Borrower and any obligor under the Loan against Lender and Lender Parties, which such release shall include a waiver of Borrower's and any other obligor's rights under California Civil Code Section 1542.

8.      <u>Representations and Warranties</u>.

8.1     <u>By Buyer</u>.  Buyer hereby represents and warrants to Lender, as follows:

(a)     Buyer has conducted such due diligence, investigation, and inquiry as Buyer deemed necessary and appropriate to the transactions contemplated by this Agreement, and, in entering into this Agreement (and other than as expressly set forth herein), Buyer is relying solely upon its own due diligence, investigation, and inquiry and the representations, warranties and obligations of Lender under this Agreement;

(b)     Buyer has been advised by counsel of his choosing of the conditions and limitations imposed by law upon holders of obligations secured in whole or in part by real property and/or personal property, and understands the effects of judicial and non-judicial foreclosure on the rights of holders of obligations secured by real property, including as to junior priority obligations;

(c)     Other than as expressly set forth herein, neither Lender, nor anyone claiming to represent Lender, has made any representation or warranty to Buyer, or anyone claiming to represent Buyer, concerning the Loan, Loan Documents, Borrower, any other obligor under the Loan, property of Borrower, or other Collateral, except as is expressly and fully set forth in this Agreement;

(d)     This Agreement constitutes a valid and binding obligation of Buyer to Lender enforceable in accordance with its terms;

(e)     The execution and delivery by Buyer of this Agreement, and consummation of the transactions contemplated herein, will not, with or without giving of notice or passage of time, or both:  (i) conflict with or violate in any material respect any law, statute, rule, regulation, or administrative order to which Buyer is subject or by which Buyer's assets are bound or affected; (ii) violate any judgment, order, writ, or decree of any court or administrative body in any suit or proceeding to which Buyer is a party; (iii) result in a breach of, or default under, any material agreement, commitment, contract (written or oral), or other material instrument, to which Buyer is a party or by which any of Buyer's assets are bound or affected; or (iv) render Buyer insolvent or without sufficient working capital;

(f)     Buyer is a sophisticated investor;

(g)    Buyer has received independent legal advice from attorneys of his choice with respect to entering into this Agreement;

(h)    There are no actions, suits, claims, proceedings, or investigations, pending or threatened against Buyer which might impair the consummation of the terms and conditions of this Agreement;

(i)    Buyer is an individual who is domiciled in the State of California; and

(j)    Buyer has obtained all approvals necessary or required to enter into this Agreement and consummate the transactions contemplated hereby.

9.    Release.

9.1    Except for any obligations of Lender expressly and specifically provided for in this Agreement, Buyer, for itself and each of his past, present, or future advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (herein individually and collectively referred to as, "Buyer Releasor"), hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and discharges Lender and Lender Parties, from and against any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, including, without limitation, those arising out of, or in any way connected with, any of the following:  the Loan, the Loan Documents, the obligations of Lender and Lender Parties under the Loan and Loan Documents, the origination, administration, servicing, and/or enforcement of the Loan and the Loan Documents, Borrower, any other obligor under the Loan, the Collateral and other property of Borrower (including, without limitation, the condition of the Collateral and other property and any hazardous substances or materials in, on, under, or about the property).

9.2    Except for any obligations of Buyer expressly and specifically provided for in this Agreement, Lender, for itself and each of Lender's past, present, or future advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (herein individually and collectively referred to as, "Lender Releasor" and, together with the Buyer Releasor, the "Releasor"), hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and discharges Buyer and Buyer's affiliates, advisors, attorneys and agents, from and against any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, including, without limitation, those arising out of, or in any way connected with, any of the following:  the Loan, the Loan Documents, the obligations of Lender and Lender Parties under the Loan and Loan Documents, the origination, administration, servicing, and/or enforcement of the Loan and the

11

Loan Documents, Borrower, any other obligor under the Loan, the Collateral and other property of Borrower (including, without limitation, the condition of the Collateral and other property and any hazardous substances or materials in, on, under, or about the property).

9.3     Each Releasor acknowledges and agrees that it has been informed by its attorneys and advisors of, and is familiar with, and does hereby expressly waive, the provisions of Section 1542 of the California Civil Code, and any similar statute, code, law, or regulation of any state or the United States, to the full extent that it may waive such rights and benefits.  Civil Code, Section 1542 provides:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

9.4     In connection with each waiver and relinquishment set forth herein, each Releasor acknowledges that it may hereafter discover claims presently unknown or unsuspected, or facts in addition to, or different from, those which it now knows or believes to be true.  Nevertheless, it is the intention of each Releasor through this Agreement, to fully, finally, and forever release, waive, and relinquish all such matters, and all claims relative thereto, which now exist, may exist, or heretofore have existed.  In furtherance of such intention, the releases herein given shall be and remain in effect as a full and complete release of such matters notwithstanding the discovery or existence of any such additional or different claims or facts relative thereto.

9.5     Each Buyer Releasor represents and warrants to Lender, and each Lender Releasor represents and warrants to Buyer, in each case that it is the sole and lawful owner of all right, title, and interest in and to each and every claim or other matter which it releases herein, and that no Releasor has heretofore assigned or transferred, or purported to assign or transfer, to any individual, partnership, corporation, firm, estate, or entity any claim or other matters herein released.  Each Buyer Releasor indemnifies, defends, and holds harmless Lender, and each Lender Releasor indemnifies, defends, and holds harmless Buyer, in each case from and against any and all Claims based upon, or arising out of, or in connection with, any prior assignment or transfer, or purported assignment or transfer, of any claims or matters released herein.

9.6     The parties hereto understand and agree that any covenant or undertaking of Lender or Buyer, as applicable, pursuant to this Agreement, however contingent or provisional, is and shall be separate and legally sufficient consideration for all of the releases herein given, and any default, breach, failure of condition, or failure of consideration, to any extent applicable to this Agreement, does not operate to avoid, discriminate, rescind, revoke, diminish, or otherwise affect the validity, enforceability, and continuing effectiveness of the foregoing releases, or any of them.  The provisions of this <u>Section 8</u> survive the Closing and the earlier termination of this Agreement.

10.     <u>Brokers</u>.

10.1     The parties acknowledge that no person or entity has any right to any commission, finder's fee, or other similar compensation based upon the transactions contemplated by this Agreement.

10.2     Lender and Buyer (each an "Indemnifying Party") indemnify and shall hold one another (the "Indemnified Party") harmless from and against any and all claims, demands, damages, losses, costs, and expenses, including, without limitation all attorneys' fees and related costs, incurred by the Indemnified Party in connection with any claim or demand for brokerage commissions or finders' fees made by any broker, agent, or other person alleged to have been engaged or hired by the Indemnifying Party, and any and all brokers or others claiming to have dealt with any party other than the Indemnified Party in connection with the transactions contemplated by this Agreement.

11.     Remedies.

11.1     Remedies.  Subject to Section 10.2 below, each of the parties hereto has all rights, powers, and remedies available under this Agreement or accorded by law.  All rights, powers, and remedies of the parties hereunder may be exercised at any time by such party and from time to time after the occurrence of a Default of the other party under this Agreement, are cumulative and not exclusive, and are in addition to any other rights, powers, or remedies provided at law or in equity.  As used herein, a "Default" means an event of a default or breach by a party hereto in the performance of such party's obligations or covenants under this Agreement, or the breach by a party of said party's express representations or warranties under this Agreement, and provided all of the contingencies and conditions set forth herein for the benefit of non-defaulting party have been met and are satisfied, and provided that the non-defaulting party is in full compliance with all covenants, agreements, and obligations set forth in this Agreement and has otherwise tendered performance under this Agreement in compliance with all applicable laws.

11.2     Lender Default; Limitation of Remedies.  Buyer and Lender acknowledge that upon a Default hereunder by Lender, Buyer's sole and exclusive remedy shall be a claim for, and recovery of, such monetary damages against Lender to which Buyer shall be entitled by law, and Buyer acknowledges and agrees that the right to obtain monetary damages against Lender is a full and adequate remedy to protect its rights and interests under this Agreement.  Without limiting the generality of the foregoing, Buyer specifically waives any and all rights to seek declaratory and/or injunctive relief, equitable relief, or specific performance of Lender's obligations under this Agreement.  In respect of any Lender Default, Buyer agrees that it will commence, and thereafter diligently prosecute, the enforcement of Buyer's rights under this Agreement in a court or other proceeding, within 90 days of the date Buyer first becomes aware of such Lender Default, or Buyer shall be deemed to have forever waived its rights to enforce its remedies under this Agreement with respect to such Lender Default.  Buyer shall not assert, and waives, any and all rights and remedies at law or in equity or otherwise to redress any breach by Lender of Lender's obligations arising under this Agreement, unless Buyer actually performed, or tendered performance of, all duties and obligations of Buyer under this Agreement, and satisfied all conditions and contingencies of Lender's performance hereto (whether or not Buyer would otherwise be excused from such performance or condition) strictly within the times and in the manner herein provided for Buyer's performance and satisfaction of all such covenants and conditions.  Notwithstanding any provision to the contrary contained in this Agreement, in no

13

event shall the aggregate amount of damages which Buyer may be entitled to recover exceed the amount of the Purchase Price, and in no event shall Lender be liable to Buyer or any other party for any punitive, speculative, special, or consequential damages.

12.    <u>Miscellaneous</u>.

12.1    <u>Notices</u>.  Any notice, request, or demand required or permitted by this Agreement to be given by any of the parties hereto to any other party hereto, is deemed delivered if (a) sent by electronic mail when directed to the appropriate e-mail address (provided that the party giving notice must verify the e-mail address of the recipient prior to transmission); (b) deposited with a reputable overnight private commercial delivery service and addressed to the receiving party at the address specified below; or (c) given by personal delivery, by the party giving notice directly or through commercial messenger or courier service, at the receiving party's address specified below.  If notice is given by deposit in the U.S. Mail as herein provided, delivery is not deemed to be effective until 48 hours after such deposit; if deposited with an overnight courier or delivery service as herein provided prior to any applicable deposit deadline for guaranteed overnight delivery, delivery is deemed effective 24 hours after such deposit; if transmitted by email or personal delivery, delivery is deemed to be effective upon receipt, if transmitted or delivered during normal business hours of the receiving party.

For Buyer:    Haig Bagerdijian

_____

_____

Attention: _____

Telephone: _____

E-mail: _____

With copies to:

Ervin Cohen & Jessup LLP
9401 Wilshire Boulevard, 9th Floor
Beverly Hills, California 90212
Attention: Peter A. Davidson, Esq. and Sander C. Zagzebski, Esq.
Telephone: (310) 273-6333
E-mail: pdavidson@ecjlaw.com and szagzebski@ecjlaw.com

For Lender:    Austin Financial Services
11111 Santa Monica Blvd.
Los Angeles, CA 90025-9823
Attention:
Telephone:
E-mail:

14

With copies to:

Buchalter
1000 Wilshire Blvd., Suite 1500
Los Angeles, California 90017-1730
Attention: William Brody
Telephone: (213) 891-5015
E-mail: wbrody@buchalter.com

Either party may change its address for purposes of this Section upon delivery to the other party of a notice of a change of address in the manner provided for notices hereunder.

12.2    Attorneys' Fees.  If any legal action or any arbitration or other proceeding is brought or if an attorney is retained for the enforcement of this Agreement or any portion thereof, or because of any alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the prevailing party in any action or proceeding to interpret or enforce this Agreement, or any of its terms, is entitled, in addition to any judgment or award upon such action or proceeding, to an award for all costs and expenses (including costs of all legal or administrative proceedings or hearings and attorneys' fees) incurred by such prevailing party or parties, including, without limitation, all attorneys' fees and related costs of enforcement of any such judgment or award and upon any appeal relating thereto.  The term "prevailing party" means the party obtaining substantially the relief sought, whether by compromise, settlement, or judgment.  The provisions of this paragraph shall survive the Closing or the earlier termination of this Agreement.

12.3    Authority.  With the intent to be legally bound, each of the undersigned hereby covenants and acknowledges that he, she, or it (a) has read each of the terms set forth herein, (b) has the authority to execute this Agreement for such person or entity, and (c) expressly consents and agrees that the person or entity upon behalf of which the undersigned is acting, is bound by all terms and conditions contained herein.

12.4    Successors and Assigns.  (a) Except as hereinafter provided, Buyer shall not assign or transfer this Agreement, or any right or obligation hereunder, without the prior written consent of Lender; (b) Buyer agrees and consents to any sale or transfer by Lender, at any time, of Lender's rights and obligations hereunder to one or more assignee or transferee, whether related or unrelated to Lender.  Buyer agrees that any such assignee or transferee may enforce its rights and interests under this Agreement irrespective of any personal claims or defenses which Buyer may have against Lender; and (c) subject to the foregoing, the provisions of this Agreement is binding upon and inure to the benefit of, each of the parties hereto, and their respective successors in interest, assigns, heirs, and personal representatives.

12.5    Headings.  The section and paragraph headings set forth in this Agreement are inserted solely for the convenience of reference and are not a part of, and are not intended to govern, limit, or aid in the construction or interpretation of, any term or provision hereof.

12.6    Time.  Time is, and shall be, of the essence of each and every provision of this Agreement.

BN 31283638v5

**090**

12.7    Governing Law; Jurisdiction; Venue.  This Agreement is and shall be governed by and construed in accordance with the laws of the State of California.  Any litigation arising out of this Agreement shall be commenced in the Superior Court in the County of Los Angeles, State of California.

12.8    Neutral Interpretation.  This Agreement is the product of negotiations of the parties hereto, and in the enforcement or interpretation hereof is to be enforced and interpreted in a neutral manner, and any presumption with regard to construction or interpretation for or against any party by reason of that party having drafted, or caused to be drafted, this Agreement, or any portion thereof, shall not be effective in regard to the interpretation hereof.

12.9    Entire Agreement.  This Agreement, and any documents attached as exhibits or executed in connection herewith, constitute the parties' entire agreement with respect to the subject matter hereof, and supersede all agreements, representations, warranties, statements, promises, and understandings, whether oral or written, with respect to the subject matter herewith.  This Agreement may not be amended, altered, or modified except by a writing signed by all parties.

12.10   Counterparts.  This Agreement may be executed in two or more counterparts, each of which is deemed an original, but all of which together constitute one and the same instrument.  Facsimile or electronic signatures may be accepted as original signatures.

12.11   Execution of Additional Documents.   The parties and their agents or representatives agree to sign any and all documents reasonably necessary in order to carry out the purpose, intent, and effect of this Agreement.

12.12   WAIVER OF RIGHT TO TRIAL BY JURY; JUDICIAL REFERENCE IN THE EVENT OF JURY TRIAL WAIVER UNENFORCEABILITY.   EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (1) ARISING UNDER THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (2) IN ANY WAY CONNECTED WITH, OR RELATED OR INCIDENTAL TO, THE DEALINGS OF THE PARTIES HERETO, OR ANY OF THEM, WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY.  NOTWITHSTANDING THE FOREGOING TO THE CONTRARY, IN THE EVENT THAT THE JURY TRIAL WAIVER CONTAINED HEREIN SHALL BE HELD OR DEEMED TO BE UNENFORCEABLE, EACH PARTY HERETO HEREBY EXPRESSLY AGREES TO SUBMIT TO JUDICIAL REFERENCE ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION ARISING HEREUNDER FOR WHICH A JURY TRIAL WOULD OTHERWISE BE APPLICABLE OR AVAILABLE.  PURSUANT TO SUCH JUDICIAL REFERENCE, THE PARTIES AGREE TO THE APPOINTMENT OF A SINGLE REFEREE,

AND SHALL USE THEIR BEST EFFORTS TO AGREE ON THE SELECTION OF A REFEREE. IF THE PARTIES ARE UNABLE TO AGREE ON A SINGLE REFEREE, A REFEREE SHALL BE APPOINTED BY THE COURT TO HEAR ANY DISPUTES HEREUNDER IN LIEU OF ANY SUCH JURY TRIAL. EACH PARTY ACKNOWLEDGES AND AGREES THAT THE APPOINTED REFEREE SHALL HAVE THE POWER TO DECIDE ALL ISSUES IN THE APPLICABLE ACTION OR PROCEEDING, WHETHER OF FACT OR LAW, AND SHALL REPORT A STATEMENT OF DECISION THEREON; PROVIDED, HOWEVER, THAT ANY MATTERS WHICH WOULD NOT OTHERWISE BE THE SUBJECT OF A JURY TRIAL WILL BE UNAFFECTED BY THIS WAIVER AND THE AGREEMENTS CONTAINED HEREIN. THE PARTIES HERETO AGREE THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARM'S-LENGTH BASIS, WITH BOTH SIDES AGREEING TO THE SAME KNOWINGLY AND BEING AFFORDED THE OPPORTUNITY TO HAVE THEIR RESPECTIVE LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN. ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY AND THE AGREEMENTS CONTAINED HEREIN REGARDING THE APPLICATION OF JUDICIAL REFERENCE IN THE EVENT OF THE INVALIDITY OF SUCH JURY TRIAL WAIVER.

*[Signature Page Follows]*

BN 31283638v5

***092***

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

AUSTIN FINANCIAL SERVICES, INC.:
a Delaware corporation


By: _____

Name: _____

Its: _____


BUYER:


_____
HAIG BAGERDIJIAN

## EXHIBIT A

## LOAN STATUS STATEMENT

BN 31283638v5

*094*

# LOAN STATUS STATEMENT

All information is as of _____:

Principal Balance:  $_____

Accrued and Unpaid Interest (_____ TO _____):  $_____ plus per diem of $_____

Escrow, Reserve and Impound Amounts, if any: $N/A

Fees and costs (including legal fees through _____):  $_____

Total:  $_____

<u>WIRING INSTRUCTIONS</u>

AUSTIN FINANCIAL SERVICES, INC.
11111 SANTA MONICA BLVD. SUITE 1000
LOS ANGELES, CA 90025-9823

ROUTING #_____
ACCOUNT #_____
REF: _____
ATTN: _____

A-2

**EXHIBIT B**

**ASSIGNMENT OF LOAN DOCUMENTS**

BN 31283638v5

## ASSIGNMENT OF LOAN DOCUMENTS

THIS ASSIGNMENT OF LOAN DOCUMENTS ("Assignment") is made_____, 20___, by AUSTIN FINANCIAL SERVICES, INC., a Delaware corporation ("Assignor"), to HAIG BAGERDIJIAN, an individual ("Assignee").

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby sell, transfer, and assign to Assignee, all of Assignor's right, title, and interest in and to the documents (except as provided in the Loan Sale Agreement dated as of November ___, 2017 (the "Loan Sale Agreement")) instruments, and agreements listed on Schedule 1, attached hereto and incorporated herein by this reference (collectively, the "Loan Documents") free and clear of all liens, security interests or other encumbrances in accordance with, and subject to, the terms of that certain Loan Sale Agreement dated as of _____, 20___, by and between Assignor and Assignee (the "Loan Sale Agreement").  It is the intention of Assignor to transfer and assign to Assignee any and all right, title, interest, benefits, obligations, and duties held, or that may be held, by Assignor in, to, and under the Loan Documents and the loan evidenced thereby.  The Assignment made by Assignor hereby is made "AS IS, WHERE IS, AND WITH ALL FAULTS, DEFICIENCIES, AND DEFECTS, LATENT OR PATENT, KNOWN OR UNKNOWN" (except as provided in the Loan Sale Agreement).   All such terms and conditions of the Loan Sale Agreement are incorporated herein by this reference as if set forth in full.

IN CONNECTION THEREWITH, Assignee hereby accepts the foregoing Assignment and hereby assumes all of the duties, obligations, and liabilities of Assignor under, and with respect to, the Loan Documents arising from and after the date of the Closing (as defined in the Loan Sale Agreement).

*[Signatures on Next Page]*

2

BN 31283638v5

*097*

IN WITNESS WHEREOF, Assignor and Assignee have duly executed this Assignment of Loan Documents to be effective as of the date first above written.

ASSIGNOR:

AUSTIN FINANCIAL SERVICES, INC.,
a Delaware corporation


By: _____
Name: _____
Its: _____


ASSIGNEE:


_____
HAIG BAGERDIJIAN

3

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
22287 Mulholland Hwy., #318
Calabasas, CA 91302

A true and correct copy of the foregoing document entitled: **NOTICE OF MOTION FOR** (*specify name of motion*)
 APPROVING POST-PETITION FINANCING AND RELATED LIENS AND ADEQUATE PROTECTION;
 (2) APPROVING CASH COLLATERAL USE AND RELATED LIENS AND ADEQUATE PROTECTION; ETC.
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
11/22/2017   , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*)  11/22/2017   , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Judge Brand, US Bankruptcy Court, 255 E Temple Street, Suite 1382, Los Angeles, CA 90012
Attached list of 20 largest unsecured creditors and secured creditors per separate proof of service by mailing service

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*)            , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 11/22/2017 | Lewis R. Landau | /s/ Lewis R. Landau |
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

| | |
|---|---|
| In re: Point.360, a California corporation<br><br>Debtor(s). | CHAPTER: 11<br><br>CASE NUMBER: 2:17-bk-22432 WB |

**ADDITIONAL SERVICE INFORMATION (if needed):**

NEF Service List (category I):

William S Brody on behalf of Creditor Austin Financial Services, Inc.
wbrody@buchalter.com, dbodkin@buchalter.com;IFS_filing@buchalter.com

Sara Chenetz on behalf of Interested Party Sara L. Chenetz
schenetz@perkinscoie.com, dlax@perkinscoie.com;cmallahi@perkinscoie.com

Peter A Davidson on behalf of Interested Party Courtesy NEF
pdavidson@ecjlaw.com, lpekrul@ecjlaw.com

Brian T Harvey on behalf of Creditor Austin Financial Services, Inc.
bharvey@buchalter.com, IFS_filing@buchalter.com;dbodkin@buchalter.com

Lewis R Landau on behalf of Debtor Point.360, a California Corporation
Lew@Landaunet.com

Alvin Mar on behalf of U.S. Trustee United States Trustee (LA)
alvin.mar@usdoj.gov

Shane J Moses on behalf of Interested Party Courtesy NEF
smoses@ml-sf.com, csnell@ml-sf.com

Lisa Seabron on behalf of Creditor WRI West Gate South, L.P.
lseabron@weingarten.com

Ronald A Spinner on behalf of Creditor Softitler dba Deluxe Localization Sfera
spinner@millercanfield.com

United States Trustee (LA)
ustpregion16.la.ecf@usdoj.gov

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                                           F 9013-3.1

Rolf Woolner
Winston & Strawn LLP
333 S Grand Ave Fl 38
Los Angeles, CA 90071

Los Angeles County Treas/Tax Coll
PO Box 54110
Los Angeles, CA 90054-0110

United Healthcare Ins. Co
Judy Eastin
Dept. 6940
Los Angeles CA 90084

William Gould
TROY GOULD PC
1801 Century Park East, #1600
Los Angeles, CA 90067

Sony Electronics Inc
Victoria Jaime
One Sony Drive
Park Ridge, NJ 07656

Signiant, Inc.
Attn: Finance
91 Hartwell Ave., 2nd Fl
Lexington, MA 02421

Eric Smith
Monteleone and McCrory LLP
725 S Figueroa St Ste 3200
Los Angeles, CA 90017

Sfera Lab LLC
Joanna Blei
2400 W. Empire Ave
Burbank, CA 91503

Susquehanna Commercial Fin., Inc.
2 Country View Road, Suite 300
Malvern, PA 19355

Christopher B. Wick
Hahn Loeser & Parks LLP
200 Public Square, Suite 2800
Cleveland, OH  44114-2316

Ivan Gold
Allen Matkins et al
3 Embarcadero Ctr 12FL
San Francisco, CA 94111

California Physicians' Service
dba Blue Shield of California
c/o Maryann Lagura
50 Beale Street, 22nd Floor
San Francisco, CA 94105

WILCON
Glenn Nieves
624 S. Grand Ave., Suite 2500
Los Angeles CA 90017

Sub-Tech Localization Svs.
Jeremy Stewart
345 Gulf Stream Way
Costa Mesa, CA 92627

Sohonet, Inc.
Saundra Dunbar
12950 Culver Blvd., Suite 100A
Los Angeles, CA 90066

Sfera Studios LLC
Joanna Blei
2400 W. Empire Ave
Burbank, CA 91503

AFCO
Steven Nelson
4501 College Blvd, Suite 320
Leawood, KS 66211

Wells Fargo Financial Services LLC
PO Box 35701
Billings MT 59107

U.S. Bank, N.A. d/b/a
U.S. Bank Equipment Finance
1310 Madrid Street
Marshall, MN 56258

REEP-OFC 2300 Empire CA LLC
c/o Agent CT Corporation
Vivian Imperial
818 W Seventh St, Ste 930
Los Angeles, CA 90017

Leafs Properties, LP
Bridget Kotz
1333 Camino Del Rio S., # 310
San Diego, CA 92108

Media Storage Group
Eric Johnson
3759 Cahuenga Blvd.
Studio City CA 91604

Zayo Group
Al Ruiz
1821 30th Street Unite A
Boulder, CO 80301

American Express
c/o Becket and Lee LLP
PO Box 3001
Malvern PA 19355-0701

Acco Engineered Systems
6265 San Fernando Road
Glendale, CA 91201

La Media Center Owners Assoc.
Manager
PO Box 697
Camarillo, CA 93011

EPlus Technology, Inc.
13595 Dulles Technology Dr.
Herndon, VA 20171

De Lage Landen Financial Serv, Inc.
1111 Old Eagle School Road
Wayne PA 19087