# EXHIBIT A

EXECUTION VERSION

## SALE AGREEMENT PURSUANT TO ARTICLE 9 OF THE UNIFORM COMMERCIAL CODE

This Sale Agreement Pursuant to Article 9 of the Uniform Commercial Code (this "**Agreement**") is entered into as of July 8, 2015, by and among Point.360, a California corporation ("**Buyer**"), Medley Capital Corporation, a Delaware corporation (in its individual capacity, "**Medley**"), as administrative agent and collateral agent for the Lenders (in such capacity, the "**Agent**" or "**Seller**"), Medley Opportunity Fund II LP, a Delaware limited partnership ("**MOF II**"), Congruent Credit Opportunities Fund II, LP ("**Congruent**"), and Main Street Equity Interests, Inc., a Delaware corporation, ("**Main Street,**" and together with MOF II, Congruent and Medley, the "**Lenders**") and Haig Bagerdjian ("**HB**").

## RECITALS

**WHEREAS**, pursuant to that certain Credit Agreement, dated as of September 25, 2012 (as heretofore or hereafter amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among Modern VideoFilm, Inc., a Delaware corporation ("**MVF**"), as the borrower thereunder ("**Borrower**"), MVF Wordwide Services, LLC, a Delaware limited liability company ("**MVF Worldwide**"), MOCA Services, LLC, a Delaware limited liability company ("**MOCA**"), Modern VideoFilm – GA, LLC, a Delaware limited liability company ("**MVF-GA**"),  and Modern VideoFilm – LA, LLC, a Delaware limited liability company ("**MVF-LA**," and together with MVF, MVF Worldwide, MOCA, MVF-GA and MVF-LA, the "**Loan Parties**"), Agent and the Lenders, (as well as certain other documents, instruments and agreements executed pursuant thereto or in connection therewith (together with, and as defined in, the Credit Agreement, the "**Loan Documents**"), Agent and Lenders made loans to, and made other financial accommodations to or for the benefit of, Borrower (all such loans and other financial accommodations being herein referred to collectively as the "**Loans**"). The Loans and all other liabilities and obligations of Borrower and the other Loan Parties owing to Agent and Lenders under the Credit Agreement and other Loan Documents, howsoever created, arising or evidenced (as further defined in the Credit Agreement, the "**Obligations**"), are secured by properly perfected liens on and security interests in substantially all assets of the Loan Parties and properties granted in favor of Agent (for the benefit of itself and the Lenders). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Credit Agreement;

**WHEREAS**, as a result of the occurrence and continuance of numerous Events of Default under the Credit Agreement (all such continuing Events of Default, the "**Existing Defaults**"), Agent and Lenders have determined, and the Loan Parties have not contested, that the Lenders are entitled under the Uniform Commercial Code, as adopted in the State of New York, and solely to the extent applicable to the transactions contemplated hereby, as adopted in other states (collectively, the "**UCC**"), and specifically Sections 9-610 through 9-619 and 9-623 through 9-628 of the UCC, the Loan Documents and other applicable law, to sell and transfer to any natural person, corporation, partnership or association or entity ("**Person**") for value all of the Loan Parties' right, title and interest in and to the Purchased Assets (as defined below) in one or more sales pursuant to Article 9 of the UCC; and

**WHEREAS**, based on the foregoing, Agent, on behalf and at the direction of the Lenders, desires to sell, transfer and deliver to Buyer, and Buyer desires to acquire from Agent, on behalf and at the direction of the Lenders, for value in a private sale pursuant to Sections 9-610 through 9-619 and 9-623 through 9-628 of the UCC and on the terms and conditions hereinafter set forth, all of the Loan Parties' right, title and interest in and to the Purchased Assets (as hereinafter defined), which shall be surrendered by the Loan Parties to Buyer at the Closing (as hereinafter defined) free and clear of all liens of the Agent and all liens subordinate to the liens of Agent, in each case by operation of, and to the fullest extent permitted in, Section 9-617 of the UCC.

**NOW, THEREFORE**, in consideration of the foregoing, and other good and valuable consideration, the receipt of which hereby is acknowledged, the parties hereto hereby agree as follows:

## ARTICLE 1
## PURCHASE AND SALE OF PURCHASED ASSETS

**1.1    Purchase and Sale of Purchased Assets**.  Subject to the terms and conditions of this Agreement, at the Closing (as defined in <u>Section 5.1</u> below), pursuant to Sections 9-610 through 9-619 and 9-623 through 9-628 of the UCC, the Loan Documents and other applicable law, Agent, on behalf of and at the direction of the Lenders, shall sell, deliver, assign and transfer to Buyer, and Buyer shall purchase, acquire and take assignment of, all of the Loan Parties' right, title and interest in and to all of the assets of MVF and the Loan Parties other than those assets listed in <u>Schedule l.1</u> (the "**Excluded Assets**"), on an "as is, where is" basis to the fullest extent Agent can transfer such right, title and interest pursuant to the UCC, including UCC Section 9-610 (such assets, the "**Purchased Assets**"), whereupon Agent's liens and security interests in the Purchased Assets and all liens subordinate to the Agent's liens on the Purchased Assets will be discharged by operation of, and to the fullest extent provided in, the UCC, including UCC Section 9-617.  Following the Closing, Buyer shall have the right to sell any Purchased Asset which Buyer determines, in its sole discretion, is not needed for continuing operations relating to the Purchased Assets, and Buyer shall retain all consideration received by Buyer in connection with any such sale.  Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign, sell or transfer any contract or any other asset that is not assignable or transferrable without the consent of any Person to the extent that such consent shall not have been given prior to the Closing (the "**Unassigned Assets**"), and any such Unassigned Asset shall not be a Purchased Asset under this Agreement; <u>provided</u>, that the Seller shall assign its freely assignable rights under such Unassigned Assets.  The Purchased Assets shall include $200,000 of the Loan Parties' cash (the "**Purchased Cash**"), which shall be wired to the Buyer no later than the business day following the Closing Date.  Within ten days following the Closing Date, Seller shall obtain from the Loan Parties, and deliver to Buyer, a schedule setting forth the Purchased Assets with a value of $25,000 or more (the "**Material Assets**") and a written certification (the "**Asset Certification**") providing that the Loan Parties owned such Material Assets immediately prior to the Closing Date, that such Material Assets were included in the Purchased Assets and the location of such Material Assets.  Buyer and Seller agree that the Material Assets shall constitute Purchased Assets, it being understood that the Seller and Buyer are entitled to rely on the Asset Certification.  Within five days after the Closing, Seller shall cause the Loan Parties to transfer title to the vehicles owned by the Loan

Parties to the Buyer, it being understood that such vehicles constitute Purchased Assets and that there are at least seven of such vehicles.

**1.2    Limited Assumption of Liabilities.**    At the Closing, Buyer shall assume, discharge and perform and be solely liable for the liabilities of the Loan Parties described in Schedule 1.2 (the "**Assumed Liabilities**").  With the exception of those certain liabilities more particularly described in Schedule 1.2, Buyer shall not assume or be liable for any debts, obligations or liabilities of Seller or any of the Loan Parties, whether related to the Purchased Assets or to the Loan Parties' other assets and whether known or unknown, including, but not limited to, payroll, related benefits, or any accounts payable related to periods prior to the Closing, except for paid time off (including, without limitation, accrued vacation) owed to former MVF employees employed by Buyer in connection with the Closing (the "**Hired Employee**") to the extent (i) accrued and unused as of the Closing Date and (ii) such Hired Employees have not requested such paid time off to be paid by MVF ("**PTO**").  Buyer shall not advise or encourage any Hired Employee to request paid time off to be paid by MVF and shall not waive, amend, modify or terminate any provision of an offer letter executed by a Hired Employee ("**Offer Letter**") related to paid (personal) time off.  If requested by Seller, Buyer shall provide Offer Letters to Seller. For purposes of clarity, Buyer shall not assume any liability or obligation for paid time off of employees of the Loan Parties who have not agreed that such paid time off shall be assumed by the Buyer.

**1.3    Purchase Price.**  In consideration for the sale and transfer of the Purchase Assets to Buyer, on the Closing Date (as defined in Section 5.1 below), in full payment for all right, title and interest of Seller in the Purchased Assets, Buyer shall issue to Lenders (i) 2,000,000 shares (the "**Common Shares**") of common stock of Buyer ("**Common Stock**"), and (ii) a five-year warrant (the "**Warrant**", and together with the Common Shares, the "**Consideration**"), substantially in the form attached hereto as Exhibit A, to purchase 800,000 shares (the "**Warrant Shares**", and together with the Common Shares, the "**Shares**") of Common Stock at an exercise price of $0.75 per share.  The Common Shares and Warrant Shares will be allocated to Lenders as set forth on Schedule 1.3. Buyer and Seller have determined that the fair market value of the Consideration is $4,177,585.40.  Buyer shall provide to the Lenders evidence of the issuance of the Common Shares to the Lenders no later than the business day following the Closing.

**1.4    Taxes.**  Seller shall be liable for the payment of any and all sales and use taxes arising out of the transfer of the Purchased Assets to Buyer.  Buyer agrees to reasonably cooperate with Seller to the extent reasonably requested by Seller to minimize sales and use taxes in connection with the transactions contemplated by this Agreement; provided, that Buyer shall not be required to incur any out-of-pocket expense in connection with such compliance unless Seller agrees to promptly reimburse Buyer for such expense.

**1.5    Allocation of Purchase Price**.  Within 90 days following the Closing Date, Seller shall prepare and deliver to Buyer a schedule setting forth an allocation of the Consideration among the Purchased Assets as of Closing (the "**Allocation**"), in accordance with Section 1060 of the Internal Revenue Code and the Treasury regulations promulgated thereunder.  Upon receipt of the Allocation, Buyer shall have 30 days to review the Allocation.  If Buyer disagrees with any aspect of the Allocation, the parties shall have 45 days to resolve their differences.  If the parties are unable to resolve their differences within that time period, each party shall be

entitled to apply its own allocation of the purchase price for tax purposes.  If Buyer and Seller agree on the Allocation, then Buyer and Seller shall prepare and file tax returns on a basis consistent with the Allocation.  Buyer and Seller shall timely file all forms and tax returns required to be filed in connection with the Allocation.

      **1.6**    **Compliance with UCC**.  It is the express intent of the parties hereto that the sale of the Purchased Assets contemplated hereby be consummated pursuant to all applicable sections of the UCC, including Sections 9-610 through 9-619 and 9-623 through 9-628 of the UCC.  To the extent not waived in writing to the satisfaction of the Agent and Buyer, Agent, on behalf of the Lenders, shall send notices with respect to the UCC sale contemplated hereby to (i) any secondary obligor (as defined in the UCC), (ii) any Person from whom Agent or any Lender has received before the notification date (as defined in Section 9-611(a) of the UCC) an authenticated notification of a claim of an interest in the Purchased Assets, (iii) any secured party or lienholder pursuant to Sections 9-611(c)(3)(B) (by compliance with Sections 9-611(e)) and 9-611(c)(3)(C) the UCC and (iv) the Loan Parties.

## ARTICLE 2
## SELLER'S REPRESENTATIONS AND WARRANTIES

      Except as set forth in the disclosure letter that has been prepared by Seller and delivered to Buyer in connection with the execution and delivery of this Agreement (it being agreed that any disclosures made therein shall apply to any other section or subsection without repetition where it is clear, upon a reading of such disclosure without any independent knowledge on the part of the reader regarding the matter disclosed that the disclosure is relevant to such other section or subsection), Seller represents and warrants to Buyer as of the date hereof and as of the Closing Date as follows:

      **2.1**    **Organization and Good Standing**.  Seller is a corporation, duly incorporated, validly existing and in good standing under the laws of the State of Delaware.  Seller has power and authority on behalf and at the direction of the Lenders to (i) sell all of the Loan Parties' right, title and interest in and to all of the Purchased Assets to the fullest extent Seller can transfer such right, title and interest pursuant to UCC Section 9-610, (ii) execute and deliver this Agreement and the other transaction documents to which it is a party, and (iii) carry out all of the actions required of it pursuant to the terms of this Agreement and the other transaction documents to which it is a party.

      **2.2**    **Authority.**  Seller has the full right, power and authority to execute and deliver this Agreement on behalf of itself and on behalf of each Lender, to bind each Lender to the terms of this Agreement, and to consummate the transactions contemplated hereby.  All acts and other proceedings required to be taken by Seller in order to enable it to carry out this Agreement and the transactions contemplated hereby have been taken or will be taken prior to the Closing.

      **2.3**    **Binding Effect.**  This Agreement has been duly executed and delivered by Seller and, assuming all of the representations and warranties in Article 3 are correct, constitutes a legal, valid and binding obligation of Seller, enforceable in accordance with its terms.

**2.4**   **No Breach.**   Neither the execution and delivery of this Agreement by Seller nor the consummation of any transaction contemplated hereby by Seller will (i) violate any law, regulation, judgment or order applicable to Seller, (ii) result in the acceleration of obligations, breach or termination of, or constitute a default under, any loan agreement, charter document, lease, deed of trust or other agreement to which Seller is subject, or (iii) result in the creation of any lien or other encumbrance upon any of the Purchased Assets other than those caused by Buyer.

**2.5**   **Ownership of Assets.**   Except as set forth on Schedule 2.5(a), Agent, for the benefit of itself and the Lenders, has a valid, enforceable and first priority properly perfected security interest in the Purchased Assets in which a security interest may be perfected by filing a UCC-1 financing statement(s) in the appropriate jurisdiction(s) for perfecting such interests. Seller has a perfected, valid and enforceable first-priority security interest in the Purchased Assets.  Seller has furnished to Buyer true, correct and complete copies of the Guaranty and Security Agreement and all other agreements, including all amendments thereto, and documents related thereto, including, but not limited to, all financing statements filed in connection with Seller's first-priority security interest in the Assets.  The delivery to Buyer of the instruments of transfer of ownership contemplated by this Agreement will vest good and marketable title to the Purchased Assets in Buyer, free and clear of all liens, security interests and other claims and encumbrances other than those caused by Buyer.

**2.6**   **Foreclosure Sale.**   Seller, on behalf of the Lenders, has complied, or will comply, with all relevant provisions of the UCC, including Sections 9-610 through 9-619 and 9-623 through 9-628 of the UCC, to transfer the Loan Parties' right, title and interest in and to the Purchased Assets to Buyer in accordance with the provisions of this Agreement.  To the extent not waived in writing to the satisfaction of Seller and Buyer, Seller has sent, or will send, notices with respect to the UCC sale contemplated hereby to (i) any secondary obligor (as defined in the UCC), (ii) any Person from whom the Seller has received before the notification date (as defined in Section 9-611(a) of the UCC) an authenticated notification of a claim of an interest in the Purchased Assets, (iii) any secured party or lienholder pursuant to Sections 9-611(c)(3)(B) (by compliance with Sections 9-611(e)) and 9-611(c)(3)(C) of the UCC and (iv) each of the Loan Parties, which notices represent all notices required to be sent under the UCC in connection with the transfer described in this Section 2.6.

**2.7**   **Litigation.**   Except as set forth on Schedule 2.7, there is no litigation, arbitration, investigation or other proceeding pending or threatened against Seller or any of the Purchased Assets which could, following the Closing, cause Buyer to not own each of the Purchased Assets free and clear of all liens, security interests or other claims or encumbrances.

**2.8**   **Finders and Brokers.**   Other than Deloitte, no Person has acted as a finder, broker or other intermediary on behalf of Seller in connection with this Agreement.  Other than Deloitte, no Person is entitled to any broker's or finder's fee or similar fee with respect to this Agreement or such transactions as a result of actions taken by Seller.  All obligations to Deloitte will be the responsibility of Seller.

**2.9     Employees.**  Seller has furnished to Buyer prior to the date hereof a true, correct and complete list of all employees of MVF, together with such persons' job titles, annual vacation, current compensation and years of service.

**2.10     Fraudulent Conveyance**.    Seller has not entered into this Agreement or transactions set forth herein with the intent to defraud any creditor of the Loan Parties.

**2.11     Investment Representations**. Seller and each Lender represents and warrants to Buyer as to itself that it (i) is an "accredited investor" as that term is defined by Rule 501(a) of the Securities Act of 1933, as amended (the "**Securities Act**"), (ii) is a sophisticated investor for purposes of applicable United States federal and state securities laws and regulations, and (iii) has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Shares.  Seller and each Lender confirms that Buyer has made available to Seller and such Lender and its agents the opportunity to ask questions of the officers and management employees of Buyer as well as access to the documents, information and records of Buyer and to acquire additional information about the business and financial condition of Buyer.  Seller and each Lender is acquiring the Shares for investment and not with a view toward, or for sale in connection with, any distribution thereof, or with any present intention of distributing or selling the Shares.  Seller and each Lender understands and agrees that the Shares may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act, except pursuant to an exemption from such registration available under the Securities Act, and without compliance with state, local and foreign securities laws, in each case, to the extent applicable. Seller and each Lender represents and warrants that it is able to bear the economic risk of an investment in the Shares for an indefinite period of time.

**2.12     PTO; Employees**.  Seller has furnished to Buyer a schedule containing a true and correct representation of the paid time off obligations of the Loan Parties to employees as of the Closing.  Other than claims by Moshe Barkat and Hugh Miller, Seller is not aware of any legal actions pending or threatened in writing by current or former employees of MVF against MVF.

**2.13     Legend.**  Seller and each Lender acknowledges and agrees that any certificate or instrument representing the Shares and the Warrant shall be imprinted with a legend in substantially the following form:

> "The securities represented by this certificate have not been registered under the securities act of 1933, as amended (the 'Securities Act'), or applicable state securities laws, and have not been approved or disapproved by the securities and exchange commission or any state regulatory authority.  The securities represented by this certificate may not be offered or sold in the absence of an effective registration statement under the securities act and any applicable state securities laws unless an exemption from such registration is available."

**2.14     Exclusivity of Representations**.    The representations and warranties made by Seller in this Section 2 are the sole and exclusive representations, warranties and statements made by Seller and the Lenders with respect to MVF, MVF's subsidiaries, their business

(including assets, liabilities, financial condition and otherwise), the Assets, the Purchased Assets and/or the Assumed Liabilities.  Seller and the Lenders hereby disclaim any other express or implied representations, warranties or statements.  Buyer acknowledges and agrees that it has not relied on any statements, information, representations or warranties regarding MVF, MVF's subsidiaries, their business (including assets, liabilities, financial condition and otherwise), the Assets, the Purchased Assets and/or the Assumed Liabilities except those representations and warranties expressly set forth in this <u>Section 2</u>.

**ARTICLE 3**
**BUYER'S REPRESENTATIONS AND WARRANTIES**

Except (a) as set forth in the disclosure letter that has been prepared by Buyer and delivered to Seller in connection with the execution and delivery of this Agreement (it being agreed that any disclosures made therein shall apply to any other section or subsection without repetition where it is clear, upon a reading of such disclosure without any independent knowledge on the part of the reader regarding the matter disclosed that the disclosure is relevant to such other section or subsection), or (b) as disclosed in publicly available Buyer SEC Documents filed with or furnished to, as applicable, the Securities and Exchange Commission ("**SEC**") prior to the date of this Agreement, Buyer represents and warrants to Seller and the Lenders as of the date hereof and as of the Closing Date as follows:

3.1     **Organization and Good Standing.**  Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of California.

3.2     **Authority.**  (i) Buyer has the full right, power and authority to execute and deliver this Agreement and the Warrant, and to consummate the transactions contemplated hereby and under the Warrant, including issuance of the Shares, and (ii) all acts and other proceedings required to be taken by Buyer in order to enable it to carry out this Agreement and the Warrant, and the transactions contemplated hereby and thereby have been taken, including issuance of the Shares.

3.3     **Binding Effect.**  This Agreement and the Warrant have been duly executed and delivered by Buyer and, assuming all of the representations and warranties in <u>Article 2</u> are correct, constitutes its legal, valid and binding obligation, enforceable in accordance with their terms.

3.4     **Shares**.  When issued to Lenders, the Common Shares and the Warrants Shares (as to the Warrant Shares, when issued upon exercise of the Warrant in accordance with the terms of the Warrant), will be validly issued, fully paid, and nonassessable, and Lenders will have good title to the Common Shares and the Warrant Shares, free and clear of any liens, mortgages, pledges, security interests and other encumbrances.

3.5     **Finders and Brokers.**  No Person has acted as a finder, broker or other intermediary on behalf of Buyer in connection with this Agreement or the transactions contemplated hereby, and no Person is entitled to any broker's or finder's fee or similar fee with respect to this Agreement or such transactions as a result of actions taken by Buyer.

**3.6** **No Breach.** Except as set forth on Schedule 3.6, neither the execution and delivery of this Agreement or the Warrant by Buyer nor the consummation of any transaction contemplated hereby or thereby by Buyer will (i) violate any law, regulation, judgment or order applicable to Buyer, (ii) result in the acceleration of obligations, breach or termination of, or constitute a default under, any loan agreement, charter document, lease, deed of trust or other agreement to which Buyer is subject, or (iii) result in the creation of any lien or other encumbrance upon any of the Purchased Assets.

**3.7** **Litigation.** Except as set forth on Schedule 3.7, there is no litigation, arbitration, investigation or other proceeding pending or threatened against Buyer which could, following the Closing, cause Buyer to not own each of the Purchased Assets free and clear of all liens, security interests or other claims or encumbrances.

**3.8** **Capitalization.** The authorized capital stock of Buyer consists of 50,000,000 shares of Common Stock, no par value, and 5,000,000 shares of Preferred Stock, no par value. There are 10,536,906 shares of Common Stock issued and outstanding, and no other shares of capital stock of Buyer are issued and outstanding, and no shares of capital stock are held in treasury or owned by a subsidiary of Buyer. All the outstanding capital stock of Buyer has been duly authorized, validly issued, and are fully paid and non-assessable. As further described in the Buyer SEC Documents, the Buyer implemented a stock rights program, pursuant to which stockholders of record on August 7, 2007, received a dividend of one right to purchase for $10 one one-hundredth of a share of a newly created Series A Junior Participating Preferred Stock. The rights are attached to the Common Stock and will also become attached to shares of Common Stock issued subsequent to August 7, 2007. The rights will not become exercisable until the occurrence of a triggering event (as defined). The rights will expire on August 6, 2017 and are redeemable at $0.0001 per right.

(b)     Other than this Agreement, equity-based awards to employees, officers, directors, or consultants, and as disclosed in the Buyer SEC Documents (as defined in Section 3.11), there are no outstanding subscriptions, options, rights, warrants, equity-based or equity-related awards, convertible, exercisable or exchangeable securities, or other agreements or commitments obligating Buyer to issue, grant, award, purchase, acquire, sell or transfer any capital stock or other equity interests.

(c)     All the outstanding equity interests in each of Buyer's subsidiaries are owned directly or indirectly by Buyer.

**3.9** **No Conflicts**. The execution, delivery and performance of this Agreement by Buyer and consummation of the transactions contemplated by this Agreement will not:  (a) conflict with the organizational or governing documents of Buyer; or (b) require any action by (including any authorization, consent or approval) or in respect of (including notice to), any Person under any Contract of Buyer or its subsidiaries.

**3.10** **Governmental Consents.** No consent, approval or authorization of, or designation, declaration or filing with, any court or nation or government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government (including any government authority,

agency, department, board, commission or instrumentality of the United States, any State of the United States or any political subdivision thereof), or any tribunal or arbitrator(s) of competent jurisdiction, or any self-regulatory organization ("**Governmental Authority**") is required on the part of Buyer in connection with the execution, delivery and performance of this Agreement by Buyer or consummation of the transactions contemplated by this Agreement by Buyer.**SEC Documents; Financial Statements**.

(a)    Buyer has timely filed with, or furnished (on a publicly available basis) to the SEC, substantially all forms, schedules, documents, statements and reports required to be filed by Buyer with the SEC since January 1, 2014 (the forms, documents, statements and reports filed with the SEC since January 1, 2014 and those filed with the SEC since the date of this Agreement, if any, including any amendment thereto (including any registration statements), the "**Buyer SEC Documents**").  As of their respective dates, the Buyer SEC Documents (other than preliminary materials) complied in all material respects with the requirements of the Securities Act or the United States Securities Exchange Act of 1934 (the  "**Exchange Act**"), as the case may be, and the rules and regulations of the SEC thereunder applicable to such Buyer SEC Documents and none of the Buyer SEC Documents, at the time of filing or being furnished, contained any untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statement therein, in light of the circumstances under which they were made, not misleading, except to the extent such statements have been modified or superseded by later Buyer SEC Documents filed or furnished and publicly available prior to the date of this Agreement.

(b)    The consolidated financial statements of Buyer included or incorporated by reference in the SEC Documents, including the related notes and schedules complied as to form in all material respects with the applicable accounting requirements and the published rules and regulations of the SEC with respect thereto, have been prepared in accordance with U.S. generally accepted accounting principles ("**GAAP**") applied on a consistent basis during the period involved (except as may be indicated in the notes thereto, or, in the case of the unaudited statements, as permitted by Rule 10-01 of Regulation S-X under the Exchange Act) and fairly presented, in all material respects, in accordance with applicable requirements of GAAP and the applicable rules and regulations of the SEC (subject, in the case of the unaudited statements, to normal, recurring adjustments, none of which are material), the consolidated financial position of Buyer and its subsidiaries, taken as a whole, as of the respective dates.

(c)    Buyer is not a party to nor has any commitment to become a party to, any joint venture, off-balance sheet partnership or any similar contract or arrangement (including any contract relating to any transaction or relationship Buyer on the one hand, and any unconsolidated affiliate of Buyer, including any structured finance, special purpose or limited purpose entity or Person, on the other hand, or any "off balance sheet arrangements" (as defined in Item 303(a) of Regulation S-K of the SEC)), where the result, purpose or effect of such contract is to avoid disclosure of any material transaction involving, or material liabilities of, Buyer in Buyer's audited financial statements or other Buyer SEC Documents.

(d)    To the extent required by any and all domestic (federal, state or local) or foreign laws, rules, regulations, orders, judgments or decrees promulgated by any Governmental Authority, Buyer has established and maintains a system of "internal controls over financial

reporting" (as defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) that is sufficient to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

3.12    **Transactions with Affiliates**.  Except as set forth on Schedule 3.12, neither Buyer nor any direct or indirect subsidiary of Buyer has entered into any contract (oral or written) or transaction with HB or any individual related by blood, marriage or adoption to HB or any entity in which any of the foregoing Persons owns any beneficial interest in (except for ownership of less than 5% of the outstanding common stock of a publicly traded company) (HB and each such persons, an "**Affiliated Person**").  No Affiliated Person owns any property or assets used by Buyer or any of its direct or indirect subsidiaries in connect with their business.  Neither Buyer nor any of its direct or indirect subsidiaries has any liability or obligation to any Affiliated Person.

3.13    **Private Sale**. Based in part upon the representations of the Seller in Article 2 of this Agreement, the Warrant and Shares will be issued in material compliance with all applicable federal and state securities laws.

**ARTICLE 4**
**COVENANTS**

4.1    **Conduct of Business by Buyer Pending the Closing; No Solicitation**.

(a)    Except as otherwise contemplated by this Agreement, from the date hereof and until the Closing, (i) Buyer will conduct its business in the ordinary course consistent with previous practices without any material change in its assets, liabilities and operations with respect to the content management and TV post production services, (ii) Buyer shall use all reasonable efforts to preserve intact its business organization and goodwill, and preserve the goodwill and business relationships with customers and others having business relationships with it, other than as expressly permitted by the terms of this Agreement, and (iii) Buyer shall maintain its books and records in accordance with past practice.

(b)    From the date of this Agreement until the earlier of the Closing or the termination of this Agreement, Buyer shall not (and shall not permit its direct or indirect subsidiaries or representatives to) directly or indirectly: (a) solicit, initiate, or encourage the submission of any proposal or offer relating to, or enter into or consummate any transaction relating to, the acquisition of any equity interests of Buyer or any of its direct or indirect subsidiaries, except for equity-based awards to employees, officers and directors consistent with past practice, or any merger, recapitalization, leveraged dividend, share exchange, sale of substantial assets or any similar transaction or alternative to the transactions contemplated by this Agreement; (b) participate in any discussions or negotiations regarding, furnish any information with respect to, assist or participate in, or facilitate in any other manner, any effort or attempt to do or seek any of the foregoing, or (c) declare or pay any dividend.

(c)    From the date of this Agreement until the earlier of the Closing or the termination of this Agreement, Seller shall not consent to or permit any transaction relating to, the acquisition of any equity interests of MVF or any of its direct or indirect subsidiaries, or any

merger, recapitalization, leveraged dividend, share exchange, sale of substantial assets or any similar transaction or alternative to the transactions contemplated by this Agreement.

**4.2    Board Representation.**

(a)    Buyer's Board of Directors ("**Buyer's Board**") currently consists of five (5) directors.  Subject to the occurrence of the Closing, upon Shareholder Approval (the "**Buyer's Board Expansion Date**"), Buyer's Board shall consist of seven (7) directors, as follows:  (i) HB, Greggory J. Hutchins, Sam P. Bell, G. Samuel Oki and J.R. DeLang, which persons currently serve as members of Buyer's Board; and (ii) two (2) directors designated by Seller (the "**Seller Directors**"), who shall initially be James Frank and James Feeley.  The Seller Directors shall not receive compensation for their service as directors; provided, that the Buyer shall promptly reimburse the Seller Directors for all reasonable and documented out-of-pocket expenses incurred by them in connection with their service as directors.  HB, Medley and MOF II each agree to vote all of their Shares in support of this Section 4.2(a).

(b)    Subject to the occurrence of the Closing, (i) following the Buyer's Board Expansion Date, a super-majority (66 2/3%) vote of Buyer's Board (which shall include the vote of the Seller Directors) and (ii) prior to the Buyer's Board Expansion Date, written consent of Seller shall be required to approve transactions constituting a "reorganization" under the California Corporations Code or any possible change of control transaction to which Buyer or any subsidiary thereof is a party.  A "change of control transaction" shall include, without limitation, any transaction (by stock sale, merger, consolidation or otherwise) whereby any Person or group of Persons acquire 50% or more of the voting securities of Buyer or any sale of all or any material portion of the assets of Buyer or its subsidiaries (including, without limitation, equity interests of Buyer's subsidiaries).

(c)    If on any date after the Closing Date, the Seller and MOF II (together with their affiliate transferees) beneficially own in the aggregate less than 90% of the Common Shares acquired by the Seller and MOF II pursuant to this Agreement, Seller shall no longer be entitled to designate any Seller Directors to Buyer's Board and the Seller Directors shall, upon the written request of Buyer, promptly tender their resignations.   If on any date after the Closing Date, HB beneficially owns less than 90% of the shares of Common Stock owned by him on the date of this Agreement, the Lenders voting obligations under Section 4.2(a) shall terminate and expire.

(d)    From the date of the Closing until the Buyer's Board Expansion Date, Seller may designate one person to attend every Buyer's Board meeting as an unpaid advisor to Buyer's Board, and Buyer shall provide to Seller copies of all information, materials and consents provided to Buyer's Board and reimburse such advisor's reasonable and documented out-of-pocket expenses incurred in connection with his or her attendance at meetings.

**4.3    Buyer Shareholder Approval.**  Buyer shall take all action necessary and within its powers under applicable law to call, give notice of and hold in November 2015 its annual meeting of shareholders (the "**Annual Meeting**") for purposes of obtaining the affirmative vote of the holders of a majority of the outstanding shares of Common Stock to amend Buyer's

Bylaws to increase the authorized number of directors to seven (7) directors ("**Shareholder Approval**") and to elect the Seller Directors to the Board.

4.4    **Stock Options.**  Buyer will not "cash out" any stock options of Buyer outstanding as of the Closing Date in anticipation of, or as a result of, the transactions contemplated herein. Such stock options will remain outstanding in accordance with their terms.  It is expected that Buyer's Board will evaluate an option package for the new management team of Buyer after the Closing.

4.5    **Reasonable Efforts.**  Each party to this Agreement agrees to provide reasonable cooperation to the other party in the performance of all obligations under this Agreement.  Each party shall use its reasonable efforts to satisfy or cause to be satisfied, at or prior to the Closing, the conditions to the other party's Closing obligations under this Agreement.

4.6    **Publicity; Confidentiality.**

(a)    Except for a filing of a report on Form 8-K with the SEC within four business days after the execution of this Agreement and the Closing Date, without the prior written approval of Buyer and Seller, no party shall disclose the existence and/or contents of any discussions relating hereto nor issue any press release or other public disclosure regarding the transactions contemplated by this Agreement, except as required by applicable securities or other laws.

(b)    Seller and each Lender understands and agrees that any confidential and proprietary information of the Buyer, including, without limitation, any and all trade secrets ("**Confidential Information**"), constitutes valuable assets and, following the Closing, agrees not to, and agrees to cause its controlled affiliates not to, direct or indirectly, disclose any Confidential Information; provided, however, that Confidential Information shall not include any information that is or becomes generally available to the public other than as a result of a breach of this Agreement by Seller or a Lender.  Anything herein to the contrary notwithstanding, neither Seller nor any Lender will be restricted from disclosing Confidential Information that is required to be disclosed by law; provided, however, that in the event disclosure is required by law after the Closing, (i) the applicable Seller or Lender shall provide the Buyer with as much advanced notice as is practicable of such requirement so that the Buyer may seek an appropriate protective order prior to any such required disclosure, and (ii) the applicable Seller or Lender shall (A) use commercially reasonable efforts to assist the Buyer in seeking such protective order (at the Buyer's cost and expense) and (B) only disclose the portion of the Confidential Information that is required to be disclosed by the law.

(c)    Notwithstanding the foregoing, the parties to this Agreement may disclose the contents of this Agreement and Confidential Information in any legal proceedings between the parties relating to this Agreement or to any advisors, service providers or investors (provided such advisors, service providers and investors agree to treat such Confidential Information in accordance with the terms of this Section 4.6).

4.7    **Transition Costs.**  Following the Closing, Buyer shall (i) be responsible for Buyer's moving expenses and other expenses, if any, caused by Buyer's negligence or willful

conduct related to the relocation of Purchased Assets from MVF's facilities located at 2300 W. Empire Ave., Burbank, CA 91504 (the "**Burbank Facility**"), 2500 Broadway Ave., Santa Monica, CA 90404 (the "**Santa Monica Facility**"), and 1733 Flower St., Glendale, CA 91201 (the "**Glendale Facility**," and together with the Burbank Facility and the Santa Monica Facility, the "**Facilities**"), and (ii) pay a portion of the rent for each Facility to its landlord on a per diem basis based on the number of days post-Closing, if any and as applicable, that Buyer occupies such Facility to complete the foregoing relocation of Purchase Assets.

  **4.8** **MVF Employees.** As of the Closing, other than PTO, Seller shall ensure that all payment obligations of MVF to current or past employees of MVF have been satisfied in full under California law, which shall consist solely of current wages, and that all MVF employees are terminated. Buyer shall have no liability or responsibility with respect to any obligations to, or any claims of, any current or past MVF employees, except with respect to PTO as set forth in Section 1.2 above.  Prior to the Closing, Buyer shall make an offer in writing to hire all existing employees of MVF whose names are listed in the document entitled "Modern VideoFilm, Inc., Current Active Employees," which Seller delivered to Buyer or its representatives on July 5, 2015 (the "**Employee List**"), in substantially similar roles, and with the same annual salary, as set forth on the Employee List with respect to such employee.  For the avoidance of doubt, other than PTO assumed as provided in Section 1.2, Buyer is not assuming any of the Loan Parties' obligations or liabilities to its employees.

  **4.9** **Employment Agreements.** Following the Closing, as promptly as practicable following the next scheduled Buyer board meeting, HB and Alan R. Steel shall enter into Employment Agreements with Buyer.

  **4.10** **Term Loan.** Upon the Closing, Seller shall agree to provide Buyer a five-year, $6,000,000 term loan, pursuant to the Term Loan Agreement ("**Term Loan Agreement**").

  **4.11** **PTO.** Seller agrees that (i) within 5 days following the Closing it will deliver to Buyer a true, correct and complete list of all Hired Employees who requested of MVF that their respective paid time off be paid by MVF, and (ii) thereafter, it will promptly notify Buyer in writing following each request of a Hired Employee to MVF within 180 days after the 5 day period referenced in clause (i), above, that MVF pay such Hired Employee's paid time off, which list and notifications shall contain the name of each such Hired Employee, the date of the request and the amount of the paid time off.

  **4.12** **Transactions with Affiliates.** At any time that Buyer ceases to have filing obligations under the Exchange Act, neither Buyer nor any direct or indirect subsidiary of Buyer will enter into any material contract (oral or written) or material transaction with (including, without limitation, issuance of equity interests or incurrence of debt to or from) any Affiliated Person without the prior written consent of Seller.

  **4.13** **Termination of Certain Rights**. Upon the payment in full of all outstanding principal and interest on the Term Loans (as defined) under the Term Loan Agreement, the Seller Directors shall, upon the written request of Buyer, promptly tender their resignations.

  **4.14** **Access to Information; Books and Records**.

(a)    From the date hereof until the Closing, (i) Seller shall afford Buyer full and free access to and the right to inspect all of the Purchased Assets and other documents related to the Purchased Assets, and (ii) Seller shall furnish Buyer with all financial, operating, books and records, and other data and information related to the Purchased Assets to enable Buyer to comply with applicable financial reporting and other requirements with respect to reports and filings with the SEC.

(b)    Following the Closing, (i) Buyer shall provide copies and otherwise make any and all books and records of MVF included in the Purchased Assets as of the Closing available to Seller upon reasonable request by Seller, and at Seller's expense and (ii) Seller shall provide written information received from Gordon Brothers with respect to the value of the Purchased Assets (other than as prohibited by confidentiality obligations with Gordon Brothers).

## ARTICLE 5
## CLOSING DELIVERIES; CLOSING

**5.1    Closing.**    Subject to satisfaction or waiver of the conditions set forth in this Section 5, the closing of the transactions contemplated by this Agreement (the "**Closing**") shall occur effective as of July 8, 2015, or such other date as Buyer and Seller may agree in writing, and shall take place at such time and at such location as Buyer and Seller may agree in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**".

**5.2    Conditions Precedent to Buyer's Closing Obligations.**    Each of the following shall be a condition to the obligation of Buyer to consummate the transactions contemplated by this Agreement, except to the extent that Buyer may elect to waive any of such conditions in writing:

(a)    Each representation and warranty of Seller contained in this Agreement (including any exhibit, schedule or other agreement or document delivered pursuant hereto) shall be true and correct in all material respects on and as of the Closing Date and Seller shall have performed or complied in all material respects with all agreements required by this Agreement to be performed or complied with by the Seller prior to or at the Closing.

(b)    The Loan Parties shall have conducted their businesses in the ordinary course consistent with previous practices without any material change in its assets, liabilities and operations with respect to the content management and TV post production services, and MVF's books and records shall be maintained in accordance with past practice.

(c)    Seller shall have executed and delivered the agreements and documents that are described in Section 5.4(a) below.

(d)    No claim, action, investigation or other proceeding shall be pending or threatened before any court or governmental agency that presents a substantial risk of the restraint or rescission of the transactions contemplated by this Agreement or that imposes a substantial risk to Buyer's ability to obtain title to and possession of the Purchased Assets on the terms and conditions contemplated by this Agreement.

(e)    There shall have been obtained all permits, approvals and consents from governmental agencies and third parties that Buyer determines are required in order to transfer the Purchased Assets to it.

(f)    All actions required to be taken by Seller to authorize the execution, delivery and performance of this Agreement shall have been duly and validly taken.

(g)    Seller shall have delivered to Buyer all documents evidencing that Seller conducted its foreclosure on the Purchased Assets in compliance with all applicable laws, including Article 9 of the UCC.

(h)    There shall not have occurred between the date hereof and the closing, any fact, event, circumstance or change that is or would reasonably be expected to be, individually or in the aggregate, materially adverse to (i) the Purchased Assets, or (ii) the ability of Seller to perform any of its obligations under this Agreement.

**5.3    Conditions Precedent to Seller's Closing Obligations.**    Each of the following shall be a condition to the obligation of Seller to consummate the transactions contemplated by this Agreement, except to the extent that Seller may elect to waive any of such conditions in writing:

(a)    Each representation and warranty of Buyer contained in this Agreement (including any exhibit, schedule or other agreement or document delivered pursuant hereto) shall be true and correct in all material respects on and as of the Closing Date and Buyer shall have performed or complied in all material respects with all agreements required by this Agreement to be performed or complied with by it prior to or at the Closing.

(b)    No claim, action, investigation or other proceeding shall be pending or threatened before any court or governmental agency that presents a substantial risk of the restraint or rescission of the transactions contemplated by this Agreement.

(c)    Subject to receipt of the Shareholder Approval, all actions required to be taken by Buyer to authorize the execution, delivery and performance of this Agreement shall have been duly and validly taken.

(d)    Buyer shall have executed and delivered the agreements and documents that are described in Section 5.4(b) below.

(e)    There shall not have occurred between the date hereof and the closing, any fact, event, circumstance or change that is or would reasonably be expected to be, individually or in the aggregate, materially adverse to (i) the financial condition, business, assets (taken as a whole), liabilities (taken as a whole), or results of operations of Buyer and its subsidiaries, or (ii) the ability of Buyer or any successor to perform any of its obligations under this Agreement.

**5.4    Closing Deliveries.**

(a)    At or prior to the Closing, Seller shall:

(i)     execute and deliver to Buyer bills of sale and other such assignment instruments, in form and substance reasonably satisfactory to Buyer, covering the Purchased Assets and effecting the full sale and conveyance of the Purchased Assets to Buyer, free and clear of all liens, security interests and other encumbrances;

(ii)     execute and deliver to Buyer the certificate described above in Section 5.2(g);

(iii)     execute and deliver to Buyer the Term Loan Agreement;

(iv)     deliver to Buyer all books, records, correspondence and other documents that evidence or relate to the Purchased Assets and the business of MVF prior to the Closing, provided that Seller shall not deliver to Buyer any information the delivery of which would violate applicable privacy laws;

(v)     execute and deliver to Buyer such other closing documents as Buyer may reasonably request in order to consummate the transactions contemplated by this Agreement.

(b)     At or prior to the Closing, Buyer shall:

(i)     issue and deliver to Seller the Common Shares;

(ii)     execute and deliver to Seller the Warrant and a Registration Rights Agreement in form and substance satisfactory to Seller to be entered into between Buyer and Seller; and

(iii)     execute and deliver to Seller the Term Loan Agreement.

## ARTICLE 6
## TERMINATION

**6.1     Termination of Agreement**.  Buyer or Seller may terminate this Agreement as provided below:

(a)     Buyer and Seller may terminate this Agreement by mutual written consent at any time prior to the Closing Date;

(b)     Subject to Section 6.2 below, Buyer may terminate this Agreement by giving written notice to Seller at any time prior to the Closing Date in the event Seller is in breach of any material representation, warranty, or covenant contained in this Agreement in any material respect, and Seller may terminate this Agreement by giving written notice to Buyer at any time prior to the Closing Date in the event Buyer is in breach of any material representation, warranty, or covenant contained in this Agreement in any material respect; provided, however, that the party in breach shall have ten calendar days following notice of such breach and the terminating party's intention to terminate this Agreement to cure such breach;

(c)    Buyer may terminate this Agreement by giving written notice to Seller at any time prior to the Closing Date if the Closing shall not have occurred on or before the 10th day following the date of this Agreement (unless the failure to close results primarily from Buyer itself breaching any representation, warranty, or covenant contained in this Agreement); or

(d)    Seller may terminate this Agreement by giving written notice to Buyer at any time prior to the Closing Date if the Closing shall not have occurred on or before the 10th day following the date of this Agreement (unless the failure to close results primarily from Seller breaching any representation, warranty, or covenant contained in this Agreement).

**6.2**    **Effect of Termination**.  In the event of a termination of this Agreement by Buyer or Seller pursuant to <u>Section 6.1</u> above (other than pursuant to <u>Section 6.1(b)</u>), all obligations of the parties hereunder shall terminate without liability of any party to any other party.  The termination of this Agreement by either party shall not adversely affect any right that a party may have against another party for intentional breach of contract.

## <u>ARTICLE 7</u>
## <u>INDEMNIFICATION</u>

**7.1**    **<u>Survival of Representations and Warranties</u>**.  All representations, warranties, covenants and agreements contained herein and all related rights to indemnification shall survive the Closing.  All representations, warranties and agreements of the parties made in any exhibit or schedule to this Agreement or in any other agreement or document delivered pursuant to this Agreement shall be deemed to be contained in this Agreement.

**7.2**    **<u>Indemnification by Medley</u>**.    Subject to the provisions of this <u>Article 7</u>, following the Closing, Medley, in its capacity as Seller and in its capacity as Agent on behalf of each Lender, shall indemnify and hold harmless Buyer, and Buyer's officers, directors, employees and agents (collectively, the "**<u>Buyer Indemnified Parties</u>**"), from and against any and all losses, damages, liabilities, costs and expenses, including, without limitation, settlement costs and reasonable legal, accounting and other expenses for investigating or defending any actions (collectively, "**<u>Losses</u>**") that the Buyer Indemnified Parties may incur based upon, arising out of, with respect to or by reason of (i) any inaccuracy in or breach of any of Seller's representations and warranties to Buyer, including those regarding the validity, priority, extent and enforceability of Seller's liens on, and rights with respect to, the Purchased Assets, and Buyer's ownership of the Purchased Assets free and clear of all liens, security interests and other claims on title and encumbrances (provided, that the representation set forth in Section 2.10 shall not be deemed to be breached unless a court of competent jurisdiction has issued a non-appealable ruling that the Seller has acted with the intent to defraud the creditors of the Loan Parties), and (ii) any defects in title to the Purchased Assets transferred relating to the private sale under the UCC contemplated hereunder.

**7.3**    **<u>Indemnification by Buyer</u>**.  Subject to the provisions of this <u>Article 7</u>, following the Closing, Buyer shall indemnify and hold harmless Seller, and Seller's officers, directors, employees and agents (collectively, the "**<u>Seller Indemnified Parties</u>**"), from and against any and all Losses that the Seller Indemnified Parties may incur based upon, arising out of, with respect

to or by reason of any inaccuracy in or breach of any of Buyer's representations and warranties to Seller.

**7.4    Reserved.**

**7.5    Indemnification Procedures.**    Whenever any claim shall arise for indemnification hereunder, the Indemnified Party shall promptly provide written notice of such claim to the other party (the **"Indemnifying Party"**). In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any legal suit, action or proceeding (collectively, "**Action**") by a person or entity who is not a party to this Agreement, the Indemnifying Party, at its sole cost and expense and upon written notice to the Indemnified Party, may assume the defense of any such Action with counsel reasonably satisfactory to the Indemnified Party. The Indemnified Party shall be entitled to participate in the defense of any such Action, with its counsel and at its own cost and expense. If the Indemnifying Party does not assume the defense of any such Action, the Indemnified Party may, but shall not be obligated to, defend against such Action in such manner as it may deem appropriate, including, but not limited to, settling such Action, after giving notice of it to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate and no action taken by the Indemnified Party in accordance with such defense and settlement shall relieve the Indemnifying Party of its indemnification obligations herein provided with respect to any damages resulting therefrom. The Indemnifying Party shall not settle any Action without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld or delayed).

**7.6    Special Indemnity**.    Notwithstanding anything to the contrary herein, and in addition to Medley's obligations under Section 7.2 hereof, Medley, also in its capacity as Seller and Agent, shall pay to Buyer within 15-days of Buyer's written notice to Medley, Buyer's documented Losses, in an amount not to exceed $250,000 in the aggregate, that the Buyer may incur upon, arising out of, with respect to or by reason of (i) the failure of Seller to carry out any of its obligations hereunder, (ii) any obligation of MVF or any other Loan Party to any current or past employee of MVF or any other Loan Party under applicable law, other than with respect to PTO, (iii) any claim from any landlord of the Facilities, other than with respect to the payment of Buyer's portion of the rent for the Facilities, if any, as set forth in Section 4.7 hereto, and (iv) the action brought by Moshe Barkat and Modern VideoFilm Holdings, LLC, in the Superior Court of the State of California, County of Los Angeles, Central District (Case No. BC583437), and any action brought by Moshe Barkat, his controlled affiliates or any other party in connection with the transactions contemplated by this Agreement.  The indemnity set forth in this Section 7.6 shall be Buyer's sole remedy for the matters set forth in this Section 7.6 and in no event shall Buyer be entitled to indemnity, remedy or recourse from Medley, under Section 7.2 or otherwise, for the matters set forth in this Section 7.6 other than pursuant to this Section 7.6. Notwithstanding the foregoing, the foregoing sentence shall not impair Buyer's ability to make claims under Section 7.2 related to the validity, priority, extent and enforceability of Seller's liens on, and rights with respect to, the Purchased Assets, and Buyer's ownership of the Purchased Assets free and clear of all liens, security interests and other claims on title and encumbrances.

**7.7    Effect of Investigation**. The Indemnified Parties' right to indemnification or other remedy based on the representations, warranties, covenants and agreements of Seller contained herein will not be affected by any investigation conducted by Buyer with respect to, or

any knowledge acquired by Buyer at any time, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant or agreement.

### ARTICLE 8
### GENERAL PROVISIONS

    **8.1**     **Notices.**   All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (i) when delivered by hand (with written confirmation of receipt); (ii) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (iii) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (iv) on the second day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 8.1):

<table>
<tr><td>If to Buyer:</td><td>Point.360<br>2701 Media Center Drive<br>Los Angeles, CA 90065<br>Facsimile:  (818) 847-2503<br>E-Mail: asteel@point360.com<br>Attention: Alan Steel, Chief Financial Officer</td></tr>
<tr><td></td><td>With a copy to:<br>TroyGould PC<br>1801 Century Park East, 16th Floor<br>Los Angeles, CA 90067<br>Facsimile: (310) 201-4746<br>E-Mail: wgould@troygould.com<br>Attention: William D. Gould, Esq.</td></tr>
<tr><td>If to Seller:</td><td>Medley Capital Corporation<br>375 Park Avenue<br>33rd Floor<br>New York, NY 10152<br>Email:  richard.craybas@medleycapital.com<br>Attention: Richard Craybas</td></tr>
<tr><td></td><td>With a copy to:<br>Proskauer Rose LLP<br>One International Place<br>Boston, MA 02110<br>Facsimile: (617)526-9899<br>Email: sellis@proskauer.com;<br>ppossinger@proskauer.com;<br>mmano@proskauer.com</td></tr>
</table>

Attention: Steven Ellis, Paul
Possinger and Michael Mano

**8.2**     **Amendments and Termination; Entire Agreement.** This Agreement may be amended or terminated only by a writing executed by each party hereto. Together with the exhibits, schedules and other agreements and documents delivered pursuant hereto, this Agreement constitutes the entire agreement of the parties hereto relating to the subject matter hereof and supersedes all prior oral and written understandings and agreements relating to such subject matter.

**8.3**     **Successors and Assigns.** This Agreement shall be binding upon, and shall benefit, the parties hereto and their respective successors and assigns. Notwithstanding the foregoing, the obligations of Sellers hereunder are not assignable to another person without Buyer's prior written consent.

**8.4**     **Calculation of Time.** Except as otherwise provided herein, wherever in this Agreement a period of time is stated in a number of days, it shall be deemed to mean calendar days. However, when any period of time so stated would end upon a Saturday, Sunday or legal holiday, such period shall be deemed to end upon the next day following that is not a Saturday, Sunday or legal holiday.

**8.5**     **Further Assurances.** Each party shall perform any further acts and execute and deliver any further documents that may be reasonably necessary or advisable to carry out the provisions of this Agreement.

**8.6**     **Severability.** All provisions of this Agreement shall be applicable only to the extent that they do not violate any applicable law, and are intended to be limited to the extent necessary so that they will not render this Agreement invalid, illegal or unenforceable under any applicable law. If any provision of this Agreement or any application thereof shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of other provisions of this Agreement or of any other application of such provision shall in no way be affected thereby.

**8.7**     **Waiver of Rights.** No party to this Agreement shall be deemed to have waived any right or remedy that it has under this Agreement unless this Agreement expressly provides a period of time within which such right or remedy must be exercised and such period has expired, or unless such party has expressly waived the same in writing. The waiver by a party of a right or remedy hereunder shall not be deemed to be a waiver of any other right or remedy or of any subsequent right or remedy of the same kind.

**8.8**     **Headings; Gender and Number.** The headings contained in this Agreement are for reference purposes only and shall not affect in any manner the meaning or interpretation of this Agreement. Where appropriate to the context of this Agreement, use of the singular shall be deemed also to refer to the plural, and use of the plural to the singular, and pronouns of certain gender shall be deemed to comprehend either or both of the other genders. The terms "hereof," "herein," "hereby" and variations thereof shall, whenever used in this Agreement, refer to this Agreement as a whole and not to any particular section hereof. The term "person" refers to any natural person, corporation, partnership or other association or entity. Any form of the word

"include" when used in this Agreement is not intended to be exclusive (that is, the word "include" means "including, without limitation").

**8.9**   **Counterparts.**   This Agreement may be executed in counterparts, and by each party on a separate counterpart, each of which shall be deemed an original but all of which taken together shall constitute but one and the same instrument.

**8.10**   **No Strict Construction.**   The language of this Agreement is the language chosen by the parties hereto to express their mutual intent, and this Agreement shall be construed without regard to any presumption or rule requiring construction against the party causing the instrument to be drafted.

**8.11**   **Expenses.**   Except as otherwise provided herein, each party shall bear its own costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, whether or not the Closing occurs.

**8.12**   **No Third Party Beneficiaries.**   Except as provided in Article 7, no provision of this Agreement is intended to or shall create any rights with respect to the subject matter of this Agreement in any third party.

**8.13**   **Governing Laws.**   This Agreement shall be governed by, and construed and enforced in accordance with, the internal laws of the State of California without giving effect to such state's conflict-of-law principles; provided, that all aspects of Seller's exercise of remedies under the UCC against the Loan Parties shall be governed by the laws of the State of New York.

**8.14**   **Specific Performance.**   The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**8.15**   **Attorneys' Fees and Other Expenses.**   The unsuccessful party to any arbitration proceeding or to any court action that is permitted by this Agreement shall pay to the prevailing party all costs and expenses, including, without limitation, reasonable attorneys' fees, incurred therein by the successful party, all of which shall be included in and as a part of the award rendered in such proceeding or action.

*(Signature page follows)*

**IN WITNESS WHEREOF**, the parties hereto have executed and delivered this Agreement as of the date first above written.

"BUYER"
POINT.360

By:_____
   Name: Haig S. Bagerdjian
   Title:  Chief Executive Officer

"SELLER"
MEDLEY CAPITAL CORPORATION, in its
capacity as collateral agent to the Lenders

By:_____
   Name:
   Title:

"LENDERS"
MEDLEY OPPORTUNITY FUND II LP

By: _____
   Name:
   Title:

MAIN STREET CAPITAL CORPORATION

By: _____
   Name:
   Title:

CONGRUENT  CAPITAL  OPPORTUNITIES
FUND II, LP

By: _____
   Name:
   Title:

[Signature Page to Sale Agreement Pursuant to Article 9 of the Uniform Commercial Code]

**IN WITNESS WHEREOF**, the parties hereto have executed and delivered this Agreement as of the date first above written.

"BUYER"
POINT.360

By:_____
    Name: Haig S. Bagerdjian
    Title:  Chief Executive Officer

"SELLER"
MEDLEY CAPITAL CORPORATION, in its
capacity as collateral agent to the Lenders

By:_____
Name: Richard T. Allorto
Title:  Chief Financial Officer

"LENDERS"
MEDLEY OPPORTUNITY FUND II LP

By:_____
Name: Richard T. Allorto
Title: Chief Financial Officer

MAIN STREET EQUITY INTERESTS, INC.

By: _____
    Name:
    Title:

CONGRUENT   CREDIT   OPPORTUNITIES
FUND II, LP

By: _____
    Name:
    Title:

*[Signature Page to Sale Agreement Pursuant to Article 9 of the Uniform Commercial Code]*

**IN WITNESS WHEREOF**, the parties hereto have executed and delivered this Agreement as of the date first above written.

"BUYER"
POINT.360

By:_____
　　　Name: Haig S. Bagerdjian
　　　Title:  Chief Executive Officer


"SELLER"
MEDLEY CAPITAL CORPORATION, in its capacity as collateral agent to the Lenders


By:_____
　　　Name:
　　　Title:

"LENDERS"
MEDLEY OPPORTUNITY FUND II LP


By: _____
　　　Name:
　　　Title:


MAIN STREET EQUITY INTERESTS, INC.


By: _____
　　　Name: Nick Mosca
　　　Title: Managing Director


CONGRUENT  CREDIT  OPPORTUNITIES FUND II, LP


By: _____
　　　Name:
　　　Title:


*[Signature Page to Sale Agreement Pursuant to Article 9 of the Uniform Commercial Code]*

**IN WITNESS WHEREOF**, the parties hereto have executed and delivered this Agreement as of the date first above written.

**"BUYER"**
**POINT.360**

By:_____
    Name: Haig S. Bagerdjian
    Title:  Chief Executive Officer

**"SELLER"**
**MEDLEY CAPITAL CORPORATION, in its capacity as collateral agent to the Lenders**

By:_____
    Name:
    Title:

**"LENDERS"**
**MEDLEY OPPORTUNITY FUND II LP**

By: _____
    Name:
    Title:

**MAIN STREET EQUITY INTERESTS, INC.**

By: _____
    Name:
    Title:

**CONGRUENT   CREDIT   OPPORTUNITIES FUND II, LP**

By: _____
    Name:    Matthew Killebrew
    Title:    Authorized Signatory

*[Signature Page to Sale Agreement Pursuant to Article 9 of the Uniform Commercial Code]*

**HAIG S. BAGERDJIAN, only with respect to his agreement under Sections 4.2(a)**

By: _____

    Name: Haig S. Bagerdjian

- 0.0

**SCHEDULE 1.1**
**EXCLUDED ASSETS**

**Excluded Assets.**  Buyer is not acquiring, and the Purchased Assets shall not include the following assets or properties of the Loan Parties (collectively, the "Excluded Assets")

1. Amounts due to any of the Loan Parties from, and all claims against, (a) Moshe Barkat and his affiliates and family members, and (b) Hugh Miller;
2. All cash and cash equivalents (other than the Purchased Cash);
3. Insurance policies entered into by MVF and all proceeds thereof;
4. Minute books, stock record books, corporate certificates of authority of each Loan Party, and employee records;
5. All equity interests in any of the Loan Parties;
6. Net operating loss carry forwards;
7. Tax refunds of any kind that may be due and or may be applied for;
8. All claims and causes of action of the Loan Parties other than those arising from the operation of the Loan Parties' business;
9. Any third party owned items, leased property, consignment goods, and intellectual property subject to licensing agreements;
10. Any prepaid insurance premiums (other than prepaid employee health premium for July) and security deposits;

## SCHEDULE 1.2
### ASSUMED LIABILITIES

Per diem rent obligations as detailed in Section 4.7.

PTO

## SCHEDULE 1.3
### ALLOCATION OF SHARES

| Lender | Common Shares | Warrant Shares |
|--------|--------------:|---------------:|
| Medley Opportunity Fund II LP | 1,018,476 | 407,391 |
| Medley Capital Corporation | 479,283 | 191,713 |
| Congruent Credit Opportunities Fund II, LP | 338,583 | 135,433 |
| Main Street Equity Interests, Inc. | 163,658 | 65,463 |

## SCHEDULE 2.5(A)
### OWNERSHIP OF ASSETS

None.

**SCHEDULE 2.7**
**SELLER LITIGATION**

A complaint was filed against Seller on May 29, 2015 in the Superior Court of the State of California, in case number BC 583437, entitled *Barkat, et al v. Medley Capital Corporation, et al*.

**EXHIBIT A**
**FORM OF WARRANT**

(see attached)

## WARRANT TO PURCHASE SHARES OF COMMON STOCK
## OF POINT.360

**THIS WARRANT AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "1933 ACT") OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS ("BLUE SKY LAWS"). NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THIS WARRANT OR THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT OR ANY INTEREST THEREIN MAY BE MADE EXCEPT (a) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE 1933 ACT AND ANY APPLICABLE BLUE SKY LAWS OR (b) IF THE CORPORATION HAS BEEN FURNISHED WITH AN OPINION OF COUNSEL FOR THE HOLDER, WHICH OPINION AND COUNSEL SHALL BE REASONABLY SATISFACTORY TO THE CORPORATION, TO THE EFFECT THAT NO REGISTRATION IS REQUIRED BECAUSE OF THE AVAILABILITY OF AN EXEMPTION FROM REGISTRATION UNDER THE 1933 ACT AND APPLICABLE BLUE SKY LAWS.**

THIS CERTIFIES THAT, for good and valuable consideration [●] ("Holder"), or the Holder's registered assigns, is entitled to subscribe for and purchase from Point.360, a California corporation (the "Corporation"), [●] fully paid and nonassessable shares of the Common Stock of the Corporation at the price of $[●] per share (the "Warrant Exercise Price"), as adjusted pursuant to the provisions of this Warrant. This Warrant may be exercised at any time commencing on July [●], 2015 (the "Initial Exercise Date") to and including July [●], 2020 (the "Termination Date").

The Warrant is issued pursuant to the Sale Agreement Pursuant to Article 9 of the Uniform Commercial Code, entered into as of the date hereof, between the Corporation and the Holder.

The shares which may be acquired upon exercise of this Warrant are referred to herein as the "Warrant Shares." As used herein, the term "Holder" means the Holder, any party who acquires all or a part of this Warrant as a registered transferee of the Holder, or any record holder or holders of the Warrant Shares issued upon exercise, whether in whole or in part, of the Warrant. The term "Common Stock" means the common stock, no par value, of the Corporation. The term "exercise" shall include an exercise for cash pursuant to Section 1(a) or a cashless exercise pursuant to Section 3(c).

This Warrant is subject to the following provisions, terms and conditions:

    1.    <u>EXERCISE; TRANSFERABILITY</u>.

        (a)    The rights represented by this Warrant may be exercised by the Holder hereof, in whole or in part, by written notice of exercise (in the form attached hereto) delivered to the Corporation at the principal office of the Corporation prior to the Termination Date and accompanied or preceded by the surrender of this Warrant along with a check in payment of the Warrant Exercise Price for such Warrant Shares or (ii) cashless exercise pursuant to Section 3(c).

(b)    Subject to compliance with any applicable securities laws and the reasonable conditions  and documentation required by the Corporation, this Warrant and all rights hereunder (including, without limitation, any registration rights) are transferable, in whole or in part, upon surrender of this Warrant at the principal office of the Corporation or its designated agent, together with a written Assignment of this Warrant substantially in the form attached hereto duly executed by the Holder or its agent or attorney and funds sufficient to pay any transfer taxes payable upon the making of such transfer.  Upon such surrender and, if required, such payment, the Company shall execute and deliver a new Warrant or Warrants in the name of the assignee or assignees, as applicable, and in the denomination or denominations specified in such instrument of assignment, and shall issue to the assignor a new Warrant evidencing the portion of this Warrant not so assigned, and this Warrant shall promptly be cancelled.  The Warrant, if properly assigned, may be exercised by a new holder for the purchase of Warrant Shares without having a new Warrant issued.

2.    <u>EXCHANGE AND REPLACEMENT</u>. Subject to the terms hereof, this Warrant is exchangeable upon the surrender hereof by the Holder to the Corporation at its office for new Warrants of like tenor and date representing in the aggregate the right to purchase the number of Warrant Shares purchasable hereunder, each of such new Warrants to represent the right to purchase such number of Warrant Shares (not to exceed the aggregate total number purchasable hereunder) as shall be designated by the Holder at the time of such surrender. Upon receipt by the Corporation of evidence reasonably satisfactory to it of the loss, theft, destruction, or mutilation of this Warrant, and, in case of loss, theft or destruction, of indemnity or security reasonably satisfactory to it (it being understood that a written indemnification agreement or affidavit of loss of the Holder shall be sufficient indemnity), and upon surrender and cancellation of this Warrant, if mutilated, the Corporation will make and deliver a new Warrant of like tenor, in lieu of this Warrant. This Warrant shall be promptly canceled by the Corporation upon the surrender hereof in connection with any exchange or replacement. The Corporation shall pay all expenses, taxes (other than stock transfer taxes), and other charges payable in connection with the preparation, execution, and delivery of Warrants pursuant to this Section 2. If this Warrant shall have been exercised in part, the Corporation shall, deliver to Holder a new Warrant evidencing the rights of Holder to purchase the unpurchased Warrant Shares called for by this Warrant, which new Warrant shall in all other respects be identical to this Warrant.

3.    <u>ISSUANCE OF THE WARRANT SHARES</u>.

(a)    The Corporation agrees that the Warrant Shares shall be and are deemed to be issued to the Holder as of the close of business on the date on which this Warrant shall have been exercised. Subject to the provisions of paragraph (b) of this Section 3, certificates for the Warrant Shares so purchased shall be delivered to the Holder promptly after the date this Warrant shall have been exercised, and, unless this Warrant has expired, a new Warrant representing the right to purchase the number of Warrant Shares, if any, with respect to which this Warrant shall not then have been exercised shall also be delivered to the Holder.

(b)    Notwithstanding the foregoing, however, the Corporation shall not be required to deliver any certificate for Warrant Shares upon exercise of this Warrant except in accordance with exemptions from the applicable securities registration requirements or registrations under applicable securities laws. Nothing herein shall obligate the Corporation to

effect registrations under federal or state securities laws. The Holder agrees to execute such documents and make such representations, warranties, and agreements as may be required solely to comply with the exemptions relied upon by the Corporation, or the registrations made, for the issuance of the Warrant Shares.

(c)    Notwithstanding any provisions herein to the contrary, in lieu of exercising this Warrant for cash, the Holder may from time to time, elect to convert this Warrant, in whole or in part, into a number of Warrant Shares equal to:

$$X = \frac{Y (A\text{-}B)}{A}$$

Where        $X =$    the number of Warrant Shares to be issued to the Holder

$Y =$    the number of Warrant Shares with respect to which this Warrant is being exercised

$A =$    the fair market value of one Warrant Share (at the date of such calculation)

$B =$    the Warrant Exercise Price (as adjusted to the date of such calculation)

For purposes of Rule 144 promulgated under the 1933 Act, it is intended, understood and acknowledged that the Warrant Shares issued in a cashless exercise transaction pursuant to this Section 3(c) shall be deemed to have been acquired by the Holder, and the holding period for such Warrant Shares shall be deemed to have commenced, on the Initial Exercise Date.

For purposes of this Warrant, the fair market value of one share of Common Stock shall be:

i.    the average daily Market Price (as defined below) during the period of the most recent ten (10) trading days, ending on the last business day before the effective date of exercise of the Warrant, on which the national securities exchanges or over-the-counter market in which the shares of Common Stock is quoted were open for trading.  If the Common Stock is traded on a national securities exchange or admitted to unlisted trading privileges on such an exchange, the Market Price as of a specified day shall be the last reported sale price of Common Stock on such exchange on such date or if no such sale is made on such day, the mean of the closing bid and asked prices for such day on such exchange (the "Market Price"); or

ii.    if the Common Stock is not then listed or admitted to trading on any national securities exchange or over the counter market, the fair market value shall be determined in good faith by the Board of Directors of the Corporation.

4.    <u>COVENANTS OF THE CORPORATION</u>. The Corporation covenants and agrees that all Warrant Shares will, upon issuance, be duly authorized and issued, fully paid, nonassessable and free from all taxes, liens and charges with respect to the issue thereof. The Corporation further covenants and agrees that during the period within which the rights represented by this Warrant may be exercised, the Corporation will at all times have authorized and reserved for the purpose of issue or transfer upon exercise of the subscription rights evidenced by this Warrant a sufficient number of shares of Common Stock to provide for the exercise of the rights represented by this Warrant.  The Corporation will not take any action which would result in any adjustment of the Warrant Exercise Price if the total number of shares of Common Stock issuable after such action upon exercise of all outstanding warrants, together with all shares of Common Stock then outstanding and all shares of Common Stock then issuable upon exercise of all options and upon the conversion of all convertible securities then outstanding, would exceed the total number of shares of Common Stock then authorized by the Corporation's Articles of Incorporation, as amended. The Corporation shall at all times in good faith assist in the carrying out of all such terms and in the taking of all such actions as may be necessary or appropriate to protect the rights of Holder as set forth in this Warrant against impairment.

5.    <u>CERTAIN ADJUSTMENTS</u>. The provisions of this Warrant are subject to adjustment as provided in this Section 5.

(a)    The Warrant Exercise Price shall be adjusted from time to time such that in case the Corporation shall hereafter:

(i)    pay any dividends or make any other distribution on any class of stock of the Corporation payable in Common Stock or securities convertible into Common Stock;

(ii)    subdivide its then outstanding shares of Common Stock (by any stock split, recapitalization or otherwise) into a greater number of shares; or

(iii)    combine its then outstanding shares of Common Stock (by combination, reverse stock split or otherwise) into a smaller number of shares;

then, in any such event, the Warrant Exercise Price in effect immediately prior to such event shall (until adjusted again pursuant hereto) be adjusted immediately after such event to a price (calculated to the nearest full cent) determined by dividing (A) the number of shares of Common Stock outstanding immediately prior to such event, multiplied by the then existing Warrant Exercise Price, by (B) the total number of shares of Common Stock outstanding immediately after such event (including in each case the maximum number of shares of Common Stock issuable in respect of any securities convertible into Common Stock). An adjustment made pursuant to this Subsection shall become effective immediately after the effective date of the dividend, subdivision or combination. If, as a result of an adjustment made pursuant to this Section 5, the Holder of any Warrant thereafter surrendered for exercise shall become entitled to receive shares of two or more classes of capital stock or shares of Common Stock and other capital stock, the Board of Directors (whose determination shall be conclusive) shall determine the allocation of the adjusted Warrant Exercise Price between or among shares of such classes of

capital stock or shares of Common Stock and other capital stock. All calculations under this Subsection shall be made to the nearest cent or to the nearest 1/100 of a share, as the case may be. In the event that at any time as a result of an adjustment made pursuant to this Section 5, the holder of any Warrant thereafter surrendered for exercise shall become entitled to receive any shares of capital stock other than shares of Common Stock, thereafter the Warrant Exercise Price of such other shares so receivable upon exercise of any Warrant shall be subject to adjustment from time to time in a manner and on terms as nearly equivalent as practicable to the provisions with respect to Common Stock contained in this Section 5.

(b)    Upon each adjustment of the Warrant Exercise Price pursuant to Section 5(a) above, the Holder of each Warrant shall thereafter (until another such adjustment) be entitled to purchase at the adjusted Warrant Exercise Price the number of shares, calculated to the nearest full share, obtained by multiplying the number of shares specified in such Warrant (as adjusted as a result of all adjustments in the Warrant Exercise Price in effect prior to such adjustment) by the Warrant Exercise Price in effect prior to such adjustment and dividing the product so obtained by the adjusted Warrant Exercise Price.

(c)    In case of any (i) capital reorganization of the Company, (ii) reclassification of the stock of the Company, (iii) consolidation or merger to which the Corporation is a party other than a merger or consolidation in which the Corporation is the continuing corporation, or in case of any sale or conveyance to another corporation of the property of the Corporation as an entirety or substantially as an entirety, or in the case of any statutory exchange of securities with another corporation (including any exchange effected in connection with a merger of a third corporation into the Corporation), or (iv) other similar transaction, there shall be no adjustment under Subsection (a) of this Section 5 but the Holder of this Warrant shall have the right thereafter to receive upon exercise of this Warrant the kind and amount of shares of stock and other securities and property which he would have owned or have been entitled to receive immediately after such reorganization, reclassification, consolidation, merger, statutory exchange, sale, or conveyance had such Warrant been exercised immediately prior to the effective date of such reorganization, reclassification, consolidation, merger, statutory exchange, sale, or conveyance and, in any such case thereafter, appropriate adjustment shall be made in the application of the provisions set forth in this Section 5 with respect to the rights and interests thereafter of any Holders of the Warrant to the end that the provisions set forth in this Section 5 shall thereafter correspondingly be made applicable, as nearly as may reasonably be, in relation to any shares of stock and other securities and property thereafter deliverable on the exercise of the Warrant. The provisions of this Subsection shall similarly apply to successive consolidations, mergers, statutory exchanges, sales or conveyances. The Corporation will not effect any such reorganization, reclassification, consolidation, merger or sale unless, prior to the consummation thereof, the successor entity (if other than the Corporation) resulting from such reorganization, reclassification, consolidation, merger or sale shall assume the obligation to deliver to such Holder such shares of stock, securities or property as, in accordance with the foregoing provisions, such Holder may be entitled to purchase.

(d)    If any event of the type contemplated by the provisions of this Section 5 but not expressly provided for by such provisions (including without limitation, the granting of stock appreciation rights, phantom stock rights or other rights with equity features) occurs, then the Board shall make an appropriate adjustment in the Warrant Exercise Price and the number of

Warrant Shares issuable upon exercise of this Warrant so as to protect the rights of the Holder in a manner consistent with the provisions of this Section 5.

(e)    Upon any adjustment of the Warrant Exercise Price, then and in each such case, the Corporation shall give written notice thereof, by first-class mail, postage prepaid, addressed to the Holder as shown on the books of the Corporation, which notice shall state the Warrant Exercise Price resulting from such adjustment and the increase or decrease, if any, in the number of shares of Warrant Shares purchasable at such price upon the exercise of this Warrant, setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based.

(f)    The Corporation shall give notice to the Holder if at any time prior to the expiration or exercise in full of this Warrant, any of the following events shall occur:

(i)    The Corporation shall declare any dividend (or any other distribution in whatever form) on the Common Stock;

(ii)    The Corporation shall authorize the issuance to all holders of Common Stock of any additional shares of Common Stock or of rights, options or warrants to subscribe for or purchase Common Stock or any of any other subscription rights, options or warrants;

(iii)    A dissolution, liquidation or winding up of the Corporation (other than in connection with a consolidation, merger, or sale or conveyance of the property of the Corporation as an entirety or substantially as an entirety); or

(iv)    A capital reorganization or reclassification of the Common Stock (other than a subdivision or combination of the outstanding Common Stock and other than a change in the par value of the Common Stock) or any consolidation or merger of the Corporation with or into another corporation (other than a consolidation or merger in which the Corporation is the continuing corporation and that does not result in any reclassification or change of Common Stock outstanding) or any sale or conveyance to another corporation of the property of the Corporation as an entirety or substantially an entirety.

Such notice shall be given at least 10 business days prior to the date fixed as a record date or effective date or the date of closing of the Corporation's stock transfer books for the determination of the stockholders entitled to such dividend, distribution, or subscription rights, or for the determination of the stockholders entitled to vote on such proposed merger, consolidation, sale, conveyance, dissolution, liquidation or winding up.  Such notice shall specify such record date or the date of the closing of the stock transfer books, as the case may be.

6.    NO VOTING RIGHTS. This Warrant shall not entitle the Holder to any voting rights or other rights as a shareholder of the Corporation.

7.    NOTICE OF TRANSFER OF WARRANT OR RESALE OF THE WARRANT SHARES.

EXHIBIT A  -  43

(a)    Subject to the sale, assignment, hypothecation, or other transfer restrictions set forth in Section 1 hereof, the Holder, by acceptance hereof, agrees to give written notice to the Corporation before transferring this Warrant or transferring any Warrant Shares of such Holder's intention to do so, describing briefly the manner of any proposed transfer. Promptly upon receiving such written notice, the Corporation shall present copies thereof to the Corporation's counsel. If in the opinion of such counsel the proposed transfer may be effected without registration or qualification (under any federal or state securities laws), the Corporation, as promptly as practicable, shall notify the Holder of such opinion, whereupon the Holder shall be entitled to transfer this Warrant or to dispose of Warrant Shares received upon the previous exercise of this Warrant, all in accordance with the terms of the notice delivered by the Holder to the Corporation; provided that an appropriate legend may be endorsed on this Warrant or the certificates for such Warrant Shares respecting restrictions upon transfer thereof necessary or advisable in the opinion of counsel and satisfactory to the Corporation to prevent further transfers which would be in violation of Section 5 of the 1933 Act and applicable state securities laws; and provided further that the prospective transferee or purchaser shall execute such documents and make such representations, warranties, and agreements as may be required solely to comply with the exemptions relied upon by the Corporation for the transfer or disposition of the Warrant or Warrant Shares.

(b)    If, in the opinion of the Corporation's counsel, the proposed transfer or disposition of the Warrant or such Warrant Shares described in the written notice given pursuant to this Section 7 may not be effected without registration or qualification of this Warrant or such Warrant Shares, the Corporation shall promptly give written notice thereof to the Holder, and the Holder will limit its activities in respect to such transfer or disposition as, in the opinion of such counsel, are permitted by law.

8.    <u>FRACTIONAL SHARES</u>. Fractional shares shall not be issued upon the exercise of this Warrant, but in any case where the Holder would, except for the provisions of this Section, be entitled under the terms hereof to receive a fractional share, the Corporation shall, upon the exercise of this Warrant for the largest number of whole shares then called for, pay to Holder a sum in cash equal to such fraction multiplied by the Market Price on the day prior to the date of exercise of this Warrant in lieu of such fractional share.

9.    <u>REPRESENTATIONS OF HOLDER</u>. The holder of this Warrant, by the acceptance hereof, represents that it is acquiring this Warrant and the Warrant Shares for its own account and not with a view toward, or for resale in connection with, the public sale or distribution of this Warrant or the Warrant Shares, except pursuant to sales registered or exempted under the 1933 Act.  The holder of this Warrant further represents, by acceptance hereof, that, as of this date, the holder is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D promulgated by the Securities and Exchange Commission under the 1933 Act.  Upon exercise of this Warrant, the holder shall, if requested by the Corporation, confirm in writing, in a form satisfactory to the Corporation, representations concerning the matters described in this <u>Section 9</u>.

10.    <u>MISCELLANEOUS</u>.

(a)    NOTICES. All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed facsimile if sent during normal business hours of the recipient, if not, then on the next business day, or (c) two (2) business days after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the Corporation at the address as set forth on the signature page hereof, to the Holder at the Holder's address as appearing on the Corporation's records, or at such other address as the Corporation or Holder may designate by ten (10) days advance written notice to the other party hereto.

(b)    ATTORNEYS' FEES. If any action at law or in equity is necessary to enforce or interpret the terms of this Warrant, the prevailing party shall be entitled to reasonable attorneys' fees, costs and disbursements in addition to any other relief to which such party may be entitled.

(c)    AMENDMENTS AND WAIVERS. This Warrant may be amended or modified only upon the written consent of both Holder and the Corporation. This Warrant and any provision hereof may be waived only by an instrument in writing signed by the party against which enforcement of the same is sought.

(d)    SEVERABILITY. If one or more provisions of this Warrant are held to be unenforceable under applicable law, such provision shall be excluded from this Warrant and the balance of the Warrant shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

(e)    GOVERNING LAW. This Warrant shall be governed by and construed and enforced in accordance with the laws of the State of California, without giving effect to its conflicts of laws principles.

(f)    BINDING EFFECT. This Warrant shall be binding upon any entity succeeding the Corporation by merger, consolidation or acquisition of all or substantially all of the Corporation's assets.  All of the covenants and agreements of the Corporation shall inure to the benefit of the successors and assigns of the Holder hereof.

IN WITNESS WHEREOF, Point.360 has caused this Warrant to be signed by its duly authorized officer and this Warrant to be dated as of July ___, 2015.

POINT.360

By:_____
    Name:   Haig S. Bagerdjian
    Title:    Chief Executive Officer

    Point.360
    2701 Media Center Drive
    Los Angeles, CA 90065

## NOTICE OF EXERCISE

*(To be signed only upon exercise of the Warrant)*

To: Point.360

The undersigned hereby irrevocably elects to exercise the attached Warrant to purchase for cash, _____ of the shares issuable upon the exercise of such Warrant pursuant to Section 1(a), and requests that certificates for such shares (together with a new Warrant to purchase the number of shares, if any, with respect to which this Warrant is not exercised) shall be issued in the name of:

The undersigned hereby irrevocably elects to convert the attached Warrant into shares pursuant to Section 3(c) of the attached Warrant. This conversion is exercised with respect to _____ of the shares issuable upon the exercise of such Warrant. The undersigned requests that certificates for such shares (together with a new Warrant to purchase the number of shares, if any, with respect to which this Warrant is not exercised) shall be issued in the name of:

**[Strike paragraph above that does not apply.]**

NAME:_____

**SOC. SEC. or
TAX I.D. NO.**    _____

**ADDRESS:**    _____

_____

_____

<u>Accredited Investor</u>.  The undersigned is an "accredited investor" as defined in Regulation D promulgated under the Securities Act of 1933, as amended.

Date:_____, 201__    _____

Signature*

\*  The signature on the Notice of Exercise of Warrant must correspond to the name as written upon the face of the Warrant in every particular without alteration or enlargement or any change whatsoever. When signing on behalf of a corporation, partnership, trust or other entity, please indicate your position(s) and title(s) with such entity.

# EXHIBIT B

## GENERAL ASSIGNMENT AND BILL OF SALE

MEDLEY CAPITAL CORPORATION, a Delaware corporation, in its capacity as administrative agent ("Agent") for itself and the other Lenders (collectively, the "Lenders") under the Credit Agreement dated as of September 25, 2012 by and among Agent, Lenders, Modern VideoFilm, Inc., a Delaware corporation ("MVF"), as the borrower thereunder, MVF Wordwide Services, LLC, a Delaware limited liability company ("MVF Worldwide"), MOCA Services, LLC, a Delaware limited liability company ("MOCA"), Modern VideoFilm – GA, LLC, a Delaware limited liability company ("MVF-GA"), and Modern VideoFilm – LA, LLC, a Delaware limited liability company ("MVF-LA," and together with MVF, MVF Worldwide, MOCA, MVF-GA and MVF-LA, the "Loan Parties"), for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby sell, convey, assign, transfer and deliver to Point.360, a California corporation (the "Buyer"), and its successors and assigns forever, pursuant to Sections 9-610 through 9-619 and 9-623 through 9-628 of the UCC, the Loan Documents and other applicable law, all the right, title and interest of the Loan Parties in and to all of the personal property and assets of the Loan Parties (collectively, the "Purchased Assets") listed on Schedule I hereto.  The Purchased Assets shall also include $200,000 of the Loan Parties' cash (the "Purchased Cash").  Within Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the UCC Sale Agreement (defined below).

EXCEPT AS EXPRESSLY SET FORTH IN THAT CERTAIN SALE AGREEMENT PURSUANT TO ARTICLE 9 OF THE UNIFORM COMMERCIAL CODE, DATED AS OF JULY 8, 2015, BY AND AMONG LENDERS, BUYER AND HB (THE "UCC SALE AGREEMENT"), NEITHER AGENT NOR ANY LENDER MAKES ANY REPRESENTATION, WARRANTY, COVENANT OR UNDERTAKING, EXPRESS OR IMPLIED, WITH RESPECT TO ANY SPECIFIC ITEMS CONSTITUTING THE PROPERTY OR THE QUANTITY THEREOF, OR THE LOAN PARTIES' BUSINESS OR PROSPECTS, OR THE CONDITION, QUALITY, MERCHANTABILITY (IN THE SENSE OF A UCC WARRANTY), FITNESS FOR A PARTICULAR PURPOSE OR VALUE OF THE PROPERTY; AND THE PROPERTY IS SOLD WITHOUT RECOURSE ON AN ABSOLUTE "AS IS, WHERE IS" BASIS.

Within ten days following the Closing Date, Seller shall obtain from the Loan Parties, and deliver to Buyer, a schedule setting forth the Purchased Assets with a value of $25,000 or more (the "Material Assets") and a written certification (the "Asset Certification") providing that the Loan Parties owned such Material Assets immediately prior to the Closing Date, that such Material Assets were included in the Purchased Assets and the location of such Material Assets.  Buyer and Seller agree that the Material Assets shall constitute Purchased Assets, it being understood that the Seller and Buyer are entitled to rely on the Asset Certification.  Within five days after the Closing, Seller shall cause the Loan Parties to transfer title to the vehicles owned by the Loan Parties to the Buyer, it being understood that such vehicles constitute Purchased Assets and that there are at least seven of such vehicles.

On or after the date hereof, Agent will, at Buyer's sole expense, from time to time at Buyer's reasonable request, execute and deliver such further instruments and take or cause to be taken such other action to carry out the effect, intent and purpose of the conveyance, assignment and transfer to Buyer hereunder and otherwise in the carrying out of the intent and purposes of this General Assignment and Bill of Sale.

Dated this 8th day of July, 2015.

**MEDLEY CAPITAL CORPORATION**, a
Delaware corporation, as Agent for itself and the
Lenders

By: _____

Name: _____

Its: _____

**MEDLEY CAPITAL CORPORATION**, a
Delaware corporation, as Agent for itself and the
Lenders

By: _____

Name: _____Richard T. Allorto, Jr._____

Its: _____Chief Financial Officer_____

## <u>SCHEDULE I</u>

Except for any Excluded Assets as set forth, and defined in, <u>Schedule 1.1</u> to the UCC Sale Agreement, all of the Loan Parties' right, title and interest in and to the following personal property of each of the Loan Parties, in each case to the fullest extent Agent can transfer such right, title and interest pursuant to UCC Section 9-610. Capitalized terms used on this <u>Schedule I</u> and not otherwise defined in the UCC Sale Agreement shall have the meanings ascribed to them in that certain Guaranty and Security Agreement, dated as of September 25, 2012, by and among each grantor party thereto, in favor of Agent, on behalf of the Lenders (the "<u>Security Agreement</u>").

      (a)     all Accounts;

      (b)     all Chattel Paper;

      (c)     all Contracts;

      (d)     all Deposit Accounts;

      (e)     all Documents;

      (f)     all Equipment;

      (g)     all General Intangibles;

      (h)     all Instruments;

      (i)     all Intellectual Property;

      (j)     all Inventory;

      (k)     all Investment Property;

      (l)     all Letter-of-Credit Rights;

      (m)     all Goods and other property not otherwise described above (except for any property specifically excluded from any clause in this section above, and any property specifically excluded from any defined term used in any clause of this section above);

      (n)     all books and records pertaining to the Collateral;

      (o)     all Commercial Tort Claims listed on Schedule 5 to the Security Agreement or described in any notice sent pursuant to Section 5.9 of the Security Agreement, other than any such Commercial Tort Claims included in Excluded Assets; and

      (p)     to the extent not otherwise included, all Proceeds, Supporting Obligations and products of any and all of the foregoing and all collateral security and guarantees given by any Person to such Grantor with respect to any of the foregoing.

# EXHIBIT C

## WARRANT TO PURCHASE SHARES OF COMMON STOCK
## OF POINT.360

**THIS WARRANT AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "1933 ACT") OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS ("BLUE SKY LAWS"). NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THIS WARRANT OR THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT OR ANY INTEREST THEREIN MAY BE MADE EXCEPT (a) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE 1933 ACT AND ANY APPLICABLE BLUE SKY LAWS OR (b) IF THE CORPORATION HAS BEEN FURNISHED WITH AN OPINION OF COUNSEL FOR THE HOLDER, WHICH OPINION AND COUNSEL SHALL BE REASONABLY SATISFACTORY TO THE CORPORATION, TO THE EFFECT THAT NO REGISTRATION IS REQUIRED BECAUSE OF THE AVAILABILITY OF AN EXEMPTION FROM REGISTRATION UNDER THE 1933 ACT AND APPLICABLE BLUE SKY LAWS.**

THIS CERTIFIES THAT, for good and valuable consideration Medley Capital Corporation ("Holder"), or the Holder's registered assigns, is entitled to subscribe for and purchase from Point.360, a California corporation (the "Corporation"), 191,713 fully paid and nonassessable shares of the Common Stock of the Corporation at the price of $0.75 per share (the "Warrant Exercise Price"), as adjusted pursuant to the provisions of this Warrant. This Warrant may be exercised at any time commencing on July 8, 2015 (the "Initial Exercise Date") to and including July 7, 2020 (the "Termination Date").

The Warrant is issued pursuant to the Sale Agreement Pursuant to Article 9 of the Uniform Commercial Code, entered into as of the date hereof, between the Corporation and the Holder.

The shares which may be acquired upon exercise of this Warrant are referred to herein as the "Warrant Shares." As used herein, the term "Holder" means the Holder, any party who acquires all or a part of this Warrant as a registered transferee of the Holder, or any record holder or holders of the Warrant Shares issued upon exercise, whether in whole or in part, of the Warrant. The term "Common Stock" means the common stock, no par value, of the Corporation. The term "exercise" shall include an exercise for cash pursuant to Section 1(a) or a cashless exercise pursuant to Section 3(c).

This Warrant is subject to the following provisions, terms and conditions:

     1.    EXERCISE; TRANSFERABILITY.

     (a)    The rights represented by this Warrant may be exercised by the Holder hereof, in whole or in part, by written notice of exercise (in the form attached hereto) delivered to the Corporation at the principal office of the Corporation prior to the Termination Date and accompanied or preceded by the surrender of this Warrant along with a check in payment of the Warrant Exercise Price for such Warrant Shares or (ii) cashless exercise pursuant to Section 3(c).

(b)    Subject to compliance with any applicable securities laws and the reasonable conditions  and documentation required by the Corporation, this Warrant and all rights hereunder (including, without limitation, any registration rights) are transferable, in whole or in part, upon surrender of this Warrant at the principal office of the Corporation or its designated agent, together with a written Assignment of this Warrant substantially in the form attached hereto duly executed by the Holder or its agent or attorney and funds sufficient to pay any transfer taxes payable upon the making of such transfer.  Upon such surrender and, if required, such payment, the Company shall execute and deliver a new Warrant or Warrants in the name of the assignee or assignees, as applicable, and in the denomination or denominations specified in such instrument of assignment, and shall issue to the assignor a new Warrant evidencing the portion of this Warrant not so assigned, and this Warrant shall promptly be cancelled.  The Warrant, if properly assigned, may be exercised by a new holder for the purchase of Warrant Shares without having a new Warrant issued.

2.    EXCHANGE AND REPLACEMENT. Subject to the terms hereof, this Warrant is exchangeable upon the surrender hereof by the Holder to the Corporation at its office for new Warrants of like tenor and date representing in the aggregate the right to purchase the number of Warrant Shares purchasable hereunder, each of such new Warrants to represent the right to purchase such number of Warrant Shares (not to exceed the aggregate total number purchasable hereunder) as shall be designated by the Holder at the time of such surrender. Upon receipt by the Corporation of evidence reasonably satisfactory to it of the loss, theft, destruction, or mutilation of this Warrant, and, in case of loss, theft or destruction, of indemnity or security reasonably satisfactory to it (it being understood that a written indemnification agreement or affidavit of loss of the Holder shall be sufficient indemnity), and upon surrender and cancellation of this Warrant, if mutilated, the Corporation will make and deliver a new Warrant of like tenor, in lieu of this Warrant. This Warrant shall be promptly canceled by the Corporation upon the surrender hereof in connection with any exchange or replacement. The Corporation shall pay all expenses, taxes (other than stock transfer taxes), and other charges payable in connection with the preparation, execution, and delivery of Warrants pursuant to this Section 2. If this Warrant shall have been exercised in part, the Corporation shall, deliver to Holder a new Warrant evidencing the rights of Holder to purchase the unpurchased Warrant Shares called for by this Warrant, which new Warrant shall in all other respects be identical to this Warrant.

3.    ISSUANCE OF THE WARRANT SHARES.

(a)    The Corporation agrees that the Warrant Shares shall be and are deemed to be issued to the Holder as of the close of business on the date on which this Warrant shall have been exercised. Subject to the provisions of paragraph (b) of this Section 3, certificates for the Warrant Shares so purchased shall be delivered to the Holder promptly after the date this Warrant shall have been exercised, and, unless this Warrant has expired, a new Warrant representing the right to purchase the number of Warrant Shares, if any, with respect to which this Warrant shall not then have been exercised shall also be delivered to the Holder.

(b)    Notwithstanding the foregoing, however, the Corporation shall not be required to deliver any certificate for Warrant Shares upon exercise of this Warrant except in accordance with exemptions from the applicable securities registration requirements or registrations under applicable securities laws. Nothing herein shall obligate the Corporation to

effect registrations under federal or state securities laws. The Holder agrees to execute such documents and make such representations, warranties, and agreements as may be required solely to comply with the exemptions relied upon by the Corporation, or the registrations made, for the issuance of the Warrant Shares.

(c)    Notwithstanding any provisions herein to the contrary, in lieu of exercising this Warrant for cash, the Holder may from time to time, elect to convert this Warrant, in whole or in part, into a number of Warrant Shares equal to:

$$X = \frac{Y\,(A-B)}{A}$$

Where

$X =$    the number of Warrant Shares to be issued to the Holder

$Y =$    the number of Warrant Shares with respect to which this Warrant is being exercised

$A =$    the fair market value of one Warrant Share (at the date of such calculation)

$B =$    the Warrant Exercise Price (as adjusted to the date of such calculation)

For purposes of Rule 144 promulgated under the 1933 Act, it is intended, understood and acknowledged that the Warrant Shares issued in a cashless exercise transaction pursuant to this Section 3(c) shall be deemed to have been acquired by the Holder, and the holding period for such Warrant Shares shall be deemed to have commenced, on the Initial Exercise Date.

For purposes of this Warrant, the fair market value of one share of Common Stock shall be:

i.    the average daily Market Price (as defined below) during the period of the most recent ten (10) trading days, ending on the last business day before the effective date of exercise of the Warrant, on which the national securities exchanges or over-the-counter market in which the shares of Common Stock is quoted were open for trading.  If the Common Stock is traded on a national securities exchange or admitted to unlisted trading privileges on such an exchange, the Market Price as of a specified day shall be the last reported sale price of Common Stock on such exchange on such date or if no such sale is made on such day, the mean of the closing bid and asked prices for such day on such exchange (the "Market Price"); or

ii.    if the Common Stock is not then listed or admitted to trading on any national securities exchange or over the counter market, the fair market value shall be determined in good faith by the Board of Directors of the Corporation.

EXHIBIT C  -  54

4.     COVENANTS OF THE CORPORATION. The Corporation covenants and agrees that all Warrant Shares will, upon issuance, be duly authorized and issued, fully paid, nonassessable and free from all taxes, liens and charges with respect to the issue thereof. The Corporation further covenants and agrees that during the period within which the rights represented by this Warrant may be exercised, the Corporation will at all times have authorized and reserved for the purpose of issue or transfer upon exercise of the subscription rights evidenced by this Warrant a sufficient number of shares of Common Stock to provide for the exercise of the rights represented by this Warrant.  The Corporation will not take any action which would result in any adjustment of the Warrant Exercise Price if the total number of shares of Common Stock issuable after such action upon exercise of all outstanding warrants, together with all shares of Common Stock then outstanding and all shares of Common Stock then issuable upon exercise of all options and upon the conversion of all convertible securities then outstanding, would exceed the total number of shares of Common Stock then authorized by the Corporation's Articles of Incorporation, as amended. The Corporation shall at all times in good faith assist in the carrying out of all such terms and in the taking of all such actions as may be necessary or appropriate to protect the rights of Holder as set forth in this Warrant against impairment.

5.     CERTAIN ADJUSTMENTS. The provisions of this Warrant are subject to adjustment as provided in this Section 5.

(a)     The Warrant Exercise Price shall be adjusted from time to time such that in case the Corporation shall hereafter:

(i)     pay any dividends or make any other distribution on any class of stock of the Corporation payable in Common Stock or securities convertible into Common Stock;

(ii)     subdivide its then outstanding shares of Common Stock (by any stock split, recapitalization or otherwise) into a greater number of shares; or

(iii)     combine its then outstanding shares of Common Stock (by combination, reverse stock split or otherwise) into a smaller number of shares;

then, in any such event, the Warrant Exercise Price in effect immediately prior to such event shall (until adjusted again pursuant hereto) be adjusted immediately after such event to a price (calculated to the nearest full cent) determined by dividing (A) the number of shares of Common Stock outstanding immediately prior to such event, multiplied by the then existing Warrant Exercise Price, by (B) the total number of shares of Common Stock outstanding immediately after such event (including in each case the maximum number of shares of Common Stock issuable in respect of any securities convertible into Common Stock). An adjustment made pursuant to this Subsection shall become effective immediately after the effective date of the dividend, subdivision or combination. If, as a result of an adjustment made pursuant to this Section 5, the Holder of any Warrant thereafter surrendered for exercise shall become entitled to receive shares of two or more classes of capital stock or shares of Common Stock and other capital stock, the Board of Directors (whose determination shall be conclusive) shall determine the allocation of the adjusted Warrant Exercise Price between or among shares of such classes of

capital stock or shares of Common Stock and other capital stock. All calculations under this Subsection shall be made to the nearest cent or to the nearest 1/100 of a share, as the case may be. In the event that at any time as a result of an adjustment made pursuant to this Section 5, the holder of any Warrant thereafter surrendered for exercise shall become entitled to receive any shares of capital stock other than shares of Common Stock, thereafter the Warrant Exercise Price of such other shares so receivable upon exercise of any Warrant shall be subject to adjustment from time to time in a manner and on terms as nearly equivalent as practicable to the provisions with respect to Common Stock contained in this Section 5.

(b)    Upon each adjustment of the Warrant Exercise Price pursuant to Section 5(a) above, the Holder of each Warrant shall thereafter (until another such adjustment) be entitled to purchase at the adjusted Warrant Exercise Price the number of shares, calculated to the nearest full share, obtained by multiplying the number of shares specified in such Warrant (as adjusted as a result of all adjustments in the Warrant Exercise Price in effect prior to such adjustment) by the Warrant Exercise Price in effect prior to such adjustment and dividing the product so obtained by the adjusted Warrant Exercise Price.

(c)    In case of any (i) capital reorganization of the Company, (ii) reclassification of the stock of the Company, (iii) consolidation or merger to which the Corporation is a party other than a merger or consolidation in which the Corporation is the continuing corporation, or in case of any sale or conveyance to another corporation of the property of the Corporation as an entirety or substantially as an entirety, or in the case of any statutory exchange of securities with another corporation (including any exchange effected in connection with a merger of a third corporation into the Corporation), or (iv) other similar transaction, there shall be no adjustment under Subsection (a) of this Section 5 but the Holder of this Warrant shall have the right thereafter to receive upon exercise of this Warrant the kind and amount of shares of stock and other securities and property which he would have owned or have been entitled to receive immediately after such reorganization, reclassification, consolidation, merger, statutory exchange, sale, or conveyance had such Warrant been exercised immediately prior to the effective date of such reorganization, reclassification, consolidation, merger, statutory exchange, sale, or conveyance and, in any such case thereafter, appropriate adjustment shall be made in the application of the provisions set forth in this Section 5 with respect to the rights and interests thereafter of any Holders of the Warrant to the end that the provisions set forth in this Section 5 shall thereafter correspondingly be made applicable, as nearly as may reasonably be, in relation to any shares of stock and other securities and property thereafter deliverable on the exercise of the Warrant. The provisions of this Subsection shall similarly apply to successive consolidations, mergers, statutory exchanges, sales or conveyances. The Corporation will not effect any such reorganization, reclassification, consolidation, merger or sale unless, prior to the consummation thereof, the successor entity (if other than the Corporation) resulting from such reorganization, reclassification, consolidation, merger or sale shall assume the obligation to deliver to such Holder such shares of stock, securities or property as, in accordance with the foregoing provisions, such Holder may be entitled to purchase.

(d)    If any event of the type contemplated by the provisions of this Section 5 but not expressly provided for by such provisions (including without limitation, the granting of stock appreciation rights, phantom stock rights or other rights with equity features) occurs, then the Board shall make an appropriate adjustment in the Warrant Exercise Price and the number of

Warrant Shares issuable upon exercise of this Warrant so as to protect the rights of the Holder in a manner consistent with the provisions of this Section 5.

(e)    Upon any adjustment of the Warrant Exercise Price, then and in each such case, the Corporation shall give written notice thereof, by first-class mail, postage prepaid, addressed to the Holder as shown on the books of the Corporation, which notice shall state the Warrant Exercise Price resulting from such adjustment and the increase or decrease, if any, in the number of shares of Warrant Shares purchasable at such price upon the exercise of this Warrant, setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based.

(f)    The Corporation shall give notice to the Holder if at any time prior to the expiration or exercise in full of this Warrant, any of the following events shall occur:

(i)    The Corporation shall declare any dividend (or any other distribution in whatever form) on the Common Stock;

(ii)    The Corporation shall authorize the issuance to all holders of Common Stock of any additional shares of Common Stock or of rights, options or warrants to subscribe for or purchase Common Stock or any of any other subscription rights, options or warrants;

(iii)    A dissolution, liquidation or winding up of the Corporation (other than in connection with a consolidation, merger, or sale or conveyance of the property of the Corporation as an entirety or substantially as an entirety); or

(iv)    A capital reorganization or reclassification of the Common Stock (other than a subdivision or combination of the outstanding Common Stock and other than a change in the par value of the Common Stock) or any consolidation or merger of the Corporation with or into another corporation (other than a consolidation or merger in which the Corporation is the continuing corporation and that does not result in any reclassification or change of Common Stock outstanding) or any sale or conveyance to another corporation of the property of the Corporation as an entirety or substantially an entirety.

Such notice shall be given at least 10 business days prior to the date fixed as a record date or effective date or the date of closing of the Corporation's stock transfer books for the determination of the stockholders entitled to such dividend, distribution, or subscription rights, or for the determination of the stockholders entitled to vote on such proposed merger, consolidation, sale, conveyance, dissolution, liquidation or winding up.  Such notice shall specify such record date or the date of the closing of the stock transfer books, as the case may be.

6.    <u>NO VOTING RIGHTS</u>. This Warrant shall not entitle the Holder to any voting rights or other rights as a shareholder of the Corporation.

7.    <u>NOTICE OF TRANSFER OF WARRANT OR RESALE OF THE WARRANT SHARES</u>.

EXHIBIT C  -  57

(a)    Subject to the sale, assignment, hypothecation, or other transfer restrictions set forth in Section 1 hereof, the Holder, by acceptance hereof, agrees to give written notice to the Corporation before transferring this Warrant or transferring any Warrant Shares of such Holder's intention to do so, describing briefly the manner of any proposed transfer. Promptly upon receiving such written notice, the Corporation shall present copies thereof to the Corporation's counsel. If in the opinion of such counsel the proposed transfer may be effected without registration or qualification (under any federal or state securities laws), the Corporation, as promptly as practicable, shall notify the Holder of such opinion, whereupon the Holder shall be entitled to transfer this Warrant or to dispose of Warrant Shares received upon the previous exercise of this Warrant, all in accordance with the terms of the notice delivered by the Holder to the Corporation; provided that an appropriate legend may be endorsed on this Warrant or the certificates for such Warrant Shares respecting restrictions upon transfer thereof necessary or advisable in the opinion of counsel and satisfactory to the Corporation to prevent further transfers which would be in violation of Section 5 of the 1933 Act and applicable state securities laws; and provided further that the prospective transferee or purchaser shall execute such documents and make such representations, warranties, and agreements as may be required solely to comply with the exemptions relied upon by the Corporation for the transfer or disposition of the Warrant or Warrant Shares.

(b)    If, in the opinion of the Corporation's counsel, the proposed transfer or disposition of the Warrant or such Warrant Shares described in the written notice given pursuant to this Section 7 may not be effected without registration or qualification of this Warrant or such Warrant Shares, the Corporation shall promptly give written notice thereof to the Holder, and the Holder will limit its activities in respect to such transfer or disposition as, in the opinion of such counsel, are permitted by law.

8.    FRACTIONAL SHARES. Fractional shares shall not be issued upon the exercise of this Warrant, but in any case where the Holder would, except for the provisions of this Section, be entitled under the terms hereof to receive a fractional share, the Corporation shall, upon the exercise of this Warrant for the largest number of whole shares then called for, pay to Holder a sum in cash equal to such fraction multiplied by the Market Price on the day prior to the date of exercise of this Warrant in lieu of such fractional share.

9.    REPRESENTATIONS OF HOLDER. The holder of this Warrant, by the acceptance hereof, represents that it is acquiring this Warrant and the Warrant Shares for its own account and not with a view toward, or for resale in connection with, the public sale or distribution of this Warrant or the Warrant Shares, except pursuant to sales registered or exempted under the 1933 Act. The holder of this Warrant further represents, by acceptance hereof, that, as of this date, the holder is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D promulgated by the Securities and Exchange Commission under the 1933 Act. Upon exercise of this Warrant, the holder shall, if requested by the Corporation, confirm in writing, in a form satisfactory to the Corporation, representations concerning the matters described in this Section 9.

10.    MISCELLANEOUS.

EXHIBIT C  -  58

(a)    NOTICES. All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed facsimile if sent during normal business hours of the recipient, if not, then on the next business day, or (c) two (2) business days after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the Corporation at the address as set forth on the signature page hereof, to the Holder at the Holder's address as appearing on the Corporation's records, or at such other address as the Corporation or Holder may designate by ten (10) days advance written notice to the other party hereto.

(b)    ATTORNEYS' FEES. If any action at law or in equity is necessary to enforce or interpret the terms of this Warrant, the prevailing party shall be entitled to reasonable attorneys' fees, costs and disbursements in addition to any other relief to which such party may be entitled.

(c)    AMENDMENTS AND WAIVERS. This Warrant may be amended or modified only upon the written consent of both Holder and the Corporation. This Warrant and any provision hereof may be waived only by an instrument in writing signed by the party against which enforcement of the same is sought.

(d)    SEVERABILITY. If one or more provisions of this Warrant are held to be unenforceable under applicable law, such provision shall be excluded from this Warrant and the balance of the Warrant shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

(e)    GOVERNING LAW. This Warrant shall be governed by and construed and enforced in accordance with the laws of the State of California, without giving effect to its conflicts of laws principles.

(f)    BINDING EFFECT. This Warrant shall be binding upon any entity succeeding the Corporation by merger, consolidation or acquisition of all or substantially all of the Corporation's assets.  All of the covenants and agreements of the Corporation shall inure to the benefit of the successors and assigns of the Holder hereof.

IN WITNESS WHEREOF, Point.360 has caused this Warrant to be signed by its duly authorized officer and this Warrant to be dated as of July ___, 2015.

POINT.360

By:_____
    Name:   Haig S. Bagerdjian
    Title:    Chief Executive Officer

Point.360
2701 Media Center Drive
Los Angeles, CA 90065

MEDLEY CAPITAL CORPORATION

By:_____
    Name:
    Title:

*[Signature Page to Point.360 Warrant]*

EXHIBIT C  -  60

IN WITNESS WHEREOF, Point.360 has caused this Warrant to be signed by its duly authorized officer and this Warrant to be dated as of July ___, 2015.

POINT.360

By:_____

    Name:   Haig S. Bagerdjian
    Title:    Chief Executive Officer

    Point.360
    2701 Media Center Drive
    Los Angeles, CA 90065

MEDLEY CAPITAL CORPORATION

By:_____

    Name: Richard T. Allorto
    Title:   CFO

*[Signature Page to Point.360 Warrant]*

EXHIBIT C  -  61

## NOTICE OF EXERCISE
*(To be signed only upon exercise of the Warrant)*

To: Point.360

The undersigned hereby irrevocably elects to exercise the attached Warrant to purchase for cash, _____ of the shares issuable upon the exercise of such Warrant pursuant to Section 1(a), and requests that certificates for such shares (together with a new Warrant to purchase the number of shares, if any, with respect to which this Warrant is not exercised) shall be issued in the name of:

The undersigned hereby irrevocably elects to convert the attached Warrant into shares pursuant to Section 3(c) of the attached Warrant. This conversion is exercised with respect to _____ of the shares issuable upon the exercise of such Warrant. The undersigned requests that certificates for such shares (together with a new Warrant to purchase the number of shares, if any, with respect to which this Warrant is not exercised) shall be issued in the name of:

**[Strike paragraph above that does not apply.]**

NAME:_____

**SOC. SEC. or**
**TAX I.D. NO.**   _____

**ADDRESS:**   _____
_____
_____

<u>Accredited Investor</u>.  The undersigned is an "accredited investor" as defined in Regulation D promulgated under the Securities Act of 1933, as amended.

Date:_____, 201__   _____
Signature*

* The signature on the Notice of Exercise of Warrant must correspond to the name as written upon the face of the Warrant in every particular without alteration or enlargement or any change whatsoever. When signing on behalf of a corporation, partnership, trust or other entity, please indicate your position(s) and title(s) with such entity.

# EXHIBIT D

## WARRANT TO PURCHASE SHARES OF COMMON STOCK
## OF POINT.360

**THIS WARRANT AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "1933 ACT") OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS ("BLUE SKY LAWS"). NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THIS WARRANT OR THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT OR ANY INTEREST THEREIN MAY BE MADE EXCEPT (a) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE 1933 ACT AND ANY APPLICABLE BLUE SKY LAWS OR (b) IF THE CORPORATION HAS BEEN FURNISHED WITH AN OPINION OF COUNSEL FOR THE HOLDER, WHICH OPINION AND COUNSEL SHALL BE REASONABLY SATISFACTORY TO THE CORPORATION, TO THE EFFECT THAT NO REGISTRATION IS REQUIRED BECAUSE OF THE AVAILABILITY OF AN EXEMPTION FROM REGISTRATION UNDER THE 1933 ACT AND APPLICABLE BLUE SKY LAWS.**

THIS CERTIFIES THAT, for good and valuable consideration Medley Opportunity Fund II LP ("Holder"), or the Holder's registered assigns, is entitled to subscribe for and purchase from Point.360, a California corporation (the "Corporation"), 407,391 fully paid and nonassessable shares of the Common Stock of the Corporation at the price of $0.75 per share (the "Warrant Exercise Price"), as adjusted pursuant to the provisions of this Warrant. This Warrant may be exercised at any time commencing on July 8, 2015 (the "Initial Exercise Date") to and including July 7, 2020 (the "Termination Date").

The Warrant is issued pursuant to the Sale Agreement Pursuant to Article 9 of the Uniform Commercial Code, entered into as of the date hereof, between the Corporation and the Holder.

The shares which may be acquired upon exercise of this Warrant are referred to herein as the "Warrant Shares." As used herein, the term "Holder" means the Holder, any party who acquires all or a part of this Warrant as a registered transferee of the Holder, or any record holder or holders of the Warrant Shares issued upon exercise, whether in whole or in part, of the Warrant. The term "Common Stock" means the common stock, no par value, of the Corporation. The term "exercise" shall include an exercise for cash pursuant to Section 1(a) or a cashless exercise pursuant to Section 3(c).

This Warrant is subject to the following provisions, terms and conditions:

    1.    EXERCISE; TRANSFERABILITY.

        (a)    The rights represented by this Warrant may be exercised by the Holder hereof, in whole or in part, by written notice of exercise (in the form attached hereto) delivered to the Corporation at the principal office of the Corporation prior to the Termination Date and accompanied or preceded by the surrender of this Warrant along with a check in payment of the Warrant Exercise Price for such Warrant Shares or (ii) cashless exercise pursuant to Section 3(c).

(b)      Subject to compliance with any applicable securities laws and the reasonable conditions  and documentation required by the Corporation, this Warrant and all rights hereunder (including, without limitation, any registration rights) are transferable, in whole or in part, upon surrender of this Warrant at the principal office of the Corporation or its designated agent, together with a written Assignment of this Warrant substantially in the form attached hereto duly executed by the Holder or its agent or attorney and funds sufficient to pay any transfer taxes payable upon the making of such transfer.  Upon such surrender and, if required, such payment, the Company shall execute and deliver a new Warrant or Warrants in the name of the assignee or assignees, as applicable, and in the denomination or denominations specified in such instrument of assignment, and shall issue to the assignor a new Warrant evidencing the portion of this Warrant not so assigned, and this Warrant shall promptly be cancelled.  The Warrant, if properly assigned, may be exercised by a new holder for the purchase of Warrant Shares without having a new Warrant issued.

2.      EXCHANGE AND REPLACEMENT. Subject to the terms hereof, this Warrant is exchangeable upon the surrender hereof by the Holder to the Corporation at its office for new Warrants of like tenor and date representing in the aggregate the right to purchase the number of Warrant Shares purchasable hereunder, each of such new Warrants to represent the right to purchase such number of Warrant Shares (not to exceed the aggregate total number purchasable hereunder) as shall be designated by the Holder at the time of such surrender. Upon receipt by the Corporation of evidence reasonably satisfactory to it of the loss, theft, destruction, or mutilation of this Warrant, and, in case of loss, theft or destruction, of indemnity or security reasonably satisfactory to it (it being understood that a written indemnification agreement or affidavit of loss of the Holder shall be sufficient indemnity), and upon surrender and cancellation of this Warrant, if mutilated, the Corporation will make and deliver a new Warrant of like tenor, in lieu of this Warrant. This Warrant shall be promptly canceled by the Corporation upon the surrender hereof in connection with any exchange or replacement. The Corporation shall pay all expenses, taxes (other than stock transfer taxes), and other charges payable in connection with the preparation, execution, and delivery of Warrants pursuant to this Section 2. If this Warrant shall have been exercised in part, the Corporation shall, deliver to Holder a new Warrant evidencing the rights of Holder to purchase the unpurchased Warrant Shares called for by this Warrant, which new Warrant shall in all other respects be identical to this Warrant.

3.      ISSUANCE OF THE WARRANT SHARES.

(a)      The Corporation agrees that the Warrant Shares shall be and are deemed to be issued to the Holder as of the close of business on the date on which this Warrant shall have been exercised. Subject to the provisions of paragraph (b) of this Section 3, certificates for the Warrant Shares so purchased shall be delivered to the Holder promptly after the date this Warrant shall have been exercised, and, unless this Warrant has expired, a new Warrant representing the right to purchase the number of Warrant Shares, if any, with respect to which this Warrant shall not then have been exercised shall also be delivered to the Holder.

(b)      Notwithstanding the foregoing, however, the Corporation shall not be required to deliver any certificate for Warrant Shares upon exercise of this Warrant except in accordance with exemptions from the applicable securities registration requirements or registrations under applicable securities laws. Nothing herein shall obligate the Corporation to

effect registrations under federal or state securities laws. The Holder agrees to execute such documents and make such representations, warranties, and agreements as may be required solely to comply with the exemptions relied upon by the Corporation, or the registrations made, for the issuance of the Warrant Shares.

(c)    Notwithstanding any provisions herein to the contrary, in lieu of exercising this Warrant for cash, the Holder may from time to time, elect to convert this Warrant, in whole or in part, into a number of Warrant Shares equal to:

$$X = \frac{Y(A-B)}{A}$$

Where

$X =$    the number of Warrant Shares to be issued to the Holder

$Y =$    the number of Warrant Shares with respect to which this Warrant is being exercised

$A =$    the fair market value of one Warrant Share (at the date of such calculation)

$B =$    the Warrant Exercise Price (as adjusted to the date of such calculation)

For purposes of Rule 144 promulgated under the 1933 Act, it is intended, understood and acknowledged that the Warrant Shares issued in a cashless exercise transaction pursuant to this Section 3(c) shall be deemed to have been acquired by the Holder, and the holding period for such Warrant Shares shall be deemed to have commenced, on the Initial Exercise Date.

For purposes of this Warrant, the fair market value of one share of Common Stock shall be:

i.    the average daily Market Price (as defined below) during the period of the most recent ten (10) trading days, ending on the last business day before the effective date of exercise of the Warrant, on which the national securities exchanges or over-the-counter market in which the shares of Common Stock is quoted were open for trading.  If the Common Stock is traded on a national securities exchange or admitted to unlisted trading privileges on such an exchange, the Market Price as of a specified day shall be the last reported sale price of Common Stock on such exchange on such date or if no such sale is made on such day, the mean of the closing bid and asked prices for such day on such exchange (the "Market Price"); or

ii.    if the Common Stock is not then listed or admitted to trading on any national securities exchange or over the counter market, the fair market value shall be determined in good faith by the Board of Directors of the Corporation.

4.    COVENANTS OF THE CORPORATION. The Corporation covenants and agrees that all Warrant Shares will, upon issuance, be duly authorized and issued, fully paid, nonassessable and free from all taxes, liens and charges with respect to the issue thereof. The Corporation further covenants and agrees that during the period within which the rights represented by this Warrant may be exercised, the Corporation will at all times have authorized and reserved for the purpose of issue or transfer upon exercise of the subscription rights evidenced by this Warrant a sufficient number of shares of Common Stock to provide for the exercise of the rights represented by this Warrant.  The Corporation will not take any action which would result in any adjustment of the Warrant Exercise Price if the total number of shares of Common Stock issuable after such action upon exercise of all outstanding warrants, together with all shares of Common Stock then outstanding and all shares of Common Stock then issuable upon exercise of all options and upon the conversion of all convertible securities then outstanding, would exceed the total number of shares of Common Stock then authorized by the Corporation's Articles of Incorporation, as amended. The Corporation shall at all times in good faith assist in the carrying out of all such terms and in the taking of all such actions as may be necessary or appropriate to protect the rights of Holder as set forth in this Warrant against impairment.

5.    CERTAIN ADJUSTMENTS. The provisions of this Warrant are subject to adjustment as provided in this Section 5.

(a)    The Warrant Exercise Price shall be adjusted from time to time such that in case the Corporation shall hereafter:

(i)    pay any dividends or make any other distribution on any class of stock of the Corporation payable in Common Stock or securities convertible into Common Stock;

(ii)    subdivide its then outstanding shares of Common Stock (by any stock split, recapitalization or otherwise) into a greater number of shares; or

(iii)    combine its then outstanding shares of Common Stock (by combination, reverse stock split or otherwise) into a smaller number of shares;

then, in any such event, the Warrant Exercise Price in effect immediately prior to such event shall (until adjusted again pursuant hereto) be adjusted immediately after such event to a price (calculated to the nearest full cent) determined by dividing (A) the number of shares of Common Stock outstanding immediately prior to such event, multiplied by the then existing Warrant Exercise Price, by (B) the total number of shares of Common Stock outstanding immediately after such event (including in each case the maximum number of shares of Common Stock issuable in respect of any securities convertible into Common Stock). An adjustment made pursuant to this Subsection shall become effective immediately after the effective date of the dividend, subdivision or combination. If, as a result of an adjustment made pursuant to this Section 5, the Holder of any Warrant thereafter surrendered for exercise shall become entitled to receive shares of two or more classes of capital stock or shares of Common Stock and other capital stock, the Board of Directors (whose determination shall be conclusive) shall determine the allocation of the adjusted Warrant Exercise Price between or among shares of such classes of

capital stock or shares of Common Stock and other capital stock. All calculations under this Subsection shall be made to the nearest cent or to the nearest 1/100 of a share, as the case may be. In the event that at any time as a result of an adjustment made pursuant to this Section 5, the holder of any Warrant thereafter surrendered for exercise shall become entitled to receive any shares of capital stock other than shares of Common Stock, thereafter the Warrant Exercise Price of such other shares so receivable upon exercise of any Warrant shall be subject to adjustment from time to time in a manner and on terms as nearly equivalent as practicable to the provisions with respect to Common Stock contained in this Section 5.

(b)     Upon each adjustment of the Warrant Exercise Price pursuant to Section 5(a) above, the Holder of each Warrant shall thereafter (until another such adjustment) be entitled to purchase at the adjusted Warrant Exercise Price the number of shares, calculated to the nearest full share, obtained by multiplying the number of shares specified in such Warrant (as adjusted as a result of all adjustments in the Warrant Exercise Price in effect prior to such adjustment) by the Warrant Exercise Price in effect prior to such adjustment and dividing the product so obtained by the adjusted Warrant Exercise Price.

(c)     In case of any (i) capital reorganization of the Company, (ii) reclassification of the stock of the Company, (iii) consolidation or merger to which the Corporation is a party other than a merger or consolidation in which the Corporation is the continuing corporation, or in case of any sale or conveyance to another corporation of the property of the Corporation as an entirety or substantially as an entirety, or in the case of any statutory exchange of securities with another corporation (including any exchange effected in connection with a merger of a third corporation into the Corporation), or (iv) other similar transaction, there shall be no adjustment under Subsection (a) of this Section 5 but the Holder of this Warrant shall have the right thereafter to receive upon exercise of this Warrant the kind and amount of shares of stock and other securities and property which he would have owned or have been entitled to receive immediately after such reorganization, reclassification, consolidation, merger, statutory exchange, sale, or conveyance had such Warrant been exercised immediately prior to the effective date of such reorganization, reclassification, consolidation, merger, statutory exchange, sale, or conveyance and, in any such case thereafter, appropriate adjustment shall be made in the application of the provisions set forth in this Section 5 with respect to the rights and interests thereafter of any Holders of the Warrant to the end that the provisions set forth in this Section 5 shall thereafter correspondingly be made applicable, as nearly as may reasonably be, in relation to any shares of stock and other securities and property thereafter deliverable on the exercise of the Warrant. The provisions of this Subsection shall similarly apply to successive consolidations, mergers, statutory exchanges, sales or conveyances. The Corporation will not effect any such reorganization, reclassification, consolidation, merger or sale unless, prior to the consummation thereof, the successor entity (if other than the Corporation) resulting from such reorganization, reclassification, consolidation, merger or sale shall assume the obligation to deliver to such Holder such shares of stock, securities or property as, in accordance with the foregoing provisions, such Holder may be entitled to purchase.

(d)     If any event of the type contemplated by the provisions of this Section 5 but not expressly provided for by such provisions (including without limitation, the granting of stock appreciation rights, phantom stock rights or other rights with equity features) occurs, then the Board shall make an appropriate adjustment in the Warrant Exercise Price and the number of

Warrant Shares issuable upon exercise of this Warrant so as to protect the rights of the Holder in a manner consistent with the provisions of this Section 5.

(e)     Upon any adjustment of the Warrant Exercise Price, then and in each such case, the Corporation shall give written notice thereof, by first-class mail, postage prepaid, addressed to the Holder as shown on the books of the Corporation, which notice shall state the Warrant Exercise Price resulting from such adjustment and the increase or decrease, if any, in the number of shares of Warrant Shares purchasable at such price upon the exercise of this Warrant, setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based.

(f)     The Corporation shall give notice to the Holder if at any time prior to the expiration or exercise in full of this Warrant, any of the following events shall occur:

(i)     The Corporation shall declare any dividend (or any other distribution in whatever form) on the Common Stock;

(ii)     The Corporation shall authorize the issuance to all holders of Common Stock of any additional shares of Common Stock or of rights, options or warrants to subscribe for or purchase Common Stock or any of any other subscription rights, options or warrants;

(iii)     A dissolution, liquidation or winding up of the Corporation (other than in connection with a consolidation, merger, or sale or conveyance of the property of the Corporation as an entirety or substantially as an entirety); or

(iv)     A capital reorganization or reclassification of the Common Stock (other than a subdivision or combination of the outstanding Common Stock and other than a change in the par value of the Common Stock) or any consolidation or merger of the Corporation with or into another corporation (other than a consolidation or merger in which the Corporation is the continuing corporation and that does not result in any reclassification or change of Common Stock outstanding) or any sale or conveyance to another corporation of the property of the Corporation as an entirety or substantially an entirety.

Such notice shall be given at least 10 business days prior to the date fixed as a record date or effective date or the date of closing of the Corporation's stock transfer books for the determination of the stockholders entitled to such dividend, distribution, or subscription rights, or for the determination of the stockholders entitled to vote on such proposed merger, consolidation, sale, conveyance, dissolution, liquidation or winding up.  Such notice shall specify such record date or the date of the closing of the stock transfer books, as the case may be.

6.     NO VOTING RIGHTS. This Warrant shall not entitle the Holder to any voting rights or other rights as a shareholder of the Corporation.

7.     NOTICE OF TRANSFER OF WARRANT OR RESALE OF THE WARRANT SHARES.

(a)      Subject to the sale, assignment, hypothecation, or other transfer restrictions set forth in Section 1 hereof, the Holder, by acceptance hereof, agrees to give written notice to the Corporation before transferring this Warrant or transferring any Warrant Shares of such Holder's intention to do so, describing briefly the manner of any proposed transfer. Promptly upon receiving such written notice, the Corporation shall present copies thereof to the Corporation's counsel. If in the opinion of such counsel the proposed transfer may be effected without registration or qualification (under any federal or state securities laws), the Corporation, as promptly as practicable, shall notify the Holder of such opinion, whereupon the Holder shall be entitled to transfer this Warrant or to dispose of Warrant Shares received upon the previous exercise of this Warrant, all in accordance with the terms of the notice delivered by the Holder to the Corporation; provided that an appropriate legend may be endorsed on this Warrant or the certificates for such Warrant Shares respecting restrictions upon transfer thereof necessary or advisable in the opinion of counsel and satisfactory to the Corporation to prevent further transfers which would be in violation of Section 5 of the 1933 Act and applicable state securities laws; and provided further that the prospective transferee or purchaser shall execute such documents and make such representations, warranties, and agreements as may be required solely to comply with the exemptions relied upon by the Corporation for the transfer or disposition of the Warrant or Warrant Shares.

(b)      If, in the opinion of the Corporation's counsel, the proposed transfer or disposition of the Warrant or such Warrant Shares described in the written notice given pursuant to this Section 7 may not be effected without registration or qualification of this Warrant or such Warrant Shares, the Corporation shall promptly give written notice thereof to the Holder, and the Holder will limit its activities in respect to such transfer or disposition as, in the opinion of such counsel, are permitted by law.

8.      FRACTIONAL SHARES. Fractional shares shall not be issued upon the exercise of this Warrant, but in any case where the Holder would, except for the provisions of this Section, be entitled under the terms hereof to receive a fractional share, the Corporation shall, upon the exercise of this Warrant for the largest number of whole shares then called for, pay to Holder a sum in cash equal to such fraction multiplied by the Market Price on the day prior to the date of exercise of this Warrant in lieu of such fractional share.

9.      REPRESENTATIONS OF HOLDER. The holder of this Warrant, by the acceptance hereof, represents that it is acquiring this Warrant and the Warrant Shares for its own account and not with a view toward, or for resale in connection with, the public sale or distribution of this Warrant or the Warrant Shares, except pursuant to sales registered or exempted under the 1933 Act. The holder of this Warrant further represents, by acceptance hereof, that, as of this date, the holder is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D promulgated by the Securities and Exchange Commission under the 1933 Act. Upon exercise of this Warrant, the holder shall, if requested by the Corporation, confirm in writing, in a form satisfactory to the Corporation, representations concerning the matters described in this Section 9.

10.      MISCELLANEOUS.

(a)    NOTICES. All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed facsimile if sent during normal business hours of the recipient, if not, then on the next business day, or (c) two (2) business days after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the Corporation at the address as set forth on the signature page hereof, to the Holder at the Holder's address as appearing on the Corporation's records, or at such other address as the Corporation or Holder may designate by ten (10) days advance written notice to the other party hereto.

(b)    ATTORNEYS' FEES. If any action at law or in equity is necessary to enforce or interpret the terms of this Warrant, the prevailing party shall be entitled to reasonable attorneys' fees, costs and disbursements in addition to any other relief to which such party may be entitled.

(c)    AMENDMENTS AND WAIVERS. This Warrant may be amended or modified only upon the written consent of both Holder and the Corporation. This Warrant and any provision hereof may be waived only by an instrument in writing signed by the party against which enforcement of the same is sought.

(d)    SEVERABILITY. If one or more provisions of this Warrant are held to be unenforceable under applicable law, such provision shall be excluded from this Warrant and the balance of the Warrant shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

(e)    GOVERNING LAW. This Warrant shall be governed by and construed and enforced in accordance with the laws of the State of California, without giving effect to its conflicts of laws principles.

(f)    BINDING EFFECT. This Warrant shall be binding upon any entity succeeding the Corporation by merger, consolidation or acquisition of all or substantially all of the Corporation's assets.  All of the covenants and agreements of the Corporation shall inure to the benefit of the successors and assigns of the Holder hereof.

IN WITNESS WHEREOF, Point.360 has caused this Warrant to be signed by its duly authorized officer and this Warrant to be dated as of July ___, 2015.

POINT.360

By:_____
    Name:   Haig S. Bagerdjian
    Title:    Chief Executive Officer

Point.360
2701 Media Center Drive
Los Angeles, CA 90065

MEDLEY OPPORTUNITY FUND II LP

By:_____
    Name:
    Title:

*[Signature Page to Point.360 Warrant]*

IN WITNESS WHEREOF, Point.360 has caused this Warrant to be signed by its duly authorized officer and this Warrant to be dated as of July ___, 2015.

POINT.360

By:_____
    Name:  Haig S. Bagerdjian
    Title:    Chief Executive Officer

    Point.360
    2701 Media Center Drive
    Los Angeles, CA 90065

MEDLEY OPPORTUNITY FUND II LP

By:_____
    Name:  Richard T. Allorto
    Title:    CFO

*[Signature Page to Point.360 Warrant]*

EXHIBIT D  -  72

## NOTICE OF EXERCISE

*(To be signed only upon exercise of the Warrant)*

To: Point.360

The undersigned hereby irrevocably elects to exercise the attached Warrant to purchase for cash, _____ of the shares issuable upon the exercise of such Warrant pursuant to Section 1(a), and requests that certificates for such shares (together with a new Warrant to purchase the number of shares, if any, with respect to which this Warrant is not exercised) shall be issued in the name of:

The undersigned hereby irrevocably elects to convert the attached Warrant into shares pursuant to Section 3(c) of the attached Warrant. This conversion is exercised with respect to _____ of the shares issuable upon the exercise of such Warrant. The undersigned requests that certificates for such shares (together with a new Warrant to purchase the number of shares, if any, with respect to which this Warrant is not exercised) shall be issued in the name of:

**[Strike paragraph above that does not apply.]**

NAME:_____

**SOC. SEC. or
TAX I.D. NO.**   _____

**ADDRESS:**   _____
_____
_____

Accredited Investor. The undersigned is an "accredited investor" as defined in Regulation D promulgated under the Securities Act of 1933, as amended.

Date:_____, 201__   _____
Signature*

* The signature on the Notice of Exercise of Warrant must correspond to the name as written upon the face of the Warrant in every particular without alteration or enlargement or any change whatsoever. When signing on behalf of a corporation, partnership, trust or other entity, please indicate your position(s) and title(s) with such entity.

# EXHIBIT E

## WARRANT TO PURCHASE SHARES OF COMMON STOCK
## OF POINT.360

**THIS WARRANT AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "1933 ACT") OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS ("BLUE SKY LAWS"). NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THIS WARRANT OR THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT OR ANY INTEREST THEREIN MAY BE MADE EXCEPT (a) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE 1933 ACT AND ANY APPLICABLE BLUE SKY LAWS OR (b) IF THE CORPORATION HAS BEEN FURNISHED WITH AN OPINION OF COUNSEL FOR THE HOLDER, WHICH OPINION AND COUNSEL SHALL BE REASONABLY SATISFACTORY TO THE CORPORATION, TO THE EFFECT THAT NO REGISTRATION IS REQUIRED BECAUSE OF THE AVAILABILITY OF AN EXEMPTION FROM REGISTRATION UNDER THE 1933 ACT AND APPLICABLE BLUE SKY LAWS.**

THIS CERTIFIES THAT, for good and valuable consideration Congruent Credit Opportunities Fund II, LP ("Holder"), or the Holder's registered assigns, is entitled to subscribe for and purchase from Point.360, a California corporation (the "Corporation"), 135,433 fully paid and nonassessable shares of the Common Stock of the Corporation at the price of $0.75 per share (the "Warrant Exercise Price"), as adjusted pursuant to the provisions of this Warrant. This Warrant may be exercised at any time commencing on July 8, 2015 (the "Initial Exercise Date") to and including July 7, 2020 (the "Termination Date").

The Warrant is issued pursuant to the Sale Agreement Pursuant to Article 9 of the Uniform Commercial Code, entered into as of the date hereof, between the Corporation and the Holder.

The shares which may be acquired upon exercise of this Warrant are referred to herein as the "Warrant Shares." As used herein, the term "Holder" means the Holder, any party who acquires all or a part of this Warrant as a registered transferee of the Holder, or any record holder or holders of the Warrant Shares issued upon exercise, whether in whole or in part, of the Warrant. The term "Common Stock" means the common stock, no par value, of the Corporation. The term "exercise" shall include an exercise for cash pursuant to Section 1(a) or a cashless exercise pursuant to Section 3(c).

This Warrant is subject to the following provisions, terms and conditions:

1.     EXERCISE; TRANSFERABILITY.

    (a)    The rights represented by this Warrant may be exercised by the Holder hereof, in whole or in part, by written notice of exercise (in the form attached hereto) delivered to the Corporation at the principal office of the Corporation prior to the Termination Date and accompanied or preceded by the surrender of this Warrant along with a check in payment of the Warrant Exercise Price for such Warrant Shares or (ii) cashless exercise pursuant to Section 3(c).

(b)    Subject to compliance with any applicable securities laws and the reasonable conditions  and documentation required by the Corporation, this Warrant and all rights hereunder (including, without limitation, any registration rights) are transferable, in whole or in part, upon surrender of this Warrant at the principal office of the Corporation or its designated agent, together with a written Assignment of this Warrant substantially in the form attached hereto duly executed by the Holder or its agent or attorney and funds sufficient to pay any transfer taxes payable upon the making of such transfer.  Upon such surrender and, if required, such payment, the Company shall execute and deliver a new Warrant or Warrants in the name of the assignee or assignees, as applicable, and in the denomination or denominations specified in such instrument of assignment, and shall issue to the assignor a new Warrant evidencing the portion of this Warrant not so assigned, and this Warrant shall promptly be cancelled. The Warrant, if properly assigned, may be exercised by a new holder for the purchase of Warrant Shares without having a new Warrant issued.

2.    EXCHANGE AND REPLACEMENT. Subject to the terms hereof, this Warrant is exchangeable upon the surrender hereof by the Holder to the Corporation at its office for new Warrants of like tenor and date representing in the aggregate the right to purchase the number of Warrant Shares purchasable hereunder, each of such new Warrants to represent the right to purchase such number of Warrant Shares (not to exceed the aggregate total number purchasable hereunder) as shall be designated by the Holder at the time of such surrender. Upon receipt by the Corporation of evidence reasonably satisfactory to it of the loss, theft, destruction, or mutilation of this Warrant, and, in case of loss, theft or destruction, of indemnity or security reasonably satisfactory to it (it being understood that a written indemnification agreement or affidavit of loss of the Holder shall be sufficient indemnity), and upon surrender and cancellation of this Warrant, if mutilated, the Corporation will make and deliver a new Warrant of like tenor, in lieu of this Warrant. This Warrant shall be promptly canceled by the Corporation upon the surrender hereof in connection with any exchange or replacement. The Corporation shall pay all expenses, taxes (other than stock transfer taxes), and other charges payable in connection with the preparation, execution, and delivery of Warrants pursuant to this Section 2. If this Warrant shall have been exercised in part, the Corporation shall, deliver to Holder a new Warrant evidencing the rights of Holder to purchase the unpurchased Warrant Shares called for by this Warrant, which new Warrant shall in all other respects be identical to this Warrant.

3.    ISSUANCE OF THE WARRANT SHARES.

(a)    The Corporation agrees that the Warrant Shares shall be and are deemed to be issued to the Holder as of the close of business on the date on which this Warrant shall have been exercised. Subject to the provisions of paragraph (b) of this Section 3, certificates for the Warrant Shares so purchased shall be delivered to the Holder promptly after the date this Warrant shall have been exercised, and, unless this Warrant has expired, a new Warrant representing the right to purchase the number of Warrant Shares, if any, with respect to which this Warrant shall not then have been exercised shall also be delivered to the Holder.

(b)    Notwithstanding the foregoing, however, the Corporation shall not be required to deliver any certificate for Warrant Shares upon exercise of this Warrant except in accordance with exemptions from the applicable securities registration requirements or registrations under applicable securities laws. Nothing herein shall obligate the Corporation to

effect registrations under federal or state securities laws. The Holder agrees to execute such documents and make such representations, warranties, and agreements as may be required solely to comply with the exemptions relied upon by the Corporation, or the registrations made, for the issuance of the Warrant Shares.

(c)     Notwithstanding any provisions herein to the contrary, in lieu of exercising this Warrant for cash, the Holder may from time to time, elect to convert this Warrant, in whole or in part, into a number of Warrant Shares equal to:

$$X = \frac{Y (A-B)}{A}$$

Where            $X =$  the number of Warrant Shares to be issued to the Holder

$Y =$  the number of Warrant Shares with respect to which this Warrant is being exercised

$A =$  the fair market value of one Warrant Share (at the date of such calculation)

$B =$  the Warrant Exercise Price (as adjusted to the date of such calculation)

For purposes of Rule 144 promulgated under the 1933 Act, it is intended, understood and acknowledged that the Warrant Shares issued in a cashless exercise transaction pursuant to this Section 3(c) shall be deemed to have been acquired by the Holder, and the holding period for such Warrant Shares shall be deemed to have commenced, on the Initial Exercise Date.

For purposes of this Warrant, the fair market value of one share of Common Stock shall be:

i.    the average daily Market Price (as defined below) during the period of the most recent ten (10) trading days, ending on the last business day before the effective date of exercise of the Warrant, on which the national securities exchanges or over-the-counter market in which the shares of Common Stock is quoted were open for trading. If the Common Stock is traded on a national securities exchange or admitted to unlisted trading privileges on such an exchange, the Market Price as of a specified day shall be the last reported sale price of Common Stock on such exchange on such date or if no such sale is made on such day, the mean of the closing bid and asked prices for such day on such exchange (the "Market Price"); or

ii.   if the Common Stock is not then listed or admitted to trading on any national securities exchange or over the counter market, the fair market value shall be determined in good faith by the Board of Directors of the Corporation.

4.    COVENANTS OF THE CORPORATION. The Corporation covenants and agrees that all Warrant Shares will, upon issuance, be duly authorized and issued, fully paid, nonassessable and free from all taxes, liens and charges with respect to the issue thereof. The Corporation further covenants and agrees that during the period within which the rights represented by this Warrant may be exercised, the Corporation will at all times have authorized and reserved for the purpose of issue or transfer upon exercise of the subscription rights evidenced by this Warrant a sufficient number of shares of Common Stock to provide for the exercise of the rights represented by this Warrant. The Corporation will not take any action which would result in any adjustment of the Warrant Exercise Price if the total number of shares of Common Stock issuable after such action upon exercise of all outstanding warrants, together with all shares of Common Stock then outstanding and all shares of Common Stock then issuable upon exercise of all options and upon the conversion of all convertible securities then outstanding, would exceed the total number of shares of Common Stock then authorized by the Corporation's Articles of Incorporation, as amended. The Corporation shall at all times in good faith assist in the carrying out of all such terms and in the taking of all such actions as may be necessary or appropriate to protect the rights of Holder as set forth in this Warrant against impairment.

5.    CERTAIN ADJUSTMENTS. The provisions of this Warrant are subject to adjustment as provided in this Section 5.

(a)    The Warrant Exercise Price shall be adjusted from time to time such that in case the Corporation shall hereafter:

(i)    pay any dividends or make any other distribution on any class of stock of the Corporation payable in Common Stock or securities convertible into Common Stock;

(ii)    subdivide its then outstanding shares of Common Stock (by any stock split, recapitalization or otherwise) into a greater number of shares; or

(iii)    combine its then outstanding shares of Common Stock (by combination, reverse stock split or otherwise) into a smaller number of shares;

then, in any such event, the Warrant Exercise Price in effect immediately prior to such event shall (until adjusted again pursuant hereto) be adjusted immediately after such event to a price (calculated to the nearest full cent) determined by dividing (A) the number of shares of Common Stock outstanding immediately prior to such event, multiplied by the then existing Warrant Exercise Price, by (B) the total number of shares of Common Stock outstanding immediately after such event (including in each case the maximum number of shares of Common Stock issuable in respect of any securities convertible into Common Stock). An adjustment made pursuant to this Subsection shall become effective immediately after the effective date of the dividend, subdivision or combination. If, as a result of an adjustment made pursuant to this Section 5, the Holder of any Warrant thereafter surrendered for exercise shall become entitled to receive shares of two or more classes of capital stock or shares of Common Stock and other capital stock, the Board of Directors (whose determination shall be conclusive) shall determine the allocation of the adjusted Warrant Exercise Price between or among shares of such classes of

capital stock or shares of Common Stock and other capital stock. All calculations under this Subsection shall be made to the nearest cent or to the nearest 1/100 of a share, as the case may be. In the event that at any time as a result of an adjustment made pursuant to this Section 5, the holder of any Warrant thereafter surrendered for exercise shall become entitled to receive any shares of capital stock other than shares of Common Stock, thereafter the Warrant Exercise Price of such other shares so receivable upon exercise of any Warrant shall be subject to adjustment from time to time in a manner and on terms as nearly equivalent as practicable to the provisions with respect to Common Stock contained in this Section 5.

(b)     Upon each adjustment of the Warrant Exercise Price pursuant to Section 5(a) above, the Holder of each Warrant shall thereafter (until another such adjustment) be entitled to purchase at the adjusted Warrant Exercise Price the number of shares, calculated to the nearest full share, obtained by multiplying the number of shares specified in such Warrant (as adjusted as a result of all adjustments in the Warrant Exercise Price in effect prior to such adjustment) by the Warrant Exercise Price in effect prior to such adjustment and dividing the product so obtained by the adjusted Warrant Exercise Price.

(c)     In case of any (i) capital reorganization of the Company, (ii) reclassification of the stock of the Company, (iii) consolidation or merger to which the Corporation is a party other than a merger or consolidation in which the Corporation is the continuing corporation, or in case of any sale or conveyance to another corporation of the property of the Corporation as an entirety or substantially as an entirety, or in the case of any statutory exchange of securities with another corporation (including any exchange effected in connection with a merger of a third corporation into the Corporation), or (iv) other similar transaction, there shall be no adjustment under Subsection (a) of this Section 5 but the Holder of this Warrant shall have the right thereafter to receive upon exercise of this Warrant the kind and amount of shares of stock and other securities and property which he would have owned or have been entitled to receive immediately after such reorganization, reclassification, consolidation, merger, statutory exchange, sale, or conveyance had such Warrant been exercised immediately prior to the effective date of such reorganization, reclassification, consolidation, merger, statutory exchange, sale, or conveyance and, in any such case thereafter, appropriate adjustment shall be made in the application of the provisions set forth in this Section 5 with respect to the rights and interests thereafter of any Holders of the Warrant to the end that the provisions set forth in this Section 5 shall thereafter correspondingly be made applicable, as nearly as may reasonably be, in relation to any shares of stock and other securities and property thereafter deliverable on the exercise of the Warrant. The provisions of this Subsection shall similarly apply to successive consolidations, mergers, statutory exchanges, sales or conveyances. The Corporation will not effect any such reorganization, reclassification, consolidation, merger or sale unless, prior to the consummation thereof, the successor entity (if other than the Corporation) resulting from such reorganization, reclassification, consolidation, merger or sale shall assume the obligation to deliver to such Holder such shares of stock, securities or property as, in accordance with the foregoing provisions, such Holder may be entitled to purchase.

(d)     If any event of the type contemplated by the provisions of this Section 5 but not expressly provided for by such provisions (including without limitation, the granting of stock appreciation rights, phantom stock rights or other rights with equity features) occurs, then the Board shall make an appropriate adjustment in the Warrant Exercise Price and the number of

Warrant Shares issuable upon exercise of this Warrant so as to protect the rights of the Holder in a manner consistent with the provisions of this Section 5.

(e)    Upon any adjustment of the Warrant Exercise Price, then and in each such case, the Corporation shall give written notice thereof, by first-class mail, postage prepaid, addressed to the Holder as shown on the books of the Corporation, which notice shall state the Warrant Exercise Price resulting from such adjustment and the increase or decrease, if any, in the number of shares of Warrant Shares purchasable at such price upon the exercise of this Warrant, setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based.

(f)    The Corporation shall give notice to the Holder if at any time prior to the expiration or exercise in full of this Warrant, any of the following events shall occur:

(i)    The Corporation shall declare any dividend (or any other distribution in whatever form) on the Common Stock;

(ii)    The Corporation shall authorize the issuance to all holders of Common Stock of any additional shares of Common Stock or of rights, options or warrants to subscribe for or purchase Common Stock or any of any other subscription rights, options or warrants;

(iii)    A dissolution, liquidation or winding up of the Corporation (other than in connection with a consolidation, merger, or sale or conveyance of the property of the Corporation as an entirety or substantially as an entirety); or

(iv)    A capital reorganization or reclassification of the Common Stock (other than a subdivision or combination of the outstanding Common Stock and other than a change in the par value of the Common Stock) or any consolidation or merger of the Corporation with or into another corporation (other than a consolidation or merger in which the Corporation is the continuing corporation and that does not result in any reclassification or change of Common Stock outstanding) or any sale or conveyance to another corporation of the property of the Corporation as an entirety or substantially an entirety.

Such notice shall be given at least 10 business days prior to the date fixed as a record date or effective date or the date of closing of the Corporation's stock transfer books for the determination of the stockholders entitled to such dividend, distribution, or subscription rights, or for the determination of the stockholders entitled to vote on such proposed merger, consolidation, sale, conveyance, dissolution, liquidation or winding up.  Such notice shall specify such record date or the date of the closing of the stock transfer books, as the case may be.

6.    <u>NO VOTING RIGHTS</u>. This Warrant shall not entitle the Holder to any voting rights or other rights as a shareholder of the Corporation.

7.    <u>NOTICE OF TRANSFER OF WARRANT OR RESALE OF THE WARRANT SHARES</u>.

(a)     Subject to the sale, assignment, hypothecation, or other transfer restrictions set forth in Section 1 hereof, the Holder, by acceptance hereof, agrees to give written notice to the Corporation before transferring this Warrant or transferring any Warrant Shares of such Holder's intention to do so, describing briefly the manner of any proposed transfer. Promptly upon receiving such written notice, the Corporation shall present copies thereof to the Corporation's counsel. If in the opinion of such counsel the proposed transfer may be effected without registration or qualification (under any federal or state securities laws), the Corporation, as promptly as practicable, shall notify the Holder of such opinion, whereupon the Holder shall be entitled to transfer this Warrant or to dispose of Warrant Shares received upon the previous exercise of this Warrant, all in accordance with the terms of the notice delivered by the Holder to the Corporation; provided that an appropriate legend may be endorsed on this Warrant or the certificates for such Warrant Shares respecting restrictions upon transfer thereof necessary or advisable in the opinion of counsel and satisfactory to the Corporation to prevent further transfers which would be in violation of Section 5 of the 1933 Act and applicable state securities laws; and provided further that the prospective transferee or purchaser shall execute such documents and make such representations, warranties, and agreements as may be required solely to comply with the exemptions relied upon by the Corporation for the transfer or disposition of the Warrant or Warrant Shares.

(b)     If, in the opinion of the Corporation's counsel, the proposed transfer or disposition of the Warrant or such Warrant Shares described in the written notice given pursuant to this Section 7 may not be effected without registration or qualification of this Warrant or such Warrant Shares, the Corporation shall promptly give written notice thereof to the Holder, and the Holder will limit its activities in respect to such transfer or disposition as, in the opinion of such counsel, are permitted by law.

8.     FRACTIONAL SHARES. Fractional shares shall not be issued upon the exercise of this Warrant, but in any case where the Holder would, except for the provisions of this Section, be entitled under the terms hereof to receive a fractional share, the Corporation shall, upon the exercise of this Warrant for the largest number of whole shares then called for, pay to Holder a sum in cash equal to such fraction multiplied by the Market Price on the day prior to the date of exercise of this Warrant in lieu of such fractional share.

9.     REPRESENTATIONS OF HOLDER. The holder of this Warrant, by the acceptance hereof, represents that it is acquiring this Warrant and the Warrant Shares for its own account and not with a view toward, or for resale in connection with, the public sale or distribution of this Warrant or the Warrant Shares, except pursuant to sales registered or exempted under the 1933 Act. The holder of this Warrant further represents, by acceptance hereof, that, as of this date, the holder is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D promulgated by the Securities and Exchange Commission under the 1933 Act. Upon exercise of this Warrant, the holder shall, if requested by the Corporation, confirm in writing, in a form satisfactory to the Corporation, representations concerning the matters described in this Section 9.

10.     MISCELLANEOUS.

(a)     NOTICES. All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed facsimile if sent during normal business hours of the recipient, if not, then on the next business day, or (c) two (2) business days after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the Corporation at the address as set forth on the signature page hereof, to the Holder at the Holder's address as appearing on the Corporation's records, or at such other address as the Corporation or Holder may designate by ten (10) days advance written notice to the other party hereto.

(b)     ATTORNEYS' FEES. If any action at law or in equity is necessary to enforce or interpret the terms of this Warrant, the prevailing party shall be entitled to reasonable attorneys' fees, costs and disbursements in addition to any other relief to which such party may be entitled.

(c)     AMENDMENTS AND WAIVERS. This Warrant may be amended or modified only upon the written consent of both Holder and the Corporation. This Warrant and any provision hereof may be waived only by an instrument in writing signed by the party against which enforcement of the same is sought.

(d)     SEVERABILITY. If one or more provisions of this Warrant are held to be unenforceable under applicable law, such provision shall be excluded from this Warrant and the balance of the Warrant shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

(e)     GOVERNING LAW. This Warrant shall be governed by and construed and enforced in accordance with the laws of the State of California, without giving effect to its conflicts of laws principles.

(f)     BINDING EFFECT. This Warrant shall be binding upon any entity succeeding the Corporation by merger, consolidation or acquisition of all or substantially all of the Corporation's assets.  All of the covenants and agreements of the Corporation shall inure to the benefit of the successors and assigns of the Holder hereof.

IN WITNESS WHEREOF, Point.360 has caused this Warrant to be signed by its duly authorized officer and this Warrant to be dated as of July ___, 2015.

POINT.360

By:_____
    Name:   Haig S. Bagerdjian
    Title:    Chief Executive Officer

Point.360
2701 Media Center Drive
Los Angeles, CA 90065


CONGRUENT CREDIT OPPORTUNITIES
FUND II, LP

By:_____
    Name:
    Title:

*[Signature Page to Point.360 Warrant]*

IN WITNESS WHEREOF, Point.360 has caused this Warrant to be signed by its duly authorized officer and this Warrant to be dated as of July ___, 2015.

POINT.360

By:_____

    Name:  Haig S. Bagerdjian
    Title:   Chief Executive Officer

    Point.360
    2701 Media Center Drive
    Los Angeles, CA 90065

CONGRUENT CREDIT OPPORTUNITIES FUND II, LP

By:_____
    Name:    Matthew Killebrew
    Title:    Authorized Signatory

*[Signature Page to Point.360 Warrant]*

EXHIBIT E  -  83

## NOTICE OF EXERCISE
*(To be signed only upon exercise of the Warrant)*

To: Point.360

The undersigned hereby irrevocably elects to exercise the attached Warrant to purchase for cash, _____ of the shares issuable upon the exercise of such Warrant pursuant to Section 1(a), and requests that certificates for such shares (together with a new Warrant to purchase the number of shares, if any, with respect to which this Warrant is not exercised) shall be issued in the name of:

The undersigned hereby irrevocably elects to convert the attached Warrant into shares pursuant to Section 3(c) of the attached Warrant. This conversion is exercised with respect to _____ of the shares issuable upon the exercise of such Warrant. The undersigned requests that certificates for such shares (together with a new Warrant to purchase the number of shares, if any, with respect to which this Warrant is not exercised) shall be issued in the name of:

**[Strike paragraph above that does not apply.]**

NAME:_____

**SOC. SEC. or
TAX I.D. NO.** _____

**ADDRESS:** _____
_____
_____

Accredited Investor. The undersigned is an "accredited investor" as defined in Regulation D promulgated under the Securities Act of 1933, as amended.

Date:_____, 201__    _____
Signature*

*  The signature on the Notice of Exercise of Warrant must correspond to the name as written upon the face of the Warrant in every particular without alteration or enlargement or any change whatsoever. When signing on behalf of a corporation, partnership, trust or other entity, please indicate your position(s) and title(s) with such entity.

# EXHIBIT F

## WARRANT TO PURCHASE SHARES OF COMMON STOCK
## OF POINT.360

**THIS WARRANT AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "1933 ACT") OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS ("BLUE SKY LAWS"). NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THIS WARRANT OR THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT OR ANY INTEREST THEREIN MAY BE MADE EXCEPT (a) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE 1933 ACT AND ANY APPLICABLE BLUE SKY LAWS OR (b) IF THE CORPORATION HAS BEEN FURNISHED WITH AN OPINION OF COUNSEL FOR THE HOLDER, WHICH OPINION AND COUNSEL SHALL BE REASONABLY SATISFACTORY TO THE CORPORATION, TO THE EFFECT THAT NO REGISTRATION IS REQUIRED BECAUSE OF THE AVAILABILITY OF AN EXEMPTION FROM REGISTRATION UNDER THE 1933 ACT AND APPLICABLE BLUE SKY LAWS.**

THIS CERTIFIES THAT, for good and valuable consideration Main Street Equity Interests, Inc. ("Holder"), or the Holder's registered assigns, is entitled to subscribe for and purchase from Point.360, a California corporation (the "Corporation"), 65,463 fully paid and nonassessable shares of the Common Stock of the Corporation at the price of $0.75 per share (the "Warrant Exercise Price"), as adjusted pursuant to the provisions of this Warrant.  This Warrant may be exercised at any time commencing on July 8, 2015 (the "Initial Exercise Date") to and including July 7, 2020 (the "Termination Date").

The Warrant is issued pursuant to the Sale Agreement Pursuant to Article 9 of the Uniform Commercial Code, entered into as of the date hereof, between the Corporation and the Holder.

The shares which may be acquired upon exercise of this Warrant are referred to herein as the "Warrant Shares." As used herein, the term "Holder" means the Holder, any party who acquires all or a part of this Warrant as a registered transferee of the Holder, or any record holder or holders of the Warrant Shares issued upon exercise, whether in whole or in part, of the Warrant. The term "Common Stock" means the common stock, no par value, of the Corporation.  The term "exercise" shall include an exercise for cash pursuant to Section 1(a) or a cashless exercise pursuant to Section 3(c).

This Warrant is subject to the following provisions, terms and conditions:

    1.    EXERCISE; TRANSFERABILITY.

        (a)    The rights represented by this Warrant may be exercised by the Holder hereof, in whole or in part, by written notice of exercise (in the form attached hereto) delivered to the Corporation at the principal office of the Corporation prior to the Termination Date and accompanied or preceded by the surrender of this Warrant along with a check in payment of the Warrant Exercise Price for such Warrant Shares or (ii) cashless exercise pursuant to Section 3(c).

(b)    Subject to compliance with any applicable securities laws and the reasonable conditions and documentation required by the Corporation, this Warrant and all rights hereunder (including, without limitation, any registration rights) are transferable, in whole or in part, upon surrender of this Warrant at the principal office of the Corporation or its designated agent, together with a written Assignment of this Warrant substantially in the form attached hereto duly executed by the Holder or its agent or attorney and funds sufficient to pay any transfer taxes payable upon the making of such transfer.  Upon such surrender and, if required, such payment, the Company shall execute and deliver a new Warrant or Warrants in the name of the assignee or assignees, as applicable, and in the denomination or denominations specified in such instrument of assignment, and shall issue to the assignor a new Warrant evidencing the portion of this Warrant not so assigned, and this Warrant shall promptly be cancelled.  The Warrant, if properly assigned, may be exercised by a new holder for the purchase of Warrant Shares without having a new Warrant issued.

2.    EXCHANGE AND REPLACEMENT. Subject to the terms hereof, this Warrant is exchangeable upon the surrender hereof by the Holder to the Corporation at its office for new Warrants of like tenor and date representing in the aggregate the right to purchase the number of Warrant Shares purchasable hereunder, each of such new Warrants to represent the right to purchase such number of Warrant Shares (not to exceed the aggregate total number purchasable hereunder) as shall be designated by the Holder at the time of such surrender. Upon receipt by the Corporation of evidence reasonably satisfactory to it of the loss, theft, destruction, or mutilation of this Warrant, and, in case of loss, theft or destruction, of indemnity or security reasonably satisfactory to it (it being understood that a written indemnification agreement or affidavit of loss of the Holder shall be sufficient indemnity), and upon surrender and cancellation of this Warrant, if mutilated, the Corporation will make and deliver a new Warrant of like tenor, in lieu of this Warrant. This Warrant shall be promptly canceled by the Corporation upon the surrender hereof in connection with any exchange or replacement. The Corporation shall pay all expenses, taxes (other than stock transfer taxes), and other charges payable in connection with the preparation, execution, and delivery of Warrants pursuant to this Section 2. If this Warrant shall have been exercised in part, the Corporation shall, deliver to Holder a new Warrant evidencing the rights of Holder to purchase the unpurchased Warrant Shares called for by this Warrant, which new Warrant shall in all other respects be identical to this Warrant.

3.    ISSUANCE OF THE WARRANT SHARES.

(a)    The Corporation agrees that the Warrant Shares shall be and are deemed to be issued to the Holder as of the close of business on the date on which this Warrant shall have been exercised. Subject to the provisions of paragraph (b) of this Section 3, certificates for the Warrant Shares so purchased shall be delivered to the Holder promptly after the date this Warrant shall have been exercised, and, unless this Warrant has expired, a new Warrant representing the right to purchase the number of Warrant Shares, if any, with respect to which this Warrant shall not then have been exercised shall also be delivered to the Holder.

(b)    Notwithstanding the foregoing, however, the Corporation shall not be required to deliver any certificate for Warrant Shares upon exercise of this Warrant except in accordance with exemptions from the applicable securities registration requirements or registrations under applicable securities laws. Nothing herein shall obligate the Corporation to

effect registrations under federal or state securities laws. The Holder agrees to execute such documents and make such representations, warranties, and agreements as may be required solely to comply with the exemptions relied upon by the Corporation, or the registrations made, for the issuance of the Warrant Shares.

(c)     Notwithstanding any provisions herein to the contrary, in lieu of exercising this Warrant for cash, the Holder may from time to time, elect to convert this Warrant, in whole or in part, into a number of Warrant Shares equal to:

$$X = \frac{Y\,(A-B)}{A}$$

Where

$X =$     the number of Warrant Shares to be issued to the Holder

$Y =$     the number of Warrant Shares with respect to which this Warrant is being exercised

$A =$     the fair market value of one Warrant Share (at the date of such calculation)

$B =$     the Warrant Exercise Price (as adjusted to the date of such calculation)

For purposes of Rule 144 promulgated under the 1933 Act, it is intended, understood and acknowledged that the Warrant Shares issued in a cashless exercise transaction pursuant to this Section 3(c) shall be deemed to have been acquired by the Holder, and the holding period for such Warrant Shares shall be deemed to have commenced, on the Initial Exercise Date.

For purposes of this Warrant, the fair market value of one share of Common Stock shall be:

i.     the average daily Market Price (as defined below) during the period of the most recent ten (10) trading days, ending on the last business day before the effective date of exercise of the Warrant, on which the national securities exchanges or over-the-counter market in which the shares of Common Stock is quoted were open for trading.  If the Common Stock is traded on a national securities exchange or admitted to unlisted trading privileges on such an exchange, the Market Price as of a specified day shall be the last reported sale price of Common Stock on such exchange on such date or if no such sale is made on such day, the mean of the closing bid and asked prices for such day on such exchange (the "Market Price"); or

ii.     if the Common Stock is not then listed or admitted to trading on any national securities exchange or over the counter market, the fair market value shall be determined in good faith by the Board of Directors of the Corporation.

**EXHIBIT F  -  87**

4.    COVENANTS OF THE CORPORATION. The Corporation covenants and agrees that all Warrant Shares will, upon issuance, be duly authorized and issued, fully paid, nonassessable and free from all taxes, liens and charges with respect to the issue thereof. The Corporation further covenants and agrees that during the period within which the rights represented by this Warrant may be exercised, the Corporation will at all times have authorized and reserved for the purpose of issue or transfer upon exercise of the subscription rights evidenced by this Warrant a sufficient number of shares of Common Stock to provide for the exercise of the rights represented by this Warrant.  The Corporation will not take any action which would result in any adjustment of the Warrant Exercise Price if the total number of shares of Common Stock issuable after such action upon exercise of all outstanding warrants, together with all shares of Common Stock then outstanding and all shares of Common Stock then issuable upon exercise of all options and upon the conversion of all convertible securities then outstanding, would exceed the total number of shares of Common Stock then authorized by the Corporation's Articles of Incorporation, as amended. The Corporation shall at all times in good faith assist in the carrying out of all such terms and in the taking of all such actions as may be necessary or appropriate to protect the rights of Holder as set forth in this Warrant against impairment.

5.    CERTAIN ADJUSTMENTS. The provisions of this Warrant are subject to adjustment as provided in this Section 5.

(a)    The Warrant Exercise Price shall be adjusted from time to time such that in case the Corporation shall hereafter:

(i)    pay any dividends or make any other distribution on any class of stock of the Corporation payable in Common Stock or securities convertible into Common Stock;

(ii)    subdivide its then outstanding shares of Common Stock (by any stock split, recapitalization or otherwise) into a greater number of shares; or

(iii)    combine its then outstanding shares of Common Stock (by combination, reverse stock split or otherwise) into a smaller number of shares;

then, in any such event, the Warrant Exercise Price in effect immediately prior to such event shall (until adjusted again pursuant hereto) be adjusted immediately after such event to a price (calculated to the nearest full cent) determined by dividing (A) the number of shares of Common Stock outstanding immediately prior to such event, multiplied by the then existing Warrant Exercise Price, by (B) the total number of shares of Common Stock outstanding immediately after such event (including in each case the maximum number of shares of Common Stock issuable in respect of any securities convertible into Common Stock). An adjustment made pursuant to this Subsection shall become effective immediately after the effective date of the dividend, subdivision or combination. If, as a result of an adjustment made pursuant to this Section 5, the Holder of any Warrant thereafter surrendered for exercise shall become entitled to receive shares of two or more classes of capital stock or shares of Common Stock and other capital stock, the Board of Directors (whose determination shall be conclusive) shall determine the allocation of the adjusted Warrant Exercise Price between or among shares of such classes of

capital stock or shares of Common Stock and other capital stock. All calculations under this Subsection shall be made to the nearest cent or to the nearest 1/100 of a share, as the case may be. In the event that at any time as a result of an adjustment made pursuant to this Section 5, the holder of any Warrant thereafter surrendered for exercise shall become entitled to receive any shares of capital stock other than shares of Common Stock, thereafter the Warrant Exercise Price of such other shares so receivable upon exercise of any Warrant shall be subject to adjustment from time to time in a manner and on terms as nearly equivalent as practicable to the provisions with respect to Common Stock contained in this Section 5.

(b)     Upon each adjustment of the Warrant Exercise Price pursuant to Section 5(a) above, the Holder of each Warrant shall thereafter (until another such adjustment) be entitled to purchase at the adjusted Warrant Exercise Price the number of shares, calculated to the nearest full share, obtained by multiplying the number of shares specified in such Warrant (as adjusted as a result of all adjustments in the Warrant Exercise Price in effect prior to such adjustment) by the Warrant Exercise Price in effect prior to such adjustment and dividing the product so obtained by the adjusted Warrant Exercise Price.

(c)     In case of any (i) capital reorganization of the Company, (ii) reclassification of the stock of the Company, (iii) consolidation or merger to which the Corporation is a party other than a merger or consolidation in which the Corporation is the continuing corporation, or in case of any sale or conveyance to another corporation of the property of the Corporation as an entirety or substantially as an entirety, or in the case of any statutory exchange of securities with another corporation (including any exchange effected in connection with a merger of a third corporation into the Corporation), or (iv) other similar transaction, there shall be no adjustment under Subsection (a) of this Section 5 but the Holder of this Warrant shall have the right thereafter to receive upon exercise of this Warrant the kind and amount of shares of stock and other securities and property which he would have owned or have been entitled to receive immediately after such reorganization, reclassification, consolidation, merger, statutory exchange, sale, or conveyance had such Warrant been exercised immediately prior to the effective date of such reorganization, reclassification, consolidation, merger, statutory exchange, sale, or conveyance and, in any such case thereafter, appropriate adjustment shall be made in the application of the provisions set forth in this Section 5 with respect to the rights and interests thereafter of any Holders of the Warrant to the end that the provisions set forth in this Section 5 shall thereafter correspondingly be made applicable, as nearly as may reasonably be, in relation to any shares of stock and other securities and property thereafter deliverable on the exercise of the Warrant. The provisions of this Subsection shall similarly apply to successive consolidations, mergers, statutory exchanges, sales or conveyances. The Corporation will not effect any such reorganization, reclassification, consolidation, merger or sale unless, prior to the consummation thereof, the successor entity (if other than the Corporation) resulting from such reorganization, reclassification, consolidation, merger or sale shall assume the obligation to deliver to such Holder such shares of stock, securities or property as, in accordance with the foregoing provisions, such Holder may be entitled to purchase.

(d)     If any event of the type contemplated by the provisions of this Section 5 but not expressly provided for by such provisions (including without limitation, the granting of stock appreciation rights, phantom stock rights or other rights with equity features) occurs, then the Board shall make an appropriate adjustment in the Warrant Exercise Price and the number of

Warrant Shares issuable upon exercise of this Warrant so as to protect the rights of the Holder in a manner consistent with the provisions of this Section 5.

(e)     Upon any adjustment of the Warrant Exercise Price, then and in each such case, the Corporation shall give written notice thereof, by first-class mail, postage prepaid, addressed to the Holder as shown on the books of the Corporation, which notice shall state the Warrant Exercise Price resulting from such adjustment and the increase or decrease, if any, in the number of shares of Warrant Shares purchasable at such price upon the exercise of this Warrant, setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based.

(f)     The Corporation shall give notice to the Holder if at any time prior to the expiration or exercise in full of this Warrant, any of the following events shall occur:

(i)     The Corporation shall declare any dividend (or any other distribution in whatever form) on the Common Stock;

(ii)     The Corporation shall authorize the issuance to all holders of Common Stock of any additional shares of Common Stock or of rights, options or warrants to subscribe for or purchase Common Stock or any of any other subscription rights, options or warrants;

(iii)     A dissolution, liquidation or winding up of the Corporation (other than in connection with a consolidation, merger, or sale or conveyance of the property of the Corporation as an entirety or substantially as an entirety); or

(iv)     A capital reorganization or reclassification of the Common Stock (other than a subdivision or combination of the outstanding Common Stock and other than a change in the par value of the Common Stock) or any consolidation or merger of the Corporation with or into another corporation (other than a consolidation or merger in which the Corporation is the continuing corporation and that does not result in any reclassification or change of Common Stock outstanding) or any sale or conveyance to another corporation of the property of the Corporation as an entirety or substantially an entirety.

Such notice shall be given at least 10 business days prior to the date fixed as a record date or effective date or the date of closing of the Corporation's stock transfer books for the determination of the stockholders entitled to such dividend, distribution, or subscription rights, or for the determination of the stockholders entitled to vote on such proposed merger, consolidation, sale, conveyance, dissolution, liquidation or winding up.  Such notice shall specify such record date or the date of the closing of the stock transfer books, as the case may be.

6.     NO VOTING RIGHTS. This Warrant shall not entitle the Holder to any voting rights or other rights as a shareholder of the Corporation.

7.     NOTICE OF TRANSFER OF WARRANT OR RESALE OF THE WARRANT SHARES.

(a)    Subject to the sale, assignment, hypothecation, or other transfer restrictions set forth in Section 1 hereof, the Holder, by acceptance hereof, agrees to give written notice to the Corporation before transferring this Warrant or transferring any Warrant Shares of such Holder's intention to do so, describing briefly the manner of any proposed transfer. Promptly upon receiving such written notice, the Corporation shall present copies thereof to the Corporation's counsel. If in the opinion of such counsel the proposed transfer may be effected without registration or qualification (under any federal or state securities laws), the Corporation, as promptly as practicable, shall notify the Holder of such opinion, whereupon the Holder shall be entitled to transfer this Warrant or to dispose of Warrant Shares received upon the previous exercise of this Warrant, all in accordance with the terms of the notice delivered by the Holder to the Corporation; provided that an appropriate legend may be endorsed on this Warrant or the certificates for such Warrant Shares respecting restrictions upon transfer thereof necessary or advisable in the opinion of counsel and satisfactory to the Corporation to prevent further transfers which would be in violation of Section 5 of the 1933 Act and applicable state securities laws; and provided further that the prospective transferee or purchaser shall execute such documents and make such representations, warranties, and agreements as may be required solely to comply with the exemptions relied upon by the Corporation for the transfer or disposition of the Warrant or Warrant Shares.

(b)    If, in the opinion of the Corporation's counsel, the proposed transfer or disposition of the Warrant or such Warrant Shares described in the written notice given pursuant to this Section 7 may not be effected without registration or qualification of this Warrant or such Warrant Shares, the Corporation shall promptly give written notice thereof to the Holder, and the Holder will limit its activities in respect to such transfer or disposition as, in the opinion of such counsel, are permitted by law.

8.    FRACTIONAL SHARES. Fractional shares shall not be issued upon the exercise of this Warrant, but in any case where the Holder would, except for the provisions of this Section, be entitled under the terms hereof to receive a fractional share, the Corporation shall, upon the exercise of this Warrant for the largest number of whole shares then called for, pay to Holder a sum in cash equal to such fraction multiplied by the Market Price on the day prior to the date of exercise of this Warrant in lieu of such fractional share.

9.    REPRESENTATIONS OF HOLDER. The holder of this Warrant, by the acceptance hereof, represents that it is acquiring this Warrant and the Warrant Shares for its own account and not with a view toward, or for resale in connection with, the public sale or distribution of this Warrant or the Warrant Shares, except pursuant to sales registered or exempted under the 1933 Act. The holder of this Warrant further represents, by acceptance hereof, that, as of this date, the holder is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D promulgated by the Securities and Exchange Commission under the 1933 Act. Upon exercise of this Warrant, the holder shall, if requested by the Corporation, confirm in writing, in a form satisfactory to the Corporation, representations concerning the matters described in this Section 9.

10.    MISCELLANEOUS.

(a)    NOTICES. All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed facsimile if sent during normal business hours of the recipient, if not, then on the next business day, or (c) two (2) business days after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the Corporation at the address as set forth on the signature page hereof, to the Holder at the Holder's address as appearing on the Corporation's records, or at such other address as the Corporation or Holder may designate by ten (10) days advance written notice to the other party hereto.

(b)    ATTORNEYS' FEES. If any action at law or in equity is necessary to enforce or interpret the terms of this Warrant, the prevailing party shall be entitled to reasonable attorneys' fees, costs and disbursements in addition to any other relief to which such party may be entitled.

(c)    AMENDMENTS AND WAIVERS. This Warrant may be amended or modified only upon the written consent of both Holder and the Corporation. This Warrant and any provision hereof may be waived only by an instrument in writing signed by the party against which enforcement of the same is sought.

(d)    SEVERABILITY. If one or more provisions of this Warrant are held to be unenforceable under applicable law, such provision shall be excluded from this Warrant and the balance of the Warrant shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

(e)    GOVERNING LAW. This Warrant shall be governed by and construed and enforced in accordance with the laws of the State of California, without giving effect to its conflicts of laws principles.

(f)    BINDING EFFECT. This Warrant shall be binding upon any entity succeeding the Corporation by merger, consolidation or acquisition of all or substantially all of the Corporation's assets.  All of the covenants and agreements of the Corporation shall inure to the benefit of the successors and assigns of the Holder hereof.

IN WITNESS WHEREOF, Point.360 has caused this Warrant to be signed by its duly authorized officer and this Warrant to be dated as of July ___, 2015.

POINT.360

By: _____
    Name:  Haig S. Bagerdjian
    Title:   Chief Executive Officer

    Point.360
    2701 Media Center Drive
    Los Angeles, CA 90065


MAIN STREET EQUITY INTERESTS, INC.


By: _____
    Name:
    Title:

*[Signature Page to Point.360 Warrant]*

EXHIBIT F  -  93

IN WITNESS WHEREOF, Point.360 has caused this Warrant to be signed by its duly authorized officer and this Warrant to be dated as of July ___, 2015.

POINT.360

By:_____
    Name:  Haig S. Bagerdjian
    Title:   Chief Executive Officer

    Point.360
    2701 Media Center Drive
    Los Angeles, CA 90065

MAIN STREET EQUITY INTERESTS, INC.

By:_____
    Name: Nick Meserve
    Title: Managing Director

*[Signature Page to Point.360 Warrant]*

## NOTICE OF EXERCISE
*(To be signed only upon exercise of the Warrant)*

To: Point.360

The undersigned hereby irrevocably elects to exercise the attached Warrant to purchase for cash, _____ of the shares issuable upon the exercise of such Warrant pursuant to Section 1(a), and requests that certificates for such shares (together with a new Warrant to purchase the number of shares, if any, with respect to which this Warrant is not exercised) shall be issued in the name of:

The undersigned hereby irrevocably elects to convert the attached Warrant into shares pursuant to Section 3(c) of the attached Warrant. This conversion is exercised with respect to _____ of the shares issuable upon the exercise of such Warrant. The undersigned requests that certificates for such shares (together with a new Warrant to purchase the number of shares, if any, with respect to which this Warrant is not exercised) shall be issued in the name of:

**[Strike paragraph above that does not apply.]**

NAME:_____

**SOC. SEC. or**
**TAX I.D. NO.**    _____

**ADDRESS:**    _____

_____

_____

Accredited Investor.  The undersigned is an "accredited investor" as defined in Regulation D promulgated under the Securities Act of 1933, as amended.

Date:_____, 201__    _____

Signature*

* The signature on the Notice of Exercise of Warrant must correspond to the name as written upon the face of the Warrant in every particular without alteration or enlargement or any change whatsoever. When signing on behalf of a corporation, partnership, trust or other entity, please indicate your position(s) and title(s) with such entity.

# EXHIBIT G

EXECUTION VERSION

**REGISTRATION RIGHTS AGREEMENT**

**By and Among**

**POINT.360,**

**MEDLEY CAPITAL CORPORATION,**

**MEDLEY OPPORTUNITY FUND II LP,**

**MAIN STREET CAPITAL CORPORATION**

**AND**

**CONGRUENT CAPITAL OPPORTUNITIES FUND II, LP**

_____

**Dated as of July 8, 2015**

_____

# TABLE OF CONTENTS

**Page**

ARTICLE I    DEFINITIONS; RULES OF CONSTRUCTION ....................................................1

SECTION 1.01.    Definitions..................................................................................1
SECTION 1.02.    Rules of Construction ...............................................................3

ARTICLE II    REPRESENTATIONS AND WARRANTIES.......................................................3

SECTION 2.01.    Authority; Enforceability ..........................................................3
SECTION 2.02.    Consent .......................................................................................4

ARTICLE III    REGISTRATION RIGHTS ....................................................................................4

SECTION 3.01.    Company Registration ...............................................................4
SECTION 3.02.    Demand Registration Rights .....................................................5
SECTION 3.03.    Registration Procedures ............................................................6
SECTION 3.04.    Registration Expenses ...............................................................9
SECTION 3.05.    Indemnification.........................................................................10
SECTION 3.06.    Holdback Agreements...............................................................12
SECTION 3.07.    Participation in Registrations ...................................................13
SECTION 3.08.    Rule 144 .....................................................................................13

ARTICLE IV    MISCELLANEOUS ...............................................................................................14

SECTION 4.01.    Notices .......................................................................................14
SECTION 4.02.    Binding Effect; Benefits ...........................................................15
SECTION 4.03.    Amendment................................................................................15
SECTION 4.04.    Assignability .............................................................................15
SECTION 4.05.    Governing Law; Submission to Jurisdiction............................15
SECTION 4.06.    Enforcement...............................................................................15
SECTION 4.07.    Severability ................................................................................15
SECTION 4.08.    Additional Securities Subject to Agreement............................15
SECTION 4.09.    Section and Other Headings.......................................................16
SECTION 4.10.    Counterparts...............................................................................16
SECTION 4.11.    Waiver of Jury Trial ..................................................................16
SECTION 4.12.    Further Assurances.....................................................................16
SECTION 4.13.    Entire Agreement .......................................................................16

9932/51494-005 current/50364946v5
02523-0017  271273.3

EXHIBIT G  -  97

## REGISTRATION RIGHTS AGREEMENT

THIS REGISTRATION RIGHTS AGREEMENT (this "Agreement"), dated as of 8, 2015, by and among Point.360, a California corporation (the "Company"), Medley Capital Corporation, a Delaware Corporation, Medley Opportunity Fund II LP, a Delaware limited partnership, Main Street Equity Interests, Inc., a Delaware corporation, and Congruent Credit Opportunities Fund II, LP, a limited partnership (such parties individually, a "Stockholder" and, collectively, the "Stockholders").

WHEREAS, on July 8, 2015, the Company and the Stockholders entered into a Sale Agreement pursuant to Article 9 of the Uniform Commercial Code (the "Sale Agreement") (Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Agreement); and

WHEREAS, the Company and the Stockholders desire to enter into this Agreement to provide for certain registration rights with respect to the Common Stock (as defined below), now or hereafter held by the Stockholders.

NOW, THEREFORE, the parties mutually agree as follows:

## ARTICLE I

## DEFINITIONS; RULES OF CONSTRUCTION

SECTION 1.01.    Definitions.  The following terms, as used herein, have the following meanings:

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling, controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "**control**" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "**controlling**" and "**controlled**" have meanings correlative to the foregoing.  No Person shall be deemed to be an Affiliate of another Person solely by virtue of the fact that both Persons own shares of the Company's Capital Stock.

"**Agreement**" has the meaning set forth in the preamble.

"**Board**" means the Board of Directors of the Company.

"**Business Day**" means each day that is not a day on which banking institutions in the City of New York are authorized or obligated by law or executive order to close.

"**Capital Stock**" means, with respect to any Person, any and all shares, interests, participations, rights in or other equivalents (however designated) of such Person's capital stock, and any debt, rights, warrants or options exercisable or exchangeable for or convertible into such capital stock.

"**Commission**" means the Securities and Exchange Commission.

"**Common Stock**" means the Common Stock, no par value per share, of the Company.

"**Company**" has the meaning set forth in the preamble.

"**Demand Holder**" has the meaning set forth in <u>Section 3.02(a)</u>.

"**Demand Registration**" has the meaning set forth in <u>Section 3.02(a)</u>.

"**Effectiveness Period**" has the meaning set forth in <u>Section 3.02(a)</u>.

"**Exchange Act**" means the Securities Exchange Act of 1934.

"**Lock-up Period**" has the meaning set forth in <u>Section 3.06(a)</u>.

"**Person**" means an individual, a corporation, a general or limited partnership, a limited liability company, a joint stock company, an association, a trust or any other entity or organization, including a government, a political subdivision or an agency or instrumentality thereof.

"**Piggyback Holder**" has the meaning set forth in <u>Section 3.01(a)</u>.

"**Piggyback Notice**" has the meaning set forth in <u>Section 3.01(a)</u>.

"**Piggyback Registration**" has the meaning set forth in <u>Section 3.01(a)</u>.

"**Qualified Public Offering**" means a bona fide initial public offering of Common Stock pursuant to an effective registration statement filed under the Securities Act (excluding registration statements filed on Form S-8, any similar successor form or another form used for a purpose similar to the intended use for such forms).

"**Registrable Securities**" means (a) the Common Shares owned by any Stockholder at the time of determination, (b) the Warrant Shares and (c) any other Capital Stock issued or issuable with respect to such Common Shares and Warrant Shares by way of a stock split, stock dividend, reclassification, subdivision or reorganization, recapitalization or similar event.  A Registrable Security shall cease to be a Registrable Security when (i) a registration statement with respect to the offering of such security by the holder thereof shall have been declared effective under the Securities Act and such security shall have been disposed of by such holder pursuant to such registration statement, (ii) such security may be sold to the public, without registration under the Securities Act, pursuant to Rule 144 (or any other similar provision then in force) promulgated under the Securities Act without regard to the volume and manner requirements thereunder, or (iii) such security shall have been otherwise transferred by the holder thereof and a certificate for such security not bearing a legend restricting further transfer shall have been delivered by the Company or its transfer agent and any subsequent transfer of such security shall not require registration or qualification under the Securities Act or any similar state law then in force.

2

"**Registration**" means a Piggyback Registration or Demand Registration.

"**Request Notice**" has the meaning set forth in <u>Section 3.02(a)</u>.

"**Securities Act**" means the Securities Act of 1933.

"**Stockholder**" and "**Stockholders**" has the meaning set forth in the preamble.

SECTION 1.02.    <u>Rules of Construction</u>.  Any provision of this Agreement that refers to the words "include," "includes" or "including" shall be deemed to be followed by the words "without limitation."  References to "<u>dollars</u>" or "<u>$</u>" shall mean dollars in lawful currency of the United States of America.  References to numbered or letter articles, sections and subsections refer to articles, sections and subsections, respectively, of this Agreement unless expressly stated otherwise.  All references to this Agreement include, whether or not expressly referenced, the exhibits and schedules attached hereto.  References to a Section, paragraph, Exhibit or Schedule shall be to a Section or paragraph of, or Exhibit or Schedule to, this Agreement unless otherwise indicated.  The words "<u>hereof</u>," "<u>herein</u>" and "<u>hereunder</u>" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The word "<u>or</u>" when used in this Agreement is not exclusive.  Any agreement, instrument, law or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument, or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein.  References to a Person are also to its permitted successors and assigns.  In the event that any claim is made by any Person relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Person or its counsel.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES

Each of the parties hereby severally represents and warrants to each of the other parties as follows:

SECTION 2.01.    <u>Authority; Enforceability</u>.  Such party (a) has the legal capacity or organizational power and authority to execute, deliver and perform its obligations under this Agreement and (b) is duly organized and validly existing and in good standing under the laws of its jurisdiction of organization.  This Agreement has been duly executed and delivered by such party and constitutes a legal, valid and binding obligation of such party, enforceable against it in accordance with the terms of this Agreement, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other laws affecting the rights of creditors generally and to the exercise of judicial discretion in accordance with general principles of equity (whether applied by a court of law or of equity).

3

SECTION 2.02.    Consent.  No consent, waiver, approval, authorization, exemption, registration, license or declaration is required to be made or obtained by such party, other than those that have been made or obtained on or prior to the date hereof, in connection with (a) the execution or delivery of this Agreement or (b) the consummation of any of the transactions contemplated hereby.

## ARTICLE III

## REGISTRATION RIGHTS

SECTION 3.01.    Company Registration.

(a)    Right to Piggyback on Registration of Stock.  Subject to Section 3.01(c), if at any time or from time to time following the Qualified Public Offering the Company proposes to register shares of Common Stock under the Securities Act in connection with a public offering of such Common Stock on any form other than Form S-4 or Form S-8 or any similar successor forms or another form used for a purpose similar to the intended use for such forms (a "Piggyback Registration"), whether for its own account or for the account of one or more stockholders of the Company, the Company shall give each Stockholder written notice (a "Piggyback Notice") of such proposal (i) at least 10 days prior to the filing of the registration statement with the Commission in connection with such Piggyback Registration and (ii) within 10 Business Days after the Company's receipt of any notice of an exercise of demand registration rights in accordance with Section 3.02.  Upon the written request of any Stockholder (the "Piggyback Holder") given within 10 Business Days after receipt of any Piggyback Notice, the Company shall cause to be registered under the Securities Act all of the Registrable Securities held by such Stockholder that the Stockholder has requested to be registered; provided, that if, at any time after the delivery of a Piggyback Notice and prior to the effective date of the registration statement filed in connection with such Piggyback Registration, the Company shall determine for any reason not to register or to delay registration of all such shares of Common Stock, the Company may, at its election, give written notice of such determination to each Piggyback Holder and, (x) in the case of a determination not to register any of such shares of Common Stock, shall be relieved of its obligation to register any Registrable Securities in connection with such Piggyback Registration (but not from any obligation of the Company to pay the registration expenses in connection therewith); and (y) in the case of a determination to delay the Piggyback Registration, shall be permitted to delay registering any Registrable Securities for the same period as the delay in the Piggyback Registration.  No registration effected under this Section 3.01 shall relieve the Company of its obligation to effect any Demand Registration under Section 3.02. The Company shall not include any Registrable Securities owned by any holder of the Company's Capital Stock in the Qualified Public Offering unless the Stockholders are provided the right to include Registrable Securities in such Qualified Public Offering in accordance with the terms and provisions of this Section 3.01.

(b)    Selection of Underwriters.  If any Piggyback Registration involves an underwritten primary offering of the Company's securities, the Board shall have the right to select any underwriter or underwriters to manage such Piggyback Registration.

4

(c)     Priority on Piggyback Registrations.  In the event that the Piggyback Registration is an underwritten offering, the Company shall so advise the Stockholders as part of the Piggyback Notice and the registration rights provided in Section 3.01(a) shall be subject to the condition that if the managing underwriter or underwriters of a Piggyback Registration advise the Company that in its or their opinion the number of Registrable Securities proposed to be sold in such Piggyback Registration exceeds the number that can be sold without materially and adversely affecting the marketability, proposed offering price, timing, distribution method or probability of success of the offering, the Company and the Stockholders, as the case may be, will include in such Registration only the number of Registrable Securities which, in the opinion of such underwriter or underwriters, can be sold in such offering without such material adverse effect.  Except in the case of a Demand Registration, which shall be governed by Section 3.02(f), the shares of Common Stock so included in such Piggyback Registration shall be apportioned as follows: (i) first, to any shares of Common Stock that the Company proposes to sell and, (ii) second, *pro rata* among shares of the Registrable Securities included in such Piggyback Registration, in each case according to the total number of shares of the Registrable Securities requested for inclusion by the Piggyback Holders, or in such other proportions as shall mutually be agreed to among the Piggyback Holders.

SECTION 3.02.     Demand Registration Rights.

(a)     Right to Demand.  Subject to Section 3.02(b) below, at any time that the Company is eligible to file a registration statement on Form S-3 (or any successor form) under the Securities Act, one or more Stockholders (collectively, the "Demand Holder") holding not less than 50% of the Registrable Securities held by all Stockholders, may make a written request, which request will specify the aggregate number of Registrable Securities to be registered on Form S-3 (or such successor form) and will also specify the intended methods of disposition thereof (the "Request Notice") to the Company for registration with the Commission under and in accordance with the provisions of the Securities Act of all or part of the Registrable Securities then owned by the Demand Holder (a "Demand Registration").

The Company shall not be obligated to maintain a registration statement pursuant to a Demand Registration effective for more than (x) three years or (y) such shorter period when all of the Registrable Securities covered by such registration statement have been sold pursuant thereto (the "Effectiveness Period").  Upon any such request for a Demand Registration, the Company will deliver any Piggyback Notices required by Section 3.01 and thereupon the Company will, subject to Section 3.01(c) and 3.02(f), use commercially reasonable efforts to effect the prompt registration under the Securities Act of:

(i)     the Registrable Securities which the Company has been so requested to register by the Demand Holder as contained in the Request Notice; and

(ii)     all other Registrable Securities which the Company has been requested to register by the Piggyback Holders;

all to the extent required to permit the disposition of the Registrable Securities so to be registered in accordance with the intended method or methods of disposition of each seller of such Registrable Securities.

5

(b)    <u>Number of Demand Registrations</u>. The Company will not be required to effect more than an aggregate of one Demand Registration.

(c)    <u>Effective Registration</u>.  A registration will not count as a Demand Registration if such registration is interfered with by any stop order, injunction or other order or requirement of the Commission or other governmental agency or court for any reason (other than as a result of any act by the Demand Holder) and the Company fails to have such stop order, injunction or other order or requirement removed, withdrawn or resolved to the Demand Holder's satisfaction.

SECTION 3.03.    <u>Registration Procedures</u>.  It shall be a condition precedent to the obligations of the Company to take any action pursuant to this <u>Article III</u> that the Stockholders requesting inclusion in any Registration shall furnish to the Company such information regarding them, the Registrable Securities held by them, the intended method of disposition of such Registrable Securities, and such agreements regarding indemnification, disposition of such Registrable Securities and other matters referred to in and consistent with this <u>Article III</u>, as the Company shall reasonably request and as shall be required in connection with the action to be taken by the Company (such intended method of distribution may include a distribution to, and resale by, the partners of the holders of any Registrable Securities).  With respect to any Registration which includes Registrable Securities held by a Stockholder, the Company will, subject to <u>Sections 3.01</u> and <u>3.02</u>:

(a)    As promptly as possible (in the case of a Demand Registration, no more than 30 days after the Company's receipt of a Request Notice), prepare and file with the Commission a registration statement on the appropriate form prescribed by the Commission for such intended method of disposition and use its commercially reasonable efforts to cause such registration statement to become effective as soon as practicable thereafter; <u>provided</u>, that before filing a registration statement or prospectus or any amendments or supplements thereto, the Company shall furnish to counsel representing the Stockholders selling Registrable Securities under such Registration copies of all documents proposed to be filed, which documents shall be subject to the review and reasonable comments of such counsel; <u>provided</u>, <u>further</u>, that the Company shall not be obligated to maintain such Registration effective for a period longer than the Effectiveness Period;

(b)    Prepare and file with the Commission such amendments and post-effective amendments to such registration statement and any documents required to be incorporated by reference therein as may be necessary to keep the registration statement effective for a period of not less than the Effectiveness Period (but not prior to the expiration of the time period referred to in Section 4(3) of the Securities Act and Rule 174 thereunder, if applicable); cause the prospectus to be supplemented by any required prospectus supplement, and as so supplemented to be filed pursuant to Rule 424 under the Securities Act and comply with the Securities Act in a timely manner; and comply with the provisions of the Securities Act applicable to it with respect to the disposition of all Registrable Securities covered by such registration statement during the applicable period in accordance with the intended method or methods of disposition by the sellers thereof set forth in such registration statement or supplement to the prospectus;

6

(c)     Promptly incorporate in a prospectus supplement or post-effective amendment such information as the underwriter(s) or the Demand Holder reasonably request to be included therein relating to the plan of distribution with respect to such Registrable Securities; and make all required filings of such prospectus supplements or post-effective amendments as soon as practical after being notified of the matters to be incorporated in such supplement or amendment;

(d)     Furnish to such Stockholder, without charge, such number of conformed copies of the registration statement and any post-effective amendment thereto, as such Stockholder may reasonably request, and such number of copies of the prospectus (including each preliminary prospectus) and any amendments or supplements thereto, and any documents incorporated by reference therein, as the Stockholder or underwriter or underwriters, if any, may request in order to facilitate the disposition of the securities being sold by the Stockholder (it being understood that the Company consents to the use of the prospectus and any amendment or supplement thereto by the Stockholder covered by the registration statement and the underwriter or underwriters, if any, in connection with the offering and sale of the securities covered by the prospectus or any amendments or supplements thereto);

(e)     Notify such Stockholder, at any time when a prospectus relating thereto is required to be delivered under the Securities Act, when the Company becomes aware of the happening of any event as a result of which the prospectus included in such registration statement (as then in effect) contains any untrue statement of material fact or omits to state a material fact necessary to make the statements therein (in the case of the prospectus or any preliminary prospectus, in light of the circumstances under which they were made) not misleading and, as promptly as practicable thereafter, prepare and file with the Commission and furnish a supplement or amendment to such prospectus so that, as thereafter delivered to the investors of such securities, such prospectus will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(f)     Provide a CUSIP number for all Registrable Securities no later than the effective date of the Registration and provide the applicable transfer agent and registrar for all such Registrable Securities with printed certificates representing the Registrable Securities that are in a form eligible for deposit with The Depositary Trust Company not later than the effective date of the registration statement;

(g)     Use its commercially reasonable efforts to cause all securities included in such registration statement to be listed, by the date of the first sale of securities pursuant to such registration statement, on any national securities exchange, quotation system or other market on which the Common Stock is then listed or proposed to be listed by the Company, if any, or, failing that, to arrange for at least two market makers to register as such with respect to such securities with the Financial Industry Regulatory Authority;

(h)     At any time that a shelf registration statement covering Registrable Securities is effective, upon receipt of a notice from a Stockholder stating that it intends to transfer all or part of its Registrable Securities included by it on the shelf registration statement,

7

amend or supplement the shelf registration statement as may be necessary to enable such Registrable Securities to be distributed pursuant to such shelf registration statement;

(i)        After the filing of a registration statement, (i) notify each Stockholder holding Registrable Securities covered by such registration statement of any stop order issued or, to the Company's knowledge, threatened by the Commission and of the receipt by the Company of any notification with respect to the suspension of the qualification of any Registrable Securities for sale under the applicable securities or blue sky laws of any jurisdiction, (ii) take all reasonable actions to obtain the withdrawal of any order suspending the effectiveness of the registration statement or the qualification of any Registrable Securities at the earliest possible moment, and (iii) make available for inspection by any seller of Registrable Securities, any underwriter participating in any disposition pursuant to such registration statement, and any attorney, accountant, or other agent retained by any such seller or underwriter, all financial and other records, pertinent corporate and business documents and properties of the Company as shall be necessary to enable them to exercise their due diligence responsibility, and cause the Company's officers, directors, employees, agents, representatives, and independent accountants to supply all such information reasonably requested by any such seller, underwriter, attorney, accountant, or agent in connection with such registration statement;

(j)        In connection with the preparation and filing of each Registration, give each holder of Registrable Securities included in such Registration, the underwriter(s) and their respective counsel, accountants and other representatives and agents the opportunity to participate in the preparation of each registration statement, each prospectus included therein or filed with the Commission, and each amendment thereof or supplement thereto and comparable statements under the securities or blue sky laws of any jurisdiction and give each of the foregoing Persons access to the books and records, pertinent corporate and business documents and properties of the Company and its subsidiaries and such opportunities to discuss the business and affairs of the Company and its subsidiaries with the respective directors, officers, employees, agents, representatives and the independent public accountants who have certified the Company's consolidated financial statements, and supply all other information and respond to all other inquiries requested by such holders, underwriter(s), counsel, accountants and other representatives and agents as shall be necessary or appropriate, in the opinion of such holders or underwriter(s), to conduct a reasonable investigation within the meaning of the Securities Act, and the Company shall not file any registration statement or amendment thereto or any prospectus or supplement thereto to which such holder or such underwriter(s) shall object;

(k)        Cause its employees to participate in "road shows" and other presentations as reasonably requested by the underwriters in connection with such Registration;

(l)        Deliver promptly to counsel representing the Stockholders selling Registrable Securities under such Registration and each underwriter, if any, participating in the offering of the Registrable Securities, copies of all correspondence between the Commission and the Company, its counsel or auditors, and all memoranda relating to discussions with the Commission or its staff with respect to such Registration; and

(m)        On or prior to the date on which the registration statement is declared or otherwise becomes effective, use commercially reasonable efforts to (i) register or qualify, and

8

cooperate with such underwriter or underwriters, if any, and their counsel in connection with the registration or qualification of, the securities covered by the registration statement for offer and sale under the securities or blue sky laws of each state and other jurisdiction of the United States as the managing underwriter or underwriters, if any, requests in writing, to use commercially reasonable efforts to keep each such registration or qualification effective, including through new filings, or amendments or renewals, during the Effectiveness Period and do any and all other acts or things necessary or advisable to enable the disposition in all such jurisdictions of the Registrable Securities covered by the applicable registration statement; provided, that the Company will not be required to qualify generally to do business in any jurisdiction where it is not then so qualified or to take any action which would subject it to general service of process in any such jurisdiction where it is not then so subject, and (ii) enter into and perform its obligations under such customary agreements (including underwriting agreements in customary form) and take all such other actions as the holders of a majority of the Registrable Securities included in the Request Notice, in the case of a Demand Registration, or the holders of a majority of the Registrable Securities being sold or the underwriters, if any, in the case of a Piggyback Registration, reasonably request in order to expedite or facilitate the disposition of such Registrable Securities (including effecting a stock split, combination of shares, recapitalization, or reorganization);

(n)    Otherwise use its reasonable efforts to take all other steps necessary to effect the registration of such Registrable Securities contemplated hereby.

The Stockholders, upon receipt of any notice from the Company of the happening of any event of the kind described in subsection (e) of this Section 3.03, will forthwith discontinue disposition of the Registrable Securities until the Stockholders' receipt of the copies of the supplemented or amended prospectus contemplated by subsection (e) of this Section 3.03 or until it is advised in writing by the Company that the use of the prospectus may be resumed, and has received copies of any additional or supplemental filings which are incorporated by reference in the prospectus, and, if so directed by the Company, each Stockholder will, or will request the managing underwriter or underwriters, if any, to, deliver, to the Company (at the Company's sole expense) all copies, other than permanent file copies then in such Stockholder's possession, of the prospectus covering such securities current at the time of receipt of such notice.

No holder of Registrable Securities shall be required to make any representations or warranties to or agreements with the Company, other than representations and warranties regarding such holder, such holder's ownership of and title to the Registrable Securities to be sold in such offering, and its intended method of distribution and any liability of any such holder under such underwriting agreement shall be limited to liability arising from breach of its representations and warranties therein and shall be limited to an amount equal to the net amount received by such holder from the sale of Registrable Securities pursuant to such registration statement.

SECTION 3.04.    Registration Expenses.

(a)    Subject to Section 3.04(b), in the case of any Registration, all expenses incurred by the Company in performing or complying with its obligations pursuant to

9

Sections 3.01, 3.02 and 3.03 of this Agreement, including all Commission and stock exchange or Financial Industry Regulatory Authority registration and filing fees and expenses, fees and expenses of compliance with securities or blue sky laws (including reasonable fees and disbursements of counsel for the Company in connection with blue sky qualifications of the Registrable Securities), rating agency fees, printing expenses, messenger, telephone and delivery expenses, and fees and disbursements of counsel for the Company, shall be paid by the Company.

(b)    Each Stockholder that participates in any Registration shall promptly reimburse the Company for the expenses incurred by the Company with respect to such Registration, on a *pro rata* basis according to such Stockholder's number of Registrable Securities included in such Registration, up to a total aggregate amount of $100,000 for all Registrations, provided that if the Company is not reimbursed by any such Stockholder after five-days' written notice from the Company to such Stockholder of its portion of the Company's reimbursable expenses, the Company's obligations to the Stockholders hereunder shall terminate unless the Company is reimbursed in full by any Stockholder after fifteen-days' written notice from the Company to the Stockholders.

SECTION 3.05.    Indemnification.

(a)    Indemnification by the Company.  The Company agrees to indemnify and hold harmless each Stockholder, the underwriters selling such Stockholder's Registrable Securities and their respective officers, directors, Affiliates and agents and each Person who controls (within the meaning of the Securities Act or the Exchange Act) any of them, including any general partner or manager of any thereof, against all losses, claims, damages, liabilities and expenses (including reasonable out-of-pocket counsel fees and disbursements) arising out of or based upon any untrue or alleged untrue statement of a material fact contained in any registration statement, prospectus or preliminary prospectus, or any amendment thereof or supplement thereto, in which such Stockholder participates in an offering of Registrable Securities or in any document incorporated by reference therein or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein (in the case of the prospectus or any preliminary prospectus, in the light of the circumstances under which they were made) not misleading, and shall reimburse such Persons for any legal or other expenses reasonably incurred by any of them in connection with investigating such loss, claim, damage or liability, except insofar as the same are caused by or contained in any information with respect to such Stockholder furnished in writing to the Company by such Stockholder expressly for use therein. The indemnification provided under this Section 3.05(a) shall remain in full force and effect regardless of any investigation made by or on behalf of the indemnified party or any officer, director or controlling person of such indemnified party and shall survive the transfer of the Registrable Securities.

(b)    Indemnification by the Stockholders.  In connection with any registration statement in which a Stockholder is participating, each such Stockholder will furnish to the Company in writing such information and affidavits with respect to such Stockholder as the Company reasonably requests for use in connection with any registration statement or prospectus covering the Registrable Securities of such Stockholder and to the extent permitted by law agrees to indemnify and hold harmless the Company, its directors, officers and agents and each Person

10

who controls (within the meaning of the Securities Act or the Exchange Act) the Company, against any losses, claims, damages, liabilities and expenses arising out of or based upon any untrue statement of a material fact or any omission to state a material fact required to be stated therein or necessary to make the statements in the registration statement, prospectus or preliminary prospectus (in the case of the prospectus or preliminary prospectus, in light of the circumstances under which they were made) not misleading, to the extent, but only to the extent, that such untrue statement or omission is made in reliance on and in conformity with the information or affidavit with respect to such Stockholder so furnished in writing by such Stockholder expressly for use in the registration statement or prospectus; provided, that the obligation to indemnify shall be several, not joint and several, among such Stockholders and the liability of each such Stockholder shall be in proportion to and limited to the net amount received by such Stockholder from the sale of Registrable Securities pursuant to such registration statement in accordance with the terms of this Agreement.  The indemnity agreement contained in this Section 3.05(b) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability, action or proceeding if such settlement is effected without the consent of such Stockholder.  The Company and the holders of the Registrable Securities hereby acknowledge and agree that, unless otherwise expressly agreed to in writing by such holders, the only information furnished or to be furnished to the Company for use in any registration statement or prospectus relating to the Registrable Securities or in any amendment, supplement or preliminary materials associated therewith are statements specifically relating to (i) the beneficial ownership of shares of Common Stock by such holder and its Affiliates, (ii) the name and address of such holder and (iii) any additional information about such holder or the plan of distribution (other than for an underwritten offering) required by law or regulation to be disclosed in any such document.

(c)      Conduct of Indemnification Proceedings.  Any Person entitled to indemnification hereunder will (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification and (ii) unless in such indemnified party's reasonable judgment a conflict of interest may exist between such indemnified and indemnifying parties with respect to such claim, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party.  The failure to so notify the indemnifying party shall not relieve the indemnifying party from any liability hereunder with respect to the action, except to the extent that such indemnifying party is materially prejudiced by the failure to give such notice; provided, that any such failure shall not relieve the indemnifying party from any other liability which it may have to any other party or to such indemnified party other than pursuant to this Section 3.05.  No indemnifying party in the defense of any such claim or litigation, shall, except with the consent of such indemnified party, which consent shall not be unreasonably withheld, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect of such claim or litigation.  An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim will not be obligated to pay the fees and expenses of more than one counsel for all parties indemnified by such indemnifying party with respect to such claim, unless in the reasonable judgment of any indemnified party there may be one or more legal or equitable defenses available to such indemnified party which are in addition to or may conflict with those available to any other of such indemnified parties with respect to such claim, in which event the

11

indemnifying party shall be obligated to pay the reasonable fees and expenses of such additional counsel or counsels.

(d)    Contribution.  If for any reason the indemnification provided for in the preceding paragraphs (a) and (b) of this Section 3.05 is unavailable to an indemnified party as contemplated by the preceding paragraphs (a) and (b) of this Section 3.05 or is insufficient to hold such indemnified party harmless, then the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such loss, claim, damage or liability (i) in such proportion as is appropriate to reflect the relative benefits received by the indemnified party and the indemnifying party, or (ii) if the allocation provided by the preceding clause (i) is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in the preceding clause (i) but also the relative fault of the indemnified party and the indemnifying party, as well as any other relevant equitable considerations.  The relative fault of the Company on the one hand and of the sellers of Registrable Securities and any other sellers participating in the registration statement on the other hand shall be determined by reference to, among other things, whether the untrue or alleged omission to state a material fact relates to information supplied by the Company or by the sellers of Registrable Securities or other sellers participating in the registration statement and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.  In no event shall the liability of any such Stockholder be greater in amount than the amount of net proceeds received by such Stockholder upon such sale or the amount for which such indemnifying party would have been obligated to pay by way of indemnification if the indemnification provided in paragraph (b) of this Section 3.05 had been available.

SECTION 3.06.    Holdback Agreements.

(a)    Whenever the Company proposes to register any of its equity securities under the Securities Act in an underwritten offering for its own account (other than on Form S-4 or S-8 or any similar successor form or another form used for a purpose similar to the intended use of such forms) or is required to use its reasonable efforts to effect the registration of any Registrable Securities under the Securities Act pursuant to Section 3.01 or 3.02, upon the request of the managing underwriter of such offering, each holder of Registrable Securities agrees by acquisition of such Registrable Securities, without the consent of the managing underwriter for such offering, not to effect any sale or distribution, including any sale pursuant to Rule 144 under the Securities Act, or to request registration under Section 3.02 of any Registrable Securities for the time period reasonably requested by the managing underwriter for the underwritten offering; provided, that in no event shall such period exceed 180 days (the "Lock-up Period") after the effective date of the registration statement relating to such Registration, except (i) as part of such Registration or (ii) in the case of a private sale or distribution, unless the transferee agrees in writing to be subject to this Section 3.06.  If requested by such managing underwriter, each holder of Registrable Securities agrees to execute a holdback agreement, in customary form, consistent with the terms of this Section 3.06(a); provided, that the form of the lock-up shall be substantially identical as to each similarly situated Stockholder; provided, further, that if the Company releases any holder of Registrable Securities from such holdback agreement, it shall similarly release all other holders of Registrable Securities on a pro rata basis.  Notwithstanding the foregoing, no Stockholder shall be subject to a Lock-up Period in excess of 180 days in any calendar year due to the registration of any Registrable Securities pursuant to Section 3.02.

9932/51494-005 current/50364946v5
02523-0017 271273.3

(b)    The Company agrees not to effect any sale or distribution of any of its equity securities or securities convertible into or exchangeable or exercisable for any such equity securities within the Lock-up Period (except as part of such underwritten Registration or pursuant to registrations on Form S-8, S-4 or any successor forms thereto), except that such restriction shall not prohibit any such sale or distribution after the effective date of the registration statement (i) pursuant to any stock option, warrant, stock purchase plan or agreement or other benefit plans approved by the Board to officers, directors or employees of the Company or its subsidiaries; (ii) pursuant to Section 4(2) of the Securities Act; or (iii) as consideration to any third party seller in connection with the bona fide acquisition by the Company or any subsidiary of the Company of the assets or securities of any Person in any transaction approved by the Board.  In addition, upon the request of the managing underwriter, the Company shall use commercially reasonable efforts to cause each holder of its equity securities or any securities convertible into or exchangeable or exercisable for any of such securities whether outstanding on the date of this Agreement or issued at any time after the date of this Agreement (other than any such securities acquired in a public offering), to agree not to effect any such public sale or distribution of such securities during such period, except as part of any such registration if permitted, and to cause each such holder to enter into a similar agreement to such effect with such managing underwriter.  Notwithstanding the foregoing, the Company shall not be subject to a Lock-up Period in excess of 180 days in any calendar year due to the registration of any Registrable Securities pursuant to <u>Section 3.02</u>.

SECTION 3.07.    <u>Participation in Registrations</u>.  No Stockholder may participate in any Registration hereunder that is underwritten unless such Stockholder (a) agrees to sell its securities on the basis provided in any underwriting arrangements approved by the Persons entitled hereunder to approve such arrangements (<u>provided</u>, that such underwriting arrangements shall not limit any of such Stockholder's rights under this Agreement), and (b) completes and executes all questionnaires, powers of attorney, underwriting agreements and other documents customarily required under the terms of such underwriting arrangements.

SECTION 3.08.    <u>Rule 144</u>.  The Company shall file any reports required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the Commission thereunder, and it will take such further action as any holder may reasonably request to enable such holder to sell Registrable Securities without registration under the Securities Act as permitted by (i) Rules 144 under the Securities Act, or (ii) any similar rules or regulation hereafter adopted by the Commission.  Upon the request of a holder of Registrable Securities, the Company, at the holder's own expense, will deliver to such holder:  (x) a written statement as to whether it has complied with the requirements that would make the exemption provided by such Rule or Rules available to such holder (and such holder shall be entitled to rely on the accuracy of such written statement); (y) a copy of the most recent annual or quarterly report of the Company; and (z) such other reports and documents as such holder may reasonably request in order to avail itself of any rule or regulation of the Commission allowing it to sell Registrable Securities without registration.

13

# ARTICLE IV

# MISCELLANEOUS

SECTION 4.01.    Notices.  Except as otherwise specified herein, all notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, return receipt requested, postage prepaid or otherwise delivered by hand, messenger, facsimile transmission or electronic mail and shall be given to such party at its address or facsimile number set forth on the signature pages hereof or such other address or facsimile number as such party may hereafter specify in writing in accordance with this Section 4.01; provided, that:

(a)    unless otherwise specified by a Stockholder in a notice delivered by such Stockholder in accordance with this Section 4.01, any notice required to be delivered to such Stockholder shall be properly delivered if delivered to the address set forth below such Stockholder's signature hereto

with a copy (which shall not constitute notice) to:

> Proskauer Rose LLP
> One International Place
> Boston, MA 02110
> Fax: (617) 526-9899
> Email: sellis@proskauer.com; ppossinger@proskauer.com;
> mmano@proskauer.com
> Attention: Steven Ellis, Paul Possinger and Michael Mano

(b)    unless otherwise specified by the Company in a notice delivered by the Company in accordance with this Section 4.01, any notice required to be delivered to the Company shall be properly delivered if delivered to:

> Point.360
> 2701 Media Center Drive
> Los Angeles, CA 90065
> Fax: (818) 847-2503
> Email: asteel@point360.com
> Attention: Alan Steel, Chief Financial Officer

with a copy (which shall not constitute notice) to:

TroyGould PC
1801 Century Park East, 16th Floor
Los Angeles, CA 90067
Fax: (310) 201-4746
Email: wgould@troygould.com
Attention: William D. Gould, Esq.

14

SECTION 4.02.    Binding Effect; Benefits.  This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors and permitted assigns.  Except as set forth in Section 3.05, nothing in this Agreement, express or implied, is intended or shall be construed to give any Person other than the parties to this Agreement or their respective successors or permitted assigns any legal or equitable right, remedy or claim under or in respect of any agreement or any provision contained herein.

SECTION 4.03.    Amendment.  This Agreement may not be amended, restated, modified or supplemented in any respect and the observance of any term of this Agreement may not be waived except by a written instrument executed by the parties hereto.

SECTION 4.04.    Assignability.  Neither this Agreement nor any right, remedy, obligation or liability arising hereunder or by reason hereof shall be assignable by either the Company or any Stockholder except as otherwise expressly stated hereunder.

SECTION 4.05.    Governing Law; Submission to Jurisdiction.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to its principles of conflict of laws.  The parties hereto irrevocably submit, in any legal action or proceeding relating to this Agreement, to the jurisdiction of the courts of the United States located in the State of New York or in any New York state court located in New York county and consent that any such action or proceeding may be brought in such courts and waive any objection that they may now or hereafter have to the venue of such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient forum.

SECTION 4.06.    Enforcement.  The parties hereto agree that irreparable damage (for which monetary damages, even if available, would not be an adequate remedy) would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms on a timely basis or were otherwise breached.  It is accordingly agreed that the Stockholders shall be entitled to an injunction, specific performance and other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any court identified in Section 4.05 above without the need to post bond, this being in addition to any other remedy to which they are entitled at law or in equity.

SECTION 4.07.    Severability.  If any provision of this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

SECTION 4.08.    Additional Securities Subject to Agreement.  All shares of Capital Stock that any Stockholder hereafter acquires by means of a stock split, stock dividend, distribution, exercise of options or warrants or otherwise (other than pursuant to a public offering) whether by merger, consolidation or otherwise (including shares of a surviving corporation into which the shares of Capital Stock are exchanged in such transaction) will be subject to the provisions of this Agreement to the same extent as if held on the date of the this Agreement.

9932/51494-005 current/50364946v5
02523-0017 271273.3

SECTION 4.09.    Section and Other Headings.  The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

SECTION 4.10.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which may be executed by less than all of the parties hereto, each of which shall be enforceable against the parties actually executing such counterparts, and all of which together shall constitute one instrument.

SECTION 4.11.    Waiver of Jury Trial.  Each party to this Agreement hereby irrevocably and unconditionally waives to the fullest extent permitted by applicable law all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to the actions of the parties hereto pursuant to this Agreement or in the negotiation, administration, performance or enforcement of this Agreement.

SECTION 4.12.    Further Assurances.  Each party shall perform any further acts and execute and deliver any further documents that may be reasonably necessary or advisable to carry out the provisions of this Agreement.

SECTION 4.13.    Entire Agreement.  This Agreement supersedes all prior agreements, whether written or oral, between the parties with respect to its subject matter (including this Agreement) and constitutes (along with the exhibits and other documents delivered pursuant to this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter.

[SIGNATURE PAGES FOLLOW]

9932/51494-005 current/50364946v5
02523-0017 271273.3

IN WITNESS WHEREOF, the Company and each Stockholder have executed this Agreement as of the day and year first above written.

POINT.360

By: _____

Name: Haig S. Bagerdjian

Title: CEO

MEDLEY CAPITAL CORPORATION

By: _____

Name:

Title:

MEDLEY OPPORTUNITY FUND II LP

By: _____

Name:

Title:

MAIN STREET CAPITAL CORPORATION

By: _____

Name:

Title:

CONGRUENT CAPITAL OPPORTUNITIES FUND II, LP

By: _____

Name:

Title:

*[Signature Page to Registration Rights Agreement]*

EXHIBIT G  -  114

IN WITNESS WHEREOF, the Company and each Stockholder have executed this Agreement as of the day and year first above written.

POINT.360

By: _____
    Name:
    Title:

MEDLEY CAPITAL CORPORATION

By: _____
    Name: Richard T. Allorto
    Title:CFO

MEDLEY OPPORTUNITY FUND II LP

By: _____
    Name: Richard T. Allorto
    Title:CFO

MAIN STREET EQUITY INTERESTS, INC.

By: _____
    Name:
    Title:

CONGRUENT CREDIT OPPORTUNITIES FUND II, LP

By: _____
    Name:
    Title:

*[Signature Page to Registration Rights Agreement]*

IN WITNESS WHEREOF, the Company and each Stockholder have executed this Agreement as of the day and year first above written.

POINT.360

By: _____
        Name:
        Title:


MEDLEY CAPITAL CORPORATION


By: _____
        Name:
        Title:


MEDLEY OPPORTUNITY FUND II LP


By: _____
        Name:
        Title:

MAIN STREET EQUITY INTERESTS, INC.


By: _____
        Name: Nick Meserve
        Title: Managing Director

CONGRUENT CREDIT OPPORTUNITIES FUND II, LP


By: _____
        Name:
        Title:


*[Signature Page to Registration Rights Agreement]*

IN WITNESS WHEREOF, the Company and each Stockholder have executed this Agreement as of the day and year first above written.

POINT.360

By: _____
    Name:
    Title:

MEDLEY CAPITAL CORPORATION

By: _____
    Name:
    Title:

MEDLEY OPPORTUNITY FUND II LP

By: _____
    Name:
    Title:

MAIN STREET EQUITY INTERESTS, INC.

By: _____
    Name:
    Title:

CONGRUENT CREDIT OPPORTUNITIES FUND II, LP

By: _____
    Name:    **Matthew Killebrew**
    Title:    **Authorized Signatory**

*[Signature Page to Registration Rights Agreement]* EXHIBIT G  -  117

# EXHIBIT H

**Medley Capital Corporation**
**Medley Opportunity Fund II LP**
**375 Park Avenue, Suite 3304**
**New York, NY 10152**


**PERSONAL AND CONFIDENTIAL**


July 8, 2015

Congruent Credit Opportunities Fund II, LP
c/o Congruent Investment Partners
3131 McKinney Avenue
Suite 850
Dallas, Texas 75204
Attn: Travis Baldwin

Main Street Capital Corporation
1300 Post Oak Blvd.
Suite 800
Houston, Texas 77056
Attn: Roger Stout


Re:     **Modern VideoFilm, Inc.**

Ladies and Gentlemen:

Reference is hereby made to that certain (i) Credit Agreement (the "Credit Agreement"), dated as of September 25, 2012, by and among Modern VideoFilm Holdings, LLC ("Holdings"), Modern VideoFilm, Inc. ("Borrower" and, together with Holdings and any Subsidiaries of Holdings that are Guarantors or become Guarantors under the Credit Agreement, the "Credit Parties" and each a "Credit Party"), the lenders signatory thereto (the "Lenders") and Medley Capital Corporation ("Medley"), as Administrative Agent and Collateral Agent for the Secured Parties (in such capacities, collectively the "Agent") and (ii) Sale Agreement Pursuant to Article 9 of the Uniform Commercial Code (the "Sale Agreement") by and between the Agent and Point.360, a California corporation.  Capitalized terms not defined herein shall have the meanings ascribed thereto in the Credit Agreement.

Notwithstanding anything to the contrary contained in the Credit Agreement or the Sale Agreement, this letter agreement shall serve to reflect our collective agreement that all sums received by the Agent in repayment of the Term Loans, including, without limitation, the proceeds of the transactions contemplated by the Sale Agreement to be received by the Agent shall be applied and distributed to the Lenders in accordance with the Credit Agreement,

provided, however, that each Lender's pro rata distribution shall be based on a deemed Term Loan balance calculated by adding (a) all advances of Term Loans other than advances of Term Loans made by Medley and Medley Opportunity Fund II LP with respect to which no other Lender made any contribution, in the aggregate amount of up to $3,500,000 (the "Medley Advances"), plus (b) the amount of the Medley Advances multiplied by six.

This letter agreement may be executed in any number of counterparts, each of which when executed will be an original, and all of which, when taken together, will constitute one agreement.  Delivery of an executed counterpart of a signature page of this fee letter by facsimile or other electronic transmission will be effective as delivery of a manually executed counterpart hereof.

This letter agreement will be governed by and construed in accordance with the laws of the State of New York without regard to conflict of law principles that would result in the application of any law other than the law of the State of New York.

If the foregoing correctly represents our understanding, kindly indicate by signing the enclosed copy of this fee letter and returning it to us.

*[Signature Pages Follow]*

Modern VideoFilm Letter Agreement

EXHIBIT H  -  119

Very truly yours,

**MEDLEY CAPITAL CORPORATION**

By: _____

Name: _Richard T. Allorto_

Title: _CFO_

**MEDLEY OPPORTUNITY FUND II LP**

By: _____

Name: _Richard T. Allorto_

Title: _CFO_

Modern VideoFilm Letter Agreement

EXHIBIT H  -  120

Agreed and Accepted this
8th day of July, 2015

**CONGRUENT CREDIT OPPORTUNITIES FUND II, LP,**

By: _____

Name: ~~Matthew Killebrew~~

Title: ~~Authorized Signatory~~

**MAIN STREET CAPITAL CORPORATION**

By: _____

Name: _____

Title: _____

Modern VideoFilm Letter Agreement

Agreed and Accepted this
*8th* day of July, 2015


**CONGRUENT CREDIT OPPORTUNITIES FUND II, LP,**
By: _____
Name: _____
Title: _____


**MAIN STREET CAPITAL CORPORATION**

By: _____
Name: Nick Meserve
Title: Managing Director


Modern VideoFilm Letter Agreement

# EXHIBIT I

**Medley Capital Corporation**
**375 Park Avenue, Suite 3304**
**New York, NY 10152**

**PERSONAL AND CONFIDENTIAL**

July 9, 2015

Equity Office Management, LLC
3200 Ocean Park Blvd., Ste. 100
Santa Monica, CA 90405
Attn: D. Zehm, General Manager

Re:   **Landlord's Waiver and Consent – Modern VideoFilm, Inc.**

Ladies and Gentlemen:

Reference is hereby made to that certain Landlord's Waiver and Consent (the "Agreement"), dated as of September 25, 2012, by and between Medley Capital Corporation, as administrative agent and collateral agent for certain lenders (in such capacity, the "Agent") and CA-Colorado Center, L.L.C. ("Landlord"), a copy of which is attached here as Exhibit A. Capitalized terms not defined herein shall have the meanings ascribed thereto in the Agreement.

Pursuant to the terms of the Agreement, Agent hereby notifies Landlord that Point.360, a California corporation, and its employees are Agent's invitees with respect to the Premises, and are authorized to enter and occupy the Premises, and to inspect, repossess and/or remove and or all of the Collateral pursuant to the terms of the Agreement.

Very truly yours,

**MEDLEY CAPITAL CORPORATION,**
as Agent

By: _____
Name: _Richard T. Alloto_
Title: _CFO_

EXHIBIT I  -  123

**<u>Exhibit A</u>**

*[Attached]*

EXHIBIT I  -  124

## LANDLORD'S WAIVER AND CONSENT

THIS LANDLORD'S WAIVER AND CONSENT ("Waiver and Consent") is made and entered into as of this 25th day of September, 2012, by and between CA-COLORADO CENTER, L.L.C., a Delaware limited liability company ("Landlord"), and MEDLEY CAPITAL CORPORATION, a Delaware corporation ("Medley"), as administrative agent for the lenders (collectively, "Lenders") from time to time party to the Credit Agreement (as defined below) (in such capacity, together with its successors and assigns in such capacity, the "Administrative Agent") and Medley, as collateral agent for the Secured Parties (in such capacity, together with its successors and assigns in such capacity, the "Collateral Agent", and together with the Administrative Agent, collectively, the "Agents" and each an "Agent").

    A.    Landlord is the owner of the real property located at 2500 Broadway, Santa Monica, California, commonly known as Yahoo! Center (the "Premises").

    B.    Landlord has entered into that certain Lease Agreement dated as of October 29, 2010 (together with all amendments and modifications thereto and waivers thereof, the "Lease") with Modern VideoFilm, Inc., a Delaware corporation ("Company"), with respect to a portion of the Premises consisting of approximately 18,750 square feet on the first floor.

    C.    Company, Agent and Lenders have entered into a Credit Agreement dated as of September 25, 2012 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), and to secure the obligations arising under the Credit Agreement, Company has granted to Agent, for the benefit of Agent and Lenders, a security interest in and lien upon, among other things, all of Company's goods, inventory, machinery, equipment, and furniture and trade fixtures (such as equipment bolted to floors), together with all additions, substitutions, replacements and improvements to, and proceeds of, the foregoing, but excluding building fixtures (such as plumbing, lighting and HVAC systems) (collectively, the "Collateral").

NOW, THEREFORE, in consideration of any financial accommodations extended by Lenders to Company at any time, and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

    1.    Landlord acknowledges that (a) the Lease is in full force and effect and (b) Landlord is not aware of any existing default under the Lease.

    2.    Landlord will use reasonable efforts to provide Agent with written notice of any default by Company under the Lease resulting in termination of the Lease (a "Default Notice"). Agent shall have at least 15 days following receipt of such Default Notice to cure such default, but neither Agent nor any Lender shall be under any obligation to cure any default by Company under the Lease. No action by Agent or any Lender pursuant to this Waiver and Consent shall be deemed to be an assumption by Agent or Lenders of any obligation under the Lease, and, except as provided in **paragraphs 6** and **7** below, Agent shall not have any obligation to Landlord.

    3.    Landlord acknowledges the validity of Agent's lien on the Collateral and, until such time as the obligations of Company to Lenders are indefeasibly paid in full, Landlord

EXHIBIT I  -  125

waives any interest in the Collateral and agrees not to distrain or levy upon any Collateral or to assert any landlord lien or right of distraint against the Collateral; provided, that nothing in this Waiver and Consent shall be deemed to limit Landlord's rights to enforce the provisions of the Lease against Company, including obtaining a judgment against Company with respect thereto.

4.     Landlord agrees that the Collateral consisting of trade fixtures such as equipment bolted to the floor shall not be deemed a fixture or part of the real estate but shall at all times be considered personal property.

5.     Prior to a termination of the Lease, to the extent permitted under the terms of the Credit Agreement, Agent or its representatives or invitees may enter upon the Premises at any time without any interference by Landlord to inspect or remove any or all of the Collateral, including without limitation, by private sale pursuant to the provisions of **paragraph 7** below. Agent is its representatives shall comply with Landlord's reasonable rules and regulations with respect to the entry into the Premises and the performance of any work thereon.  In no event shall Agent conduct a public auction of the Collateral at the Premises.

6.     Upon a termination of the Lease, Landlord will permit Agent and its representatives and invitees to occupy and remain on the Premises for the limited purpose of removing the Collateral and repairing any damage caused by such removal; provided, that (a) such period of occupation (the "Disposition Period") shall not exceed up to 90 days following receipt by Agent of a Default Notice or, if the Lease has expired by its own terms (absent a default thereunder), up to 30 days following such expiration, (b) for the actual period of occupancy by Agent, Agent will pay to Landlord the basic rent due under the Lease pro-rated on a per diem basis determined on a 30-day month, and shall provide and retain liability and property insurance coverage, electricity and heat to the extent required by the Lease, (c) such amounts paid by Agent to Landlord shall exclude any rent adjustments, indemnity payments or similar amounts for which the Company remains liable under the Lease for default, holdover status or other similar charges, and (d) Agent will begin to remove the Collateral from the Premises no later than 30 days following Agent's receipt of written notice from Landlord that Landlord has entered into an agreement to re-lease the Premises, and Agent will diligently proceed thereafter with such removal.

7.     During any Disposition Period, (a) Agent and its representatives and invitees may inspect, repossess, remove and otherwise deal with the Collateral, and Agent may conduct private sales of the Collateral at the Premises, in each case without interference by Landlord or liability of Agent or any Lender to Landlord, and (b) Agent shall make the Premises available for inspection by Landlord and prospective tenants and shall cooperate in Landlord's reasonable efforts to re-lease the Premises. If Agent conducts a private sale of the Collateral at the Premises, Agent shall use reasonable efforts to notify Landlord first and to hold such sale in a manner which would not unduly disrupt Landlord's or any other tenant's use of the Premises.

8.     Agent shall promptly repair, at Agent's expense, or reimburse Landlord for any physical damage to the Premises actually caused by the conduct of such sale and any removal of Collateral by or through Agent (ordinary wear and tear excluded).  Neither Agent nor any Lender shall be liable for any diminution in value of the Premises caused by the absence of

2

EXHIBIT I  -  126