PETER C. ANDERSON, UNITED STATES TRUSTEE
JILL M. STURTEVANT, ASSISTANT UNITED STATES TRUSTEE
ALVIN MAR, TRIAL ATTORNEY, SBN 151482
OFFICE OF THE UNITED STATES TRUSTEE
915 Wilshire Blvd., Suite 1850, Los Angeles, California 90017
(213) 894-4219  Facsimile: (213) 894-2603
email: alvin.mar@usdoj.gov

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>**POINT.360, A CALIFORNIA CORPORATION,**<br><br>Reorganized Debtor(s). | **NOTICE OF MOTION AND MOTION UNDER 11 U.S.C. § 1112(b)(1) TO CONVERT, DISMISS OR APPOINT A CHAPTER 11 TRUSTEE WITH AN ORDER DIRECTING PAYMENT OF QUARTERLY FEES AND FOR JUDGMENT THEREON; DECLARATION OF BANKRUPTCY ANALYST** |
| | CHAPTER 11<br><br>CASE NUMBER **2:17-bk-22432-WB** |

TO THE DEBTOR, DEBTOR'S ATTORNEY, CREDITORS, AND OTHER INTERESTED PARTIES:

NOTICE IS HEREBY GIVEN that on the following date and time in the indicated courtroom, the United States Trustee will move, and does hereby move the Court for an order either converting the above entitled chapter 11 case to chapter 7 or dismissing the case, for payment of quarterly fees, for judgment thereon and for such other relief as may be appropriate on the grounds set forth below.

**Hearing Date:   NOVEMBER 17, 2019   Time: 10:00 A.M.          Courtroom: 1375**

**Location:  255 E. Temple Street,  Los Angeles, California 90012**

Local Bankruptcy Rule 9013-1(f) requires that any opposition or response to this motion be stated in writing, filed with the Clerk of the Court and served upon the United States Trustee at the address set forth in the upper left-hand corner of this document, upon the chapter 11 trustee and his or her attorney if a trustee has been appointed, and upon the debtor and the debtor's attorney no less than fourteen (14) days prior to the above hearing date.  The court may treat failure to file a written response to this motion within the required time period as consent to the motion.

## FILING INFORMATION
[X] A voluntary petition under chapter 11 was filed on: 10/10/17

Revised 08/29/13

| In Re: | | CHAPTER 11 |
|---|---|---|
| POINT.360, A CALIFORNIA CORPORATION, | | |
| | Debtor(s) | CASE NUMBER **2:17 -bk-22432-WB** |

## FACTS

1.    [X]  An 'Order Confirming Debtor's Second Amended Chapter 11 Plan as Modified' was entered on June 11, 2019 (doc. no. 713).

2.    The Debtor has failed to comply with the requirements of the United States Trustee Chapter 11 Notices and Guides Effective September 1, 2011 (Notices and Guides), Bankruptcy Code and/or Local Bankruptcy Rules by failing to provide documents, financial reports or attend required meetings as follows:[1]

    [X]  Pay quarterly fees:

        Second Quarter 2019 United States Trustee quarterly fees of $86,658.43 is presently due and delinquent.  Third Quarter 2019 United States Trustee quarterly fees are present accruing.

3.    [X]  Attached to the declaration of bankruptcy analyst, are true and correct copies of the following documents in support of the above allegations:

    Exhibit 1 – True and correct copy of Reorganized Debtor's Second Quarter 2019 quarterly disbursement report dated July 15, 2019.

    Exhibit 2 – True and correct copy of United States Trustee's quarterly fee 'Account Reconciliation' for Reorganized Debtor as of September 23, 2019.

    Exhibit 3 – True and correct copy of 'Debtor's Second Amended Disclosure Statement Describing Second Amended Chapter 11 Plan' filed on December 5, 2018 (doc. no. 431) without exhibits.

---

[1]The United States Trustee respectfully requests that the Court take judicial notice of Debtor's petition, schedules, statement of financial affairs and other documents filed therewith and any amendments thereto which are in the Court's file, pursuant to Fed. R. Evid. 201, as made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 9017. The information contained in these documents, signed under penalty of perjury by Debtor, are admissible admissions of the Debtor pursuant to Fed. R. Evid. 801(d).

| In Re: | | CHAPTER 11 |
|---|---|---|
| POINT.360, A CALIFORNIA CORPORATION, | Debtor(s) | CASE NUMBER 2:17-bk-22432-WB |

## MEMORANDUM OF POINTS AND AUTHORITIES

- Except as provided in paragraph (2) and subsection ( C ), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate."11 U.S.C. § 1112(b)(1).

- "For the purposes of this subsection, the term "cause" includes- (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; (B) gross mismanagement of the estate; ( C ) failure to maintain appropriate insurance that poses a risk to the estate or to the public; (D) unauthorized use of cash collateral substantially harmful to 1 or more creditors; (E) failure to comply with an order of the court; (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter; (G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor; (H) failure timely to provide information or attend meetings reasonably requested by the United States Trustee (or the bankruptcy administrator, if any); (I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief; (J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court; (K) failure to pay any fees or charges required under chapter 123 of title 28; (L) revocation of an order of confirmation under section 1144 of this title; (M) inability to effectuate substantial consummation of a confirmed plan; (N) material default by the debtor with respect to a confirmed plan; (O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and (P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition." *11 U.S.C. § 1112(b)(4)*.

- "In a small business case . . . (2) the plan and disclosure statement (if any) shall be filed not later than 300 days after the date of the order for relief". *11 U.S.C. § 1121(e)(2)*.

- Local Bankruptcy Rule 2015-2(b) provides that timely compliance with the reasonable requirements of the Office of the United States Trustee is mandatory.

- Failure to comply with the reporting requirements of the United States Trustee and the Local Bankruptcy Rules is cause to dismiss a chapter 11 case or convert it to one under chapter 7 (11 U.S.C. § 1112(b)(1) and (b)(4)), [*In re 3868-70 White Plains Road Inc.*, 28 B.R. 515 (Bankr. S.D.N.Y. 1983); *In re Bianco*, 5 B.R. 466 (Bank. D. Mass.1980); *In re Pappas*, 17 B.R. 662 (Bankr. D. Mass. 1982)].

- The court may convert or dismiss a case where no reasonable possibility of effective reorganization exists, the debtor is unable to effectuate a plan and/or for unreasonable delay which prejudices the rights of creditors. *See, e.g., In re Johnston*, 149 Bankr 158, 161 (9th Cir. BAP 1992).

- The court may prohibit the debtor from filing another bankruptcy petition for a period of 180 days where the debtor has failed to properly prosecute the case. 11 U.S.C. §§ 105, 109(g) and 349(a).

- The United States Trustee Notices and Guides provide that payment of quarterly fees is due upon dismissal of the case. The United States Trustee requests that the court order payment as requested herein and enter a judgment pursuant to Bankruptcy Rules 9014 and 7052 if the case is dismissed.

| In Re: | | CHAPTER 11 |
|---|---|---|
| POINT.360, A CALIFORNIA CORPORATION, | | |
| | Debtor(s) | CASE NUMBER **2:17-bk-22432-WB** |

**Based on the above facts and law, and also based upon such oral and/or documentary evidence as may be presented at the time of the hearing, the United States Trustee respectfully requests as follows.**

1.  convert it to one under chapter 7 or appoint a Chapter 11 trustee if in the best interest of creditors.  Under § 1112(b)(1), when the court finds "cause" to dismiss or convert a chapter 11 case, the court must decide which of several court actions will best serve the estate's creditors.  It must:

> "(1) decide whether dismissal, conversion, or the appointment of a trustee or examiner is in the best interests of creditors and the estate; and (2) identify whether there are unusual circumstances that establish that dismissal or conversion is not in the best interests of creditors and the estate."

> *Sullivan v. Harnisch (In re Sullivan)*, 522 B.R. 604, 612 (9th Cir. BAP 2014).

Based on the United States Trustee's review of the record and evidence, the United States Trustee suggests:

☒ conversion of reorganized case is more appropriate to allow Chapter 7 trustee to administer case for benefit of creditors. The Chapter 7 trustee may consider pursuing the claims against Medley which is referred to in the 'Debtor's Second Amended Disclosure Statement Describing Second Amended Chapter 11 Plan' filed on December 5, 2018 (doc. no. 431) which may result in augmenting a return to Debtor's unsecured creditors.  A true and correct copy of the 'Debtor's Second Amended Disclosure Statement Describing Second Amended Chapter 11 Plan' filed on December 5, 2018 (doc. no. 431) without exhibits is attached hereto as Exhibit 3.

2.  If the case is converted to one under chapter 7, that the Court enter an order requiring debtor's counsel to file a fee application under Bankruptcy Code § 330 within thirty (30) days.

3.  If the case is dismissed, and the Court finds cause, that the court enter an order prohibiting the debtor from filing another bankruptcy petition for a period of 180 days after the date of entry of the order of dismissal.

4.  If the case is dismissed, that the Court order the debtor to pay any quarterly fees due to the United States Trustee forthwith and enter a judgment in favor of the United States Trustee for any unpaid quarterly fees.

5.  In the alternative, that the Court set dates certain for the debtor to file a disclosure statement and plan, to obtain court approval of the adequacy of information in the disclosure statement, and to obtain court confirmation of a plan of reorganization ("dates certain") and that this court order that the debtor remain in full and timely compliance with the United States Trustee requirements.

6.  If the court sets date(s) certain and/or orders that the debtor remain in full and timely compliance with the United States Trustee requirements, that the court further order that if the debtor fails to comply with any date set or to remain in full and timely compliance, that this case may be converted or dismissed without further hearing, upon application of the United States Trustee to the court, served upon debtor and debtor's counsel.

| In Re: | CHAPTER 11 |
|---|---|
| POINT.360, A CALIFORNIA CORPORATION,        Debtor(s) | CASE NUMBER **2:17 -bk-22432-WB** |

7.   That the court order such other and further relief as may be appropriate in the circumstances.

Date: 9/23/19

**PETER C. ANDERSON
UNITED STATES TRUSTEE**

By _____
ALVIN MAR
Attorney for United States Trustee

# DECLARATION OF
# BANKRUPTCY ANALYST

# DECLARATION OF
# BANKRUPTCY ANALYST

| In Re: | CHAPTER 11 |
|---|---|
| POINT.360, A CALIFORNIA CORPORATION,<br><br>Debtor(s) | CASE NUMBER 2:17 -bk-22432-WB |

## DECLARATION OF BANKRUPTCY ANALYST

I am over the age of eighteen years and am not a party to this case. If called upon to testify I could and would do so competently. I am employed as a Bankruptcy Analyst by the Office of the United States Trustee for the Central District of California, in the Los Angeles Field Office. I am the **Analyst assigned** to Point.360, a California Corporation, Case No. 2:17-bk-22432-WB. I have personal knowledge of the facts set forth herein, and based on that personal knowledge I assert that all such facts are true and correct to the best of my knowledge.

1. I am familiar with the procedures of the United States Trustee for maintaining paper and electronic submissions by debtors of the requirements of the United States Trustee for Chapter 11 debtors. These procedures include the routine maintenance of paper and electronic submissions by debtors in electronic files that are maintained for each Chapter 11 case in order for the United States Trustee to discharge his statutory duties. I have reviewed the files and electronic records of the United States Trustee for his case and have included the results of my review in this declaration.

2. [X] An 'Order Confirming Debtor's Second Amended Chapter 11 Plan as Modified' was entered on June 11, 2019 (doc. no. 713).

3. [X] The Debtor has failed to comply with the requirements of the United States Trustee Chapter 11 Notices and Guides, Bankruptcy Code and/or Local Bankruptcy Rules by failing to provide documents, financial reports or attend required meetings as follows:

   [X] Pay quarterly fees:
   Second Quarter 2019 United States Trustee quarterly fees of $86,658.43 are presently due and delinquent. Third Quarter 2019 United States Trustee quarterly fees are present accruing.

4. [X] Attached are true and correct copies of the following documents in support of the above allegations:

   Exhibit 1 – True and correct copy of Reorganized Debtor's Second Quarter 2019 quarterly disbursement report dated July 15, 2019.

   Exhibit 2 – True and correct copy of United States Trustee's quarterly fee 'Account Reconciliation' for Reorganized Debtor as of September 23, 2019.

   Exhibit 3 – True and correct copy of 'Debtor's Second Amended Disclosure Statement Describing Second Amended Chapter 11 Plan' filed on December 5, 2018 (doc. no. 431) without exhibits.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on the following date at Los Angeles, California.

Date: 9/23/19

YOLANDA CANNON
Bankruptcy Analyst

# EXHIBIT 1

# EXHIBIT 1

## Office of the United States Trustee

| In re:<br>Point 360. Debtor-In-Possession<br><br>Chapter 11 Case No: 2:17-bk- 22432-WB | Debtor(s) | **Post-Confirmation Status Report**<br><br>Quarter Ending: **June 30, 2019**<br>(Month / Year) |
|---|---|---|

| Attorney/Professional - Name, Address, Phone & FAX:<br>**Lewis R. Landau (SBN 143391) Attorney-at-Law**<br>22287 Mulholland Hwy., # 318   Calabasas, California 91302<br>Voice & Fax: (888) 822-4340  Email: lew@landaunet.com | Person responsible for report - Name, Address, Phone & FAX<br>Haig Bagerdjian<br>2701 Media Center Drive<br>Los Angeles, CA 90065  Tel: 323.987.9400 fax  818.847.2503 |
|---|---|

| Date Order was entered confirming plan | June 10, 2019 |
|---|---|
| Disbursing Agent (if any) (Please print) | **Debtor in possession** |

| SUMMARY OF DISBURSEMENTS MADE DURING THE QUARTER | |
|---|---|
| Disbursements made under the plan | $2,370,414 |
| Other Disbursements | $6,284,774 |
| **Total Disbursements** | **$8,655,188** |

| Projected date of final decree | Jan . 1, 2020 pending litigation |
|---|---|
| What needs to be achieved before a final decree will be sought?<br>*(Attach a separate sheet if necessary)* | Concluding post-confirmation administrative and litigation matters. |
| Narrative of events which impact upon the ability to perform under the reorganization plan or other significant events that have occurred during the reporting period<br>*(Attach a separate sheet if necessary)* | Continued operations; None. |
| Date last U. S. Trustee fee paid | April 30, 2019 |
| Amount Paid | $68,005 |

I declare under penalty of perjury that the information contained in the document is true, complete and correct.

Date:
July 15, 2019

Signature of person responsible for this report

*This report is to be filed with the U.S. Trustee quarterly until a final decree is entered. **This report is for U.S. Trustee purposes only. You may be required to file additional reports with the Bankruptcy Court.***

EXHIBIT 2

EXHIBIT 2



## Chapter 11 Quarterly Fee Information and Collection System (FICS)
**US Trustees, US Department of Justice**

### Account Reconciliation

Field Office: 16 01 Los Angeles, CA

| | | | | |
|---|---|---|---|---|
| Case #:  732-17-22432 | CPC: 06-11-19 | OCS: | Billed($): | **453,996.15** |
| Debtor:  POINT.360, A CALIFORNIA CORPOR | CDC: | CTO: | Fees($): | 453,985.00 |
| Opened: 10-10-17 | Closed: | CNV: | CBC: | Interest($): | 11.15 |
| | | | TIN: | Payments($): | **-367,337.72** |
| | | | | Principal($): | -367,337.72 |
| | | | | Interest($): | 0.00 |
| | | | | Balance($): | **86,658.43** |

### Quarterly Fees and Disbursements

| Quarter | Disbursements ($) | Fee ($) |
|---|---|---|
| 4-2017 | 5,343,250 | 13,000 |
| 1-2018 | 8,471,074 | 84,711 |
| 2-2018 | 7,650,920 | 76,509 |
| 3-2018 | 4,296,878 | 42,969 |
| 4-2018 | 7,104,634 | 71,046 |
| 1-2019 | 7,909,756 | 79,098 |
| 2-2019 | 8,665,188 | 86,652 |

### Payments

| Batch/Trans ID | Date | Type Code | Payment($) |
|---|---|---|---|
| 01-062 | 01-25-18 | PMTLB | -13,000.00 |
| 01-070 | 05-02-18 | PMTLB | -13,000.00 |
| 60-102 | 05-09-18 | PMTLB | -62,798.00 |
| 61-034 | 05-30-18 | PMTLB | -8,912.74 |
| 01-042 | 07-03-18 | PMTLB | -21.46 |
| 01-176 | 08-07-18 | PMTLB | -81,041.80 |
| 02-134 | 11-07-18 | PMTLB | -84,833.00 |
| 02-452 | 02-08-19 | PMTLB | -26,046.00 |
| 01-112 | 05-03-19 | PMTLB | -68,005.00 |
| 03-011 | 05-29-19 | PMTLB | -9,679.72 |

### Interest

| Transaction Date | Assessment Period | Days | Interest Rate | Amount ($) |
|---|---|---|---|---|
| 08-07-19 | 05-01-19 through 07-31-19 | 92 | 1% | 11.15 |
| 05-29-19 | 02-01-19 through 04-30-19 | 89 | 1% | 0.00 |
| 02-08-19 | 08-01-18 through 01-31-19 | 184 | 1% | 0.00 |
| 07-03-18 | 05-01-18 through 05-31-18 | 31 | 1% | 0.00 |

EXHIBIT 3

EXHIBIT 3

1  **Lewis R. Landau** (SBN 143391)
   **Attorney-at-Law**
2  22287 Mulholland Hwy., # 318
   Calabasas, California 91302
3  Voice & Fax: (888)822-4340
   *Email: lew@landaunet.com*

4

5

6  Attorneys for Point.360, a California corporation,
   Debtor and Debtor-in-Possession

7

8          UNITED STATES BANKRUPTCY COURT

9          CENTRAL DISTRICT OF CALIFORNIA

10              LOS ANGELES DIVISION

11  In re                              Case No.: 2:17-bk-22432 WB

12  Point.360, a California corporation,    In a Case Under Chapter 11 of the Bankruptcy
                                        Code (11 U.S.C. § 1101 et seq.)
13              Debtor

14                                      **DEBTOR'S SECOND AMENDED**
                                        **DISCLOSURE STATEMENT DESCRIBING**
15                                      **SECOND AMENDED CHAPTER 11 PLAN**

16                                      **Disclosure Statement Hearing**

17                                      Date:    November 8, 2018
                                        Time:    10:00 a.m.
18                                      Place:   Courtroom 1375; Judge Brand
                                                 U.S. Bankruptcy Court
19                                               255 E. Temple Street, 13th Floor
                                                 Los Angeles, CA 90012
20
                                        **Plan Confirmation Status Hearing**
21
                                        Date:    January 29, 2019
22                                      Time:    2:00 p.m.
                                        Place:   Courtroom 1375; Judge Brand
23                                               U.S. Bankruptcy Court
                                                 255 E. Temple Street, 13th Floor
24                                               Los Angeles, CA 90012

25

26

27

28

                              –1–

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................ 2

A. Purpose of This Document and Exhibits ........................................................... 2

B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing ........ 4
   1. Time and Place of the Confirmation Hearing ............................................ 5
   2. Deadline For Voting For or Against the Plan ........................................... 5
   3. Deadline For Objecting to the Confirmation of the Plan .......................... 5
   4. Identity of Person to Contact for More Information Regarding the Plan ..... 5

C. Disclaimer .......................................................................................................... 5

II. BACKGROUND ....................................................................................................... 6

A. Description and History of the Debtor's Business ............................................. 6

B. Principals/Affiliates of Debtor's Business ......................................................... 7

C. Management of the Debtor Before and After the Bankruptcy ........................... 9

D. Events Leading to Chapter 11 Filing ............................................................... 12

E. Significant Events During the Bankruptcy ....................................................... 13
   1. Bankruptcy Proceedings .......................................................................... 13
   2. Other Legal Proceedings ......................................................................... 16
   3. Actual and Projected Recovery of Preferential or Fraudulent Transfers .... 17
   4. Procedures Implemented to Resolve Financial Problems ......................... 18
   5. Current and Historical Financial Conditions ........................................... 19

III. SUMMARY OF THE PLAN OF REORGANIZATION ......................................... 19

A. What Creditors and Interest Holders Will Receive Under The Proposed Plan ..... 19

B. Unclassified Claims .......................................................................................... 19
   1. Administrative Expenses .......................................................................... 20
   2. Priority Tax Claims ................................................................................. 21
   3. Creditors' Administrative Expense Claims ............................................. 21

C. Classified Claims and Interests ........................................................................ 22
   1. Classes of Secured Claims ....................................................................... 22
   2. Classes of Priority Unsecured Claims ..................................................... 23
   3. Classes of General Unsecured Claims ..................................................... 24
   4. Class(es) of Interest Holders ................................................................... 26

D. Means of Effectuating the Plan ........................................................................ 26
   1. Funding for the Plan ................................................................................ 26
   2. Post-confirmation Management ............................................................... 27
   3. Disbursing Agent .................................................................................... 28

E. Risk Factors ..................................................................................................... 28

i

F.  Other Provisions of the Plan. ................................................................................... 29
    1.  Executory Contracts and Unexpired Leases. ................................................. 29
    2.  Changes in Rates Subject to Regulatory Commission Approval. .................... 30
    3.  Retention of Jurisdiction. .............................................................................. 30

G.  Tax Consequences of Plan. .................................................................................... 30

IV. CONFIRMATION REQUIREMENTS AND PROCEDURES ....................................... 30

A.  Who May Vote or Object. ...................................................................................... 31
    1.  Who May Object to Confirmation of the Plan. ............................................. 31
    2.  Who May Vote to Accept/Reject the Plan. .................................................... 31
    3.  Who is Not Entitled to Vote. ......................................................................... 32
    4.  Who Can Vote in More Than One Class. ........................................................ 32
    5.  Votes Necessary to Confirm the Plan. ........................................................... 33
    6.  Votes Necessary for a Class to Accept the Plan. ........................................... 33
    7.  Treatment of Nonaccepting Classes. ............................................................. 33
    8.  Request for Confirmation Despite Nonacceptance by Impaired Class(es). ....... 33

B.  Liquidation Analysis. ............................................................................................. 34

C.  Feasibility. ............................................................................................................. 35

V. EFFECT OF CONFIRMATION OF PLAN ................................................................. 36

A.  Discharge. .............................................................................................................. 36

B.  Revesting of Property in the Debtor. ...................................................................... 36

C.  Modification of Plan. ............................................................................................. 36

D.  Post-Confirmation Status Report. .......................................................................... 37

E.  Post-Confirmation Conversion/Dismissal. .............................................................. 37

F.  Final Decree. .......................................................................................................... 38

ii

# I.

## INTRODUCTION

Point.360, a California corporation ("Debtor") is the Debtor in a Chapter 11 bankruptcy case.  On October 10, 2017, the Debtor filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "Bankruptcy Court") under the United States Bankruptcy Code ("Code"), 11 U.S.C. § 101 et seq.  Chapter 11 allows the Debtor, and under some circumstances, creditors and other parties in interest, to propose a plan of reorganization ("Plan").  The Plan may provide for the Debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both.  The Debtor is the party proposing the Plan sent to you in the same envelope as this document.  THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN.

The Proponent seeks to accomplish payments under the Plan by paying creditors from revenues generated by future operations and sales of certain assets.  **A critical condition for Plan confirmation is that the Debtor obtains authority to sell the surplus MVF PPE (as defined herein) with proceeds paid to general unsecured creditors before paying Medley in full.  On January 29, 2019, there will be a hearing before the Bankruptcy Court regarding this issue.  If the Debtor is not authorized by the Bankruptcy Court to sell the MVF PPE, the Plan cannot be confirmed as currently proposed and the Debtor may be required to resolicit acceptances of the plan.**  The Effective Date of the proposed Plan is the later of **February 28, 2019** or the 15th day after entry of a Court order confirming the Plan, providing no stay of effectiveness thereof is in effect.  If a stay of effectiveness is then in effect, the Plan becomes effective when such stay is terminated.

A.    **Purpose of This Document and Exhibits.**

This Disclosure Statement summarizes what is in the Plan and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan.  The following important exhibits are attached hereto:

-2-

| | | |
|---|---|---|
| **Exhibit 1:** | Claims listings by plan class. | |
| **Exhibit 2:** | Cash flow projections for the term of the Plan. | |
| **Exhibit 3:** | Prepetition balance sheets and statements of operations. | |
| **Exhibit 4:** | Liquidation analysis, including Debtor's Schedule A/B. | |
| **Exhibit 5:** | Statement of Financial Affairs Part 2(3), (4) re prepetition transfers. | |
| **Exhibit 6:** | Treatment of executory contracts and leases. | |
| **Exhibit 7:** | Surplus Property, Plant & Equipment ("PPE") inventory valuation. | |
| **Exhibit 8:** | Declaration of Haig S. Bagerdjian in support of this Disclosure Statement. | |

In summary, the Plan proposes the following treatments for all the Debtor's creditors, equity security holders and executory leases and contracts from and after the Plan Effective Date:

| CLASS | DESCRIPTION | IMPAIRMENT | TREATMENT |
|---|---|---|---|
| Unclassified | Administrative Claims | Unimpaired. | Paid in full on Effective Date. |
| Unclassified | Priority Tax Claims: LA County TTC/ IRS, FTB Cty Orange | Unimpaired. | Statutory treatment over 5 years from petition date/ Paid on Effective Date |
| Class 1 | Austin Financial Services, Inc. | Unimpaired. | Contract rights unaltered, defaults, if any, cured. |
| Class 2 | Medley Capital Corporation Medley Opportunity Fund II, LP | Unimpaired. | Contract rights unaltered, defaults, if any, cured. |
| Class 3 | Priority Employee Claims; See Disclosure Statement Exhibit 1. | Impaired. | Paid in full on Effective Date. |
| Class 4 | UnitedHealth Priority Employee Benefit Plan Claim | Impaired. | Paid in full over 6 months from Effective Date, including from a pro rata share of Medley Litigation proceeds (if any). |
| Class 5 | SAG-AFTRA and SAG-AFTRA Health Fund and AFTRA Retirement Fund Priority Claims | Impaired. | Paid $5,000 monthly from and after the Effective Date until paid in full on 8/1/19, including from a pro rata share of Medley Litigation proceeds (if any). |
| Class 6 | General Unsecured Creditors; See Disclosure Statement Exhibit 1. | Impaired. | Paid over 36 months at $25,000 per month plus proceeds of asset sales within six (6) months of Effective Date (subject to approval by the Bankruptcy Court that the Debtor is permitted to sell the MVF PPE and use the proceeds to pay general unsecured creditors) and a share of Medley Litigation proceeds (if any) paid *pro rata*.  Paid between 89% and 100% depending on results of asset sales. |
| Class 7 | Convenience Class of Claims equal to, less than or reduced to $2,500 | Impaired. | Paid 75% on the Effective Date in full satisfaction of such claims. |
| Class 8 | Wilcon Holdings, LLC aka Crown Castle Fiber | Impaired. | Satisfied per Court approved Settlement Agreement. |
| Class 9 | Equity Interests | Impaired. | Equity interests, including stock, options and warrants, are cancelled, but allowed common stock holders receive a *pro rata* junior distribution of net Medley Litigation proceeds, if any, after payment in full of all senior claims. |
| Unclassified | Executory Leases and Contracts | Assumed. | See Disclosure Statement Exhibit 6. |

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

    (1)    **WHO CAN VOTE OR OBJECT,**

    (2)    **WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION,**

    (3)    **THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY,**

    (4)    **WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN,**

    (5)    **WHAT IS THE EFFECT OF CONFIRMATION, AND**

    (6)    **WHETHER THIS PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how this Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement. If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

The Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. The Bankruptcy Court ("Court") has approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan. Any party can now solicit votes for or against the Plan.

**B.**    **Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing.**

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

-4-

1.    **Time and Place of the Confirmation Hearing.**

The hearing where the Court will determine whether or not to confirm the Plan will take place on the date set forth in the accompanying notice, once set, in Courtroom 1375, 13th Floor, 255 E. Temple Street, Los Angeles, CA 90012.  At this time, a Plan confirmation status hearing is set for January 29, 2018 at 2:00 p.m.  On January 29, 2018, the Bankruptcy Court will determine whether the Debtor is authorized to sell the surplus MVF PPE (as defined herein) with proceeds paid to general unsecured creditors before paying Medley in full.

2.    **Deadline For Voting For or Against the Plan.**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot in the enclosed envelope to Lewis R. Landau, Attorney at Law, 22287 Mulholland Hwy., # 318, Calabasas, California 91302.

Your ballot must be received by the date set forth in the accompanying notice or it will not be counted.

3.    **Deadline For Objecting to the Confirmation of the Plan.**

Objections to the confirmation of the Plan must be filed with the Court and served upon Lewis R. Landau, Attorney at Law, 22287 Mulholland Hwy., # 318, Calabasas, California 91302 by the date set forth in the accompanying notice.

4.    **Identity of Person to Contact for More Information Regarding the Plan.**

Any interested party desiring further information about the Plan should contact Lewis R. Landau, Attorney at Law, 22287 Mulholland Hwy., # 318, Calabasas, California 91302; email: Lew@Landaunet.com; voice and fax: (888)822-4340.

C.    **Disclaimer.**

The financial data relied upon in formulating the Plan is based on the Debtor's books and records.  The information contained in this Disclosure Statement is provided by the Debtor.  The Plan Proponent represents that everything stated in the Disclosure Statement is true to the Proponent's best knowledge.  The Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

–5–

1       On January 29, 2018, there will be a hearing before the Bankruptcy Court with respect to

2    the Debtors proposal to sell the surplus MVF PPE with proceeds paid to general unsecured

3    creditors before paying Medley in full. If the Debtor is not authorized by the Bankruptcy Court to

4    sell the MVF PPE, the Plan cannot be confirmed and the Debtor will be required to resolicit

5    acceptances of any other plan.

6

## II.

7

## BACKGROUND

8    **A.**    **Description and History of the Debtor's Business.**

9       Point.360 (the "Company," "Point.360" or the "Debtor") is a California corporation,

10   originally founded in 1990 to provide video duplication and related services. The current

11   California corporate entity was formed on April 16, 2007 as "New 360", a subsidiary of

12   Point.360. Concurrent with a subsequent merger between the Company and DG FastChannel, the

13   Company contributed its post-production assets and operations to New 360, at which time each

14   Point.360 shareholder received one share of New 360 for each share held of the old Point.360.

15   New 360's name was changed back to "Point.360" immediately after the transaction on August

16   10, 2007.

17      The Company expanded its services using resources from internal growth and a 1997

18   initial public offering of its common stock to eventually include high definition and standard

19   definition digital mastering, data conversion, video and film asset management, distribution and

20   other services to owners, producers and distributors of entertainment and advertising content.

21   The Company provides the services necessary to edit, master, reformat, convert, archive and

22   ultimately distribute its clients' film and video content, including television programming feature

23   films and movie trailers. The Company's interconnected facilities provide service coverage to all

24   major U.S. media centers. Clients include major motion picture studios and independent

25   producers.

26      As described in further detail in section II(D) herein, in July 2015 the Company completed

27   the purchase of assets formerly owned by Modern VideoFilm, Inc. ("MVF") by issuing shares of

28   its common stock and warrants to purchase MVF's assets. As the result of the transaction, the

-6-

1    Company added post-production service capabilities and expanded its client base comprising

2    major studios, broadcast networks, cable outlets, streaming media companies, independent

3    producers and others.

4        The Company currently operates from two post production and administrative office

5    locations: (1) 2701 Media Center Drive, Los Angeles, California ("Media Center"); and (2) 1122

6    and 1133 North Hollywood Way, Burbank, California ("HWAY"). A facility formerly operating

7    as of the petition date at 2300 Empire Avenue, Suite 100, Burbank, California ("Empire") is now

8    closed. Each location is electronically tied to the other and serves the same customer base.

9    Production equipment consists of tape duplication, editing, encoding, standards conversion, and

10   other machinery. Skilled personnel are required to efficiently run the equipment and handle

11   customer requirements. While the two locations are not the same, an order received at one

12   location may be fulfilled at the "sister" facility to use resources in the most efficient manner.

13       Typically, a feature film or television show or related material will be submitted to a

14   facility by a motion picture studio, independent producer, advertising agency, or corporation for

15   processing and distribution. A common sales force markets the Company's capabilities for both

16   facilities. Once an order is received, the local customer service representative determines the

17   most cost-effective way to perform the services considering geographical logistics and facility

18   capabilities.

19       Debtor is a public company with securities registered under the Securities Exchange Act

20   of 1934. Debtor has 12,704,506 shares of its common stock outstanding.

21   **B.    Principals/Affiliates of Debtor's Business.**

22       The Debtor's principals and affiliates are as follows:

23       In August 2000, Haig Bagerdjian became an independent member of the Company's

24   Board of Directors. Mr. Bagerdjian became Chairman of the Board in September 2001 and was

25   appointed President and Chief Executive Officer in October 2002. Beginning in 2000, Mr.

26   Bagerdjian purchased shares of the Company's common stock in public and private transactions,

27   eventually becoming the majority shareholder of the Company.

28

-7-

In October 2016, the Company sold to HWAY LLC, a California limited liability company ("HWAY"), all of its right, title and interest in and to the Company's Hollywood Way real estate (the "HWAY Property"). Concurrently, the Company leased the HWAY Property from HWAY. Mr. Bagerdjian holds a 99% membership interest in HWAY. Pursuant to the purchase agreement, the Company sold the HWAY Property to HWAY for a purchase price of $9.8 million in cash. The Company received approximately $4.8 million in cash after payment of approximately $4.6 million of mortgage indebtedness related to the HWAY Property, approximately $0.3 million paid to HWAY for a security deposit and rent under the lease agreement, and other closing costs.

Under the lease agreement, the Company will continue to occupy the HWAY Property for an initial term of 11 years, commencing on October 11, 2016. The Lease may be extended for two five-year options; however, such options may not be exercised if (i) the Company is sold to another person, or (ii) if Mr. Bagerdjian and/or his affiliates cease to be a controlling shareholder of the Company. The term of the lease expires on October 31, 2027, unless it is extended under the Company's option rights. The monthly base rent under the lease was $65,644 which base rent is subject to an annual increase of 3%. The Company is responsible for paying utilities, operating expenses and real estate taxes.

In connection with the sale and leaseback, the Company's Board of Directors established a special committee (the "Special Committee") consisting of independent and disinterested directors. The Special Committee was granted the power and authority to (i) evaluate the terms of the sale and leaseback and (ii) negotiate the sale and leaseback documentation with Mr. Bagerdjian. As part of that process, the Special Committee considered market information that the Company obtained through the Company's efforts to sell the HWAY Property. The Special Committee engaged independent legal counsel and advisors for purposes of evaluating and negotiating the sale and leaseback with Mr. Bagerdjian. Prior to closing, the sale and leaseback documentation was approved by both the Special Committee and the Board of Directors.

-8-

## C.    Management of the Debtor Before and After the Bankruptcy.

The Debtor's President and Chief Executive Officer is Haig S. Bagerdjian.    Mr. Bagerdjian became Chairman of the Board in September 2001, was appointed President and Chief Executive Officer in October 2002, and was appointed Chief Financial Officer in February 2017.    Mr. Bagerdjian was Executive Vice President of Syncor International Corporation, a leading provider of radiopharmaceuticals, comprehensive nuclear pharmacy services and medical imaging services, from 1991 to 2002.    From 1987 to 1991, he served in several executive level positions at Calmark Holding Corporation.    He also was General Counsel for American Adventure, Inc., which was a subsidiary of Calmark Holding.    Mr. Bagerdjian received a J.D. from Harvard Law School and is admitted to the State Bar of California.    Mr. Bagerdjian is a director of Innodata-Isogen, Inc.

The Debtor's other members of its board of directors are: Sam P. Bell, J.R. DeLang, Gregory Hutchins and G. Samuel Oki.

Debtor's management personnel are as follows:

**Brian Ehrlich EVP, Operations and Sales**

Brian Ehrlich started his career in the entertainment industry as an assistant recording engineer at Capitol Records in Hollywood, California. During his time at Capitol he worked with the likes of Frank Sinatra, B.B. King, Natalie Cole, The Brian Setzer Orchestra, Bono, Tony Bennett, and many others. After his time in the music business, Brian migrated to the post-production industry as a Mixing Engineer at the first all-digital facility in the world, called Pacific Ocean Post (POP). During his time at POP Brian cut his post production teeth mixing and editing sound for commercials, documentaries, feature films, and television shows. It was at POP that Brian started restoring feature film sound for Paramount and MGM, working on such titles as Chinatown and Shane, amongst many others. Brian was recruited to start a sound restoration division for Todd-AO Sound (later Ascent Media/Deluxe). In his 5 years at Todd-AO Brian restored hundreds of films for MGM, Paramount, Disney, and Sony. In 1999 Brian decided it was time to start his own company. He secured a five year contract with MGM to handle a large sound restoration project, and Sound Solution, LLC was born. Brian served as the CEO and Managing

-9-

1    Partner at Sound Solutions from 1999 until 2005, where he oversaw the restoration and creation

2    of sound for more than 500 feature films. In 2005 Point.360 acquired the company from Brian

3    and his partners. Brian stayed on at Point.360 as the Executive Director of Audio Services until

4    2007, when he became the General Manager of the Burbank facility. During his tenure as GM,

5    Brian was able to facilitate the development of accelerated file delivery with ABC

6    Studios/Marvel, and in the final season of the blockbuster TV show Lost, Point.360 successfully

7    delivered localized files to over 65 countries within an hour of the domestic broadcast. In 2010

8    Brian was promoted to SVP of Operations, overseeing the operations for all Point.360 facilities.

9    In his role overseeing operations, Brian successfully spearheaded the initiative to add Text

10    Localization and Script Services as an offering. In 2012 revenue was added to the list of Brian's

11    responsibilities as he was promoted to EVP of Operations and Sales. In 2015 Brian and his team

12    were able to attain Netflix Preferred Vendor status for Master Quality Control, and have since

13    been added as a Gold Tier Netflix Post-production Partner (NP3) for Creative Services Picture

14    and Sound.

15    **John Schweizer, VP, Corporate Controller**

16    John Schweizer is the Company's Vice President and Corporate Controller, and has been

17    with Point.360 since January 2001. Mr. Schweizer served at Sr. Financial Analyst at Above

18    Commerce, Inc. from 1999 to 2000. From 1996 to 1999, Mr. Schweizer served a Business

19    Manager and Director of Financial Reporting for El Camino Resources, Inc. Mr. Schweizer held

20    licenses with the Securities and Exchange Commission during his service at Merrill Lynch from

21    1995 to 1996, and holds a Bachelor of Arts Degree in Business Administration from the

22    University of California at Berkeley.

23    **Dave Weathers, EVP, Business Development**

24    Dave Weathers graduated from UCLA in 1985, where he majored in motion picture and

25    television. Dave started working at Marvel Productions as an assistant editor, and was promoted

26    to run that division two years later managing 30 editors. In 1989 Dave started at Glen Glenn

27    Sound as a Sound Supervisor, working with Steven Bochco, David Kelley, and Arron Spelling.

28    In 1994 Dave founded Miles o' Fun, a sound editorial company, and grew revenues to more than

1    13 million dollars. In 2001 Dave sold Miles o' Fun to Technicolor, where he stayed on as the

2    President of Sound Services. During his tenure Dave participated in multiple acquisitions, and

3    was able to grow the business to 35 million dollars. In 2016 Dave went on to become EVP of all

4    Post-production Picture and Sound, in which he oversaw P/L responsibility of more than 180

5    million dollars. In 2013 Dave started 12 Stories Productions where he wrote and directed 10 short

6    films, as well as developing 20 other feature films and broadcast pilots. In 2016 Dave joined

7    Point.360's senior management team to help develop and grow the post-production finishing

8    business, which has included the identification and recruiting of talent for several of the growing

9    post-production team's roster.

10    **David Tuszynski, General Manger – Point.360 Media Center**

11    In 1991 David Tuszynski joined VDI Inc. (a predecessor of Point.360). David was

12    promoted to an operations manager by 1994. Ultimately VDI was acquired by Point.360, and in

13    1999 David was promoted to General Manager of the Westside facility. David held that position

14    until his departure in 2002, where he joined Modern VideoFilm as a General Manager at their

15    WSI facility. In 2005 David returned to Point.360 as an Operations Manager, and within 18

16    months was promoted to Director of Operations. In 2007 David was promoted to his current role

17    as General Manager, Media Center.  Dave is responsible for the overall management and well-

18    being of the facility, and the 3 diverse profit centers that operate within that facility.

19    **Jeff Brink, General Manger – Point.360 Burbank**

20    Jeff Brink has spent the past twenty three years in post-production with his experience

21    concentrated in technical operations and administrative management roles.  Jeff started at

22    Point.360's predecessor as a video tape operator, and has steadily risen through the ranks as an

23    Operations Manager in nearly every discipline. In 2010 Jeff was promoted to General Manager of

24    the Burbank facility, where he has successfully led a team of talented people. In his tenure as

25    GM, Jeff has implemented a hiring and training program for entry-level employees.

26    **Walt Bigelow, VP, Engineering**

27    Walt Bigelow has more than 22 years of experience in post-production engineering. Walt

28    started as a staff engineer at Varitel Video San Francisco in 1996, and continued with the

-11-

1   company through its eventual acquisition by Modern VideoFilm. In 2016 Walt was promoted by

2   Point.360 to VP, Engineering where he has successfully led a diverse team of engineers. Walt is

3   an expert in network infrastructure & security, video systems, color science, and storage area

4   networks.

5   **D.    Events Leading to Chapter 11 Filing.**

6       Here is a brief summary of the circumstances that led to the filing of this Chapter 11 case:

7       Debtor had suffered pre-tax losses of $1.2 million in 2013, and $2.7 million in 2014,

8   based upon substantially lesser sales than MVF.   In December 2014, Debtor's existing lender

9   cancelled the availability of funds under Debtor's revolving credit facility due to the Debtor's

10  failure to meet its financial covenants.  Additionally, due to the Debtor's failure to meet financial

11  covenants in the past, and uncertainty regarding the Debtor's ability to meet new covenant

12  requirements, Debtor was required to classify the balance owed for its mortgage debt and capital

13  leases as a current liability in its consolidated balance sheet as of December 31, 2014, and in its

14  Form 10-Q for the quarterly period ended December 31, 2014.

15      Debtor intended for the MVF acquisition to add two unique lines of business to augment

16  Debtor's existing businesses and strengthen and synergize the existing business lines by

17  combining operations and optimizing cost efficiencies.

18      On July 8, 2015, Debtor and Medley executed and closed on the "Sale Agreement

19  Pursuant to Article 9 of the Uniform Commercial Code" ("the Sale Agreement") and the related

20  "Term Loan Agreement" ("TLA") and Security Agreement.

21      Pursuant to the Sale Agreement, Debtor paid no cash to Medley.  Rather, Medley obtained

22  2,000,000 shares and 800,000 warrants in Debtor.  Pursuant to the Sale Agreement, Debtor

23  granted Medley two (2) seats on Debtor's expanded seven-person board.  Additionally, pursuant

24  to the Sale Agreement, Debtor agreed to make employment offers to *all* existing employees of

25  MVF in substantially similar roles and with the same annual salary, and to pay certain PTO,

26  sparing Defendants potential state and federal WARN Act liability.  As a result of closing on the

27  transaction, Debtor's bi-weekly employee payroll increased from $485,532 ($12,623.832

28  annually) to $1,276,272 ($33,183.072 annually), a nearly three-fold increase.

-12-

1   The Sale Agreement provided that, upon the closing of the Sales Agreement, Medley was

2   obligated to provide Point.360 with a $6 million five-year term loan.  The Debtor and Medley

3   entered into the TLA and Security Agreement.  Section 2 of the TLA provided that interest, at the

4   election of the Debtor, could be capitalized and added to the principal amount due at the end of

5   the term.

6   As of the closing date of the MVF transaction on July 8, 2015, Debtor's total unsecured

7   debt (excluding its capital leases, term loans and line of credit – which were secured by Debtor's

8   fixed assets and/or accounts receivable -- and including accrued vacation for Debtor's employees)

9   was less than $745,000.  As detailed in this Disclosure Statement, on the date Debtor filed its

10  petition for relief under Chapter 11, that figure had increased nearly six-fold to $4,235,547.

11  On March 31, 2016, less than nine months after the closing on the Sale Agreement, TLA

12  and Security Agreement, the Medley designees on the Debtor's Board of Directors resigned.

13  Debtor will assign standing to prosecute claims against Medley to the Creditors' Committee for

14  prosecution if the Committee elects to do so.

15  While Debtor was working toward profitability in 2017, Debtor received a 3-day notice to

16  pay rent or quit for its Media Center facility on October 6, 2017.  Debtor also settled an unlawful

17  detainer filed by REEP related to the Empire facility resulting in REEP's claim for $915,996.90.

18  *See* POC # 55.  The Debtor intends to retain the Media Center facility as a component of the

19  reorganized business and assume the Media Center lease under the Plan.  Consequently, Debtor

20  was required to file its chapter 11 petition on October 10, 2017 to maintain its core operating

21  facilities and implement its reorganization plan through the chapter 11 process.

22  **E.**    **Significant Events During the Bankruptcy.**

23  **1.**    **Bankruptcy Proceedings.**

24  The following is a history of significant events which have occurred in the case:

25  From a business operations standpoint, Debtor's post-petition period was dominated by

26  the need to preserve and maintain customer and employee relationships impacted by the chapter

27  11 filing and concurrently fully close and transition operations from its Empire facility without

28  disrupting workflow.  The transition out of Empire required substantial technical service work

-13-

1   regarding computer network and server equipment.  Debtor completed its transition out of the

2   Empire facility as needed to preserve its opportunity to resolve the REEP claim.

3          In addition to business burdens, Debtor duly addressed all legal issues arising from filing

4   its chapter 11 case.  After filing its voluntary chapter 11 petition on October 10, 2017, Debtor

5   filed first day motions to facilitate continued operations, including a motion to use Austin

6   Financial Service, Inc's ("Austin") cash collateral and pay prepetition payroll to approximately

7   250 employees.   The cash collateral motion was granted on an interim basis and prepetition

8   payroll authorized per orders entered October 12, 2017. *See* ECF #s 13 and 14.  Debtor continued

9   authorized use of cash collateral through a final order entered December 19, 2017. *See* ECF # 94.

10          During the period of cash collateral usage, Debtor negotiated a substantial Debtor in

11   Possession financing facility ("DIP Financing") with Austin.   DIP Financing was critical to

12   support and strengthen Debtor's continuing operations through October 2018 and convey

13   confidence in Debtor's business operations to customers, vendors and employees.  On November

14   22, 2017 Debtor moved to approve the DIP Financing.  The DIP Financing was approved per

15   order entered December 22, 2017. *See* ECF # 101.  The DIP Financing matures on October 31,

16   2018 and a six (6) month extension of the facility is anticipated.

17          Medley moved for adequate protection with an initial hearing set for January 11, 2018.

18   The matter was continued to February 7, 2018 and granted on a limited basis.  The Court entered

19   its order on the Medley adequate protection motion on April 30, 2018.

20          A claims bar date was set for January 31, 2018 and 79 claims have been filed to date, with

21   certain claims withdrawn or amended.    The Debtor's significant liabilities, disputed and

22   undisputed, are summarized as follows:

23      1.  Medley: not less than $6,572,764.28 plus post-petition accruals, as allowed.

24      2.  Austin: $2,475,676.48.

25      3.  REEP: $915,996.90 (settled as of 10/4/18 and reduced to $15,996.90).

26      4.  General unsecured creditors: approximately $1.66 million [with disputed; see Exhibit 1].

27      5.  HWAY, LLC: $803,923.13.

28

-14-

Debtor has also retained the following professionals: Lewis R. Landau as general bankruptcy counsel. *See* ECF # 58. TroyGould, LLP as special transactional counsel. *See* ECF # 148. McCabe & Hogan, P.C. as special litigation counsel. GlassRatner Advisory & Capital Group, LLP as financial consultant and expert witness. *See* ECF # 170. *See* ECF # 171. Holthouse Carlin & Van Trigt LLP as accountants for tax returns. *See* ECF # 209. MICOR Analytics as appraiser. *See* ECF # 218.

Finally, Debtor negotiated resolution of various executory contract issues with creditors. Debtor obtained approval of motions to assume insurance premium finance and payroll services contracts with AFCO Acceptance Corporation ("AFCO") [ECF # 40] and ADP, LLC ("ADP") [ECF # 100], respectively. Debtor also obtained stipulations for 90-day extensions of time to assume or reject real property leases pursuant to 11 U.S.C. § 365(d)(4) with lessors LEAFS Properties, L.P. ("LEAFS") regarding the Media Center facility and HWAY, LLC (an affiliate of Mr. Bagerdjian) for the Hollywood Way facility. *See* ECF #s 131, 172. These real property leases are now being assumed under the Plan. *See* Disclosure Statement Exhibit 6.

Debtor has also completed two important plan related settlements. The first is with REEP-OFC 2300 Empire CA, LLC ("REEP") concerning REEP's $915,996.90 claim, the approval of which reduced that claim to $15,996.90 in exchange for the Debtor's sale to REEP of various PPE that remained at the Empire site after Debtor vacated. *See* ECF # 365.

The second is with Wilcon Operations, LLC ("Wilcon") concerning Wilcon's prepetition contracts for datacenter, fiber and colocation professional services and Wilcon's claims for unpaid administrative expenses. The closure of the REEP Empire facility resulted in substantially reduced demand for services under the Wilcon contracts. Consequently, the Debtor and Wilcon negotiated changes to the Wilcon Contracts that reduce the services provided to reflect market rate for comparable services. Debtor's monthly service charge is reduced from $51,299.34 to $26,500 (plus taxes) as of February 1, 2018 provided Debtor extended the term of the Wilcon contracts to 36 months from February 1, 2018. Debtor wired $353,026.97 to Wilcon on September 6, 2018 to cure post-petition amounts due through September 30, 2018 which reduced the Debtor's post-petition contract rate accrual for Wilcon services from a claim of $545,710.92

to $353,026.76, a savings of $192,683.95. Moreover, the settlement with Wilcon provided terms for the repayment of the Wilcon claim for prepetition amounts due of $124,644.01 that are set forth as Wilcon's class 8 plan treatment. Most importantly, the Wilcon settlement maintain continuity for a critical service provided to maintain connectivity among the Debtor's facilities. The Debtor cannot operate without high speed, high bandwidth, data connectivity for the large video and data files Debtor moves among its facilitates and to clients.

In the interim time between filing the Debtor's original Disclosure Statement and Plan on May 8, 2018, Medley and Deloitte Corporate Finance LLC and Deloitte Transactions and Business Analytics, LLP (collectively, "Deloitte") entered into a Court approved stipulation to standstill on their disputes within the case and in related adversary proceeding number 2:18-ap-01141 WB in favor of a voluntary mediation conference. Judge Kwan mediated the parties' disputes on August 15, 2018 but the disputes were not settled and the mediation ended on that date.

Debtor moved for and obtained extensions of Debtor's plan proposal and acceptance exclusivity periods. Debtor's plan exclusivity periods have now expired as of October 5, 2018.

Debtor is in full compliance with all of its duties under 11 U.S.C. §§ 521, 1106 and 1107 and all applicable guidelines of the Office of the United States Trustee, including all Monthly Operating Reports.

### 2.    Other Legal Proceedings.

The Debtor's other legal proceedings are as follows:

Debtor's only prepetition litigation matters pending as of the chapter 11 filing date were the REEP unlawful detainer action and a collection by ACCO Engineering Systems, Inc. ("ACCO"). The REEP action was resolved through stipulated judgment and the ACCO matter is stayed and the subject of ACCO's claim # 46 filed in the bankruptcy case. Debtor disputes ACCO's claim.

Debtor will assign standing to the Creditors' Committee before or at Plan confirmation to prosecute claims against Medley if the Committee elects to do so.

-16-

1    Debtor has also claimed an interest in approximately $4 million in settlement proceeds of

2    certain commercial tort claims against Deloitte and Managease, Inc. that are subject to dispute in

3    the Modern VideoFilm, Inc. chapter 11 case (case number 8:18-bk-11792-MW).  MVF moved for

4    relief from stay to continue pursuing matters related to the proceeds.  Debtor contents that such

5    claims and proceeds were assigned to the Debtor within the July 8, 2015 Medley Sale Agreement

6    because Medley took a security interest in the commercial tort claims just before July 8, 2015.

7    MVF and Medley dispute Debtor's claim.  The matter is currently *sub judice* and the availability

8    of any proceeds to be recovered therefrom is uncertain.  If any such proceeds are recovered, such

9    proceeds will contribute to payment of general unsecured creditors under the Plan ("MVF

10   Proceeds").

11       **3.    Actual and Projected Recovery of Preferential or Fraudulent Transfers.**

12       Per the Debtor's Statement of Financial Affairs, the Debtor has identified prepetition

13   transfers as set forth in Exhibit 5 hereto.  Gross prepetition transfers on account of antecedent

14   debt in the 90-days preceding the petition date total $923,303, excluding Austin Financial

15   Services, Inc., United Healthcare and Leafs Properties, LP. (Debtor does not believe the

16   foregoing entities are subject to preference recovery).  Debtor's position on these transfers is as

17   follows:

18       1.    Debtor analyzed the accounts of creditors receiving transfers totaling over $15,000

19   during the 90-day period.  Debtor does not believe it is cost effective to pursue preference

20   recoveries for transfers not exceeding $15,000 due to the cost versus benefit of doing so.

21       2.    There were 15 creditors receiving transfers exceeding $15,000 during the 90-day

22   preference period.  Of these 15 transferees, three (3) clearly received payments within ordinary

23   business terms, leaving 12 creditors receiving transfers totaling $394,979 during the preference

24   period. Debtor believes that the 12 creditors receiving transfers totaling $394,979 would assert

25   ordinary course and new value defenses to recovery.  Assuming a 50% recovery rate and

26   $100,000 in litigation expenses, Debtor may net approximately $100,000 from the pursuit of such

27   actions.

28

3.      Based on the foregoing, and based on Debtor's anticipation of paying claims in full over the Plan term.

Debtor will not pursue avoidance actions against prepetition creditors under the Plan. Notwithstanding the foregoing, Debtor reserves and may pursue any claims against Medley, to the extent not assigned to the Committee as set forth in the Plan.

**4.      Procedures Implemented to Resolve Financial Problems.**

After the initial disappointing results of the MVF acquisition, Debtor initiated a business plan to reduce expenses and reestablish profitability.  The significant changes to Debtor's operations were as follows:

a.      Debtor eliminated approximately 100,000 square feet of rental space by vacating its Santa Monica, Glendale and Empire (second floor) facilities in 2015.

b.      Debtor further reduced rent and associated expenses by closing its 37,930-foot Empire facility (first floor).  Rent and CAM charges at this facility were approximately $200,000 monthly.  Debtor entered a prepetition stipulation with REEP to vacate the facility by December 4, 2017 and did not incur post-petition rent during the period prior to December 4, 2017 if Debtor vacated by that date.  Debtor met the vacate deadline but continued to store certain equipment at the facility per agreement with REEP. Debtor has now fully vacated the Empire facility and concluded a settlement with REEP reducing REEP's claim to $15,996.90.

c.      A Reduction in Force (RIF) has been completed reducing Debtor's employee headcount from 261 to 196.  The RIF will result in annual cost savings of $3.3 million in salary and benefits.  The reduction represents 17.5% of the Debtor's total salaries and benefits.

d.      The projections contemplate that the Media Center facility will be abandoned at lease maturity in March 2021.  The Debtor will relocate into a smaller and less expensive facility. The current rent for the Media Center facility is $145,000 per month   These projections reduce the monthly lease costs by $100,000 in April 2021.

e.      Additional information regarding recent changes in financial performance is contained in notes to the Exhibit 2 pro forma projections.

–18–

As a result of the right-sizing of the Debtor's operating expenses in concert with a continuation of the current revenue run rate, significant profitability can be attained again.

A significant component of recovery for unsecured creditors is the Debtor's liquidation of surplus MVF PPE which Debtor contends can be liquidated and paid to unsecured creditors as released from Medley's security interest under the express terms of Debtor's agreements with Medley. Debtor has obtained a valuation of such surplus PPE attached hereto as Exhibit 7. The valuation estimates a high net recovery of $915,000 and low net recovery of $537,000 from the liquidation of the MVF PPE. Debtor estimates recovering the midpoint of these estimates or approximately $750,000 which will materially reduce the claims of general unsecured creditors.

**5.    Current and Historical Financial Conditions.**

Financial statements reflecting Debtor's pre-petition and post-petition operations are attached hereto as Exhibit 3. Exhibit 3 includes prepetition and post-petition balance sheets and statements of operations through September 30, 2018. Operating projections for the term of the Plan are attached as Exhibit 2.

### III.

### SUMMARY OF THE PLAN OF REORGANIZATION

**A.    What Creditors and Interest Holders Will Receive Under The Proposed Plan.**

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority. The Plan states whether each class of claims or interests is impaired or unimpaired. The Plan provides the treatment each class will receive.

**B.    Unclassified Claims.**

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Proponent has not placed the following claims in a class.

-19-

**1.    Administrative Expenses.**

Administrative expenses are claims for costs or expenses of administering the Debtor's Chapter 11 case which are allowed under Code section 507(a)(2).  The Code requires that all administrative claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.  The following chart lists all of the Debtor's anticipated unpaid 507(a)(2) administrative claims for chapter 11 professionals, the Bankruptcy Court clerk's office and the Office of the United States Trustee and their treatment under the Plan:

| Name | Amount Owed | Treatment |
|---|---|---|
| Lewis R. Landau Attorney at Law | $TBD ($150,000 estimated unpaid as of 11/1/18) | Paid in Full on Effective Date |
| Brinkman Portillo Ronk, APC Committee Counsel | $TBD ($150,000 estimated unpaid as of 11/1/18) | Paid in Full on Effective Date |
| GlassRatner Advisory & Capital Group; Financial Advisor | $TBD ($50,000 estimated unpaid as of 11/1/18) | Paid in Full on Effective Date |
| Daniel P. Hogan Attorney at Law Special Litigation Counsel | $TBD ($19,000 estimated unpaid as of 11/1/18) | Paid in Full on Effective Date |
| TroyGould, P.C. Special Transactional Counsel | $TBD ($6,000 estimated unpaid as of 11/1/18) | Paid in Full on Effective Date |
| Clerk's Office Fees & Miscellaneous | $TBD | Paid in Full on Effective Date |
| Office of the U.S. Trustee Fees | Current | Paid in Full on Effective Date |
| | TOTAL TBD ($375,000 estimated) | |

Court Approval of Fees Required:

The Court must rule on all fees listed in this chart before the fees will be owed. For all fees except Clerk's Office fees and U.S. Trustee's fees, the professional in question must file and serve a properly noticed fee application and the Court must rule on the application.  Only the amount of fees allowed by the Court will be owed and required to be paid under this Plan.

As indicated above, the Debtor will need to pay certain administrative claims on the Effective Date of the Plan in amounts to be determined.  As indicated elsewhere in this Disclosure Statement, Debtor will have a sufficient amount of cash on hand on the Effective Date of the Plan. The source of this cash will be proceeds in the Debtor's accounts.

### 2.    Priority Tax Claims.

Priority tax claims are certain unsecured income, employment and other taxes described by Code Section 507(a)(8).  The Code requires that each holder of such a 507(a)(8) priority tax claim receive the present value of such claim in deferred cash payments, over a period not exceeding five years from the petition date with interest at the most favorable rate offered to other creditors in the Plan.  The following chart lists all of the Debtor's Section 507(a)(8) priority tax claims and their treatment under the Plan:

| Description | Amount Owed | Treatment | |
|---|---|---|---|
| • Name= | | • Pymt interval:  = 48 monthly installments | |
| • Los Angeles County TTC | $148,219.54 (POC 7-2) | • Pymt amt/interval: | = $4,354 |
| • Type of tax = Property | | • Begin date: | Effective Date |
| | | • End date: | 10/1/22 |
| • Date tax assessed= 10/27/17 | | • Interest Rate % | = 18% |
| | | • Total Payout Amount | = 100% |
| Description | Amount Owed | Treatment | |
| • Names = | | • Pymt interval:  = Single | |
| • IRS | $1,000 | • Pymt amt/interval: | = In full |
| • FTB | $800 | | |
| • County of Orange | $1,802.80 | | |
| • Type of tax = Misc. | | • Begin date: | Effective Date |
| | | • End date: | Same |
| • Date tax assessed= Misc. | | • Interest Rate % | = N/A |
| | | • Total Payout Amount | = 100% |

### 3.    Creditors' Administrative Expense Claims

Creditors may assert administrative priority expense claims arising from, e.g., their post-petition services provided to the Debtor under Code Section 503(b).  Such expenses may include rent, utilities, and insurance, among other items.  **Administrative Claims bar date**: The last day to file a request for payment of Administrative Expense Claims, other than those set forth in section II(B)(1) above, is set forth in the notice of the Plan confirmation hearing accompanying this Disclosure Statement.  The Code requires that all administrative claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

**C.    Classified Claims and Interests.**

    **1.    Classes of Secured Claims.**

    Secured claims are claims secured by liens on property of the estate.  The Debtor's secured creditors are identified below, other than purported equipment leases that may constitute financing transactions with nominal lease end purchase options.  These purported equipment lease claims are listed on Exhibit 6 to the Disclosure Statement.  Debtors shall assume purported equipment leases through the confirmation process, while reserving the right to seek recharacterization of such purported equipment leases in the event of any dispute concerning the Debtor's title to the assets subject to such purported equipment leases.  *See,* § III(F)(1).

| CLASS# | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 1 | Secured claim of: Austin Financial Services, Inc. | No | • Pymt interval = Per Loan Agreement |
| | • Name= Austin Financial Services, Inc. | | • Pymt amt/interval = Per Loan Agreement |
| | • Collateral description = All Assets | | • Balloon pymt = Maturity 10/31/18 [six month extensions of maturity anticipated] |
| | • Collateral value = Varies per operations; fully secured. | | • Begin date = Effective Date. |
| | • Priority of security int. = 1. | | • End date = Same |
| | • Principal owed = $2,475,676.48 per POC 34. | | • Interest rate % = 0% |
| | • Pre-pet. Arrearage amount = $0 | | • Total payout = Per contract. |
| | • Post-pet. Arrearage amount = $0 | | • Treatment of Lien = Unimpaired per 11 U.S.C. § 1124(1) and (2). |
| | • Total claim amount = $2,475,676.48 per POC 34, subject to post-petition changes in account status. | | *Note:* **To the extent that Austin Financial Services, Inc. does not agree to continue financing post-confirmation, the existing DIP facility requires payment in full on the Effective Date of the Plan.  At this time, Austin Financial Services, Inc. has not committed to exit financing and the existing DIP facility requires payment in full on the Effective Date of the Plan.** |

| CLASS# | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 2 | Secured claims of: Medley Capital Corporation Medley Opportunity Fund II, LP | No | • Pymt interval = Per Term Loan Agreement and related Loan Documents. |
| | • Name = Collectively Medley | | • Pymt amt/interval = Per Term Loan Agreement and related Loan Documents. |
| | • Collateral description = All assets excluding accounts and real estate | | • Balloon pymt = Maturity 7/8/20 |
| | • Collateral value = Fully secured. | | • Begin date = Effective Date. |
| | • Priority of security int. = 2. | | • End date = Same |
| | • Principal owed = $6,000,000 per POCs 72, 73 | | • Interest rate % = Per contract. |
| | • Pre-pet. Arrearage amount = $0 [PIK interest accrual] | | • Total payout = Per contract. |
| | • Post-pet. Arrearage amount = $0 [PIK interest accrual] | | • Treatment of Lien = Unimpaired per 11 U.S.C. § 1124(1) and (2). |
| | • Total secured claim amount = $ 6,572,764.28 plus post-petition accruals, if any, as allowed. | | |

2.    **Classes of Priority Unsecured Claims.**

Certain priority claims that are referred to in Code Sections 507(a)(4), (5), (6), and (7) are required to be placed in classes. These types of claims are entitled to priority treatment as follows: the Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim unless such creditor agrees to alternate treatment. However, a class of unsecured priority claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claims. The Debtor's priority unsecured claims are listed on Exhibit 1 to the Disclosure Statement.

| Class | Description | Impaired (Y/N) | Treatment |
|---|---|---|---|
| 3 | Priority Wages, Commissions, Salary Claims Per § 507(a)(4) | Yes | Payment Interval = 1. |
| | Total amount of claims = $92,685.13 See Disclosure Statement Ex 1. | | Payment amt/interval = All allowed priority claims per 11 U.S.C. § 507(a)(4) shall be paid in full on the Effective Date. |
| | | | Begin Date =  Effective Date. |
| | | | End date =    Effective Date. |
| | | | Interest Rate: None. |
| | | | Total Payout = 100%. |

–23–

| Class | Description | Impaired (Y/N) | Treatment |
|---|---|---|---|
| 4 | UnitedHealth Insurance Company; Priority Employee Benefit Plan Per § 507(a)(5) | Yes | Payment Interval = 6 monthly installments.<br>• Any default under the terms of the Plan concerning the repayment of UnitedHealthcare's claims shall be deemed to be a default under the terms of the Group Policy under Enrolling Group No. 910300. |
| | Total amount of claims = $142,152.77 per POC 33-2 | | Payment amt/interval = $24,669.34 months 1 to 5 with balance due in month 6, plus pro rata share of proceeds of Medley Litigation, if any, until paid in full. |
| | | | Begin Date = Effective Date. |
| | | | End date = August 1, 2019. |
| | | | Interest Rate:  5% |
| | | | Total Payout = 100% |

| Class | Description | Impaired (Y/N) | Treatment |
|---|---|---|---|
| 5 | SAG-AFTRA and SAG-AFTRA Health Fund and AFTRA Retirement Fund Priority Claims Per § 507(a)(5) | Yes | Payment Interval = $5,000 monthly installments. |
| | Total amount of claims = $37,466.75 per POCs 57-1 and 58-1 | | Payment amt/interval = $5,000 month, plus pro rata share of proceeds of Medley Litigation, if any, until paid in full. |
| | | | Begin Date = Effective Date. |
| | | | End date = August 1, 2019. |
| | | | Interest Rate:  N/A |
| | | | Total Payout = 100% |

**3.    Classes of General Unsecured Claims.**

General unsecured claims are unsecured claims not entitled to priority under Code Section 507(a).  The following chart identifies this Plan's treatment of the classes containing all of Debtor's general unsecured claims:

–24–

| Class | Description | Impaired (Y/N) | Treatment |
|---|---|---|---|
| 6 | Allowed General Unsecured Claims identified in Disclosure Statement Exhibit 1. | Yes | Payment Interval = 36 monthly installments plus proceeds of MVF asset sales within six months of Effective Date (subject to approval by the Court that the Debtor is permitted to sell the MVF PPE and use the proceeds to pay general unsecured creditors ) and pro rata share of net Medley Litigation proceeds, if any, until paid in full. *See* means for effectuating plan. |
| | Total amount of claims: $1,699,695.01 which includes $163,506.24 disputed | | Payment amt/interval = $25,000 monthly distribution paid pro rata from and after the Effective Date plus net proceeds of MVF PPE sale (subject to approval by the Court that the Debtor is permitted to sell the MVF PPE and use the proceeds to pay general unsecured creditors), MVF Proceeds and net Medley Litigation proceeds, if any. |
| | | | Begin date =                    Effective Date |
| | | | End date =              February 1, 2022 |
| | | | Interest rate: Federal Judgment Rate in Effect as of Confirmation Hearing. |
| | | | Total payout = 89% to 100% |

| Class | Description | Impaired (Y/N) | Treatment |
|---|---|---|---|
| 7 | Convenience Class of unsecured claims less than or reducing to $2,500. | Yes | Payment Interval = single 75% payment on Effective Date. |
| | Total amount of claims = Approx. $52,467 [excluding voluntarily reduced claims.] | | Payment amt/interval = Single payment of 75% of face amount of allowed claim. |
| | | | Begin date = Effective Date. |
| | | | End date = Single lump sum payment on Effective Date. |
| | | | Interest rate: Not applicable. |
| | | | Total payout = 75% on Effective Date. |

| Class | Description | Impaired (Y/N) | Treatment |
|---|---|---|---|
| 8 | Wilcon Holdings, LLC aka Crown Castle Fiber | Yes | Payment Interval = Per Settlement Agreement at $10,387 per month. |
| | Total amount of claims = $124,274.69 per Settlement | | Payment amt/interval = Per Settlement Agreement at $10,387 per month. |
| | | | Begin date =      Per Settlement. |
| | | | End date =       Per Settlement. |
| | | | Interest rate:   Not applicable. |
| | | | Total payout = 100% |

−25−

4.    **Class(es) of Interest Holders.**

Interest holders are the parties who hold ownership interest (i.e., equity interest) in the Debtor. If the Debtor is a corporation, entities holding preferred or common stock in the Debtor are interest holders. If the Debtor is a partnership, the interest holders include both general and limited partners. If the Debtor is an individual, the Debtor is the interest holder. The following chart identifies the Plan's treatment of the class of interest holders:

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 9 | Equity Security Holders | Yes | All equity security interests, including stock, options and warrants, are cancelled on the Effective Date. Holders of allowed equity interests for common stock as of the Effective Date shall receive a proportionate share of any net Medley Litigation proceeds after full satisfaction of class 5 general unsecured claims, if any. |

**D.    Means of Effectuating the Plan.**

1.    **Funding for the Plan.**

The Plan will be funded by the following and will be implemented pursuant to the following steps:

1.    On the Effective Date, property of the estate will revest in the Debtor.

2.    The Debtor shall manage and operate its business generally in accordance with the projections attached as Disclosure Statement Exhibit 2.

3.    The Debtor shall make all Effective Date and subsequent fixed and recurring payments set forth in the Plan.

4.    At or before the Effective Date, Debtor shall assign standing to prosecute any claims against Medley ("Medley Litigation") to the Creditors' Committee and the Committee may settle, compromise, dismiss or otherwise dispose of such claims subject to Bankruptcy Court approval. Any net proceeds recovered from the Medley Litigation shall be paid first to priority claims until paid in full and then all general unsecured creditors *pro rata* until paid in full and

then to former allowed equity security holders *pro rata* according to their percentage stock ownership in the Debtor as of the Effective Date. The Committee shall remain in effect pending the resolution of any Medley Litigation. If the Committee does not accept such claims, the Committee will terminate on the Effective Date and the Medley Litigation claims will remain vested in the post-confirmation Debtor.

5.    Within six (6) months of the Effective Date, Debtor shall have completed the sale of surplus MVF assets listed in Exhibit 7 to the Disclosure Statement (the "MVF PPE"). To the extent permitted by the Court to sell the MVF PPE and pay the proceeds to anyone other than Medley, net proceeds received by Debtor from such sale(s) shall be distributed as set forth herein.

6.    On the Effective Date, Debtor shall cancel all outstanding equity securities, including stock, options and warrants, and complete such regulatory requirements to delist Debtor's securities from the public market.

7.    Debtor shall authorize and issue 5,000,000 shares of common stock to HWAY, LLC in full satisfaction of Debtor's $803,923.13 cure obligation for assumption of the HWAY, LLC lease. Mr. Bagerdjian holds a 99% membership interest in HWAY.

8.    Any distribution made by the Debtor that remains unclaimed and outstanding for more than ninety (90) days after issuance shall be cancelled, and any such property shall revest in the Debtor.

9.    The Debtor will not issue, nor will there be, any shares of non-voting securities of the Debtor, in accordance with 11 U.S.C. § 1123(a)(6).

10.    The Court will retain jurisdiction over the post confirmation estate until such estate is fully administered and a final decree is entered.

2.    **Post-confirmation Management.**

The Debtor will be revested with all property of the estate and shall manage all post-confirmation affairs. Post-confirmation management will remain unchanged. *See* Disclosure Statement § II(C).

### 3.    Disbursing Agent.

The Debtor shall act as the disbursing agent for the purpose of making all distributions provided for under the Plan. The disbursing agent shall serve without bond and shall receive no additional compensation for distribution services rendered pursuant to the Plan.

### E.    Risk Factors.

The proposed Plan has the following risks: The primary risk is that the Court determines that the Debtor is not authorized to sell the MVF PPE and use the proceeds to pay general unsecured creditors. A second risk is that the revenues necessary to fund the plan are not achieved due to general economic conditions and market factors. A third risk is the sale proceeds received upon the liquidation of the MVF PPE necessary to fund unsecured creditor distributions are less than anticipated. A fourth risk is that Austin has not committed to exit financing and there is a risk that it does not commit to exit financing and the Debtor is required to pay the DIP Facility in full on the Effective Date. A risk is that the maturity of Medley's secured claim occurs on July 8, 2020 and the Debtor cannot demonstrate that it will have sufficient liquidity to pay Medley in full in cash on this date. Finally, the Debtor risks that the Court finds that the Plan is otherwise not confirmable for reasons that may be raised prior to or at the Confirmation Hearing.

The Debtor does not believe that these risks prevent Plan confirmation because the projections are feasible, the MVF PPE recovery is based on an expert's valuation and the Debtor's anticipated financial performance would support an enterprise valuation making the Debtor creditworthy, with positive EBITDA sufficient to secure a new term loan. Medley asserts that these risks prevent Plan confirmation because, among other reasons, the Plan is not confirmable, the projections are not feasible and the Debtor's anticipated financial performance does not support an enterprise valuation making the Debtor creditworthy, with positive EBITDA sufficient to secure a new term loan.

F.    **Other Provisions of the Plan.**

    1.    **Executory Contracts and Unexpired Leases.**

        a.    **Assumptions.**

On the Effective Date, Debtor's "executory" contracts and unexpired leases identified in Exhibit 6 to this Disclosure Statement will be assumed (i.e., cured and reinstated) as obligations of the reorganized Debtor. Pursuant to 11 U.S.C. § 1123(b)(2), the plan constitutes a motion to assume such executory contracts and leases, pursuant to the requirements of 11 U.S.C. § 365. Debtor shall pay the cure payments or issue stock as identified in Exhibit 6 to the Disclosure Statement on the Effective Date of the Plan, unless otherwise agreed to by the Debtor and such contract or lease counterparty.

Any objection to Debtor's proposed cure payment shall be filed as an objection to Plan confirmation. Confirmation of Debtor's Plan shall constitute adequate assurance of future performance under any such assumed contract or lease. The order confirming the Plan will constitute an order approving assumption of executory contracts and unexpired leases as set forth herein.

        b.    **Rejections and Ride Through.**

There are no unexpired leases or executory contracts to be rejected. Any and all executory contracts not otherwise assumed shall ride through the Plan process and remain in effect and unimpaired by the Plan, unless otherwise expressly assumed or rejected under the plan or by separate motion.

The Debtor was party to now expired collective bargaining agreements ("CBAs") with the Screen Actors Guild – American Federal of Television and Radio Artists ("SAG-AFTRA"). The parties have discussed new agreements, but none have been executed. Nonetheless, the Debtor has continuing obligations to make contributions to the SAG-AFTRA Health Fund and AFTRA Retirement Fund on behalf of its employees represented by SAG-AFTRA. Debtor intends to make those contributions in the ordinary course. In this respect, the CBAs ride through the Plan confirmation process.

-29-

2.    **Changes in Rates Subject to Regulatory Commission Approval.**

This Debtor is not subject to governmental regulatory commission approval of its rates.

3.    **Retention of Jurisdiction.**

The Court will retain jurisdiction to the extent provided by law.

G.    **Tax Consequences of Plan.**

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS. The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues this Plan may present to the Debtor. The Proponent CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action.

The following are the tax consequences which the Plan will have on the Debtors tax liability: None.

### IV.

### CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OR THIS PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims. The proponent CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a Plan. Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7

1  liquidation, and whether the Plan is feasible.  These requirements are not the only requirements

2  for confirmation.

3  **A.    Who May Vote or Object.**

4       **1.    Who May Object to Confirmation of the Plan.**

5       Any party in interest may object to the confirmation of the Plan, but as explained below

6  not everyone is entitled to vote to accept or reject the Plan.

7       **2.    Who May Vote to Accept/Reject the Plan.**

8       A creditor or interest holder has a right to vote for or against the Plan if that creditor or

9  interest holder has a claim which is both (1) allowed or allowed for voting purposes and (2)

10  classified in an impaired class.

11            **a.    What Is an Allowed Claim/Interest.**

12       As noted above, a creditor or interest holder must first have an allowed claim or interest to

13  have the right to vote. Generally, any proof of claim or interest will be allowed, unless a party in

14  interest brings a motion objecting to the claim.  When an objection to a claim or interest is filed,

15  the creditor or interest holder holding the claim or interest cannot vote unless the Court, after

16  notice and hearing, either overrules the objection or allows the claim or interest for voting

17  purposes.

18

19       THE BAR DATE FOR FILING PROOFS OF CLAIMS WAS **JANUARY 31, 2018**.  A

20  creditor or interest holder may have an allowed claim or interest even if a proof of claim or

21  interest was not timely filed.  A claim is deemed allowed if (1) it is scheduled on the Debtor's

22  schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no

23  party in interest has objected to the claim. An interest is deemed allowed if it is scheduled and no

24  party in interest has objected to the interest.  All claims are specified in the classification section

25  of this disclosure statement and in Exhibit 1 hereto.  Any plan distribution that would otherwise

26  be paid to a claimant holding a claim subject to objection as of the Effective Date of the Plan shall

27  be reserved pending entry of a final order on such objection.

28

**b.    What Is an Impaired Claim/Interest.**

As noted above, an allowed claim or interest only has the right to vote if it is in a class that is impaired under the Plan. A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that class 100% of what they are owed.

In this case, the Proponent believes that classes 3, 4, 5, 6, 7, 8 and 9 are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan. Parties who dispute the Proponent's characterization of their claim or interest as being impaired or unimpaired may file an objection to the Plan contending that the Proponent has incorrectly characterized the class.

**3.    Who is Not Entitled to Vote.**

The following four types of claims are not entitled to vote: (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Code sections 507(a)(1), (a)(2), and (a)(8); and (4) claims in classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Code sections 507(a)(1), (a)(2), and (a)(8) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Code. Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan.  EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

**4.    Who Can Vote in More Than One Class.**

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

5.      **Votes Necessary to Confirm the Plan.**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by a cramdown on non-accepting classes, as discussed later in section IV(A)(8).

6.      **Votes Necessary for a Class to Accept the Plan.**

A class of claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the claims which actually voted, voted in favor of the Plan. A class of interests is considered to have accepted the Plan when at least two-thirds (2/3) in amount of the interest-holders of such class which actually voted, voted to accept the Plan.

7.      **Treatment of Nonaccepting Classes.**

As noted above, even if all impaired classes do not accept the proposed Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner required by the Code. The process by which nonaccepting classes are forced to be bound by the terms of the Plan is commonly referred to as a cramdown. The Code allows the Plan to be crammed down on nonaccepting classes of claims or interests if it meets all consensual requirements except the voting requirements of 11 U.S.C. §1129(a)(8) and if the Plan does not discriminate unfairly and is fair and equitable toward each impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

8.      **Request for Confirmation Despite Nonacceptance by Impaired Class(es).**

The party proposing this Plan will ask the Court to confirm this Plan by cramdown on impaired classes 6, 7 and 9 if these classes do not vote to accept the Plan. Please note that the proposed Plan treatment described by this Disclosure Statement cannot be crammed down on the following classes: 3, 4, 5 and 8 because priority claims must accept treatment other than payment in full on the Effective date and the Plan incorporates settlements with the creditors in class 8 that the Debtor intends to perform. AS A RESULT, IF ANY OF THESE CLASSES DO NOT VOTE TO ACCEPT THE PLAN, THE PLAN WILL NOT BE CONFIRMED.

-33-

**B.    Liquidation Analysis.**

Another confirmation requirement is the "Best Interest Test", which requires a liquidation analysis. Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative claims are paid next. Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains after all creditors are paid, if any.

For the Court to be able to confirm this Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation. The Plan Proponent maintains that this requirement is met here for the following reasons: The plan pays allowed creditors either in full or the liquidation value of all assets of the chapter 11 estate, unless they consent otherwise.

Attached hereto as Exhibit 4, in balance sheet format, is Debtor's liquidation analysis proving that all creditors and interest holders will receive at least as much under the Plan as such creditor or interest holder would receive under a Chapter 7 liquidation. This information is provided by the Debtor. Below is a demonstration, in tabular format, that all creditors and interest holders will receive at least as much under the Plan as such creditor or holder would receive under a Chapter 7 liquidation.

| CLAIMS & CLASSES | PAYOUT PERCENTAGE UNDER THE PLAN | PAYOUT PERCENTAGE IN CHAPTER 7 LIQUIDATION AS OF CONFIRMATION[1] |
|---|---|---|
| Administrative Claims | 100% | 100% |
| Priority Tax and Non-Tax Claims | 100% | 100% |
| Class 1 = AFS | Unimpaired | 100% |
| Class 2 = Medley | Unimpaired | 18.5%[2] |
| Class 3 = Priority Wage | 100% | 100% |
| Class 4 = UnitedHealth | 100% | 31% to 54% |
| Class 5 = SAG-AFTRA Etc. | 100% | 31% to 54% |
| Class 6 = General Unsecured | 89% to 100% | 0% to nominal |
| Class 7 = Convenience class | 75% | 0% to nominal |
| Class 8 = Wilcon | Per Settlement 100% | 0% to nominal |
| Class 9 = Equity Interests | Cancelled | 0% |

## C.    Feasibility.

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses which are entitled to be paid on such date. The Plan Proponent maintains that this aspect of feasibility is satisfied as illustrated here:

| | |
|---|---|
| Cash Debtor will have on hand by Effective Date (projected to 3/1/19): | $ 100,000 |
| Line of credit available | $ 1,217,223 |
| **To Pay:** Administrative claims of Professionals | -$ 375,000 |
| **To Pay:** Misc. Administrative Expenses and Fees (contingency) | -$ 50,000 |
| **To Pay:** Other Plan Payments due on Effective Date | -$ 420,050 |
| Cash + LOC available after paying these amounts ................................................... | $ 472,173 |

---

[1] Please refer to the Point.360 Liquidation Analysis

[2] Estimated as ((Liquidation Value of PP&E + Deposits)/(Total Medley Claims))

-35-

The sources of the cash Debtor will have on hand by the Effective Date, as shown above are:

| | |
|---|---|
| $ 98,906 | Cash in DIP Account now [as of September 30, 2018] |
| $1,094 | Additional cash DIP will accumulate from net earnings between now and Effective Date |
| N/A | Capital Contributions |
| $0 | Other |
| $ 100,000 | **Total** [*excludes availability on line of credit*] |

The second aspect considers whether the Proponent will have enough cash over the life of the Plan to make the required Plan payments. Attached to the Disclosure Statement as Exhibit 2 are cash flow projections for the term of the Plan showing the Plan is feasible. Exhibit 2 includes notes and detailed assumptions regarding the feasibility of the proposed Plan.

YOU ARE ADVISED TO CONSULT WITH YOUR ACCOUNTANT OR FINANCIAL ADVISOR IF YOU HAVE ANY QUESTIONS PERTAINING TO THESE FINANCIAL STATEMENTS.

## V.

## EFFECT OF CONFIRMATION OF PLAN

**A.    Discharge.**

This Plan provides that the Debtor shall be discharged of liability for payment of debts incurred before confirmation of the Plan, as specified in 11 U.S.C. § 1141. The terms of the Plan will bind all creditors and parties in interest to the provisions thereof.

**B.    Revesting of Property in the Debtor.**

Except as provided in Section V(E) and except as provided elsewhere in the Plan, the confirmation of the Plan revests all of the property of the estate in the Debtor.

**C.    Modification of Plan.**

The Proponent of the Plan may modify the Plan at any time before confirmation. However, the Court may require a new disclosure statement and/or revoting on the Plan.

The Proponent of the Plan may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated <u>and</u> (2) the Court authorizes the proposed modifications after notice and a hearing.

**D.    Post-Confirmation Status Report.**

Within 120 days of the entry of the order confirming the Plan, Plan Proponent shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan. The status report shall be served on the United States Trustee, the twenty largest unsecured creditors, and those parties who have requested special notice. Further status reports shall be filed every 120 days and served on the same entities.

The reorganized debtor's post-confirmation status reports shall reflect all income and disbursements for each quarter or portion thereof while the case remains open, and the reorganized debtor shall timely pay U.S. Trustee Quarterly Fees pursuant to 28 U.S.C. § 1930(a)(6).

**E.    Post-Confirmation Conversion/Dismissal.**

A creditor or party in interest may bring a motion to convert or dismiss the case under § 1112(b), after the Plan is confirmed, if there is a default in performing the Plan. If the Court orders, the case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7 estate. The automatic stay will be reimposed upon the revested property, but only to the extent that relief from stay was not previously authorized by the Court during this case.

The order confirming the Plan may also be revoked under very limited circumstances. The Court may revoke the order if the order of confirmation was procured by fraud and if the party in interest brings an adversary proceeding to revoke confirmation within 180 days after the entry of the order of confirmation.

1   F.    **Final Decree.**

2          Once the estate has been fully administered as referred to in Bankruptcy Rule 3022, the

3   Plan Proponent, or other party as the Court shall designate in the Plan Confirmation Order, shall

4   file a motion with the Court to obtain a final decree to close the case.

5   Dated: December 5, 2018                    **Respectfully submitted,**

6                                              **Lewis R. Landau**
                                               **Attorney-at-Law**
7

8
                                               By /s/ Lewis R. Landau
9                                              Lewis R. Landau
                                               Attorneys for Point.360, a California Corporation,
10                                             Debtor and Debtor-in-Possession

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

**915 Wilshire Boulevard, Ste 1850, Los Angeles, CA 90017**

A true and correct copy of the foregoing document entitled (*specify*): **NOTICE OF MOTION AND MOTION UNDER 11 U.S.C. §1112(b)(1) TO CONVERT, DISMISS OR APPOINT A CHAPTER 11 TRUSTEE WITH AN ORDER DIRECTING PAYMENT OF QUARTERLY FEES AND FOR JUDGMENT THEREON; DECLARATION OF BANKRUPTCY ANALYST**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 09/23/2019 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

SEE ATTACHED SERVICE LIST (IF APPLICABLE)

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL:** On 09/23/2019, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

SEE ATTACHED SERVICE LIST (IF APPLICABLE)

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served):** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on 09/23/2019, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

SEE ATTACHED SERVICE LIST (IF APPLICABLE)

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 09/23/2019 | Helen Cruz | |
|---|---|---|
| Date | Print Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

## ADDITIONAL SERVICE INFORMATION

1.    **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

David E Ahdoot on behalf of Creditor AFTRA Retirement Fund
dahdoot@bushgottlieb.com, kireland@bushgottlieb.com

David E Ahdoot on behalf of Creditor SAG-AFTRA
dahdoot@bushgottlieb.com, kireland@bushgottlieb.com

David E Ahdoot on behalf of Creditor SAG-AFTRA Health Fund
dahdoot@bushgottlieb.com, kireland@bushgottlieb.com

James C Bastian, Jr on behalf of Creditor HWAY LLC
jbastian@shbllp.com

Ron Bender on behalf of Interested Party Courtesy NEF
rb@lnbyb.com

Ron Bender on behalf of Interested Party Visual Data Media Services, Inc.
rb@lnbyb.com

Daren Brinkman on behalf of Creditor Committee Official Committee Unsecured Creditors
office@brinkmanlaw.com, brinkmanlaw@ecf.inforuptcy.com

Daren Brinkman on behalf of Creditor Committee Official Committee of Unsecured Creditors of
Point.360, A California Corporation
office@brinkmanlaw.com, brinkmanlaw@ecf.inforuptcy.com

Daren Brinkman on behalf of Plaintiff Committee of Creditors Holding Unsecured Claims
office@brinkmanlaw.com, brinkmanlaw@ecf.inforuptcy.com

William S Brody on behalf of Creditor Austin Financial Services, Inc.
wbrody@buchalter.com, dbodkin@buchalter.com;IFS_filing@buchalter.com

Peter A Davidson on behalf of Interested Party Courtesy NEF
pdavidson@ecjlaw.com, amatsuoka@ecjlaw.com

W. Jeffery Fulton on behalf of Creditor US Bank National Association
jeff@jefffultonlaw.com, Yvonne@jefffultonlaw.com

Jeffrey F Gersh on behalf of Interested Party Visual Data Media Services, Inc.
jgersh@gershlegal.com,
hnapier@gershlegal.com;jsedivy@gershlegal.com;hcory@stubbsalderton.com;jgersh@stubbsalder
ton.com;jsedivy@stubbsalderton.com

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Asa S Hami on behalf of Interested Party Visual Data Media Services, Inc.
ahami@sulmeyerlaw.com,
agonzalez@sulmeyerlaw.com;agonzalez@ecf.inforuptcy.com;ahami@ecf.inforuptcy.com

Brian T Harvey on behalf of Creditor Austin Financial Services, Inc.
bharvey@buchalter.com, IFS_filing@buchalter.com;dbodkin@buchalter.com

Daniel P Hogan on behalf of Debtor Point.360, a California Corporation
dhogan@mccabehogan.com, dhogan460@gmail.com

Daniel P Hogan on behalf of Defendant Deloitte Corporate Finance, LLC
dhogan@mccabehogan.com, dhogan460@gmail.com

Daniel P Hogan on behalf of Defendant Deloitte Transactions and Business Analytics, LLP
dhogan@mccabehogan.com, dhogan460@gmail.com

Daniel P Hogan on behalf of Defendant Medley Capital Corporation
dhogan@mccabehogan.com, dhogan460@gmail.com

Daniel P Hogan on behalf of Defendant Medley Opportunity Fund II LP
dhogan@mccabehogan.com, dhogan460@gmail.com

Daniel P Hogan on behalf of Plaintiff Point.360, a California Corporation
dhogan@mccabehogan.com, dhogan460@gmail.com

Daniel P Hogan on behalf of Special Counsel Daniel P Hogan
dhogan@mccabehogan.com, dhogan460@gmail.com

Garrick A Hollander on behalf of Interested Party Modern VideoFilm, Inc.
ghollander@wcghlaw.com,
pj@wcghlaw.com;jmartinez@wcghlaw.com;Meir@virtualparalegalservices.com

William W Huckins on behalf of Creditor REEP-OFC 2300 Empire CA LLC
whuckins@allenmatkins.com, clynch@allenmatkins.com

Robert A Julian on behalf of Defendant Deloitte Corporate Finance, LLC
rjulian@winston.com, hhammon@winston.com

Robert A Julian on behalf of Defendant Deloitte Transactions and Business Analytics, LLP
rjulian@winston.com, hhammon@winston.com

Robert A Julian on behalf of Defendant Medley Capital Corporation
rjulian@winston.com, hhammon@winston.com

Robert A Julian on behalf of Defendant Medley Opportunity Fund II LP
rjulian@winston.com, hhammon@winston.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

Robert A Julian on behalf of Plaintiff Point.360, a California Corporation
rjulian@winston.com, hhammon@winston.com

Lance N Jurich on behalf of Defendant Deloitte Corporate Finance, LLC
ljurich@loeb.com, karnote@loeb.com;ladocket@loeb.com;ljurich@ecf.courtdrive.com

Lance N Jurich on behalf of Defendant Deloitte Transactions and Business Analytics, LLP
ljurich@loeb.com, karnote@loeb.com;ladocket@loeb.com;ljurich@ecf.courtdrive.com

Lance N Jurich on behalf of Defendant Medley Capital Corporation
ljurich@loeb.com, karnote@loeb.com;ladocket@loeb.com;ljurich@ecf.courtdrive.com

Lance N Jurich on behalf of Defendant Medley Opportunity Fund II LP
ljurich@loeb.com, karnote@loeb.com;ladocket@loeb.com;ljurich@ecf.courtdrive.com

Lance N Jurich on behalf of Plaintiff Point.360, a California Corporation
ljurich@loeb.com, karnote@loeb.com;ladocket@loeb.com;ljurich@ecf.courtdrive.com

David S Kupetz on behalf of Interested Party Visual Data Media Services, Inc.
dkupetz@sulmeyerlaw.com,
dperez@sulmeyerlaw.com;dperez@ecf.courtdrive.com;dkupetz@ecf.courtdrive.com

Lewis R Landau on behalf of Debtor Point.360, a California Corporation
Lew@Landaunet.com

Lewis R Landau on behalf of Plaintiff Committee of Creditors Holding Unsecured Claims
Lew@Landaunet.com

Lewis R Landau on behalf of Plaintiff Point.360, a California Corporation
Lew@Landaunet.com

Melissa Davis Lowe on behalf of Creditor HWAY LLC
mlowe@shbllp.com, sswartzell@shbllp.com

Alvin Mar on behalf of U.S. Trustee United States Trustee (LA)
alvin.mar@usdoj.gov

David W. Meadows on behalf of Interested Party Courtesy NEF
david@davidwmeadowslaw.com

Elissa Miller on behalf of Interested Party Courtesy NEF
emiller@sulmeyerlaw.com,
asokolowski@sulmeyerlaw.com;emillersk@ecf.inforuptcy.com;dwalker@sulmeyerlaw.com

Elissa Miller on behalf of Interested Party Visual Data Media Services, Inc.
emiller@sulmeyerlaw.com,
asokolowski@sulmeyerlaw.com;emillersk@ecf.inforuptcy.com;dwalker@sulmeyerlaw.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**

Shane J Moses on behalf of Interested Party Courtesy NEF
smoses@foley.com

Austin P Nagel on behalf of Creditor Toyota Motor Credit Corporation, servicing agent for Toyota
Lease Trust
melissa@apnagellaw.com

Sean A OKeefe on behalf of Creditor HARBOR CENTER PARTNERS, L.P.
sokeefe@okeefelc.com, seanaokeefe@msn.com

Juliet Y Oh on behalf of Interested Party Moshe Barkat
jyo@lnbrb.com, jyo@lnbrb.com

Aleksandra Page on behalf of Creditor BB&T
apage@ecf.inforuptcy.com

Sayuj Panicker on behalf of Creditor Los Angeles County Treasurer and Tax Collector
spanicker@counsel.lacounty.gov

Sayuj Panicker on behalf of Interested Party Courtesy NEF
spanicker@counsel.lacounty.gov

Laura J Portillo on behalf of Creditor Committee Official Committee Unsecured Creditors
office@brinkmanlaw.com, brinkmanlaw@ecf.inforuptcy.com

Laura J Portillo on behalf of Creditor Committee Official Committee of Unsecured Creditors of
Point.360, A California Corporation
office@brinkmanlaw.com, brinkmanlaw@ecf.inforuptcy.com

Justin E Rawlins on behalf of Creditor Medley Capital Corporation
jrawlins@winston.com, ecf_la@winston.com;justin-rawlins-0284@ecf.pacerpro.com

Justin E Rawlins on behalf of Creditor Medley Opportunity Fund II LP
jrawlins@winston.com, ecf_la@winston.com;justin-rawlins-0284@ecf.pacerpro.com

Justin E Rawlins on behalf of Defendant Medley Capital Corporation
jrawlins@winston.com, ecf_la@winston.com;justin-rawlins-0284@ecf.pacerpro.com

Justin E Rawlins on behalf of Defendant Medley Opportunity Fund II LP
jrawlins@winston.com, ecf_la@winston.com;justin-rawlins-0284@ecf.pacerpro.com

Vincent Renda on behalf of Creditor Leafs Properties, LP
vr@rendalawoffices.com, ld@rendalawoffices.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**

Michael B Reynolds on behalf of Creditor California Physicians' Service, dba Blue Shield of
California
mreynolds@swlaw.com, kcollins@swlaw.com

Jason E Rios on behalf of Interested Party CVF Capital Partners, Inc., Central Valley Fund III
(SIBC), LP and Central Valley Fund II, LP
jrios@ffwplaw.com, scisneros@ffwplaw.com

Kevin C Ronk on behalf of Creditor Committee Official Committee Unsecured Creditors
Kevin@brinkmanlaw.com, brinkmanlaw@ecf.inforuptcy.com

Andrea C Rosati on behalf of Creditor LEAFS LP
andrea@fsgjlaw.com, linh@fsgjlaw.com

Lisa Seabron on behalf of Creditor WRI West Gate South, L.P.
lseabron@weingarten.com

Ronald A Spinner on behalf of Creditor Softitler dba Deluxe Localization Sfera
spinner@millercanfield.com

Andrew Still on behalf of Creditor California Physicians' Service, dba Blue Shield of California
astill@swlaw.com, kcollins@swlaw.com

Arvin Tseng on behalf of Creditor TROY / GOULD PC
atseng@troygould.com, kjm@troygould.com;reh@troygould.com

United States Trustee (LA)
ustpregion16.la.ecf@usdoj.gov

Christopher B Wick on behalf of Creditor Crown Communication Inc.
cwick@hahnlaw.com, lmay@hahnlaw.com

Latonia Williams on behalf of Creditor UnitedHealthcare Insurance Company
lwilliams@goodwin.com, bankruptcy@goodwin.com

Rolf S Woolner on behalf of Creditor Medley Capital Corporation
rwoolner@winston.com, ecf_sf@winston.com;pacercourtfile@winston.com;rolf-woolner-
7959@ecf.pacerpro.com

Rolf S Woolner on behalf of Creditor Medley Opportunity Fund II LP
rwoolner@winston.com, ecf_sf@winston.com;pacercourtfile@winston.com;rolf-woolner-
7959@ecf.pacerpro.com

Gabe P Wright on behalf of Creditor Crown Communication Inc.
GWRIGHT@hahnlaw.COM, mkanamori@hahnlaw.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**

Claire K Wu on behalf of Interested Party Visual Data Media Services, Inc.
ckwu@sulmeyerlaw.com,
mviramontes@sulmeyerlaw.com;ckwu@ecf.courtdrive.com;ckwu@ecf.inforuptcy.com

**SEE NEF FOR CONFIRMATION OF ELECTRONIC TRANSMISSION TO THE U.S. TRUSTEE AND ANY TRUSTEE IN THIS CASE, AND TO ANY ATTORNEYS WHO RECEIVE SERVICE BY NEF.**

2.      **SERVED BY U.S. MAIL**

Debtor:
**Point.360, a California Corporation**
2701 Media Center Drive
Los Angeles, CA 90065

Other Interested Party:

Sara L. Chenetz
Perkins Coie LLP
1888 Century Park East, Suite 1700
Los Angeles, CA 90067

3.      **SERVED BY (state method for each person served):**

**BY OVERNIGHT DELIVERY**

Judge's Copy
The Honorable Julia W. Brand
U.S. Bankruptcy Court
255 E. Temple Street
9TH Floor – Judge's Bin
Los Angeles, CA  90012

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

F 9013-3.1.PROOF.SERVICE

FROM:      **OFFICE OF THE UNITED STATES TRUSTEE**

DATE:      **September 23, 2019**

TO:        **BANS - BANKRUPTCY NOTICING CENTER**

SUBJECT: NOTICE OF MOTION AND MOTION UNDER 11 U.S.C. §1112(b)

**PART I**

Please notice the subject motion for the following Chapter 11

case:

CASE NUMBER:   **2:17-bk-22432-WB**

CASE NAME:     **POINT,360 a CALIFORNIA CORPORATION**

DATE PETITION FILED: **10/10/2017**   HEARING DATE:  **11/17/2019**

TIME: **10:00 A.M.**

COURTROOM: "1375" **255 East Temple Street, Los Angeles**

CONTACT AT U.S. TRUSTEE'S OFFICE: **Alvin Mar**
                                  **Trial Attorney**

        For Conversion or Dismissal Only

Does the conversion or dismissal involve a joint petition
wherein one party (husband or wife) has been converted or
dismissed?
                    {  } Yes          {x} No
If yes, explain:

PREPARED BY: Helen Cruz

_____

**PART II**   (To be completed by BANS)
Data Entry Operator_____ Date Entered

Comments:

_____